AO 91 (REV.5/85) Criminal Complaint

AUSA Joel M. Hammerman  (312) 353-8881
AUSA Tinos Diamantatos  (312) 353-4317

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**
9-20-10
SEP 2 0 2010

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

SAMI SAMIR HASSOUN

**CRIMINAL COMPLAINT**

CASE NUMBER:  **MAGISTRATE JUDGE COX**

**1 0 CR 0773**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief:

### Count One

On or about September 19, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, SAMI SAMIR HASSOUN, defendant herein, attempted, without lawful authority, to use a weapon of mass destruction against people and property in a manner that would have affected interstate and foreign commerce in violation of Title 18, United States Code, Section 2332a(a)(2)(D); and

### Count Two

On or about September 19, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, SAMI SAMIR HASSOUN, defendant herein, attempted to damage and destroy, by means of an explosive, real property affecting interstate and foreign commerce in violation of Title 18, United States Code, Section 844(i).

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
**SAMUEL HARTMAN**
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

September 20, 2010
Date

at  Chicago, Illinois
City and State

SUSAN COX, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT )
                                 )     ss
NORTHERN DISTRICT OF ILLINOIS )

## AFFIDAVIT

I, Samuel Hartman, being duly sworn, state as follows:

### *Introduction*

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI"), assigned to the Chicago Field Division. I have been employed by the FBI as a Special Agent for approximately one and a half years. I am assigned to a FBI squad dedicated to counter-terrorism activities. In this position, I have participated in a number of terrorism-related investigations. I have participated in and completed FBI training in the investigation of counter-terrorism matters. I am one of the Special Agents involved in the investigation of Sami Samir Hassoun ("Hassoun").

2.     This affidavit is submitted for the limited purpose of establishing probable cause to support a criminal complaint charging Hassoun with: (1) attempting, without lawful authority, to use a weapon of mass destruction against people and property in a manner that would have affected interstate and foreign commerce in violation of Title 18, United States Code, Section 2332a(a)(2)(D); and (2) attempting to damage and destroy, by means of an explosive, real property affecting interstate and foreign commerce in violation of Title 18, United States Code, Section 844(i). Because this affidavit is submitted only for these limited purposes, it does not set forth each and every fact that I know about this investigation.

3.     The information contained within this affidavit is based on personal knowledge that I have derived from, *inter alia*: (1) my participation in the investigation of Sami Samir Hassoun; (2) the statements of a cooperating source; (3) consensually recorded in-person communications between

Hassoun, the cooperating source and/or undercover law enforcement agents; (4) consensually recorded telephone conversations; and (5) discussions I have had with other investigating law enforcement officers, including FBI agents and officers of the Chicago Police Department involved in the Hassoun investigation.

4.     As set forth herein, this affidavit summarizes certain recorded communications that occurred, in part, in the Arabic language. While translators have attempted to translate the substance of those portions of the conversations, the translations of foreign language communications referenced herein are preliminary, not final. Similarly, certain quotations referenced herein are taken from preliminary, not final, transcripts of recorded conversations that transpired in English. References to all recorded conversations set forth in this affidavit do not reflect the entirety of those conversations. In most instances, identifications of individuals referenced in this affidavit are based on names used during the subject communications, information provided by the cooperating source and/or undercover law enforcement officers, voice recognition and/or visual identification.

### *Sami Samir Hassoun*

5.     Sami Samir Hassoun is a twenty-two year-old Lebanese citizen residing in Chicago, Illinois as a lawful permanent resident. As explained in greater detail herein, beginning no later than Memorial Day weekend of 2010, Hassoun informed an individual who, unbeknownst to Hassoun, was a law enforcement cooperating source, (hereinafter, the "CS"), that he wanted to commit acts of violence against the city of Chicago and its residents. At law enforcement's direction, the CS subsequently introduced Hassoun to two undercover FBI agents whom Hassoun understood to be individuals interested in committing acts of terror against the United States. In the course of his dealings with the undercover agents, Hassoun researched, planned and attempted to execute an attack

2

against a commercial entertainment district and its patrons in Chicago's "Lakeview" neighborhood. Among other acts, in the early morning of September 19, 2010, Hassoun placed what he believed to be an explosive device in a city trash receptor located on North Clark Street in Chicago, Illinois.

### Hassoun's Stated Desire to Commit an Act of Terrorism

6.     Based on information relating to Hassoun that is unrelated to this matter and is therefore not stated or relied upon in this affidavit, in or about the spring of 2009, investigating FBI agents asked the CS, who had previously assisted and been compensated by the FBI in connection with his/her cooperation, and was compensated for his/her assistance in this matter, to meet and befriend Hassoun. As requested, the CS was able to introduce him/herself to Hassoun at Hassoun's then place of business. The CS and Hassoun subsequently developed a purported friendship such that, according to the CS, the CS met with Hassoun multiple times a week for approximately one year. The CS periodically reported the subject matter of his/her conversations with Hassoun to the FBI.

7.     In early June 2010, the CS reported that in their recent meetings, Hassoun had indicated to the CS that he wanted to commit acts of violence in Chicago for monetary gain and to cause political transformation. In particular, according to the CS, Hassoun had expressed a desire to perpetrate a terrorist act or acts that would reflect poorly on Chicago and would embarrass the city's mayor.

8.     At the FBI's request and direction, the CS began consensually recording his telephone and in-person conversations with Hassoun.

9.     The CS met with Hassoun during the afternoon of June 4, 2010. In their conversation, which was consensually recorded by the CS at the direction of the FBI, the CS told

3

Hassoun that he had "friends" who might be interested in some of the ideas that Hassoun had recently expressed to the CS and who, according to the CS, would be willing to pay the CS and Hassoun to engage in such activity.[1] In response, Hassoun told the CS that he wanted to take action that would force Chicago's mayor from power. Hassoun expressed his opinion that the mayor's policies had weakened Chicago's security apparatus and that he (Hassoun) wanted to do something to show it.

10.     The CS asked Hassoun about the type of targets he was considering for such a strike. In response, Hassoun initially suggested an attack against a target in downtown Chicago. The CS, however, rejected a downtown bombing, explaining that the money they would be paid for their efforts did not justify such a high profile target. As an alternative, Hassoun suggested bombing Wrigley Field and/or its surrounding area.[2] Hassoun explained that the majority of Chicago's youth spend their weekends at bars and restaurants and that an attack against an entertainment center like the one near Wrigley Field could "paralyze" that commerce. When asked by the CS how he would carry out such an attack, Hassoun succinctly stated: "You park the car, and let it 'boom.'"

11.     When the CS suggested that an attack should be designed not to kill anyone but simply to attract public attention, Hassoun stated that they could design a bomb that would not explode, but be deployed in a manner that it would appear that it was discovered prior to a planned

---

[1] In order to gain intelligence from Hassoun, the CS had, on his/her own volition, previously advised Hassoun that he/she knew people that could aid Hassoun in his proposed violent attacks.

[2] Wrigley Field is a baseball stadium located in Chicago's "Lakeview" neighborhood that serves as the home ballpark for the Chicago Cubs. The ballpark is located on the city block bounded by Clark Street to the west, Addison Street to the south, Waveland Avenue to the north and Sheffield Avenue to the east. The area immediately surrounding the ballpark, which includes a number of restaurants, bars and other commercial establishments, is often referred to as "Wrigleyville."

detonation. Hassoun further suggested deploying two car bombs in different locations, which, according to Hassoun, would have a greater deterrent effect, discouraging people from socializing in the affected areas. According to Hassoun, such an attack would force entertainment establishments to relocate, or, as suggested by the CS, close.

12. The CS told Hassoun that he/she would reach out to his/her alleged contacts and arrange to meet with them in order to discuss Hassoun's ideas. The CS stated that he/she would need to know the details of Hassoun's proposals prior to such a meeting. In response, Hassoun stated they could propose a grandiose attack or a more modest one. Hassoun identified his car bombing concept as the more modest of his ideas. Hassoun's "big jobs" proposals included unleashing a virus upon the city, poisoning Lake Michigan, attacking police officers, bombing the "Sears Tower,"[3] or attempting to assassinate Chicago's mayor.[4] The CS told Hassoun that the type of attack they would perform would need to be based on the supplies that his/her sources could provide and the money they would be willing to pay for their participation.[5]

13. In discussing these proposed terrorist acts, the CS continued to tell Hassoun that whatever they chose, he/she did not want to actually kill anyone. Hassoun, at times, appeared to

---

[3] The Sears Tower, which was recently renamed the Willis Tower, is a 110 story skyscraper located in downtown Chicago. The building, which is approximately a 1,450 feet, is the tallest building in the western hemisphere.

[4] On a number of occasions during their discussions, Hassoun identified the removal of Chicago's mayor from office as one, if not his primary goal. The CS, in turn, referenced the monetary benefits of perpetrating an attack as a justification for their proposed actions.

[5] When Hassoun asked about the CS's purported contacts and their funding, the CS stated that payment would come from sources in California.

agree: "No killing. There is no killing."[6] However, when further discussing their ideas, Hassoun and the CS agreed that they should plan an initial diversionary incident, followed by a more substantial strike that would likely result in casualties.

14.     Hassoun told the CS that he would need some initial capital to initiate planning, which the CS said he/she could provide with funds provided by his/her alleged associates. The CS assured Hassoun that these contacts would be able to pay substantially for their proposed services. Hassoun, in turn, told the CS that he was "in the game."

15.     The CS and Hassoun met again three days later, on June 7, 2010. This meeting was again consensually recorded by the CS at the FBI's direction. At the onset of their meeting, Hassoun raised the issue of the money that he and the CS would receive for their proposed terrorist activities. The CS assured Hassoun that the issue of money would be addressed.

16.     The CS explained that he/she had wanted to meet with Hassoun to learn what supplies Hassoun might need for their previously discussed plans. In response, Hassoun stated that he had compiled such a list, but that he did not then have it with him.[7] The CS told Hassoun he/she needed the list to provide it to his/her alleged sources. Hassoun stated that the list contained items such as a remote control device, a timing mechanism, dynamite and other explosive material. Hassoun claimed that with these components, he could create a bomb more powerful than that used

---

[6] As an example, when discussing proposed plans to shoot Chicago police officers, Hassoun stated: "When you hit the police, you don't kill the police. You harm the police. You attack the police."

[7] Rather, Hassoun stated that had stored the list electronically on his computer.

in Oklahoma City.[8] Hassoun further explained he had drafted plans to design his proposed bomb with the (unknowing) assistance of a chemistry professor at the university that he had attended. Hassoun bragged that his proposed bomb might be able to bring down half of the Sears (*i.e.*, Willis) Tower. Alternatively, Hassoun claimed he could make a "fake bomb" like the device that had been recently discovered in New York City's Times Square.[9]

17.     Towards the end of their meeting, the CS indicated that he needed Hassoun's list of bomb-making materials. Accordingly, at the CS's instruction, Hassoun went back to his residence and retrieved the list, which he gave to the CS. The document, which the CS subsequently provided to investigating agents, included the following proposed components: ammonium nitrate, nitromethane (liquid), 18" tovex sausages, electric blasting caps, remote electric timers, shock tube detonators, ANFO [ammonium nitrate fuel oil] and dynamite sticks.

18.     The CS and Hassoun next met on June 9, 2010. As he/she had previously, the CS wore a recording device that consensually recorded their conversation. During this meeting, Hassoun told the CS that he was able to obtain half of the components on the list that he had provided to the CS on June 7, 2010. Hassoun stated that he wanted to acquire the remaining supplies so that he could build a small, test bomb to detonate.

19.     The CS told Hassoun to be patient, assuring him that things would eventually progress and that, for the right amount of payment, they would be able to proceed with their plans.

---

[8] On April 19, 1995, Timothy McVeigh detonated a vehicle bomb in front of the Alfred P. Murrah federal building in downtown Oklahoma City resulting in the destruction of the building and the death of 168 individuals.

[9] On the evening of May 1, 2010, a New York City police officer discovered a vehicle that contained a homemade explosive device that had been ignited, but failed to explode. Law enforcement officers were able to disarm the car bomb before it detonated.

Hassoun, however, expressed impatience, stating that he wanted to proceed. In consensually recorded telephone calls with the CS that occurred on June 11, 2010 and June 12, 2010, Hassoun reiterated his impatience to the CS, stating that he was ready to act and wanted to meet with the CS's contacts. Hassoun told the CS that he had been working really hard and that the CS's contacts should take him seriously, which, the CS assured him, they would.

20.     The CS and Hassoun met again on June 14, 2010. During this consensually recorded meeting, Hassoun told the CS that, in anticipation of meeting the CS's contacts, Hassoun had been thinking about the type of "big things," *i.e.*, terrorist attacks, that would command public attention. Hassoun then identified the Daley Center as a potential target.[10] In particular, Hassoun suggested placing a bomb in Daley Plaza during the then upcoming Arabesque festival.[11] In response, the CS asked: "You're going to hit Arab people?" In his reply, Hassoun assured the CS he would not detonate an actual bomb, but would, instead, construct a device that would look like an explosive but would only emanate smoke when activated. Hassoun explained that this device coupled with

---

[10]  The Richard J. Daley Center, also known by its courtyard, Daley Plaza, is located in downtown Chicago within the city block surrounded by Randolph, Washington, Clark and Dearborn Streets, and houses, *inter alia*, the Circuit Court of Cook County and other court-related offices.
   This was not the first time that Hassoun had identified the Daley Center as a potential target. He had suggested attacking the building in his earlier, June 7, 2010 conversation with the CS.

[11]  According to its website, the Chicago Arabesque Festival was a non-religious, non-political festival sponsored by the Chicago Commission on Human Relations Advisory Council on Arab Affairs that was designed to promote public awareness, understanding, and appreciation of the cultural heritage of the Arab world. The festival was held in Daley Plaza from June 24, 2010 to June 26, 2010. *See* http://www.chicagoarabesque.com/aboutus.htm (last visited September 16, 2010).

an appropriate anonymous threat would embarrass the mayor and have a chilling effect against future civic events at the Daley Plaza location.[12]

21.     Hassoun also named Wrigley Field and its environs as a potential target during their conversation. In particular, Hassoun identified the bars and restaurants on Clark Street south of Addison Street as a viable targets. Hassoun noted how populated the neighborhood was on Friday and Saturday nights. He speculated that an explosive device in Wrigleyville's entertainment district could paralyze future activity in the busy area. If one "put something there, [it could] break up everything," Hassoun explained.[13]

22.     Although the CS and Hassoun discussed how they could profit from such an attack, including selling information about the bombing to the media, Hassoun focused on how these proposed violent acts would adversely affect Chicago's mayor. Hassoun explained that if they "fuck[ed] Chicago more and more," they could force the mayor's resignation.

23.     While the CS commended Hassoun's scheming, he encouraged Hassoun to remain patient. The CS explained that he/she was arranging for Hassoun to meet his/her alleged contacts who, according to the CS, would be interested and potentially able to assist in effectuating Hassoun's plans. The CS further explained that these sources would put "the green" on the table, and that when they did, the CS and Hassoun would be able to move forward.

24.     The CS and Hassoun met again on June 22, 2010 and June 29, 2010. As he/she had previously, the CS consensually recorded his/her conversations with Hassoun at the FBI's direction.

_____

[12] Hassoun explained the chilling effect of the proposed threat: "People are gonna be scared. [UI] will go down. Other festivals will not open up."

[13] Hassoun later stated that he was also interested in identifying a target on Chicago's south side, stating that coordinated citywide attacks could disrupt nightlife across Chicago.

25.     During their June 22, 2010 meeting, Hassoun told the CS that he had received a package from relatives in Lebanon that, according to Hassoun, contained an Arabic language manual on how to construct non-traceable explosives. Hassoun further claimed the package contained certain metal parts to be used in the construction of an explosive device. And while he claimed that his relatives would send additional parts,[14] Hassoun asked the CS if he/she could get his/her "guys" to obtain the additional materials he needed. Hassoun assured the CS: "Little by little, I'm building it up. I will fuck Chicago. I will shake Chicago."

26.     During their June 29, 2010 meeting, Hassoun and the CS again discussed, *inter alia*, their then proposed plan to meet with the CS's purported contacts. The CS repeatedly assured Hassoun that his/her contacts would be available soon and that they would provide an opportunity for everyone to make some money. In response, Hassoun assured the CS that he was ready with a plan to move forward.

27.     The CS met with Hassoun again on July 2, 2010. Their meeting, which occurred in the CS's vehicle, was consensually audio and video recorded by law enforcement. During the meeting, Hassoun told the CS that he wanted to do "something" on July 4, 2010. The CS, however, sought to discourage Hassoun from any immediate action, telling Hassoun that they needed to meet first with his/her contacts. In response, Hassoun stated: "I don't want to do it for them. I want to do it for me. I want to try out something that I did. I want to try in out on July Fourth." He further stated that he had been contemplating ways to "fuck up the Fourth of July."[15] The CS, however,

---

[14] Hassoun further told the CS that he would need money to pay for these additional parts.

[15] Hassoun claimed he was devising some sort of device that appeared as a toy that when activated would cause a minor explosion that would not cause injury, but would expel tiny notes containing ominous warnings. The CS further stated that two unidentified individuals, an Albanian

again instructed Hassoun to remain patient. The CS reminded Hassoun that they were doing this for payment, stating, "you are going to make money." The CS therefore explained that Hassoun should do nothing absent an existing offer of payment. Although Hassoun expressed a desire to "introduce" himself then, *i.e.*, commit a violent act, he agreed to wait until he and the CS were able to meet with the CS's contacts.

### Hassoun's Introduction to the Government's Undercover Agents

28.     As he/she had repeatedly promised, the CS arranged a meeting between Hassoun and one of his/her purported contacts, which occurred during the early afternoon of July 8, 2010. The meeting, which took place in a guest room at a hotel in Chicago's Streeterville neighborhood, was attended by the CS, Hassoun, and an individual who represented himself to Hassoun as an associate of the CS with further contacts interested in orchestrating potential terrorist attacks.[16] Unbeknownst to Hassoun, the CS's alleged contact was an undercover FBI task force officer (hereinafter "UC-1"), who, with investigating law enforcement agents, had previously arranged to have the meeting between them audio and video recorded.

---

and a Russian, one of whom could assist in making explosives, knew of the planned device. Hassoun assured the CS, however, that these unnamed individuals did not know of his plans with the CS. Finally, Hassoun stated that he was interested in purchasing, for personal use, a Russian made sniper rifle, which he characterized as extremely expensive. The CS, in turn, suggested that his/her contacts might be able to assist Hassoun in obtaining the rifle.

[16]     Immediately prior to the meeting, the CS told Hassoun that he/she was introducing Hassoun to some "special people" who had come to Chicago from California to meet with Hassoun. The CS further explained that this individual wanted to meet Hassoun to exchange ideas and to see what he could do. The CS assured Hassoun that, if convinced, his/her contacts would take Hassoun into their family. The CS later added that if Hassoun followed their instructions, these contacts might be willing to provide Hassoun with a house and a nice car. Hassoun assured the CS that he was ready to go anywhere and do anything and that he and the CS were a team. "You are part of what I do," Hassoun assured the CS.

11

29.     UC-1 introduced himself to Hassoun and explained that he had traveled from California to Chicago to meet with Hassoun based on the CS's representations. After providing UC-1 information about his background, Hassoun explained he had been thinking of ideas of how to foster a "revolution" in Chicago. In particular, Hassoun explained that through a series of escalating terrorist attacks, conspirators could undermine the mayor's political support, allowing one of their associates to gain control of the city. Hassoun's plan was simple: use violence to "take that Daley out and put some of our guys in."

30.     Hassoun explained to UC-1 that the mayor was politically vulnerable to Chicago's allegedly weakened security apparatus. "Security is down," Hassoun claimed. Referring to the then recent shooting deaths of two Chicago police officers, Hassoun stated that "people are afraid and show it."[17] Hassoun's proposal was to capitalize on that fear by attacking Chicago's bars and restaurants. He explained that a series of attacks could effectively "kill the nightlife." Hassoun then listed potential target areas for UC-1, including the bars surrounding Wrigley Field.

31.     UC-1 asked Hassoun how he proposed attacking Chicago's nightlife. Hassoun stated that they could strike at the city by plotting a series of escalating attacks, beginning with car bombs that would be designed to ignite, but not explode. These escalating attacks, Hassoun explained, would foment fear throughout the city. Hassoun then proposed following these near misses with what Hassoun referred to as "hits" against the police, followed by an actual "big hit." In response to UC-1's inquiries, Hassoun explained some of his "big hit" ideas: an actual bombing, the deployment of a biological weapon, like a virus, in the Daley Center, or the poisoning of the city's

---

[17] In two separate instances that occurred on or about May 19, 2010 and July 8, 2010, respectfully, off-duty Chicago police officers were shot and killed in attempted armed robberies.

12

water supply. When asked what he was prepared to do personally, Hassoun stated that he was willing to assist in planning, "could do those cars," and "could hit police, personally,"

32.     UC-1 asked Hassoun about his motivation for the attack and whether he was concerned about those who would be hurt by such violence. Acknowledging the casualties that would result from his plans, Hassoun stated that such losses were the inevitable result of "revolution," but that those costs were acceptable, especially in light of the "good" that could be done if they were successful in the end. Hassoun further explained that he had always thought of trying to start some kind of revolution and had been researching and planning possible attacks for months. While acknowledging that he needed help and advice to actualize his plans, Hassoun assured UC-1 that he wanted to proceed. Before their meeting ended, Hassoun gave UC-1 his telephone number so that UC-1 could contact him to arrange necessary future meetings.

33.     Hassoun next met with UC-1 and an individual whom UC-1 introduced to Hassoun as his "good friend" and "brother" on July 21, 2010. This meeting, which occurred in a room at a hotel at O'Hare International Airport, was consensually monitored and audio and video recorded by investigating law enforcement agents. Unbeknownst to Hassoun, UC-1's associate was an undercover FBI special agent (hereinafter, "UC-2" and, together with UC-1, the "UCs"). UC-1 explained to Hassoun that he had told UC-2 about their July 8, 2010 meeting and that UC-2 was interested in hearing some of Hassoun's ideas.

34.     UC-2, indicating that he had spoken to UC-1 about their previous meeting, asked Hassoun about his ideas for orchestrating a terrorist attack in Chicago. Hassoun explained to UC-2 that he (Hassoun) believed that Americans were psychologically weak and could be attacked through a campaign of terror. Hassoun again advocated his idea of coordinating a series of escalating violent

13

incidents designed to damage Chicago's sense of security, its economy, and trust in leadership. In particular, Hassoun stated that initial attacks should be designed solely to cause fear; in particular, explosive devices that would "ignite, but don't blow." These attacks, Hassoun explained, would be designed "to grow the fear of the people, first." Following these initial, non-lethal attacks, Hassoun advocated deploying actual explosive devices designed to inflict tangible damage.

35.     Hassoun again identified various Chicago entertainment districts like Wrigleyville, Lincoln Park, Wicker Park and the "club areas" of downtown Chicago as potential targets. Hassoun also suggested the idea of releasing a biological agent, like ricin,[18] in the Daley Center. He explained that an attack at the Daley Center, which he referred to as "the brains of Chicago," could effectively close central downtown, thereby damaging the city's economy. In particular, Hassoun stated that a downtown attack would make people "afraid to go to downtown; they're going to be afraid to come close to downtown, " and "[i]f down[town] is shut down in Chicago, the economy is shut down in Chicago."[19]

36.     UC-2 asked Hassoun if he had time to show him some of the targets he was considering. Hassoun agreed. Accordingly, the UCs and Hassoun left the hotel and drove, at Hassoun's direction, first to the commercial area neighboring Wrigley Field and then to the Daley Plaza in downtown Chicago.[20] During their trip, UC-2 gave Hassoun a digital camcorder that he

---

[18] Ricin is a protein extracted from castor beans that is poisonous if inhaled, injected or ingested.

[19] Later in the afternoon, Hassoun identified the city's rail system, the Willis Tower and the John Hancock building as additional potential targets.

[20] As they drove first towards Wrigley Field, Hassoun explained that he was taking the UCs to the area because it was "where the night life is." He further explained that the neighborhood was especially busy on weekend nights, stating: "It's a beautiful place, you know, nice hit."

explained he and UC-1 were providing to Hassoun for operational purposes. In particular, the UCs wanted Hassoun to videotape reconnaissance missions of potential targets.

37.     During their July 21, 2010 conversations, the UCs asked Hassoun about his motivation for engaging in these proposed attacks. UC-2 stated his purported purpose: "want[ing] to change how our country [*i.e.*, the United States] treats our people back home." In response, Hassoun stated that he was differently motivated: "Mine is a kind of a different concept than this." Hassoun explained he saw attacking Chicago as a means of creating chaos to gain political control of the city and its sources of revenue.[21] The proposed participants' differing motivations did not trouble Hassoun: "We're the same, we're the same boat altogether. We're floating same boat, you know. . . . [W]e're doing the same thing, but everybody has their own interest. Because you know why? The results of this is a benefit to everybody."[22]

---

[21] When UC-2 initially asked Hassoun how one could parlay terrorist attacks to political power, Hassoun answered: "I have no clue." Later, however, Hassoun explained that they could assume control of Chicago by cultivating a replacement mayoral candidate whom they could buy off and manage.

[22] Although Hassoun was clear that he was not motivated to attack Chicago based on any religious ideology, he nevertheless suggested that once attacks had taken place, the participants distance themselves from their actions by sending an attribution video to the media claiming responsibility for the violence in the name of a fictitious extremist organization. "Call it, 'the jihad in U.S.' Just make something up. You know? Just make it up so, like, when you put it, all the heat is transferred to them. You know? There's no heat in the street."

This was not the first instance in which Hassoun suggested framing others for his own proposed violent actions. In his June 14, 2010 meeting with the CS, Hassoun suggested that terrorists motivated by extremist views of Islam (*e.g.*, Al-Qaeda) could be framed for his proposed actions. Hassoun speculated that people would naturally suspect such a group for an attack against establishments serving alcohol and that the conspirators could avoid detection by directing inquiry towards such a group. Similarly, in his July 8, 2010 meeting with UC-1, Hassoun suggested that inquiries into the proposed attacks could be diverted to terrorists motivated by extremist views of Islam by bribing unknown media personnel to blame the attacks on such individuals.

38.     When the UCs asked Hassoun if he was dedicated to the proposed task, Hassoun stated that he was: "You know, when I start something, I like to finish it."[23] Despite his assurances of dedication, UC-2 reminded Hassoun that their plans posed great risk and that if, at any time, Hassoun had reservations and wanted to withdraw, there would be "no shame" in such a decision. Hassoun assured the UCs that he was committed. When the UCs asked Hassoun if he was troubled by the idea of killing people as part of their operation, Hassoun rationalized that "to make a change, you have to sacrifice people."[24]

39.     In response to the UCs' inquiries, Hassoun stated that he understood that a successful operation required significant advance planning,[25] and indicated that he had been awaiting "a more serious" commitment from others before finalizing his plans for a strike. Hassoun stated, however, that dedication to the task would require a commitment incompatible with his current employment. In particular, Hassoun stated that he would need to quit his job to dedicate himself to the operation. Hassoun suggested the UCs effectively employ him for this and future attacks. They agreed.[26] Towards the end of their meeting, the UCs told Hassoun that they wanted him to think of a concrete plan that they could understand and of which he was capable of performing.

---

[23]  Hassoun also noted that he had been thinking about ways of striking Chicago for about a year.

[24]  When UC-1 again told Hassoun that he could "walk away" at any time and that he and UC-2 would understand if that was his ultimate decision, Hassoun responded by stating that this was not their idea, but his, and that he had come to the decision on his own.

[25]  As Hassoun explained: "[Y]ou have to go out and look [at potential targets] . . . . That's why it takes time."

[26]  Beginning on July 20, 2010, the UCs began paying Hassoun for his work on their collective project. Prior to September 18, 2010, the UCs had paid Hassoun a total of approximately $2,700

16

### *Planning the Attack*

40.     Hassoun met with UC-1 and UC-2 once again on the afternoon of Monday, August

16, 2010 at a hotel located in Rosement, Illinois.  Audio and video of the UCs' meeting with

Hassoun were consensually recorded by the FBI.  The proposed purpose of the meeting was for

Hassoun to report back on his recent reconnaissance missions.  At the onset of their meeting, in

response to UC-1's inquiry, Hassoun reported that his surveillance had been successful and that

"everything is beautiful."  He explained that he had been able to record the target area on multiple

occasions and had even met a woman who had acted as his guide and, apparently unbeknownst to

her, helped him identify potential bombing locations.

41.     Hassoun provided the UCs with the camcorder on which he had recorded his

reconnaissance video, which the UCs and Hassoun then viewed together on the hotel room's

television.  That video showed that Hassoun had scouted a number of potential target areas in

Chicago's Lakeview neighborhood, focusing on the bars and restaurants on Clark Street immediately

south of Addison Street.

42.     In particular, on the evening of Sunday, August 8, 2010, Hassoun, accompanied by

an unknown male,[27] filmed as he walked south down Clark Street from near the Grace Street

intersection, past Wrigley Field, through the bar and restaurant district south of Addison Street.  As

he passed the area's bars and restaurants, Hassoun commented into the video camera's microphone

on the potential advantages and disadvantages of an attack in the area.  For example, Hassoun

---

[27] During one of his surveillance videos, Hassoun identified the unknown male as a friend
of his from Lebanon.  When questioned by the UCs about the individual on August 16, 2010,
Hassoun explained that the unknown male was a friend, who, according to Hassoun, had limited
English abilities and thought Hassoun was recording the area as part of a school project.

narrated: "These are the bars. As you can see, no cameras. I've walked through this street two, three times. Under each bar, I barely see any cameras around here." Hassoun similarly noted the degree of street traffic and the places where one could leave a parked vehicle. Hassoun's narration was not limited to identifying operational opportunities, but also articulated the target value of the area. Hassoun commented on how busy the location was at the time he was filming and speculated how much more crowded the area would be on a Friday or Saturday night. Hassoun reminded his prospective viewers that they were looking in at the "heart of Clark," where "all [the] young people, [the] hippest people" congregate.[28]

43.     At one point during the video, Hassoun stopped a woman then unknown to him, as she was walking past him to ask her about the busiest entertainment districts in Chicago. The woman, a waitress in a local bar who is hereinafter identified as "Individual A," agreed to be filmed as she named Chicago nightlife locations. Based on his questioning, it appeared that Hassoun was using this independent source to confirm that he had properly identified proposed targets for a terrorist attack. When watching the video with the UCs on August 16, 2010, Hassoun referred to his interaction with Individual A as "like God [was] opening the way."

44.     As evidenced from the video, Hassoun returned to Lakeview on the evening of August 12, 2010. Hassoun first filmed the area of Clark Street and Belmont Avenue, identifying security measures in the area. Shortly thereafter, Hassoun proceeded west to the intersection of Belmont Avenue and Halsted Street where Hassoun, who was again accompanied by the same unknown male, met Individual A. From there, the group proceeded north on Halsted Street as

---

[28] On occasion, Hassoun would note for the UCs that he was filming an area which they had collectively observed on July 21, 2010, e.g.: "That's the bar you guys have seen."

Hassoun again narrated his observations concerning the area's security (*i.e.*, street cameras and police presence) and target potential (*i.e.*, bars and restaurants). From Halsted Street, the group returned back to the intersection of Clark and Addison, before again walking south down Clark Street through what, as set forth below, would be adopted as the target area.

45. Hassoun also recorded the same Wrigleyville/Lakeview entertainment district on the evening of Saturday, August 14, 2010. He explained both on the video and to the UCs on August 16, 2010 that he had returned to that location to show the target potential of the area on a typical Saturday night.

46. After reviewing the videos, the UCs and Hassoun discussed those targets that would offer maximum damage while posing the least logistical difficulty and risk. When asked when and where they could leave an explosive device, Hassoun identified the time and area that he believed would expose the greatest number of people to the blast's effect. "Put it right here because that's where the most of the crowd is."

47. When discussing the proposed execution of an attack, UC-2 again asked Hassoun if he wanted to participate in the actual operation, to which Hassoun stated that he did.

| | |
|---|---|
| UC-2: | Do you still want to do it for yourself? |
| Hassoun: | Yes. |
| UC-2: | Or, do you want someone else to do it? |
| Hassoun: | I can do it. |
| UC-2: | Okay. Are you sure? I mean . . . |
| Hassoun: | Positive. |
| UC-2: | I mean, your job could be done here. |
| UC-1: | You don't have to do this . . . . You don't have to . . . . Like, remember what we said. There is no shame. . . . But, this is the real |

deal. You don't have to do it. . . . And I'll tell . . . you can leave at any time and we'll shake hands and . . . [we'll] be friends for life.

Hassoun: I, I, I introduced this to you, you know. I came into this.

48. UC-1 then asked Hassoun what type of device he would prefer. In response, Hassoun indicated that UC-1 could give him whatever type of device UC-1 wanted to use and he, Hassoun, would deliver it to a target zone. When UC-1 asked whether it mattered to Hassoun if the device was "explosive," Hassoun stated in Arabic that he had "no objection." The UCs then asked Hassoun what day he wanted to execute the proposed attack. Hassoun recommended the evening of Saturday, September 11, 2010, which Hassoun called a "beautiful day."

49. As their meeting concluded, the UCs gave Hassoun a few more tasks to accomplish before they next met. Hassoun was to purchase a backpack, short wave radios, and conduct additional surveillance of the target areas, deciding the precise manner in which he would execute the attack. Hassoun agreed to perform these tasks. The UCs also gave Hassoun a digital camera and laptop computer that he could use for his operational planning.

50. Hassoun met UC-1 and UC-2 again on the afternoon of August 31, 2010 at a hotel in Rosemont, Illinois. As instructed, Hassoun came to the meeting with the backpack,[33] two-way radios, batteries, and maps that the UCs had requested during their previous meeting. Hassoun also presented the digital camera previously provided to him that contained additional photographs of his final recommended targets.[34] The UCs reviewed the photographs with Hassoun and discussed

---

[33] Hassoun provided the UCs with a worn blue backpack which, Hassoun explained, he had purchased at a used goods store.

[34] Hassoun presented three final targets: a city street trash can located in the vicinity of Clark and Eddy Streets, a city street trash can located in the vicinity Clark and Addison, and the Chicago

operational logistics. The UCs told Hassoun that they had decided to delay the strike one week due to alleged concerns that additional security would exist on the anniversary of September 11, 2001. The UCs and Hassoun then left the hotel and proceeded to the Wrigleyville area to review the chosen target location together.

51.     When they reached the intersection of Clark and Eddy Streets, Hassoun showed UC-1 where he would drop Hassoun off on the day of the operation. Hassoun explained that he would walk to Clark Street from Eddy Street and place the package in a city street trash receptor located at approximately 3540 North Clark Street. The UCs and Hassoun agreed on this final target based, in part, on Hassoun's statement that it presented an opportunity to inflict a greater number of casualties than the alternate locations.[35]

52.     The UCs and Hassoun drove around the Wrigleyville area to determine where Hassoun should exit the UCs' vehicle, how he should proceed to the target location, and then return to meet the UCs in order to flee. The participants' discussion focused on the logistics of arriving at and departing from the area without delay or detection.[36] Once the group agreed upon a final plan, Hassoun did a walk-through, leaving the UCs' vehicle, walking to the target location and back. All agreed that they had a plan for their newly agreed upon date of September 18, 2010.

---

Transit Authority's Belmont elevated train stop.

[35] The target trash can is located on the sidewalk approximately five feet from the glass windows of a sports-themed bar which, based on investigating agents' inquiry, offers, *inter alia*, beer manufactured outside of the state of Illinois and internationally produced liquor.

[36] The group studied the streets to determine the best routes of entry and exit, the location of the area's security cameras and other operational concerns.

53.    UC-2 asked Hassoun if he wanted to walk through the plan one more time. Hassoun stated that he did not. Instead, Hassoun explained he would return to the site on Saturday, September 4, 2010 to walk through the target area on a Saturday evening by himself.[37] As they drove away from the location, the group talked about the type of explosive that would be used and how it would be detonated. They further speculated about all of the media coverage their attack would generate. Hassoun noted that their attack would generate the interest of the FBI and the CIA.

### The Attempted Execution of the Proposed Attack

54.    As previously planned, Hassoun met with the UCs on the evening of September 18, 2010 to execute the proposed bombing. In particular, Hassoun arrived at approximately 11:18 p.m. to meet with the UCs at their prearranged location, a hotel in Rosemont, Illinois. As before, the UCs' meeting with Hassoun was audio and video recorded by investigating agents.

55.    In the hotel room, the UCs presented Hassoun with the blue backpack that he had previously provided to them on August 31, 2010. The backpack contained what UC-1 then revealed to Hassoun as the explosive device. The enclosed device, which was prepared by FBI Explosives Unit personnel in Quantico, Virginia, was comprised of a silver, one-gallon paint can, the interior of which was lined with ball-bearings, and which contained seven cylindrical tubes bound by black electrical tape of a substance designed to appear as C-4 explosive, two of which were connected to blasting caps with electrical wire leads attached to a clear plastic box containing a 9 volt battery, blue activation light and a white mechanical timer. Although the device was designed to appear like an

---

[37] Your affiant and other law enforcement officers involved in this investigation went to the target area on the evening of Saturday, September 4, 2010 to view the location under what law enforcement believed would be circumstances comparable to those that would exist on Saturday, September 18, 2010. At approximately 12:23 a.m. on September 5, 2010, investigating agents viewed Hassoun, accompanied by an unidentified female, as he drove by the target location.

actual explosive, it was constructed of inert material, incapable of detonation. The UCs showed Hassoun the bomb and generally explained how it was constructed, would be armed and detonated. In particular, the UCs showed Hassoun the purported bomb's timing and arming mechanism.

56.     The UCs suggested to Hassoun that they were concerned their previously discussed plan to have Hassoun throw a backpack into the garbage container on Clark Street might be too conspicuous. Hassoun stated that he had similar concerns. Accordingly, the UCs provided Hassoun with a grey shopping bag which, they explained, Hassoun could use to conceal the backpack containing the bomb.

57.     Before they left the hotel room, the UCs discussed how long Hassoun should remain in Chicago after the attack.[38] The UCs told Hassoun that he should remain in Chicago for a few days so as not to raise anyone's suspicion that he was fleeing from Chicago, after which, they said, Hassoun should travel to California where UC-1 would introduce him to certain "brothers." The UCs then provided Hassoun $500, purportedly to tide him over for a few days before he traveled to California. They further told Hassoun that they would wire him additional funds to pay for the plane ticket he would need to travel to California.

58.     At approximately 11:37 p.m., the UCs and Hassoun left the hotel, and, in a rented, white Dodge Caravan equipped with FBI video and audio monitoring and recording devices, proceeded from Rosemont to the target area. While in route, the UCs and Hassoun discussed how Wrigleyville would be crowded because the stadium had been used for a concert that evening.[39]

---

[38] Hassoun had contacted UC-1 by telephone on September 17, 2010 to inquire whether he should remain in the area after the bombing.

[39] The Dave Matthews Band played a concert in Wrigley Field on the evening of September 18, 2010.

Hassoun further noted that many individuals would be in the bars in the target neighborhood having watched the Chicago Cubs on television. During their drive, the UCs noted the explosive power of the device they were providing to Hassoun. In particular, the UCs told Hassoun that the bomb was surrounded by ball bearings and that its blast would likely destroy half a city block if not more. UC-2 explained that as a result of their actions Chicago would be "different city tomorrow."

59.     As the UCs' vehicle approached the target area, UC-1 opened the bomb's detonation mechanism and told Hassoun that he was setting the bomb's timer for thirty minutes. Hassoun told UC-1 that was too much time. UC-1 accordingly set the timer for approximately twenty minutes. UC-2 warned Hassoun that he had to be quick, *i.e.*, not to take over twenty minutes. UC-1 then armed the bomb in Hassoun's presence.

60.     The UCs' vehicle arrived in the target location at approximately 12:10 a.m. in the early morning of September 19, 2010. As they had previously planned, the UCs stopped their vehicle in the vicinity of Cornelia and Seminary Avenues, approximately one block southwest of the Clark Street target location. UC-1 then handed Hassoun the shopping bag containing the backpack, and with it, the explosive device. As planned, Hassoun exited the vehicle and began walking towards the target location.

61.     Pre-positioned law enforcement agents were able to observe Hassoun as he exited the UCs' vehicle and proceeded to the Clark Street target location. As planned, Hassoun proceeded directly to the target trash receptor, deposited the backpack and, with it, what he understood to be a ticking time-bomb therein. He then turned around to proceed back to the UCs' vehicle.[40] Pre-

_____

[40] Immediately after Hassoun cleared the target area, awaiting FBI and Chicago Police Department officers seized the subject backpack from the trash can.

positioned video surveillance recorded Hassoun as he delivered the bomb. Investigating agents were again able to observe Hassoun as he walked back to the UCs.

62.     Hassoun was arrested while in route back to the UCs' vehicle by awaiting law enforcement agents.

### *Conclusion*

63.     Based upon the foregoing information, I believe there is probable cause to believe that on or about September 19, 2010, Hassoun attempted, without lawful authority, to use a weapon of mass destruction against people and property in a manner that would have affected interstate commerce in violation of Title 18, United States Code, Sections 2332a(a)(2)(D); and attempted to damage and destroy, by means of an explosive, real property affecting interstate and foreign commerce in violation of Title 18, United States Code, Section 844(i)

FURTHER AFFIANT SAYETH NOT.

SAMUEL HARTMAN
Special Agent, FBI

Subscribed and sworn
before me this 20th day of September, 2010
Chicago, Illinois

SUSAN COX
United States Magistrate Judge

25