

**FILED**

APR 2 3 2012

Judge Robert W. Gettleman
United States District Court

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
) No. 10 CR 773
vs. ) Judge Robert W. Gettleman
)
SAMI SAMIR HASSOUN )

## PLEA AGREEMENT

1. This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and defendant SAMI SAMIR HASSOUN, and his attorney, MATTHEW J. MADDEN, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C), as more fully set forth below. The parties to this Agreement have agreed upon the following:

### Charges in This Case

2. The indictment in this case charges defendant with: (Count One) attempted use of a weapon of mass destruction in violation of Title 18, United States Code, Section 2332a(a)(2)(D); and (Count Two) attempted use of an explosive device in violation of Title 18, United States Code, Section 844(i).

3. Defendant has read the charges against him contained in the indictment, and those charges have been fully explained to him by his attorney.

4. Defendant fully understands the nature and elements of the crimes with which he has been charged.

## Charges to Which Defendant is Pleading Guilty

5. By this Plea Agreement, defendant agrees to enter a voluntary plea of guilty to the following counts of the indictment: Count One, which charges defendant with attempted use of a weapon of mass destruction in violation of Title 18, United States Code, Section 2332a(a)(2)(D); and Count Two, which charges defendant with attempted use of an explosive device in violation of Title 18, United States Code, Section 844(i).

## Factual Basis

6. Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Count Two of the indictment. In pleading guilty, defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

On or about September 19, 2010, SAMI SAMIR HASSOUN, attempted, without lawful authority, to use a weapon of mass destruction against people and property in a manner that would have affected interstate and foreign commerce in violation of Title 18, United States Code, Section 2332a(a)(2)(D), and attempted to damage and destroy, by means of an explosive, real property affecting interstate and foreign commerce in violation of Title 18, United States Code, Section 844(i).

In early June 2010, HASSOUN told a law enforcement cooperating source (hereinafter, the "CS") that he wanted to commit acts of violence in Chicago for monetary gain and to cause political instability. The CS asked HASSOUN about his ideas for a terrorist attack. HASSOUN suggested bombing the commercial area surrounding Wrigley

Field as one option. HASSOUN explained that an attack against an entertainment center like the one near Wrigley Field could "paralyze" Chicago commerce. In response, the CS told HASSOUN that he/she had "friends" who might be willing to pay HASSOUN to perpetrate such an attack. Over the following weeks, the CS and HASSOUN continued to discuss HASSOUN's ideas for perpetrating a terrorist act. HASSOUN indicated that he wanted to meet with the CS's contacts and was anxious to act against Chicago.

The CS arranged a meeting between HASSOUN and an individual the CS represented to be one of his/her purported contacts on July 8, 2010. Then unbeknownst to HASSOUN, the contact was an undercover FBI task force officer (hereinafter "UC-1"). During their initial meeting, HASSOUN told UC-1 that he had been contemplating how to perpetrate terrorist attacks in Chicago. HASSOUN stated that he believed that a series of escalating violent acts could be used to undermine the city's political establishment. When asked by UC-1 what HASSOUN was personally willing to do, HASSOUN indicated that he would be willing to facilitate a car bombing or the assassination of Chicago police officers. HASSOUN assured UC-1 that he wanted to participate in some violent act. When asked if he was concerned about those who would be hurt by such violence, HASSOUN stated that casualties were the inevitable result of what he termed "revolution."

HASSOUN met with UC-1 and an individual who UC-1 introduced to HASSOUN as a "good friend" and "brother" on July 21, 2010. Then unbeknownst to HASSOUN, UC-1's associate was an undercover FBI special agent (hereinafter, "UC-2" and, together with

UC-1, the "UCs"). UC-1 explained to HASSOUN that he had told UC-2 about their July 8, 2010 meeting and that UC-2 was interested in hearing HASSOUN's ideas concerning the commission of a terrorist act. HASSOUN then told UC-2 his idea of perpetrating a series of escalating violent attacks designed to damage Chicago's sense of security, its economy, and trust in leadership. HASSOUN identified Chicago entertainment establishments, civic buildings, commercial high-rises, and transportation infrastructure as potential targets.

During their July 21, 2010 meeting, the UCs gave HASSOUN a digital camcorder to videotape potential targets. HASSOUN agreed. HASSOUN traveled to the commercial area surrounding Wrigley Field and filmed potential targets on August 8, 2010, August 12, 2010 and August 14, 2010. HASSOUN's video focused on the bars, restaurants and potential security in the areas he observed. As he filmed, HASSOUN commented on the potential tactical advantages and risks of perpetrating an attack at the various locations he observed. In particular, HASSOUN noted the most populated bars and restaurants, and identified visible police presence and street security cameras.

During their July 21, 2010 meeting, HASSOUN told the UCs that he wanted to dedicate himself to the proposed attack and asked the UCs effectively to employ him planning the bombing. The UCs agreed and from July 21, 2010 to September 18, 2010, the UCs paid HASSOUN $2,700.

HASSOUN met with the UCs again on August 16, 2010 to debrief the UCs on his reconnaissance efforts. HASSOUN provided the UCs the camcorder he had used to record

his surveillance. After reviewing the videos, the UCs and HASSOUN discussed areas that could be targeted to cause maximum casualties with minimal operational difficulty and risk.

The UCs and HASSOUN met again on August 31, 2010 to pick a final target location and discuss operational logistics. The UCs and HASSOUN traveled to the proposed target chosen by HASSOUN – a trash recepticle located at approximately 3540 North Clark Street in Chicago, Illinois. HASSOUN told the UCs he would deposit a proposed bomb in the container on a Saturday night when the area would be crowded with bar patrons. The target trash recepticle chosen by HASSOUN was located approximately five feet from the glass windows of a sports-themed bar that sold alcohol products manufactured throughout the United States and abroad. HASSOUN told the UCs that he chose the particular location because it presented the opportunity to inflict a greater number of casualties than alternate locations. The UCs and HASSOUN agreed to execute their planned attack on the night of September 18, 2010.

As prearranged, HASSOUN met with the UCs on the evening of September 18, 2010 at a hotel located in Rosemont, Illinois. There, the UCs provided HASSOUN a backpack that contained what UC-1 revealed as an explosive device. The enclosed device was comprised of a silver, one-gallon paint can, the interior of which was lined with ball-bearings, and which contained seven cylindrical tubes that appeared to be explosive material, and which were bound by black electrical tape, two of which were connected to blasting caps with electrical wire leads attached to a clear plastic box containing a 9 volt battery, blue

activation light and a white mechanical timer. The UCs told HASSOUN the device was a bomb and generally explained how it was constructed, would be armed and detonated. The UCs provided HASSOUN with a grey shopping bag which, they explained, could be used to conceal further the backpack and its enclosed bomb.

Prior to September 18, 2010, the UCs had, on a number of different occasions, told HASSOUN that they did not need his assistance with the execution of the planned attack and that he could withdraw from their plan at any time. During their July 21, 2010 meeting, the UCs questioned HASSOUN concerning whether he wanted to participate in the actual, planned attack. HASSOUN assured the UCs that he did. During that meeting, UC-1 told HASSOUN that he could "walk away" at any time. HASSOUN responded by stating that he had come to the decision to perpetrate a terrorist act in Chicago on his own. When questioned by the UCs again on August 16, 2010, HASSOUN again assured the UCs that he wanted a role in the execution of the proposed bombing.

The UCs and HASSOUN left the hotel at approximately 11:37 p.m. on the evening of September 18, 2010, and traveled together in a rented, white van from Rosemont, Illinois to the target area. While in route, the UCs and HASSOUN discussed how the area surrounding Wrigley Field would be crowded because the ballpark had been used for a concert that evening. HASSOUN further noted that many individuals would be in the surrounding bars having watched the Chicago Cubs play baseball on television. During their drive, the UCs described the purported explosive power of the device they were providing

HASSOUN. The UCs explained that the bomb was surrounded by ball bearings and that its blast could destroy up to half a city block.

As the UCs' vehicle approached the target area, UC-1 opened the explosive device's detonation mechanism and told HASSOUN that he was setting the bomb's timer for thirty minutes. HASSOUN told UC-1 that was too much time. UC-1 accordingly set the timer for approximately twenty minutes. UC-2 warned HASSOUN that he had to be quick. UC-1 then activated the purported bomb's arming mechanism in HASSOUN's presence.

The UCs' vehicle arrived close to the target location at approximately 12:10 a.m. in the early morning of September 19, 2010. As they had previously planned, the UCs parked their vehicle approximately one block southwest of the Clark Street target location. UC-1 then handed HASSOUN the shopping bag containing the backpack, and with it, the alleged explosive device. As planned, HASSOUN exited the vehicle and walked directly to the target location, where HASSOUN deposited the device in the target trash container. At the time that HASSOUN dropped the bag containing the purported bomb in the trash container, the sidewalk was crowded with people, many of whom were within 20 feet of the target location.

7. The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for defendant's plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within defendant's personal knowledge regarding the charged crimes and related conduct.

## **Maximum Statutory Penalties**

8. Defendant understands that the charges to which he is pleading guilty carry the following statutory penalties:

    a. Count One carries a maximum sentence of life imprisonment. Pursuant to Title 18, United States Code, Section 3561, defendant may not be sentenced to a term of probation on this count. Count One also carries a maximum fine of $250,000. Defendant further understands that with respect to Count One, the judge also may impose a term of supervised release of not more than five years.

    b. Count Two carries a maximum sentence of 20 years' imprisonment, and a statutory mandatory minimum sentence of 5 years. Count Two also carries a maximum fine of $250,000. Defendant further understands that with respect to Count Two, the judge also may impose a term of supervised release of not more than three years.

    c. In accord with Title 18, United States Code, Section 3013, defendant will be assessed $100 on each count to which he has pled guilty, in addition to any other penalty imposed.

    d. Therefore, under the counts to which defendant is pleading guilty, the total maximum sentence is life imprisonment, and the mandatory minimum sentence is 5 years' imprisonment. In addition, defendant is subject to a total maximum fine of $500,000, a period of supervised release, and special assessments totaling $200.

## Sentencing Guidelines Calculations

9.  Defendant understands that in imposing sentence, the Court will be guided by the United States Sentencing Guidelines. Defendant understands that the Sentencing Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

10.  For purposes of calculating the Sentencing Guidelines, the parties agree on the following points, except as specified below:

   a.  **Applicable Guidelines**. The Sentencing Guidelines to be considered in this case are those in effect at the time of sentencing. The following statements regarding the calculation of the Sentencing Guidelines are based on the Guidelines Manual currently in effect, namely the November 2011 Guidelines Manual.

   b.  **Offense Level Calculations.**

      i.  The base offense level for defendant's offense of conviction is 33, pursuant to Guideline §§ 2K1.4(c)(1), 2M6.1(c)(2) and 2A2.1(a)(1).

      ii.  Defendant's offense level should be raised by 4 levels pursuant to Guideline § 2A2.1(b)(2) because defendant requested and received money for engaging in the offense conduct.

      iii.  Defendant's offense level should be raised by 12 levels pursuant to Guideline § 3A1.4(a) because the offense of conviction involves and was intended to

promote a federal crime of terrorism as defined in Title 18, United States Code, Section 2332b(g)(5).

        iv.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if defendant continues to accept responsibility for his actions within the meaning of Guideline § 3E1.1(a), including by furnishing the United States Attorney's Office and the Probation Office with all requested financial information relevant to his ability to satisfy any fine that may be imposed in this case, a two-level reduction in the offense level is appropriate.

        v.    In accord with Guideline § 3E1.1(b), defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently. Therefore, as provided by Guideline § 3E1.1(b), if the Court determines the offense level to be 16 or greater prior to determining that defendant is entitled to a two-level reduction for acceptance of responsibility, the government will move for an additional one-level reduction in the offense level.

    c.    **Criminal History Category.** With regard to determining defendant's criminal history points and criminal history category, based on the facts now known to the government, defendant's criminal history points equal zero. However, pursuant to Guideline § 3A1.4(b), the defendant has a Category VI criminal history.

d. **Anticipated Advisory Sentencing Guidelines Range.** Therefore, based on the facts now known to the government, the anticipated offense level is 46, which, when combined with the anticipated criminal history category of VI, results in an anticipated advisory Sentencing Guidelines range of life imprisonment, in addition to any supervised release and fine the Court may impose. Defendant also acknowledges that he is subject to a statutory mandatory minimum sentence of 5 years' imprisonment.

e. Defendant and his attorney and the government acknowledge that the above Guideline calculations are preliminary in nature, and are non-binding predictions upon which neither party is entitled to rely. Defendant understands that further review of the facts or applicable legal principles may lead the government to conclude that different or additional Guideline provisions apply in this case. Defendant understands that the Probation Office will conduct its own investigation and that the Court ultimately determines the facts and law relevant to sentencing, and that the Court's determinations govern the final Guideline calculation. Accordingly, the validity of this Agreement is not contingent upon the probation officer's or the Court's concurrence with the above calculations, and defendant shall not have a right to withdraw his plea on the basis of the Court's rejection of these calculations.

f. Both parties expressly acknowledge that this plea agreement is not governed by Fed.R.Crim.P. 11(c)(1)(B), and that errors in applying or interpreting any of the Sentencing Guidelines may be corrected by either party prior to sentencing. The parties may

correct these errors either by stipulation or by a statement to the Probation Office or the Court, setting forth the disagreement regarding the applicable provisions of the Guidelines. The validity of this Plea Agreement will not be affected by such corrections, and defendant shall not have a right to withdraw his plea, nor the government the right to vacate this Plea Agreement, on the basis of such corrections.

### Cooperation

11. Defendant agrees he will fully and truthfully cooperate in any matter in which he is called upon to cooperate by a representative of the United States Attorney's Office for the Northern District of Illinois. This cooperation shall include providing complete and truthful information in any investigation and pre-trial preparation and complete and truthful testimony in any criminal, civil or administrative proceeding.

### Agreements Relating to Sentencing

12. This Agreement will be governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment in the custody of the Bureau of Prisons of not less than 20 years and not more than 30 years. The government will recommend a sentence of 30 years of imprisonment. The defendant is free to recommend any sentence within the agreed range of imprisonment. Other than this agreed range for a term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes a sentence of incarceration within the agreed range set forth

herein, defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(d) and (e). If, however, the Court refuses to impose a sentence within the agreed range of incarceration set forth herein, thereby rejecting this plea agreement, or otherwise refuses to accept defendant's plea of guilty, either party has the right to withdraw from this plea agreement.

13.     Defendant agrees to pay the special assessment of $200 at the time of sentencing with a cashier's check or money order payable to the Clerk of the U.S. District Court.

## Acknowledgments and Waivers Regarding Plea of Guilty

### Nature of Plea Agreement

14.     This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in case 10 CR 773.

15.     This Plea Agreement concerns criminal liability only. Except as expressly set forth in this Agreement, nothing herein shall constitute a limitation, waiver or release by the United States or any of its agencies of any administrative or judicial civil claim, demand or cause of action it may have against defendant or any other person or entity. The obligations of this Agreement are limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities, except as expressly set forth in this Agreement.

## Waiver of Rights

16. Defendant understands that by pleading guilty he surrenders certain rights, including the following:

    a. **Trial rights**. Defendant has the right to persist in a plea of not guilty to the charges against him, and if he does, he would have the right to a public and speedy trial.

        i. The trial could be either a jury trial or a trial by the judge sitting without a jury. However, in order that the trial be conducted by the judge sitting without a jury, defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

        ii. If the trial is a jury trial, the jury would be composed of twelve citizens from the district, selected at random. Defendant and his attorney would participate in choosing the jury by requesting that the Court remove prospective jurors for cause where actual bias or other disqualification is shown, or by removing prospective jurors without cause by exercising peremptory challenges.

        iii. If the trial is a jury trial, the jury would be instructed that defendant is presumed innocent, that the government has the burden of proving defendant guilty beyond a reasonable doubt, and that the jury could not convict him unless, after hearing all the evidence, it was persuaded of his guilt beyond a reasonable doubt and that it was to consider each count of the indictment separately. The jury would have to agree

14

unanimously as to each count before it could return a verdict of guilty or not guilty as to that count.

    iv.  If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded that the government had established defendant's guilt beyond a reasonable doubt.

    v.  At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them.

    vi.  At a trial, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court. A defendant is not required to present any evidence.

    vii.  At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

  b.  **Waiver of appellate rights.** Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial. Defendant is aware that Title 28, United States Code, Section 1291, and Title 18,

United States Code, Section 3742, afford a defendant the right to appeal his conviction and the sentence imposed. Acknowledging this, defendant knowingly waives the right to appeal his conviction, any pre-trial rulings by the Court, and, provided the Court's sentence of incarceration is within the range agreed upon in this Plea Agreement, any part of the sentence (or the manner in which that sentence was determined), including any term of imprisonment and fine within the maximums provided by law, in exchange for the concessions made by the United States in this Plea Agreement. The waiver in this paragraph does not apply to a claim of involuntariness, or ineffective assistance of counsel, which relates directly to this waiver or to its negotiation, nor does it prohibit defendant from seeking a reduction of sentence based directly on a change in the law that is applicable to defendant and that, prior to the filing of defendant's request for relief, has been expressly made retroactive by an Act of Congress, the Supreme Court, or the United States Sentencing Commission.

        c.     Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraphs. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights.

### Presentence Investigation Report/Post-Sentence Supervision

17.    Defendant understands that the United States Attorney's Office in its submission to the Probation Office as part of the Pre-Sentence Report and at sentencing shall fully apprise the District Court and the Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters. The government

will make known all matters in aggravation and mitigation relevant to sentencing, including the nature and extent of defendant's cooperation.

18. Defendant agrees to truthfully and completely execute a Financial Statement (with supporting documentation) prior to sentencing, to be provided to and shared among the Court, the Probation Office, and the United States Attorney's Office regarding all details of his financial circumstances, including his recent income tax returns as specified by the probation officer. Defendant understands that providing false or incomplete information, or refusing to provide this information, may be used as a basis for denial of a reduction for acceptance of responsibility pursuant to Guideline § 3E1.1 and enhancement of his sentence for obstruction of justice under Guideline § 3C1.1, and may be prosecuted as a violation of Title 18, United States Code, Section 1001 or as a contempt of the Court.

19. For the purpose of monitoring defendant's compliance with his obligations to pay a fine during any term of supervised release to which defendant is sentenced, defendant further consents to the disclosure by the IRS to the Probation Office and the United States Attorney's Office of defendant's individual income tax returns (together with extensions, correspondence, and other tax information) filed subsequent to defendant's sentencing, to and including the final year of any period of supervised release to which defendant is sentenced. Defendant also agrees that a certified copy of this Plea Agreement shall be sufficient evidence of defendant's request to the IRS to disclose the returns and return information, as provided for in Title 26, United States Code, Section 6103(b).

## Other Terms

20. Defendant agrees to cooperate with the United States Attorney's Office in collecting any unpaid fine for which defendant is liable, including providing financial statements and supporting records as requested by the United States Attorney's Office.

21. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, a broad range of crimes are removable offenses, including one or more offenses to which defendant is pleading guilty. Indeed, because defendant is pleading guilty to an offense that is an "aggravated felony" as that term is defined in Title 8, United States Code, Section 1101(a)(43), removal is presumptively mandatory. Removal and other immigration consequences are the subject of a separate proceeding, however, and defendant understands that no one, including his attorney or the Court, can predict to a certainty the effect of his conviction on his immigration status. Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his guilty plea may entail, even if the consequence is his automatic removal from the United States.

## Conclusion

22. Defendant understands that this Plea Agreement will be filed with the Court, will become a matter of public record and may be disclosed to any person.

23. Defendant understands that his compliance with each part of this Plea Agreement extends throughout the period of his sentence, and failure to abide by any term

of the Agreement is a violation of the Agreement. Defendant further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Agreement, rendering it null and void, and thereafter prosecute defendant not subject to any of the limits set forth in this Agreement, or may move to resentence defendant or require defendant's specific performance of this Agreement. Defendant understands and agrees that in the event that the Court permits defendant to withdraw from this Agreement, or defendant breaches any of its terms and the government elects to void the Agreement and prosecute defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

24. Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, other than those set forth in this Plea Agreement to cause defendant to plead guilty.

25. Defendant acknowledges that he has read this Plea Agreement and carefully reviewed each provision with his attorney. Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.

AGREED THIS DATE: April 23, 2012

_____  
PATRICK J. FITZGERALD  
United States Attorney

_____  
JOEL M. HAMMERMAN  
Assistant U.S. Attorney

_____  
SAMI SAMIR HASSOUN  
Defendant

_____  
MATTHEW J. MADDEN  
Attorney for Defendant