**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 10-CR-773-1** |
| **v.** | ) | **Hon. Robert W. Gettleman** |
| | ) | |
| **SAMI HASSOUN** | ) | |

**<u>DEFENDANT'S SENTENCING MEMORANDUM</u>**

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS…..…………………………………………………………..ii

TABLE OF AUTHORITIES……………………………………………………………iii

ARGUMENT………………………………………………………………………..1

    I.      Overview of Sentencing Request……..…………………………………..1

    II.     Sami Hassoun's Personal History and Characteristics Demonstrate that a Sentence Above Twenty Years Is Greater Than Necessary to Satisfy the § 3553(a) Purposes of Punishment………………………………………..1

        A.  Sami's Early Life and the Ivory Coast Coup…………………………1

        B.  Sami's Move to Lebanon and Struggles to Adjust……………………5

        C.  The 2006 Lebanon War……………………………………………….6

        D.  Post-War Lebanon and the Decision to Immigrate to the U.S………..9

        E.  Sami's Efforts to Succeed in Chicago………………………………..10

        F.  The Instant Offense and Sami's Acceptance of Responsibility………11

        G.  Sami's Growth Since the Offense……………………………………12

    III.    A Sentence of 20 Years Reflects the Seriousness and Circumstances of the Offense Under §§ 3553(a)(2)(A) and (a)(1) Because the Instant Offense was Heavily Dependent on the Actions of the Informant and the FBI……………………………………………………………………….13

        A.  The government's involvement in an offense mitigates a defendant's culpability under the § 3553(a) factors. ………………………………13

        B. The government's involvement with Sami likewise mitigates the seriousness of the instant offense under §§ 3553(a)(2)(A) and (a)(1)…...15

    IV.    Because Sami Was Not Motivated by Ideological Extremism, 20 Years' Imprisonment is Sufficient to Protect the Public Under § 3553(a)(2)(C) …………………………………………………………...……….24

    V.    A Sentence of 20 Years' Imprisonment Avoids Unwarranted Sentencing Disparities under § 3553(a)(6)…………………………………………..26

A. Sentencing Sami to more than 20 years will lead to unwarranted disparities, because he is not a jihadist and has no ties to terrorists…….28

B. Sentencing Sami to more than 20 years will also create unwarranted disparities given the notable differences between his plot and those of defendants who have been sentenced to 20 years or less………………29

VI.    A Sentence of 20 Years Is Sufficient But Not Greater Than Necessary to Protect the Public Because Sami Poses a Low Risk of Recidivism……..32

A. The expert concludes that Sami's risk of recidivism is low because he will be able to recover from the developmental trauma he suffered……..32

B. Sami's status as a first offender reduces the likelihood that he will engage in another offense after serving his sentence……………………33

C. Sami's advanced age upon release also makes him unlikely to reoffend……………………………………………………………………..34

D. Sami's pursuit of education, his employment history, and his strong work ethic also lower his risk of recidivism…………………………….34

E. Sami will be deported upon release, making him highly unlikely to re-offend in the United States………………………………………………35

VII.   A Sentence Above 20 Years is Greater Than Necessary To Provide Just Punishment Under § 3553(a)(2)(A)…………………………………….36

VIII.  Sami's Youth at the Time of the Offense Renders a Sentence of 20 Years Sufficient to Achieve the § 3553(a) Purposes of Punishment…………..37

# TABLE OF AUTHORITIES

### Cases

*Gall v. United States*, 552 U.S. 38 (2007)…………………………………………..35, 38

*Graham v. Florida*, 130 S. Ct. 2011 (2010)…………………………………………37, 38

*Miller v. Alabama*, 132 S. Ct. 2455 (2012)…………………………………....13, 37, 38

*Rita v. United States*, 551 U.S. 338 (2007)…..……………………………………….35

*Roper v. Simmons*, 543 U.S. 551 (2005)…..……………………………………………38

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993)…………………………………..............25

*United States. v. Baker*, 445 U.S. 987v(7th Cir. 2006)..………………………33, 35, 38

*United States v. Batiste*, No. 06-CR-20373-JAL (S.D. Fla. Nov. 24, 2009)…….28, 29, 32

*United States v. Batiste*, No. 06-CR-20373, 2007 U.S Dist. LEXIS 61186
     (S.D. Fla. Aug. 21, 2007)…………………………………………....28, 29, 32

*United States v. Bullion*, 466 F.3d 574 (7th Cir. 2006)..………………………………34

*United States v. Chandia*, 395 F. App'x 53 (4th Cir. 2010) ……………………………25

*United States v. Cromitie*, 2011 U.S. Dist. LEXIS 71821 (S.D.N.Y. June 29, 2011)…...15

*United States v. Ferdaus*, 11-CR-10331-RGS (D. Mass. Nov. 1, 2012)..……………….27

*United States v. Ferdaus*, No. 11-CR-10331, 2011 U.S. Dist. LEXIS 139853
     (D. Mass. Nov. 28, 2011)……………………………………………….28–32

*United States v. Guzman*, 236 F.3d 830 (7th Cir. 2001) ………………………………36

*United States v. James*, 05-CR-214-CJC (C.D. Cal. Mar 9, 2009) …………….27, 29, 31

*United States v. Kabir, et al*, No. 12-MJ-00431-DUTY (C.D. Ca. 2012)……………….17

*United States v. Kindle*, 698 F.3d 401 (7th Cir. 2012)……………………………14, 23

*United States v. Mandhai*, 02-CR-60096-WPD (S.D. Fla. Aug. 30, 2005)…………….27

*United States v. Mandhai*, 375 F.3d 1243, 1246 (11th Cir. 2004)…………………29, 30

*United States v. Mayfield*, 2013 U.S. App. LEXIS 1456 (Jan. 16, 2013)........................14

*United States v. McKenzie*, 656 F.3d 688 (7th Cir. 2011)…………………………...14, 16

*United States v. Miranda*, 505 F.3d 785 (7th Cir. 2007)……………………………….33

*United States v. Ngatia*, 477 F.3d 496 (7th Cir. 2007)..………………………………36

*United States v. Nur*, 07-CR-543-DLI (E.D.N.Y. Jan. 25, 2011) …………..……….27, 30

*United States v. Padilla*, 04-CR-60001-MGC (S.D. Fla. Jan. 22, 2008)……………….27

*United States v. Paul*, 07-CR-87-GLF (S.D. Ohio Feb. 26, 2009)..……………………27

*United States v. Rana*, 09-CR-830-8 (N.D. Ill. Jan. 17, 2013)…..…………………….27

*United States v. Ramirez*, 06-CR-299, 2007 WL 1726454 (E.D. Wis. June 14, 2007)….36

*United States v. Randle*, 208 Fed. App'x 462 (7th Cir. 2006)…………………………38

*United States v. Rodriguez*, 08-CR-509-1, 2009 WL 1811001
     (N.D. Ill. June 23, 2009)…..…………………………………………….35

*United States v. Salazar-Hernandez*, 431 F. Supp. 2d 931 (E.D. Wis. 2006)………..…35

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) ……………………………….25

*United States v. Stover*, 208 F. App'x 484 (7th Cir. 2006) ……………………………34

*United States v. Thurman*, 179 F. App'x 971 (7th Cir. 2006) ....…………………….……25

*United States v. Urbina*, 06-CR-336, 2009 WL 565485 (E.D. Wis. Mar. 5, 2009)……..34

*United States v. Wright* 12-CR-238-DDD (N.D. Ohio Nov. 21, 2012)...……...14, 26, 31


**Statutes & Rules**

18 U.S.C. § 3553(a)…………………………...……………………………........passim

U.S.S.G. § 3A1.4(b) ……………………...…………………………............33


**Other Authorities**

Aaronson, Trevor *The Informants*, Mother Jones (Sept./Oct. 2011)…………...........23

Amnesty International*, Lebanon: Deliberate Destruction or "Collateral Damage"?*
      *Israeli Attacks on Civilian Infrastructure* (Aug. 2006)..………………..…….…7

Amos, Harel & Avi Issacharoff, *34 Days: Israel, Hezbollah, and the War in Lebanon*
      (2009)…………………………………………………………………………..6

Breyer, Stephen *The Federal Sentencing Guidelines and the Key Compromises on Which*
      *They Rest*, 17 Hofstra L. Rev. 1 (1988) ………….…………………………...26

Federal Bureau of Investigation, Press Release, *Chicago Man Arrested in Attempted*
      *Bomb Plot* (Sept. 20, 2010)……………….…………………………………...16

Gruber, Staci A. & Deborah A. Yurgelun-Todd, *Neurobiology and the Law: A Role in*
      *Juvenile Justice?*, 3 Ohio St. J. Crim. L. 321 (2006)..…………..……………...37

Harer, Miles D. *Recidivism Among Federal Prisoners Released in 1987*,
      Federal Bureau of Prisons' Office of Research and Evaluation 23 (1994)…..........35

Hoffman, Bruce *Inside Terrorism* (2005)…………………………………………..25

Human Rights Watch, *Afraid and Forgotten* (Oct. 2010)……………………………..3

Kifner, John and Sabrina Taverise, *Israel Pounds Targets Across Lebanon as Hezbollah*
      *Fires Barrage of Rockets*, N.Y. Times (Aug. 6, 2006)…………………………7

MacFarquhar, Neil *Behind Lebanon Upheaval, 2 Men's Fateful Clash*, N.Y. Times (Mar.
      20, 2005) ……………………………………………………………………..6

Shipler, David K., Op-Ed., *Terrorist Plots, Hatched by the F.B.I.*, N.Y. Times (Apr. 28,
      2012) ……………………………………………………………..…...23

Szoldra, Paul, *The FBI Goes to Disturbing Lengths to Set Up Potential Terrorists*,
      Business Insider (Mar. 11, 2013)………………………………………15, 23

U.S. Sentencing Comm'n (USSC), *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* (2004)……………………………..34

U.S. Sentencing Comm'n, *Recidivism and the First Offender, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate* (May 2004)……………………….………….………………………………………34

Welham, Keri *Families in War Zone*, Dominion Post (Aug. 3, 2006)…………………7

Yenokyan, Gayane & Haroutune K. Armenian, *Triggers for Attacks in Familial Mediterranean Fever: Application of the Case-Crossover Design*, 175(10) Am. J. Epidemiology 1054–61 (Jan. 2012)…………….……………….…………….…5

Defendant SAMI HASSOUN, by attorney MATTHEW MADDEN and the University of Chicago Law School's Federal Criminal Justice Clinic and its attorney, ALISON SIEGLER, respectfully requests that this Honorable Court impose a sentence of 20 years' incarceration. In support of this request, Mr. Hassoun states as follows:

## I.      Overview of Sentencing Request

Given the Rule 11(c)(1)(C) plea agreement in the instant case, this Court is not bound by the Sentencing Guidelines and has unfettered discretion to impose a sentence of 20 years' imprisonment. Such a sentence is sufficient but not greater than necessary to reflect the 18 U.S.C. § 3553(a) purposes of punishment. First, the government's extensive involvement with Sami during the course of the offense is relevant to the circumstances and seriousness of the offense under §§ 3553(a)(1) & (2)(A). Second, the requested sentence will protect the public under § 3553(a)(2)(C) because Sami was not motivated by jihadist extremism. Third, comparing Sami with other similarly situated defendants reveals that a 20-year sentence avoids unwarranted disparities under § 3553(a)(6). Fourth, Sami poses a low risk of recidivism under § 3553(a)(2)(C). Fifth, the requested sentence provides just punishment under § 3553(a)(2)(A). Sixth, Sami's youth mitigates his conduct given brain development research upon which the Supreme Court has relied.

## II.     Sami Hassoun's Personal History And Characteristics Demonstrate that a Sentence Above Twenty Years is Greater Than Necessary to Satisfy the § 3553(a) Purposes of Punishment.

### A.  Sami's Early Life and the Ivory Coast Coup

Sami Hassoun was brought up in Abidjan, the capital of the Ivory Coast, which was for many years "a bastion of stability in a region wracked by war." Ex. 1. Sami "speaks of his childhood in the Ivory Coast as 'a beautiful life'." Ex. 2 at 3; Ex. 3. He

was primarily raised by his mother, Siham, because his father, Samir, ran a business that required him to travel a great deal. Ex. 4 at 1. Sami was fortunate to be surrounded by relatives, including his paternal grandparents and cousins. *Id.*



(Sami and friends in the Ivory Coast after a soccer game)

A coup in the Ivory Coast in 1999 marked the end of Sami's "beautiful life" and the beginning of a series of traumatic events that would culminate in the instant case. Ex. 2 at 3. When Sami was 11 years old, rebel soldiers in the Ivory Coast "went on a rampage" and overthrew the governing regime. Ex. 1. "Soldiers commandeered vehicles and headed into Abidjan, discharging automatic weapons and looting . . . shops and petrol stations." Ex. 5 at 2. The next day was even worse, as "renegades, many wearing bandanas and with faces covered in black soot, cruised by in cars commandeered from civilians . . . . [while] [m]obs of youths took advantage of the lawlessness, hijacking cars and mugging commuters. One gang carrying knives and sticks attacked two journalists . .

2

. robbing them of money, cell phones, and camera equipment." Ex. 1. The coup raged on

the next day, as "armed soldiers joy-riding in stolen cars and taxis . . . [used] their rifles

and hand grenades to blow open the doors of downtown shops in the city of 3 million

people." Ex. 6 at 1. The chaos continued into the new year.

Sequestered in his family's apartment building, Sami watched his home fall into

chaos in the days and weeks that followed, and experienced the kind of abject terror that

no child should have to endure. Ex. 4 at 1. Although Siham tried to prevent it, Sami

watched the coup unfold from the enclosed outdoor balcony of their apartment. *Id*. Sami

recalls the more horrifying events in detail, *id.* at 1–2, and his mother echoes his account:

> [I]t was so terrible, they were killing people including women and children. Sami
> would watch from balcony, he would see people with machetes running, stopping
> cars, taking people out of cars and killing them, people waving machetes and
> dancing around after the killing, lots of bloods on the street and horrible
> screaming. . . . We heard a lot of stories about men breaking into houses and
> raping girls and women in front their family.

Ex. 7 at 1. While most of the media fled after the coup began, a later report described the

country following the coup exactly as Sami and his mother remember it.[1]

On January 13, 2000, a week before Sami's 12th birthday, there was a truce for a

few hours while the French occupied the Abidjan airport. Ex. 7 at 1. Siham grabbed Sami

and fled with him to the airport, abandoning their home and all of their belongings. *Id.*

They flew to the U.S., as Siham had a brother in Wilmette, Illinois, and the American

Embassy was providing temporary visas to women and children. *Id.* Samir stayed behind,

unable to obtain a visa. Sami describes the upheaval of their departure, and the losses it

---

[1] *See Afraid and Forgotten*, Human Rights Watch (HRW) (Oct. 2010), *available at*
http://www.hrw.org/reports/2010/10/22/afraid-and-forgotten-0 ("During home attacks, husbands
are tied up and forced to watch as wives, daughters, and other female family members are being
raped. The worst treatment is almost always reserved for the immigrant populations.").

entailed: "When we fled to the U.S., we had to leave everything and everyone behind: my father, my family, my friends, and all of the things I had collected during my childhood— ninja turtles, matchbox cars, Japanese cartoons, everything." Ex. 4 at 2.

After escaping the violence in Abidjan, Sami struggled to adjust. They moved in with his uncle, Dr. Michael Maitar, in Wilmette, and Sami began attending school. Exh 7 at 2. He felt isolated and unmoored. He was a foreigner and spoke only French. *Id.* Further, Sami worried constantly about his father and feared he might never see him again. Ex. 4 at 2. He has never forgotten the pain of being unable to reach his father on his twelfth birthday. *Id.* Samir's business, which was the result of over twenty years of tireless work, vanished in weeks; looters destroyed his shop and his entire inventory was lost. Ex. 8 at 1. Sami had no idea whether his friends were alive or dead. Ex. 4 at 2.

The aftermath of the coup not only affected Sami's mental health, but led his physical health to deteriorate as well. *Id.* He developed extreme stomach pain and began throwing up bile. *See* Ex. 9. These attacks came on suddenly and lasted for days. *Id.* Sami missed many days of school, and his treating physicians struggled to diagnose his symptoms, ultimately concluding that they were stress-related. *See* Ex. 10. Sami's stomach problems became so severe that, a year after the coup, as he was approaching the age of 13, he weighed a little over 60 pounds. *See* Ex. 4 at 2.[2] Sami later discovered that he suffers from Familial Mediterranean fever ("FMF"). *See* Ex. 11; Ex. 12.[3] It is likely

---

[2] The average weight of a United States 13 year-old between 1999 and 2002 was 116.9 pounds. The fifth percentile was 71.9 pounds. http://www.cdc.gov/nchs/data/ad/ad361.pdf

[3] FMF is a hereditary inflammatory disorder. Most attacks involve fever and acute abdominal pain, similar to the symptoms of appendicitis. Colchicine is the only known drug used to treat FMF, and has been shown to decrease the frequency of attacks. Ex. 15.

that Sami's stress over the traumatic life events he had weathered contributed to the frequency and severity of his attacks during this time. *See* Ex. 10; Ex. 9.[4]

**B.  Sami's Move to Lebanon and Struggles to Adjust**

After six months in the U.S., Sami and his mother moved to Lebanon and attempted to start over. Ex. 4 at 2. They reunited with Samir, who had escaped Abidjan. Once again, Sami became an outsider in a world that felt nothing like home. *Id* at 3. He was 12 years old and had trouble adapting, as he did not speak Arabic or even much English. Ex. 13 at 1. Having lost everything, the Hassouns struggled to stay afloat financially and initially lived in an impoverished village. Ex. 4 at 2. Even after things slowly began to improve, Sami continued to feel adrift. *Id*. While his parents were able to gather enough money to enroll him in an American school in Saida, his comparative poverty set him apart from his peers and made him feel like an outcast. *Id*.; Ex. 14.

During this time, Sami began to lie about his social status in an effort to gain acceptance. Ex. 2 at 7. This was the first of his many efforts to be a "psychological and social chameleon." *Id*. He developed a facility to "become whatever his current situation demanded in order to fit in and escape attack." *Id*. His adaptive behavior became more pronounced as conditions in Lebanon worsened. As a non-religious teenager, he turned to fiction to fit in: "I felt I had to lie about being a Sunni when I was with a Sunni and a Shia when I was with a Shia in order to satisfy everyone and have friends." Ex. 4 at 3.

Sami's need to be liked by all also manifested itself in "pro-social behaviors." Ex. 2 at 7. He began volunteering at a center for the elderly through a friend. Ex. 13 at 1. This

---

[4] Reputable medical research has revealed that stress triggers FMF attacks. *See* Gayane Yenokyan & Haroutune K. Armenian, *Triggers for Attacks in Familial Mediterranean Fever: Application of the Case-Crossover Design*, 175(10) Am. J. Epidemiology 1054-61 (Jan. 2012).

organization remembers Sami fondly as one who "used to spend lots of his time talking and reading to the elderly. They all loved him and waited for him to come." Ex.16. Sami found this experience fulfilling, so he joined another charity organization, "where he was responsible for distributing food and medicine to the needy people." Ex. 13 at 1*; see* Ex. 18. Around this same time, Sami's baby brother, Adnan, was born.[5] From the beginning, Sami and his brother were "very attached," Ex. 7 at 1, and to this day their "relationship . . . is above and beyond the ordinary," Ex. 18 at 2.

After Prime Minister Rafik Hariri was assassinated in an explosion that killed 18 others,[6] Lebanon became increasingly volatile, Ex. 4 at 3; Ex. 13 at 1. Sami recalls his acute anxiety during this time: "The memories of Abidjan all came back. I was living in fear and now I had a baby brother, [Adnan], who I was worried about. I didn't want him to have to witness and see all this, to have to live my past through all this chaos, even though he was two years old, too young to understand." *Id.*

### C. The 2006 Lebanon War

On July 12, 2006, Hezbollah militants fired rockets at Israeli border towns, beginning what came to be known as the 2006 Lebanon War with Israel. *See* Harel Amos & Avi Issacharoff, *34 Days: Israel, Hezbollah, and the War in Lebanon* 249 (2009). The war impacted almost every person in Lebanon, leaving 1,200 Lebanese civilians dead and fully 15% of the population permanently disabled. *Id*. One million Lebanese were forced to migrate from the South of the country to the North due to the bombings. *Id*. The overall damage to Lebanon's infrastructure was massive—10,000 Lebanese homes were

---

[5] To comply with the redaction rules, the name of Sami's younger brother—who is a minor—has been changed to "Adnan" throughout this document and has been deleted from the exhibits.
[6] Neil MacFarquhar, *Behind Lebanon Upheaval, 2 Men's Fateful Clash*, N.Y. Times, Mar. 20, 2005, *at* http://www.nytimes.com/2005/03/20/international/middleeast/20lebanon.html?_r=0.

destroyed by bombs, 22,500 buildings were damaged beyond repair, and 73,000 buildings were partially damaged. *Id.* Amnesty International decried the violence and the destruction of entire civilian neighborhoods and villages by Israeli forces, including attacks on infrastructure indispensable to the survival of the civilian population.[7]

Civilians in Saida, where the Hassoun family was living, witnessed and suffered countless horrors during the war. Ex. 19 at 1. As Israel's first round of bombings focused on southern Lebanon, thousands of scared and wounded civilians fled to Saida.[8] Later, Saida became the target of a barrage of Israeli bombs. *Id.* Perhaps the most disturbing aspect of the 34-Day War was its effect on children. Children represented fully one third of Lebanese casualties, and many of those who survived were traumatized by the war.[9] Child psychologists warned of the future damage.[10]

Sami was but a teenager during the war. The trauma he experienced changed him irrevocably. Ex. 2 at 13. Sami recalls thousands of people fleeing to Saida as missiles pummeled the south of Lebanon in July 2006. Ex. 4 at 4. Once again, he witnessed

---

[7] *See Lebanon: Deliberate Destruction or "Collateral Damage"? Israeli Attacks on Civilian Infrastructure*, Amnesty International, Aug. 2006, http://www.amnesty.org/en/library/asset/MDE18/007/2006/en/4c966a70-d3ff-11dd-8743-d305bea2b2c7/mde18007206en.html. A senior emergencies researcher for Human Rights Watch similarly condemned Hezbollah for directly targeting Israeli civilians and using Lebanese civilians as human shields. *See* Ex. 20 at 3.

[8] *See* John Kifner and Sabrina Tavernese, *Israel Pounds Targets Across Lebanon as Hezbollah Fires Barrage of Rockets*, N.Y. Times, Aug. 6, 2006, *available at* http://www.nytimes.com/2006/08/06/world/middleeast/06mideast.html?pagewanted=print&_r=0; Keri Welham, *Families in war zone*, Dominion Post, Aug. 3, 2006, *available at* http://search.proquest.com/docview/338236536?accountid=14657.

[9] Ex. 22 at 1 ("'I was thinking, This is it, we are going to die. This is our destiny. I said, God will now punish me for all the things I did wrong.' Ali Kalash, 14, said. . . . His family's apartment building was destroyed in the strike, and they sought refuge [an] underground shelter . . . . 'I was thinking we're all going to die and we'd never comeback.' Ali said.").

[10] *Id.* at 1–2 ("Experts warn the conflict is taking a heavy psychological toll on survivors, as well. 'You can't run away from the sound of bombs. . .' said Nadine Maalouf, a child psychologist who has been working with traumatized children. Many parents say their children have become aggressive or unruly. And they relive their horrifying experiences in dreams or in drawings.").

horrific tragedies: "I saw people with their hands and legs blown off in hospitals. I was also obsessed at the time watching all the live TV coverage of the war. . . . They would show gruesome and bloody images, aftermaths of attacks." *Id.* Siham also recalls this as a time of chaos, describing people who had been burned running to hospitals. Ex. 7 at 2. Siham remembers how worried Sami was for his two-year-old brother during this time. *Id.* Sami saw what was happening to other kids and did his best to ensure that the same did not happen to Adnan, holding him often, *id.*, and treating him "like his son," Ex. 21.



(Sami holding his brother during the 2006 Lebanon War)

By the time Saida began taking hits towards the end of the war, all of the roads were closed and bridges destroyed, and the Hassouns had nowhere to run. Ex. 4 at 4; *see* Ex. 19 at 1. Sami and Siham remember scurrying to their basement constantly during those weeks as bombs exploded around them. Ex. 7 at 2. Pieces of shrapnel periodically battered their building, and one bomb hit so close that all of the windows in their building shattered. *Id.* The Hassouns were lucky to survive this event, which Siham describes as one that "took years from my life." *Id.* As Sami recalls: "I thought I was going to die.

After moments of complete shock, I raced down to the basement, carrying [Adnan]. I was so worried what could happen to my family, friends, and neighbors, and my baby brother most of all." Ex. 4 at 4. Sami lost relatives and friends to the violence. Ex. 7 at 2. He was particularly devastated by the death of his cousin—a young woman who was killed in an apartment bombing—and its effect on her two children, who survived the war.

The war damaged Sami both mentally and physically. Ex. 4 at 4. When he saw little children dying, he feared the same would happen to his baby brother. *Id*. He also feared for his own life. *Id*. And then:

> I came to a point where I didn't feel fear. I didn't fear anything, not even death itself. Life didn't matter anymore. I would constantly tell myself that if it's going to happen, we're going to die. I came to accept that the end of my life was a breath away.

*Id*.; *see also* Ex. 2 at 6. This fear and stress led Sami's stomach illness to worsen. Ex. 7 at 2. During the war, he threw up bile and lost weight precipitously. *Id*. His stomach pains and fever were so debilitating that, at times, he could not even walk. *Id*.

### D. Post-War Lebanon and the Decision to Immigrate to the U.S.

After the war ended, crime—including drugs and prostitution—became a prominent part of daily life in Saida. Ex. 2 at 6; Ex. 4 at 4; Ex. 8 at 1. During this period, "against the family advice . . . [, because] [h]e was risking his own life," Sami felt compelled to help those who were struggling. Ex. 13 at 2; *see also* Exh 19. Sami volunteered through the charity organization with which he had worked since 2004. Ex. 18. The organization greatly appreciated his work, noting that Sami was "among the few volunteers who kept working . . . [and] who risked their lives . . . to help the displace[d] people to receive aid[] during those times." *Id.* The group today feels that "lives were saved because of people like Sami Samir Hassoun." *Id*.

Immediately after the war, Sami enrolled at the prestigious American University of Beirut ("AUB"). Ex. 4 at 5. He managed to complete 13 credits, Ex. 23, but was haunted by his traumatic past. His uncle recalls that he was in a "depressed state[,] . . . did not like to eat as much as he used to and . . . [was] not acting himself again." Ex. 13 at 2. Sami soon moved back to Saida with his parents, *id*., and completed his freshman year of college at Lebanese International University. Ex. 24.

After the war, Sami felt a "need for security" that led him to resort to lies and deception. Ex. 2 at 9.[11] In his expert report, Dr. James Garbarino explains: "The social chaos in Lebanon had a profound impact of Sami's view of the world." *Id*. Specifically, "[t]he development of this pattern of deception was an adaptation to the difficult and dangerous social situation he faced in Lebanon, and it continued when he left that country. Unfortunately, it became the gateway to his present situation." *Id*. When Sami's parents immigrated to the U.S. in 2008, he was "once again forced to leave behind friends and familiar social environments." *Id*. at 6. This next transition proved to be a catastrophic one for Sami. *Id*.

**E.  Sami's Efforts to Succeed in Chicago**

While in the U.S., Sami "lived out the idea of himself that he had developed in Lebanon to deal with his situation there." *Id*. He had naïve notions of getting rich fast and thought he could solve all of his family's problems. *Id*. This was obviously impossible for a twenty year old, and despite "look[ing] for a job all over Chicago . . . he was unsuccessful and they turned him down due to the economy." Ex. 13 at 2. As a result of

---

[11] Dr. James Garbarino, Ph.D., a developmental psychologist with an expertise in "the developmental impact of war and political violence on children and youth" in the U.S. and abroad, Ex. 2 at 9, evaluated Sami and concluded that the trauma Sami experienced in the Ivory Coast and Lebanon mitigates the seriousness of the instant offense, *id*. at 8–10; *see also* Ex. 25.

his desperate desire to fit in and feel secure, Sami lied and projected an exaggerated image of himself. Ex. 2 at 6.

Sami's thirst for safety and security also led him in more productive directions. He worked endless hours, first at a candy store and then at a bakery, in an effort to provide for his family. PSR at 18. The work was not easy; the "owners of these stores let him work[] too many hours for a few dollars and never appreciate[d] that he [was] doing his best." Ex.13 at 2. Sami also continued to act as a father figure for his little brother, taking him on trips to the park and on weekly outings for ice cream or a movie. Ex. 18 at 1; Ex. 26.

### F.  The Instant Offense and Sami's Acceptance of Responsibility

Given the severe trauma that Sami experienced throughout his adolescence, it is not surprising that he continued to struggle with inner demons. Ex. 2 at 13; Ex. 4 at 5. He began to numb his pain, drinking constantly and abusing drugs. PSR at 15–16, ln. 78–82; Ex. 4 at 5. Believing he was not a "worthy" and "effective human being," Sami moved forward on a "self-destructive" path. *Id* at 5–6. Dr. Garbarino explains:

> All in all, the kind of chronic, ongoing trauma experienced by Sami can be understood as a psychologically toxic influence that can distort an individual's view of the future and relation to legitimate social authority. . . . It is clear that the trauma and social toxicity of Sami's life since he was 11 years old has disrupted his development in ways relevant to the crime for which he is being sentenced.

*Id* at 13; *see also* PSR at 15, ln. 75–76 (summarizing Dr. Garbarino's conclusions).

In the spring of 2009, The FBI sent the confidential informant in this case "to meet and befriend" Sami. Complaint at 3, § 6 ("Compl."). In the ensuing year leading up to the instant offense, Sami's parents and loved ones noticed changes in his behavior. *See* Ex. 7 at 3, Ex. 8 at 1–2, Ex. 18 at 1–2. He became "moody and aggressive." Ex. 7 at 3. As

his "cultivation by the Government's [informant]" continued, Sami became increasingly distressed. Ex. 2 at 7. His parents recall that he was often "crying" and "nervous." Ex. 7 at 3, Ex. 8 at 2. His girlfriend, Duaa, remembers him calling her, "panting, stuttering on his words, asking me to stay on the phone with him until he fell asleep." Ex. 18 at 1. Everyone around him knew that something was terribly wrong, but Sami was unable to allow them to help. *See* Ex. 7 at 3, Ex. 8 at 2, Ex. 18 at 3. On September 19, 2010, Sami placed a backpack that he believed contained a detonated bomb into a garbage can in Wrigleyville. *See* Ex. 47.

In his letter to this Court, Sami describes his crime as "unconscionable," Ex. 4 at 6, and continues, "I am so ashamed of my actions and of this horrific crime that I've committed . . . . I know that nothing I can say will change my dreadful actions." Ex. 4 at 1. His mother, Siham explains: "my son Sami felt very bad about what he did and regret a lot. When I visit him, I always see this sign of remorse on his face[.]" Ex. 7 at 3. His father, Samir, reveals: "I know that my son Sami has learned a lot from what happened to him in this hard way. When I visit my son he always asks for forgiveness and regrets a lot and feels bad." Ex. 8 at 2. Sami's girlfriend, Duaa, says: "I truly see his guilt[;] . . . forgiveness is all he seeks" Ex. 18 at 2. Sami has accepted full responsibility for the offense, pleading guilty and admitting his conduct to this Court. He "sincerely apologize[s]" for this extremely serious offense. Ex. 4 at 6.

### G. Sami's Growth Since the Offense

Those close to Sami believe that his time in jail has "cleaned his soul from the nightmare he had growing up." Ex. 7 at 2. He was a "lost soul," and his arrest constituted a momentous "wake-up call for him." Ex. 18 at 2. Sami spent the first four months of his

time at the MCC in solitary confinement; he describes this as a time to "examine myself and seek guidance." Ex. 4 at 6. Since that time, Sami has "matured significantly." Ex. 18 at 2; *see also* Ex. 7 at 3, Ex. 8 at 2. Sami has also taken many proactive steps towards self-improvement while incarcerated. Ex. 18 at 3; Ex. 4 at 6. He enrolled in cognitive skills courses and yoga sessions to clear his head and gain a sense of self, and participated in anger management courses to learn to deal effectively with the pain of his past. Ex. 27 at 1–3. In addition, he enrolled in a drug treatment course to learn how to avoid falling into his past habits for dealing with pain. *Id.* at 4. Sami has also focused on his future education. With the help of his parents, he has been accepted to the University of Ohio's College Program for the Incarcerated. Ex. 28. After his release, Sami will be deported to Lebanon, where he will have a tremendous family support network. Ex. 4 at 6. His girlfriend, Duaa, has stuck by him during the nearly three years since his arrest and is committed to him. Ex. 18 at 3. Sami tells this Court: "I am capable of being a different person than the person who committee this appalling crime." Ex. 4 at 7.

### III.  A Sentence of 20 Years Reflects the Seriousness and Circumstances of the Offense Under §§ 3553(a)(2)(A) and (a)(1) Because the Instant Offense was Heavily Dependent on the Actions of the Informant and the FBI.

#### A.  The government's involvement in an offense mitigates a defendant's culpability under the § 3553(a) factors.

The Supreme Court has emphasized that sentencing judges should consider the "circumstances of the . . . offense, including the extent of [the defendant's] participation in the conduct and the way . . . peer pressures may have affected him." *Miller v. Alabama*, 567 U.S. __, 132 S. Ct. 2455, 2468 (2012). Recent Seventh Circuit decisions confirm the appropriateness of reducing a defendant's sentence in light of government involvement in the offense. Judge Posner has criticized a judge for imposing a 27-year

sentence because the government's sting operation to some degree induced the conduct: "I should think a sentence of 5 years more than adequate." *United States v. Kindle*, 698 F.3d 401, 416 (7th Cir. 2012) (Posner, J., concurring & dissenting) (stating that the fact that the sting enabled the prosecution of the defendant is necessarily "related" to the sentencing decision), *vacated*, *reh'g en banc granted*, *United States v. Mayfield*, 2013 U.S. App. LEXIS 1456 (7th Cir. Jan. 16, 2013).[12] Likewise, in *United States v. McKenzie*, 656 F.3d 688 (7th Cir. 2011), another stash house case, the Seventh Circuit affirmed the judge's decision to "address[] the discomforting factor of the government's role in determining the severity of the Guidelines level to be applied by mitigating the defendants' sentences." *Id*. at 692; *see also id.* at 690–91 ("We echo the district judge's concern that 'the weight of the guideline sentence is significantly based upon law enforcement's creation of [the twenty kilogram amount] being in [the] stash house.'").

District judges have applied this same principle in the context of terrorism-related prosecutions, in which the government employs undercover agents who enable and influence the defendant's conduct. In *United States v. Wright*, Judge David Dowd imposed a sentence that was 15.5 to 22 years below the guidelines range—11.5 years' imprisonment instead of 27 to 33.5 years—based on the informant's role. *See* Memorandum Opinion at 11, 12-CR-238-DDD (N.D. Ohio Nov. 21, 2012), ECF No. 205. In that case, the defendant pled guilty to attempting to bomb a bridge in Ohio using an inert explosive provided by government informants. *See id.* at 6–8. In analyzing the § 3553(a)(2) factors and granting a downward variance, Judge Dowd wrote: "[T]he conduct of the [paid government informant,] while not rising to the level of entrapment,

---

[12] The fact that *Kindle* is pending rehearing *en banc* indicates deep disagreement among the judges and means that that Judge Posner's position may ultimately become the law of this circuit.

necessarily facilitate[d] in considerable measure the conduct of the defendant[.]" *Id.*

Similarly, in *United States v. Cromitie*, which one press account has called "[p]erhaps the

most extreme case of the FBI setting up potential terrorists,"[13] Judge Colleen McMahon

criticized the FBI's decision to have an informant supply the defendant with an inert

missile, which triggered a mandatory minimum sentence of 25 years' imprisonment.

2011 U.S. Dist. LEXIS 71821, *5, 9–10 (S.D.N.Y. June 29, 2011). She observed:

> [T]he defendants were not engaged in any terrorist activity before they
> encountered the CI. In fact, they were not engaged in any sort of criminal activity
> at all. . . . Agent Fuller did not stumble upon an existing conspiracy and render it
> effectively inoperative by taking it over. Rather, he (through the ears of his
> confidential informant) heard chilling expressions of hatred uttered by a bigoted
> human being, and transformed that man's fantasies—fantasies the defendant,
> James Cromitie, had no way of bringing into being—into very real criminal
> activity, whose every movement was directed and dictated by the Government.
> There is no way that these four defendants would have dreamed up the idea of
> shooting a Stinger missile at an airplane or at anything else; there is certainly no
> way they could have acquired a Stinger missile, operative or inert, unless the
> Government provided them with one.

*Id.* at *9–10.

### B. The government's involvement with Sami likewise mitigates the seriousness of the instant offense under §§ 3553(a)(2)(A) and (a)(1).

The facts surrounding the informant's and the agents' interactions with Sami

show that the government's role was especially extensive and significant in this

prosecution, thus mitigating Sami's culpability.

First, Sami is a remarkably unlikely candidate to have become involved in this

type of crime, absent government intervention. When he was targeted, he had never so

much as been arrested before, and, as the government pointed out in its own statements to

---

[13] Paul Szoldra, *The FBI Goes to Disturbing Lengths to Set Up Potential Terrorists*, Business Insider (Mar. 11, 2013), *available at* http://www.businessinsider.com/the-fbi-hatched-some-crazy-terror-plots-2013-3.

the press, he was not motivated by religious extremism.[14] Indeed, as a 21-year-old working at a bakery with no criminal ties, he seems an unfair and bizarre target for the FBI to have recruited into such a serious crime. *See* PSR at 5 n.1 ("[B]oth the [USAO] and the FBI have declined to comment to the undersigned officer on the FBI's reason for asking the CS to befriend defendant."); *McKenzie*, 656 F.3d at 692 ("The crime proposed was . . . a 'massive' one; it is somewhat baffling, then, that the young men who the authorities recruited did not have 'massive' criminal histories to match.").

Sami never suggested to the informant that he held extremist religious views or was a member of a terrorist organization, but instead exposed himself as a naïve and vulnerable young man. The record makes clear that the informant and the FBI exploited these vulnerabilities. Sami had dreams of "getting rich fast" and had high hopes for success when he moved to the United States after experiencing upheaval in Lebanon. *See* Ex. 4 at 3–5. The government apparently recognized this weakness and used it to escalate Sami's conduct by paying him at various points, including paying him $1,000 on August 16, 2010, after he did not object to using a real bomb, instead of a fake bomb. *See also* Ex. 29 ("SAMI will go after whatever drug will make him money or whatever [the informant] tells SAMI he can make money with."); PSR at 6, ln. 9 (noting that the FBI paid Sami $500 the night he was arrested). Sami also revealed his desperate need to fit in and impress others. On many occasions, Sami fabricated stories of criminal feats—which the government later learned were in fact false—to impress the informant.[15]

---

[14] Press Release, Federal Bureau of Investigation, *Chicago Man Arrested in Attempted Bomb Plot* (Sept. 20, 2010), *available at,* http://www.fbi.gov/chicago/press-releases/2010/cg092010.htm.
[15] The numerous stories include Sami's claim to the informant that "he could make a gun out of two pieces of wood, a spring, and a bullet," Ex. 30, and that in two weeks' time he dealt over ten kilograms of cocaine at $25,000 per kilo. *See* Ex. 31. Presumably the FBI recognized these

In contrast, the informant was more sophisticated than Sami—he was much older and had served as a paid informant in a previous federal investigation. Compl. at 3, ¶ 6. Moreover, the informant was paid by the government to engage Sami over the course of a year, *see id.*, and requested immigration benefits in exchange, *see* Ex. 33. It is entirely possible that the government paid him hundreds of thousands of dollars and gave him a more favorable immigration status as a result of his involvement in this case. *See, e.g.*, Complaint, *United States v. Kabir*, *et al*, No. 12-MJ-00431-DUTY (C.D. Ca. 2012), ECF No. 1, P. 6 (explaining that the informant in that terrorism investigation received "over $250,000 in payments from the government as well as immigration benefits"). The informant was also arrested for committing a crime while working on Sami's case, making it very possible that he was compensated with non-prosecution promises. *See* Ex. 29 ("CHS was admonished on 1/27/2010 for participating in Unauthorized Illegal Activity."; reporting in March 2010 that informant was arrested "in late January").

Second, the informant aggressively encouraged Sami's participation in the plot and was instrumental in planning it. Tellingly, it took the informant more than a year to cultivate Sami to the point where a plot to cause serious harm developed. Beginning in the spring of 2009, the informant was paid to meet with Sami multiple times a week and to get Sami to engage in crime—often low-level street crime. *See* Compl. at 3, ¶ 6. In June 2009, Sami told the informant that he wanted to make money, but he seemed fearful of conducting illegal activity. In August 2009, Sami sold the informant some pills that he purported were Viagra, but turned out to be fake. Over the course of more than a year, the

---

fantasies for what they were. Similarly, Sami claimed to have a connection to a counterfeiter in Kansas, and to have created $200,000 in counterfeit bills. The purportedly "counterfeit" bills were all deemed genuine by the U.S. Secret Service. *See* Ex. 32.

informant continually encouraged Sami to discuss violent and other unlawful activity during phone calls and meetings. In March 2010, the informant told the government that he would teach Sami how to deal heroin. Ex. 29 ("SAMI has not dealt heroin yet, but CHS said he/she would show SAMI how if need be."). The informant was so aggressive that FBI agents had to reprimand him "not to *encourage* SAMI to get involved in illegal activity." *Id.* (emphasis added). The informant had to be admonished by agents on at least one occasion for committing, or coming close to committing, entrapment with Sami. *See id.* ("[Agents] discussed CHS's reporting on 3/10/2010 and that CHS is or is close to committing entrapment with Sami.").

Various interactions illustrate the informant's aggressive escalation of Sami's intentions and conduct, despite the FBI's warnings regarding entrapment. On May 13, 2010, for example, while Sami and the informant were discussing the Times Square bombing attempt in New York, Sami made the ludicrous claim that he could build a bomb using baking soda. *See* Ex. 30. Rather than recognizing the claim as another empty attempt to impress him, the informant seized a golden opportunity to increase his value to the FBI. After all, at that point he had been pursuing Sami for over a year, and this was the first time the topic of a bomb had ever come up. Following this conversation, the informant repeatedly represented to Sami that he had "connections" to people and groups who were capable of committing acts of terror in the United States and who would pay Sami to help. *See* Compl. at 3–4, ¶ 9. The informant engaged in this manipulation of "his . . . own volition." *Id.* at 4, n.1. He told Sami that he had "friends" who would be interested in some of the ideas they were discussing and would be willing to pay them to engage in such activity. *Id.* at 3–4. Those purported friends were undercover FBI agents.

Third, the informant did everything in his power to ensure that Sami would have a detailed criminal plan in place by the time he met with the FBI agents. *See id.* at ¶ 11–24. In the time leading up to that meeting—the crucial turning point in the case—the informant did his best to solidify his relationship with Sami. *See, e.g.*, Ex. 34 (documenting that the informant called Sami three different times on two separate occasions—June 7, 2010 and June 9, 2010—in attempting to arrange a meeting with him). He also asked Sami "about the type of targets he was considering for a strike," encouraging him to come up with specific suggestions for criminal activity. Compl. at 4, ¶ 10. The informant said that before he set up a meeting between his "friends" and Sami, the informant "would need to know the details of Hassoun's proposals," again encouraging Sami to formulate a detailed criminal plan. *Id.* at 5, ¶ 12. During their June 7, 2010, conversation, the informant even "indicated that he needed Hassoun's list of bomb-making materials," *id.* at 7, ¶ 17, twice "urg[ing] Sami to put his details in writing," Ex. 35. Of course, "Sami was not able to produce the list right away." Ex. 36. When Sami stalled by saying the list was on his laptop, "CHS insisted that SAMI get his list off of his computer so CHS could get it to his/her people . . . ." *Id.*

The informant coaxed Sami through the first meeting with the agents. According to the FBI's summary of this July 8, 2010, meeting, the informant initiated things, "ask[ing] Sami to tell [the undercover agent] about the revolution." Ex. 37. Sami responded by telling a mostly fabricated version of his life story. *Id.* He then said that "the police force . . . has been undermined by [Mayor Daley] reducing it by 40%," and followed up with the fanciful assertion that they should "take advantage of [the undermined police force] to replace the Mayor." *Id.* Sami said that if they planted some

19

fake bombs, "people will blame the security and the police officers" and then "will start blaming Daley." *Id.* The government's own summary of this conversation illustrates the obscure and unfocused nature of Sami's motive (if it can even be dignified with that label): "Hassoun . . . expressed a desire to perpetrate . . . acts that would reflect poorly on Chicago and would embarrass the city's mayor." Compl. at 4, ¶ 9. At the end of the meeting, to solidify Sami's resolve, the informant told Sami "that the people in California are very interested in his genius ideas and he will make millions of dollars." Ex. 37 (378).

Fourth, the FBI agents also did what they could to get Sami to move the plot forward. For example, it was the agents—not Sami—who made the crucial suggestion that real explosives be used instead of a fake bomb. Initially, Sami suggested that the plot involve a fake bomb to merely cause a disruption, and he assumed that no one would be injured. *See* Ex. 38 (reporting on June 14, 2010, that Sami explained that "[h]e wouldn't blow up anything, he would just cause a disruption" and "would intentionally leave one wire disconnected so the bomb would not go off"); *see also* Ex. 39. As late as July 8, 2010, Sami emphasized "that he is not planning to kill anybody, but just to plant two or three fake car bombs that will ignite but not explode, or do any damage," and a few weeks later to "park a car bomb . . . in an area that will cause minimum damage." Ex. 37 at 377. But, at the August 16, 2010, meeting, the agent stated to Sami:

> I talked to my brothers over there and we were talking and I just [UI], okay, it is going to be a lot easier to get, probably, explosives than what we were talking, what would you prefer . . .?

Ex. 40. Although Sami did not extricate himself from the plan, it was the FBI who raised the stakes by making the final determination that the bomb would be real.

The agents also pressured Sami to follow through with the plot by questioning his "dedication" and his "tenacity" to finish what he had started:

> UCE2: "… the question is do you have it."
> H: "Do I have it?"
> UCE2: "Yes."
> H: "I can have it, huh."
> UCE2: "No, you have it or you don't. You have dedication or you don't."
> H: "I have dedication."
> UCE1: "[UI]."
> UCE2: "You know. You have the tenacity to finish what you start or you don't."
> H: "Yes, I do."
> UCE1: "Yeah."

Ex. 41 at 102. The agents suggested that Sami could make big money, but emphasized that they would not pay him unless he proved himself. *Id.* at 111–12 ("I'm not going to come here and say, 'Hey, there's $10,000,' you know. We can start you slow. . . . uh, but you'd remember, you know our, my side here, too, you know. We got to make sure that you are who you are. Do you see what I mean.").

Sami's conversations with the informant and the agents demonstrate that he did not have the knowledge or ability to commit a terrorist act on his own and that he considered them to be the supervisors of the plot. In June 2010, the informant asked Sami "what he planned on doing." Ex. 30 at 2:33. According to the informant's summary of that unrecorded conversation, Sami listed Hollywood-style actions like "poison[ing] the water supply, flood[ing] the city, and . . . try[ing] to shut down the electrical grid." *Id.* But when the informant "inquired if SAMI had any of the materials to conduct any of the proposed plans," "SAMI said no." *Id.* Sami repeatedly told the agents that he had no way of executing any of his fantasies. *See, e.g.*, Ex. 41 at 102 (H: "But I have no connections in getting materials, in getting a virus."; UCE2: "What, what do you bring to table?"; H:

"I bring you my work, you know. I bring you my ideas."). In addition, Sami told the

agents that he was working for them, not the other way around:

> UCE2 "Now, how do we get somebody of ours in power?"
> H: "How?"
> UCE2: "Yeah."
> H: "That, *I have no clue*, you know, me, my thing is I can do my things on the
> streets …
> UCE2: "Um-hum."
> H: "… do what I'm asked to do. . . You know, *you tell me what to do*, I te-, I tell
> you my ideas, *you tell me what to do*, you know."

Ex. 41 at 81 (emphasis added).

Like the informant, the agents "told [Sami] that they wanted him to think of a

concrete plan that they could understand and of which he was capable of performing."

Compl. at 16, ¶ 39. At the end of the August 16, 2010, meeting, the agents "gave

Hassoun a few more tasks to accomplish before they next met," instructing him to

"purchase a backpack, short wave radios, and conduct additional surveillance of the

target areas, deciding the precise manner in which he would execute the attack." *Id*. at 20,

¶ 49. The next time they met, Sami dutifully did the agents' bidding, providing them with

an Eagle Creek backpack, two walkie talkies, and some batteries. *See* Ex. 42. The

government proceeded to send those unsophisticated raw materials to the Quantico FBI

laboratory along with a requisition "request[ing] the Explosives Unit to construct an inert

device using the back pack and batteries" by adding "six (6) inert blocks of C4, ball

bearings, an inert blasting cap, and a digital timer." Ex. 43. Sami was so inexperienced

that the government had to design a fake bomb to advance the plot to a conclusion that

would enable them to arrest him. At the end, the FBI did not even put Sami in charge of

"detonating" the fake bomb. Instead, they set the pretend timer and "activated the purported bomb's arming mechanism" for him. Gov't Version 7.

In conclusion, as in the "disreputable" stash house sting cases, the FBI held all the strings in this plot. *Kindle*, 698 F.3d at 414 (Posner, J., concurring & dissenting). The use of the informant and undercover agents in this case is representative of the government's questionable post-9/11 counterterrorism strategy, in which "the FBI recruits potential terrorists and provides them with plans, equipment, and weapons—before finally shutting them down and getting credit for thwarting another attack."[16] Informants and sting operations have been present in the vast majority of terrorism-related prosecutions in recent years. Since 9/11, 48% of defendants charged with terrorism-related offenses were targeted by an informant; 31% were arrested during a sting; and 10% joined a sting after being convinced by an informant leading the plot. *See* Aaronson, *supra* n.16, at 36. Tellingly, of the 22 most "frightening" plans for attacks in the United States in the last decade, 14 were developed in sting operations like this one. *See* Shipler, *supra* n.16, at 3.

In the instant case, the involvement of the FBI and the informant bears heavily on §§ 3553(a)(2)(A) and (a)(1) and weighs in favor of a 20-year sentence. Given the facts, it seems extraordinarily improbable that Sami, a 21-year-old with no technical skill in the science of bomb-building, could have or would have engaged in a terrorist attack in Wrigleyville without the government's efforts and the informant's participation.

---

[16] Szoldra, *supra* n.13; *see also* David K. Shipler, Op-Ed., *Terrorist Plots, Hatched by the F.B.I.*, N.Y. Times, Apr. 28, 2012, at 1, *available at,* http://www.nytimes.com/2012/04/29/opinion/sunday/terrorist-plots-helped-along-by-the-fbi.html?pagewanted=all&_r=1&; Trevor Aaronson, *The Informants*, Mother Jones, Sept./Oct. 2011, at 32, *available at,* http://www.motherjones.com/politics/2011/08/fbi-terrorist-informants.

IV.    **Because Sami Was Not Motivated by Ideological Extremism, 20 Years'
       Imprisonment is Sufficient to Protect the Public Under § 3553(a)(2)(C).**

It is undisputed that Sami was not motivated by religious extremism or any other
firmly-held conviction. *See* Compl. at 15 n.22 ("Hassoun was clear that he was not
motivated to attack Chicago based on any religious ideology."). Rather, Sami was driven
by an adolescent's desire to fit it and impress people. His immature and atypical motives
make him much less likely to re-offend than those who commit similar crimes based on
deeply-held beliefs.

Sami's primary motivation was to impress the informant and the FBI agents and
convince them that he was one of them, a consequence of "his exposure to chronic
untreated trauma as an adolescent." Ex. 2 at 13. As Dr. Garbarino concludes: "It appears
[Sami] bec[a]me a kind of psychological and social 'chameleon,' in the sense that he
learned to become whatever his current situation demanded in order to fit in. . . . [H]is
response to the cultivation offered by the Government's CI can be seen in this light. . . .
Sami wanted to impress him at any cost." *Id*. at 7; *see also id.* 13 (explaining that Sami's
behavior is largely explained by "trauma-related adjustment problems and the effects of
repeatedly being socially and economically uprooted as a child and young adolescent").
The discovery confirms the expert's conclusion. At Sami's first meeting with the agents,
Sami said he "considered [the informant] to be like a father and he seeks his advice
always." Ex. 37 at 377. Sami explained, "So I kind of impressed him somehow and he
liked me, you know?," and the informant assured Sami that this was true, "[F]or sure if
you did not impress me man, you wouldn't be here." *Id.* In his effort to impress the
informant, Sami told a series of fantastical lies. *See supra* n.15. For instance, he bragged
that he had talked to a professor about mixing certain types of liquids and explosives

together, claiming the mix would be 10 times more powerful than the Oklahoma City bombing. *See* Ex. 36. The FBI later learned that this conversation had never occurred. *Id.*

It is well established that a defendant's motive is highly relevant in selecting an appropriate sentence. *See, e.g.*, *Wisconsin v. Mitchell,* 508 U.S. 476, 485 (1993) ("[D]efendant's motive for committing the offense is one important factor" at sentencing); *United States v. Thurman*, 179 F. App'x 971, 972 (7th Cir. 2006) ("[T]he district court's assessment of Thurman's motive [for selling drugs] may be considered under § 3553(a)."). Motives are equally relevant in terrorism cases. *See United States v. Chandia*, 395 F. App'x 53, 60 (4th Cir. 2010) (ruling that a district court shall "explain how the facts it did find related to Chandia's motive" to commit a terrorism offense).

A defendant who is motivated by jihadism is far less amenable to deterrence than a defendant who is not.[17] In contrast, defendants in terrorism cases who are not motivated by religious extremism or jihadist views are less likely to re-offend and thus require less incapacitation under §3553(a)(2)(C). *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 98 (2d Cir. 2009) (affirming 20-month sentence, deeply below 78–97 month range, because defendant Yousry's motive was to make money as a translator). In *United States v. Issa*, 09-CR-1244 (BSJ), for example, District Judge Barbara Jones recognized that secularly motivated defendants are less likely to commit further offenses than individuals motivated by religious extremism: "It seems clear to me that this defendant was not ideologically motivated. And this, to me, makes a difference and is relevant to whether or not he is looking to commit further crimes and be a danger." Ex. 44 at 51.

---

[17] *See* Bruce Hoffman, *Inside Terrorism* 127–128 (2005) ("Traditional counterterrorism approaches and policies may not be relevant, much less effective, in the face of religious terrorism . . . given both the religious terrorists' fundamentally alienated worldviews and their often extreme, resolutely uncompromising demands.").

In sum, unlike religiously motivated actors, Sami does not hold deep-seated beliefs that might render traditional deterrence methods ineffective. Rather, he committed this offense in large part because of his own insecurity and need to impress and feel accepted by those around him. Accordingly, any sentence above 20 years is "greater than necessary" to protect the public from future crimes under § 3553(a)(2)(C).

## V. A Sentence of 20 Years' Imprisonment Avoids Unwarranted Sentencing Disparities under § 3553(a)(6).

Section 3553(a)(6) requires sentencing courts to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) promotes nationwide sentencing uniformity. *See* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises on Which They Rest*, 17 Hofstra L. Rev. 1, 4–5 (1988). It is therefore essential to examine sentencing decisions from other federal districts when determining Sami's sentence.

A review of relevant sentences over the past several years reveals that federal courts tend to impose sentences ranging between 11 and 20 years' imprisonment when defendants engage in bombing schemes and other violent plots that do not ultimately cause harm, including offenses involving weapons of mass destruction. *See, e.g.*, Judgment, *United States v. Wright*, No. 12-CR-238-DDD (N.D. Ohio Nov. 21, 2012), ECF No. 208 (sentencing Douglas Wright to **11.5 years' imprisonment** after he pled guilty to conspiring and attempting to use weapons of mass destruction to bomb Brecksville-Northfield High Level Bridge); Judgment, *United States v. Batiste*, No. 06-CR-20373-JAL (S.D. Fla. Nov. 24, 2009), ECF No. 1471 (sentencing defendant to **13.5 years' imprisonment** after jury found him guilty of conspiring to bomb Sears Tower and FBI Building and conspiring to provide material support to al-Qaeda); Judgment, *United*

26

*States v. Rana*, 09-CR-830-8 (N.D. Ill. Jan. 17, 2013), ECF. No. 361 (sentencing Rana to **14 years' imprisonment** after jury found him guilty of conspiring to provide material support to terrorism in Denmark and providing material support to terrorist organization *Lashkar*); Third Amended Judgment, *United States v. Mandhai*, 02-CR-60096-WPD (S.D. Fla. Aug. 30, 2005), ECF No. 162 (sentencing defendant to **14 years' imprisonment** after he pled guilty to conspiring to bomb electrical transformer sites in Florida); Judgment, *United States v. Nur*, 07-CR-543-DLI (E.D.N.Y. Jan. 25, 2011), ECF No. 497 (sentencing defendant to **15 years' imprisonment** after he pled guilty to conspiring to bomb JFK Airport); Judgment, *United States v. Padilla*, 04-CR-60001-MGC (S.D. Fla. Jan. 22, 2008), ECF No. 1333 (sentencing defendant to **15 years' imprisonment** after jury found him guilty of conspiring to murder, kidnap, and maim persons in a foreign country and providing material support to terrorists); Judgment and Commitment, *United States v. James*, 05-CR-214-CJC (C.D. Cal. Mar 9, 2009), ECF No. 368 (sentencing defendant to **16 years' imprisonment** after he pled guilty to conspiring to levy war against U.S.); Judgment, *United States v. Ferdaus,* 11-CR-10331-RGS (D. Mass. Nov. 1, 2012), ECF No. 65 (sentencing defendant to **17 years' imprisonment** after he pled guilty to attempting to use weapons of mass destruction to bomb U.S. Pentagon and U.S. Capitol Building and attempting to provide material support to terrorists); Judgment, *United States v. Paul*, 07-CR-87-GLF (S.D. Ohio Feb. 26, 2009), ECF No. 81 (sentencing defendant to **20 years' imprisonment** after he pled guilty to conspiracy to use weapons of mass destruction against U.S. nationals and property).

27

### A. Sentencing Sami to more than 20 years will lead to unwarranted disparities, because he is not a jihadist and has no ties to terrorists.

Defendants Narseal Batiste, Rezwan Ferdaus, Kevin James, and Imran Mandhai are similarly situated to Sami in that they all engaged in bombing plots or schemes to cause large-scale harm. Unlike those defendants, Sami's conduct was not motivated by terrorist ideology, and he had none of the ties to a terrorist group that substantially increase recidivism risk. These salient differences mean that Sami has a lower risk of recidivism than Batiste, Ferdaus, James, and Mandhai. Sentencing Sami to a significantly higher term of imprisonment than Batiste, Ferdaus, James, and Mandhai will thus create unwarranted sentencing disparities under § 3553(a)(6).

Defendant Batiste, who was sentenced to 13.5 years' imprisonment for conspiring to bomb the Sears Tower and an FBI building, was also convicted of conspiring to provide material support to al-Qaeda. Specifically, Batiste was the leader of a radical Islamist group that sought to "wage violent war, or 'jihad,' from within the United States in order to overthrow the government and replace it with an Islamic government." *United States v. Batiste*, No. 06-CR-20373, 2007 U.S Dist. LEXIS 61186, at *6–7 (S.D. Fla. Aug. 21, 2007). He also actively sought to gain monetary support from extremist Islamic organizations and governments, and believed that one of the cooperating witnesses involved in the FBI's investigation was an actual member of al-Qaeda. *Id.* at *7–8.

Like Batiste, Defendant Ferdaus (who received a 17-year sentence for attempting to provide material support to terrorists and attempting to bomb the Pentagon and the U.S. Capitol Building) believed that the FBI's cooperating witnesses were members of al-Qaeda, and he housed a commitment to the killing of non-Muslims in the name of jihad. *See United States v. Ferdaus*, No. 11-CR-10331, 2011 U.S. Dist. LEXIS 139853, at *6

28

(D. Mass. Nov. 28, 2011) (writing that Ferdaus stated to cooperating witness, "[T]his is what we have to do. This is the righteous way . . . [to] terrorize enemies of Allah."); *id.* at 14–15 ("I just can't stop; there is no other choice for me [but Jihad]."). Similarly, defendant James, who was sentenced to 16 years after pleading guilty to conspiring to levy war against the United States government, founded a terrorist organization based on Islamic extremism. *See* Plea Agreement at 13, *United States v. James,* 05-CR-214-CJC (C.D. Cal. Dec. 14, 2007), ECF No. 259. James sought to organize the bombings of U.S. military facilities and Jewish synagogues in retaliation for the policies of the U.S. and Israel. He held a deep commitment to the jihadist mission and actively recruited members to carry out his plots while in prison. *See id.* Defendant Mandhai, who received a 14-year sentence after pleading guilty to planning to bomb electrical transformer sites, was likewise motivated by jihad and believed that the FBI's cooperator was a terrorist with ties to Bin Laden. *See United States v. Mandhai*, 375 F.3d 1243, 1246 (11th Cir. 2004).

> **B. Sentencing Sami to more than 20 years will also create unwarranted disparities given the notable differences between his plot and those of defendants who have been sentenced to 20 years or less.**

Sami's plot did not begin developing until well after he met the informant, and it was smaller and less complex than the schemes plotted by the above defendants.

First, Sami's offense involved a single bomb. Other defendants who have been sentenced to less than 20 years' imprisonment planned to perpetrate attacks of a much greater magnitude. Defendant Batiste (sentenced to 13.5 years) sought to bomb the Sears Tower and FBI offices in five different cities. *See Batiste*, 2007 U.S. Dis. LEXIS 61186, at *4. Defendant Ferdaus (sentenced to 17 years) plotted to fly three remote-controlled airplanes filled with 16 grenades each into the Capitol Building and the Pentagon. *See*

*Ferdaus*, 2011 U.S. Dist. LEXIS 139853, at *11. Ferdaus also planned to station six people armed with automatic rifles outside of those buildings to shoot people as they fled. *See id.* at *12. Defendant Abel Nur (sentenced to 15 years) conspired to explode fuel tanks and pipelines at JFK International Airport in an effort to destroy the entire airport. *See* Indictment, *United States v. Nur*, 07-CR-543 (E.D.N.Y. June 28, 2007), ECF No. 10. Defendant Imran Mandhai plotted to bomb multiple electrical substations in Florida. *See Mandhai*, 375 F.3d at 1245.

Second, Sami's plot was unsophisticated, as were his actions in furtherance of the plot. When the FBI agents asked him to show them potential targets, he complied, driving them around to different neighborhoods. When the FBI agents gave him a camcorder and asked him "to videotape reconnaissance missions of potential targets," Compl. 15, ¶ 36, he complied and made them a video of Wrigleyville bars. When the FBI agents asked Sami to buy a backpack and short wave radios, he complied, but it was clear he had no idea how to build a bomb. The government had to send the materials they themselves had requested off to Quantico to be made into a fake bomb.

In contrast, Defendant Ferdaus (sentenced to 17 years) extensively researched remote controlled airplanes, purchased various materials to build explosives, and personally manufactured twelve cell phone detonation devices. *See Ferdaus*, 2011 U.S. Dist. LEXIS 139853, at *7, 16. Beyond that, he flew from Boston to Washington, D.C. to scout launching locations for his remote controlled drone airplanes. *See id.* at *11. He also provided FBI informants, whom he believed were terrorists, with two different thumb drives containing the details of his planned attacks, including the flight paths of the remote controlled airplanes, GPS information, and photographs of the targets. *See id.*

In addition, he created and disseminated a training video on making cell phone detonators for the other people involved in his scheme. *See id.* at *15. His actions spanned a period of more than nine months. *See id.* at *4, 15. Similarly, Defendant James led multiple individuals and engaged in extensive planning from inside prison in furtherance of his plots to attack the U.S. government and Jewish people and institutions. He recruited various individuals to join his conspiracy; he wrote and disseminated a document to his co-conspirators entitled "Blueprint 2005," which laid out steps to perpetrate attacks; and he directed others to recruit individuals and procure weapons. *See* Plea Agreement at 13–14, 16, *United States v. James*, 05-CR-214 (C.D. Cal. Dec. 14, 2007), ECF No. 259. James plotted attacks from 1997 until his arrest in 2005. *See id.* at 13. Likewise, Defendant Wright was a leader of a criminal anarchist group and planned to recruit others to participate in violent plots. *See* Affidavit ¶¶ 13, 16, *United States v. Wright*, 12-CR-238 (N.D. Ohio Apr. 30, 2012), ECF No. 1-1. He planned to make his own explosives using an "Anarchists Cookbook" and participated in negotiating the purchase price of several bricks of C-4 explosives. *Id.* at ¶¶ 29, 42.

Third, unlike most defendants charged with similar crimes, Sami had not hatched any kind of plot before the FBI told the informant to befriend him. In contrast, defendants Ferdaus and Batiste were mobilizing troops and fundraising for explosives when the FBI first intervened. The very first time that Defendant Ferdaus met an informant, Ferdaus inquired about procuring real explosives. *See Ferdaus*, 2011 U.S. Dist. LEXIS 139853, at *4. Just a few weeks later, during a second meeting, he told an informant that he was in the process of planning the Pentagon attack, had all of the knowledge and skills to commit the offense, had recruited another to help, but just needed to raise funds to buy

the explosives. *Id.* at *4–5. Defendant Batiste's plan to "form and train an army of soldiers to fight jihad" was also well underway when the FBI became involved. *See Batiste*, 2007 U.S Dist. LEXIS 61186, at *6–11. Batiste made initial contact with the informant when he tried to recruit the informant by asking him to locate foreign Islamic extremists who might fund his mission because the informant was taking a trip to Yemen. *See id.* at *7. At that time, Batiste had already begun using an abandoned store in Miami as a meeting place for the people who were involved in the plot to commit acts of terror. *See id.* And, only two months after Batiste met the FBI informant, he advised him of his plans for bombing the Sears Tower, and explained why certain types of explosives would be more effective than others based on his experience in construction. *See id.* at *9–10.

## VI.   A Sentence of 20 Years Is Sufficient But Not Greater Than Necessary to Protect the Public Because Sami Poses a Low Risk of Recidivism.

It is not necessary to incarcerate Sami for more than 20 years under § 3553(a)(2)(C), because several factors indicate that his likelihood of recidivism is extremely low: (1) the expert concludes that Sami can recover from the trauma that contributed to the instant offense; (2) Sami is a first offender, and is therefore empirically less likely to commit another offense than a repeat offender; (3) Sami will be in his forties upon his release; (4) Sami has laid the groundwork to obtain a college degree while incarcerated; and (5) Sami will be deported after serving his sentence.

### A.   The expert concludes that Sami's risk of recidivism is low because he will be able to recover from the developmental trauma he suffered.

Dr. Garbarino explicitly considers the question of Sami's risk of recidivism, Ex. 2 at 8, and concludes: "It does not appear . . . that Sami has suffered profound and irremediable developmental damage," and Sami does not have any "underlying

32

psychological disabilities." *Id.* at 13. Sami "never received any treatment for the trauma

he experienced" as a child and adolescent. *Id.* Fortunately, "Sami is well positioned

developmentally and socially to recover from this current situation. . . . With the process

of maturation and reflection that could be open to him while serving a sentence, I believe

that Sami can rehabilitate his thinking in a way that will mitigate the risk of future

antisocial behavior, and can eventually become a productive member of society." *Id.* at

14. In addition, "[w]e can expect the results of psychotherapy to help [Sami] resolve

emotional and conduct issues that led to . . . his criminal act." *Id.* Accordingly, mental

health treatment in prison will further reduce recidivism risk.

### B. Sami's status as a first offender reduces the likelihood that he will engage in another offense after serving his sentence.

As a first offender, Sami is less likely to recidivate than those who have

committed crimes in the past. The Seventh Circuit has held that there is less of a need to

provide specific deterrence under § 3553(a)(2)(C) for a first offender than for a defendant

with a criminal record. *See United States v. Miranda*, 505 F.3d 785, 794–95 (7th Cir.

2007) (finding that "a defendant with a record of prior criminal behavior is more culpable

than a first-time offender and thus deserving of greater punishment"); *United States. v.

Baker*, 445 F.3d 987, 990–92 (7th Cir. 2006) ("[A] term of imprisonment would probably

mean more [to a first-offender defendant] and have a greater impact than on someone

who had previous experience being incarcerated.").  Sami's status as a true first

offender—meaning that he had never even been *arrested* before the instant offense—

further lowers the likelihood that he will recidivate.[18] The U.S. Sentencing Commission's

---

[18] Sami's offense of conviction places him in Criminal History Category IV. See U.S.S.G. § 3A1.4(b). The Government and Probation agree that without that statutory addition, Sami would

empirical data demonstrates that someone who, like Sami, has never before been arrested has a significantly lower recidivism rate than those with prior arrests and no convictions and those whose histories warrant even one criminal history point.[19] Sentencing courts have relied on this data in reducing the sentences of true first offenders. *See, e.g.*, *United States v. Urbina*, 06-CR-336, 2009 WL 565485, at 3 (E.D. Wis. Mar. 5, 2009) (citing U.S.S.C.'s first-offender study in support of below-Guidelines sentence).

## C. Sami's advanced age upon release also makes him unlikely to reoffend.

If Sami is sentenced to 20 years, he will be 42 by the time he is released. By that age, 86.7 percent of offenders do not re-offend.[20] The Seventh Circuit has acknowledged this criminological trend and its empirical basis. *See United States v. Stover*, 208 F. App'x 484, 486 (7th Cir. 2006) (finding that "age makes a substantial difference in recidivism rates for people in the lower criminal history categories"); *United States v. Bullion*, 466 F.3d 574, 577 (7th Cir. 2006) (agreeing that "the tendency to commit crimes, violent and otherwise, diminishes with age") (citing U.S.S.C. recidivism study).

## D. Sami's pursuit of education, his employment history, and his strong work ethic also lower his risk of recidivism.

According to Sami's former boss at Sanibel Bakery, Sami "worked tirelessly" and was "responsible and reliable, taking on even the most difficult work assignments."

---

have zero criminal history points. *See* Plea Agreement 10; PSR at 10, ln. 44–45. To assess his true likelihood of recidivism, the Court must look at his actual past conduct, not an artificial increase driven by the instant offense.

[19] The Sentencing Commission has found that "offenders . . . with no prior arrests have dramatically lower recidivism rates (6.8%) than offenders . . . with prior arrests but no convictions (17.2%)." *See* U.S. Sentencing Comm'n, *Recidivism and the First Offender, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate 14* (May 2004). The Commission has also found that the recidivism rate of offenders with zero criminal history points is half that of offenders with one criminal history point. *See id*. at 13–14.

[20] *See* U.S. Sentencing Comm'n (USSC), *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12, 28, *available at* http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf.

*See* Ex. 45. Courts have consistently held that a defendant's employment history is relevant under § 3553(a) and provides a legitimate basis for a below-Guidelines sentence. *See Baker*, 445 F.3d at 992 (holding that under § 3553(a), district court could rely on defendant's employment history in arriving at below-Guidelines sentence); *see also Rita v. United States,* 551 U.S. 338, 364–65 (2007) (Stevens, J., concurring) (identifying employment history as a factor that § 3553(a) authorizes judges to consider).

Sami's post-arrest efforts to achieve rehabilitation by taking classes and achieving certificates at the MCC, and by enrolling in a college program, also indicate that he is unlikely to re-offend. This Court should "attach[] great weight to [Sami's] self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative." *Gall v. United States*, 552 U.S. 38, 59 (2007). Courts have held that defendants who maximize educational and other opportunities while incarcerated require less specific deterrence under § 3553(a)(2)(C). *See, e.g.*, *United States v. Rodriguez*, 08-CR-509-1, 2009 WL 1811001, at 1 (N.D. Ill. June 23, 2009) (noting that defendant's "personal characteristics and supportive family history, as well as his education and work history, suggest a low risk of recidivism"); *United States v. Salazar-Hernandez*, 431 F. Supp. 2d 931, 934 (E.D. Wis. 2006). Moreover, the BOP's own research shows that acquiring education in prison lowers recidivism rates. *See* Miles D. Harer, *Recidivism Among Federal Prisoners Released in 1987*, Federal Bureau of Prisons' Office of Research and Evaluation 23 (1994).

### E.  Sami will be deported upon release, making him highly unlikely to re-offend in the United States.

Sami will be deported and will waive any and all rights to contest deportation. Thus, regardless of how much time he spends in prison, he will not live in the U.S. after

his release. The Seventh Circuit agrees that inevitable deportation permanently incapacitates a person from committing future crimes in the U.S. and thus negates the need to protect the public. *See United States v. Ngatia*, 477 F.3d 496, 502 (7th Cir. 2007) ("Considering that it is almost certain that [defendant] will be deported following her release, she will be incapacitated from further drug importation to the United States."); *see also United States v. Ramirez*, 06-CR-299, 2007 WL 1726454, at 2 (E.D. Wis. June 14, 2007) ("Given his lack of record, expression of remorse and the fact of removal, I saw no need for a substantial prison term to deter defendant from re-offending.").

### VII.    A Sentence Above 20 Years is Greater Than Necessary To Provide Just Punishment Under § 3553(a)(2)(A).

First, Sami's status as a deportable alien will render his sentence considerably more arduous than that of a non-alien, placing him in a more restrictive status within the BOP and denying him access to early release and community confinement programs that are available to non-aliens. *See United States v. Guzman*, 236 F.3d 830, 834 (7th Cir. 2001) ("[T]he status of being a deportable alien can affect the conditions of imprisonment, can make them harsher by disentitling a defendant to serve any part of his sentence in a halfway house, minimum security prison, or intensive confinement center, so that the same nominal prison sentence would be, quite apart from the sequel of deportation, a more severe punishment than if the defendant were a citizen.").

Second, a sentence above 20 years is greater than necessary to provide just punishment under § 3553(a)(2)(A) because, during Sami's time in BOP custody, he has been punished substantially more severely than an otherwise similarly-situated defendant who does not suffer from FMF would have been punished. One week into his incarceration at the MCC, Sami complained of severe stomach pain to the jail's

36

physicians, explaining that it was caused by the disease of FMF. Ex. 46 at 2. It appears that the MCC doctor did not believe that Sami suffered from FMF, and thus did not provide him with the needed medication. *Id*. After months of extreme pain, in December 2010, Sami asked for the only medication that has been shown to effectively treat FMF, colchicine. *Id*. at 3. This request was denied. It was not until June 2012, nearly two years after his initial complaints about debilitating stomach pain, that Sami finally received colchicine. Id. at 4–6. Sami has also suffered from acute acid reflux that has led to trouble breathing and sleeping, because he frequently wakes up to vomit. *Id*. at 7–8; *see also id.* at 9 (reporting muscle spasms that have resulted in debilitating back pain).

## VIII. Sami's Youth at the Time of the Offense Renders a Sentence of 20 Years Sufficient to Achieve the § 3553(a) Purposes of Punishment.

Sami was only 21 years old when the informant approached him, and was 22 at the time of his arrest. His youth must be considered when selecting an appropriate sentence under § 3553(a), as brain development research accepted by the Supreme Court indicates that young people are highly susceptible to reckless decision-making. *See Miller*, 132 S. Ct. at 2465 (citing *Graham v. Florida*, 130 S. Ct. 2011, 2029 (2010)). That is, by virtue of his age, Sami was less able to adequately consider risks and control his impulses than a mature adult.

According to the Supreme Court, brain development research makes a defendant's age highly relevant at sentencing. Neurobiological research shows that, at least through their twenties, it is more difficult for young people to control impulses, make decisions with foresight, and evaluate choices.[21] The Supreme Court has adopted

---

[21] Staci A. Gruber & Deborah A. Yurgelun-Todd, *Neurobiology and the Law: A Role in Juvenile Justice?*, 3 Ohio St. J. Crim. L. 321, 324 (2006).

this research and has confirmed that youth is relevant when evaluating a defendant's conduct in the sentencing context. *See Roper v. Simmons*, 543 U.S. 551, 569 (2005); *Graham*, 130 S. Ct. at 2026. The Court went even further in *Miller*, applying these scientific findings to the § 3553(a) analysis and "mandat[ing] . . . that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Miller*, 132 S. Ct. at 2471.

Moreover, the Supreme Court made clear in *Gall* that the brain research highlighted in *Roper* and its progeny translates directly to the § 3553(a) context. The district judge imposed a below-Guidelines sentence on Gall—a 21-year-old defendant— because of his youth, relying heavily on *Roper*'s discussion of brain development and the associated immaturity of youth. 552 U.S. at 57–58. The Court upheld the sentence and the rationale. *Id.* The Seventh Circuit has likewise determined that a defendant's youth can serve as a mitigating factor under § 3553(a). *See Baker*, 445 F.3d. at 992 (approving a district court's consideration of the defendant's "relatively young age" (27 at the time of the offense) as a mitigating factor under § 3553(a)); *United States v. Randle*, 208 Fed. App'x 462, 466 (7th Cir. 2006).

Given brain development research, Sami's youth is a significant aspect of his history and characteristics under § 3553(a)(1) and mitigates the circumstances and seriousness of the instant offense under §§ 3553(a)(1) and (a)(2). *See Roper*, 543 U.S. at 569–70 (explaining that young people are "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," and "have a greater claim than adults to be forgiven for failing to escape negative influences in their . . . environment.").

WHEREFORE, we respectfully request that this Court impose a 20-year sentence.

Respectfully submitted,

s/ Matthew Madden
Matthew Madden

s/ Alison Siegler
Alison Siegler
Attorneys for Sami Hassoun

MATTHEW J. MADDEN
Attorney at Law
53 W. Jackson Boulevard, Suite 703
Chicago, IL 60604

ALISON SIEGLER
Associate Clinical Professor of Law
Director, Federal Criminal Justice Clinic
University of Chicago Law School
6020 South University Avenue
Chicago, Illinois 60637
(773) 834-1680

Written With:
Jean Tinkham and Max Kampfner, University of Chicago Law School Class of 2013
James DuBray, University of Chicago Law School Class of 2014

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, <u>Alison Siegler</u>, an attorney with the University of Chicago Law School Mandel Legal Aid Clinic's Federal Criminal Justice Clinic, hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed R. Civ. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

## <u>DEFENDANT'S SENTENCING MEMORANDUM</u>

was served pursuant to the district court's ECF system as to ECF filers, and was sent by first class mail/hand delivery on **March 18, 2013**, to counsel/parties that are non-ECF filers.


By:    s/Alison Siegler
        ALISON SIEGLER
        Associate Clinical Professor of Law
        Director, Federal Criminal Justice Clinic
        University of Chicago Law School
        6020 South University Avenue
        Chicago, Illinois 60637
        (773) 834-1680