**IN THE**
**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **No. 10-CR-773-1** |
| v. | ) | **Hon. Robert W. Gettleman** |
| | ) | |
| **SAMI HASSOUN** | ) | |

### EXHIBITS TO DEFENDANT'S SENTENCING MEMORANDUM

Exhibit 1: Alexandra Zavis, *Military assumes control in Ivory Coast*, Associated Press, Dec. 25, 1999

Exhibit 2: Expert Report of Dr. James Garbarino

Exhibit 3: Photograph of Samir, Siham, and Sami Hassoun

Exhibit 4: Defendant's Version

Exhibit 5: Richard Cornwell, *Côte d'Ivoire: Asking for it*, African Security Review 9:1, 80-93 (2000)

Exhibit 6: Donald McNeil, Jr., *Ivory Coast Coup Draws French Reply*, N. Y. Times. Dec. 26, 1999

Exhibit 7: Letter from Mother, Siham Matar

Exhibit 8: Letter from Father, Samir Hassoun

Exhibit 9: Letter from Uncle, Dr. Michael Maitar

Exhibit 10: Letter from Dr. Ghassan Aswad

Exhibit 11: FMF Diagnosis

Exhibit 12: Photograph of Sami Suffering from FMF in the U.S.

Exhibit 13: Letter from Uncle, Anthony Matar

Exhibit 14: Photograph of Sami on his family's apartment balcony in Lebanon

Exhibit 15: Avi Livneh & Pnina Langevitz, Diagnostic and treatment concerns in familial Mediterranean fever, 14:3 Bailliere's Clinical Rheumatology 477–98 (2000)

Exhibit 16: Letter from Dar Al Ajaza, a Charity Organization in Lebanon

Exhibit 17: Letter from Al Ata, a Charity Organization in Lebanon

Exhibit 18: Letter from Girlfriend, Duaa Albadawi

Exhibit 19: Jacqueline Reis, *Local residents stuck in Lebanon*, Telegram & Gazette, July 15, 2006

Exhibit 20: Peter Bouckaert, *Both Israel and Hezbollah Committing 'War Crimes'*, Council on Foreign Relations, August 7, 2006

Exhibit 21: Letter from Aunt, Chaimaa Matar

Exhibit 22: Scheherezade Faramarzi, *Trauma of war is scarring Lebanese children*, St. Louis Post-Dispatch, July 30, 2006

Exhibit 23: Sami Hassoun's American University of Beirut Transcript

Exhibit 24: Photograph of Sami receiving his high school diploma

Exhibit 25: Dr. James Garbarino's CV (Provided Separately to the Court)

Exhibit 26: Photograph of Sami and Adnan celebrating Adnan's birthday

Exhibit 27: MCC Education and Activity Records

Exhibit 28: Ohio University Acceptance Letter

Exhibit 29: FBI Report dated 3/2/10 (Excerpt: Discovery 2:17-18)

Exhibit 30: FBI Reports dated 5/13/10 & 6/3/10 (Discovery 2:32–33)

Exhibit 31: FBI Report dated 2/16/10 (Discovery 2:13–14)

Exhibit 32: FBI Report dated 1/14/10 (Excerpt: Discovery 2:8)

Exhibit 33: FBI Report dated 7/7/10 (Discovery 2: 55-56)

Exhibit 34: Transcription of Conversation between CHS and Hassoun dated 6/7/10 & 6/9/10 (Excerpt: Discovery 5: 4–5)

Exhibit 35: Summary of Conversation between CHS and Hassoun dated 6/7/10 (Excerpt: Discovery 5:13)

Exhibit 36: FBI Report dated 6/8/10 (Excerpt: Discovery 2:37)

Exhibit 37: Summary of Conversation between UC and Hassoun date redacted (Excerpt: Discovery 5:376-78)

Exhibit 38: FBI Report dated 6/21/10 (Discovery 1: 6–7)

Exhibit 39: FBI Report dated 7/8/10 (Discovery 1:14)

Exhibit 40: Summary of Conversation between UC and Hassoun dated 8/16/10 (Excerpt: Discovery 5:372-73)

Exhibit 41: Recorded Conversation between UC and Hassoun dated 7/21/10 (Excerpts: Discovery 5: 81, 102, 111-12)

Exhibit 42: FBI Report dated 9/3/10 (Discovery 1:86–87)

Exhibit 43: FBI Report dated 9/8/10 (Discovery 1:92)

Exhibit 44: *United States v. Issa*, 09-CR-1244 (BSJ), Excerpt from Sentencing Transcript

Exhibit 45: Letter from Employer, Pierre Mounsef

Exhibit 46: MCC Medical Records

Exhibit 47: DVD of the Instant Offense (Sept. 19, 2010) (Provided Separately to the Court)

# Exhibit 1:

**Alexandra Zavis, *Military assumes control in Ivory Coast*, Associated Press, Dec. 25, 1999**

# Military assumes control in Ivory Coast

BY ALEXANDRA ZAVIS
Associated Press Writer

ABIDJAN, Ivory Coast — Ivory Coast, long a bastion of stability in a region wracked by war, was riven Friday by an army revolt that its declared leader described as a coup d'etat.

Army troops and civilians together looted parts of the capital, Abidjan, a day after soldiers went on a rampage. Many soldiers said they were owed back salary and perks, while others said the revolt was aimed at ousting the president.

Calm prevailed over the city, punctuated by bursts of gunfire as renegades, many wearing bandanas and with faces covered in black soot, cruised by in cars commandeered from civilians. A group of soldiers carrying shopping bags full of plundered goods yelled, "We won!"

Wearing a blue beret and camouflage uniform and surrounded by soldiers brandishing automatic weapons, Gen. Robert Guei appeared on state television, saying the military was taking over the reins of power from President Henri Konan Bedie.

The West African country's constitution, courts and parliament have been suspended, Guei said. The retired general appealed to citizens to remain calm.

"Power is in my hands," he said. "I will take care of everybody. You should not be worried."

Ivory Coast, a country of 19 million people, has long been considered a model of stability that unlike its neighbors has never experienced a successful coup. But in recent months, the country experienced growing political and social turmoil amid a government crackdown on opposition groups and allegations of corruption against President Bedie.

Exactly who was originally behind the revolt is unclear, although one rebel said Friday more than 500 of his comrades had joined in. Ivory Coast's military has at least 6,000 members.

"We must avoid the spilling of blood. In this country, personal dialogue can always find the solution to every problem," Guei said in a later TV broadcast. State radio and television had gone off the air Thursday and remained silent Friday aside from Guei's broadcasts.

Independent confirmation of the takeover could not be immediately obtained.

Mobs of youths took advantage of the lawlessness, hijacking cars and mugging commuters. One gang carrying knives and sticks attacked two journalists, an Associated Press photographer and a Dow Jones financial writer, robbing them of money, cellphones and camera equipment.

Western embassies informed their foreign nationals to observe a curfew that Guei said required all citizens to stay indoors between 6:00 p.m. and 5:00 a.m.

A U.S. Embassy official speaking on condition of anonymity said the mission had not yet decided to evacuate American citizens.

From the United Nations, Secretary-General Kofi Annan condemned the coup, saying "the use of violence to disrupt a country's political process is unacceptable," according to his spokesman, Fred Eckhard.

Bedie's fate was uncertain. A soldier speaking on condition of anonymity at the Ministry of Defense said the president had been detained in his residence in Abidjan's Cocody suburb. Other soldiers said several other senior government officials were also under house arrest.

A foreign news agency reported Bedie had taken refuge in the French ambassador's residence. A spokeswoman for France's Foreign Ministry, Anne Gazeau-Secret, said she could not confirm the report.

Radio France-Internationale quoted Bedie as telling the network that he remained free and that he called on his allies, including traditional chiefs, to organize an armed resistance.

France, the former colonizer of Ivory Coast, condemned the coup and issued a statement calling for the "immediate reestablishment of order and security in Abidjan."

Despite the chaos, many citizens said they hoped the uprising would improve Ivory Coast's economic and political fortunes. Citizens huddled around their radios in the streets, listening to the military announcement, some jumping up and down in excitement and chanting, "No more Bedie."

"I'm really happy. We are tired of (Bedie)," said Marie Aniele, a 27-year-old university student in Abidjan. "He couldn't run the country. Nothing works anymore, life is expensive and he only worries about politics."

Aside from claming to be in control, Guei was vague about the rebels' future plans, saying only that he would accept the country's presidency if the citizens of Ivory Coast "have trust in me."

A longtime soldier, Guei was replaced as Ivory Coast's military chief in 1995 during unrest surrounding elections won that year by Bedie, apparently after questioning the president's use of soldiers to assist police in quelling anti-government protests.

# Exhibit 2:

# Expert Report of Dr. James Garbarino

James Garbarino, Ph.D.

Consulting in Child Development and Family Systems

1333 W. Devon Avenue #178
Chicago IL 60606
607 351 2215 jgarbar@luc.edu

8/29/12
TO: Alison Siegler and Matthew Madden
RE: **Sami Hassoun 10-CR-773**

**Professional Background and Credentials**: I am a developmental psychologist who is a member and Fellow of the American Psychological Association. From 1989-1990, I served as President of the Association's Division on Child, Youth and Family Services. I am currently Maude C. Clarke Professor of Psychology at Loyola University Chicago, and was the founding Director of the Center for the Human Rights of Children. Prior to this I served as Elizabeth Lee Vincent Professor of Human Development at Cornell University in Ithaca, New York and from 1985 to 1994, as President of the Erikson Institute for Advanced Study in Child Development in Chicago, a graduate school and research center. I am the author of over 100 scholarly articles and book chapters dealing with family, child, and adolescent development issues, with an emphasis on violence and trauma, and I am the author or editor of 23 books including Lost Boys: Why Our Sons Turn Violent and How We Can Save Them. (1999), The Positive Psychology of Personal Transformation: Leveraging Resilience for Life Change (2011), Children and the Dark Side of Human Experience (2008), See Jane Hit: Why Girls Are Becoming More Violent and What We Can Do About It (2006), And Words Can Hurt Forever: How to Protect Adolescents from Bullying, Harassment and Emotional Violence (2003), What Children Can

1

Tell Us (1989), The Psychologically Battered Child (1986), Children in Danger: Coping with the Consequences of Community Violence (1992), No Place To Be A Child: Growing Up in a War Zone (1991), Raising Children in a Socially Toxic Environment (1995), and for children Let's Talk About Living in a World With Violence (1993).

My work with children and youth experiencing violence and trauma has included communities across the United States and war zones across five continents. I was the first recipient of the C. Henry Kempe Award from the National Conference on Child Abuse and Neglect. In 1989, I received the American Psychological Association's Award for Distinguished Professional Contributions to Public Service, and in 1995, the Dale Richmond Award from the American Academy of Pediatrics, specifically honoring my work in the field of community violence and trauma. I have served as a consultant to a wide range of organizations, including the American Medical Association, the National Committee to Prevent Child Abuse, and the FBI. I have received awards for my empirical research, including in 1992, from the Society for Psychological Study of Social Issues, and in 2011, the Max Hayman Award for studies contributing to the prevention of genocide, by the American Orthopsychiatric Association. Relevant to the present case, I served as a consultant to UNICEF in assessing and responding to the impact of the Gulf War on children in Iraq and Kuwait in 1991, and conducted research on the impact of political violence on Palestinian children and youth. I have traveled to Jordan (but not Lebanon) and to several countries in Africa (but not including the Ivory Coast)

**Sami Hassoun:** I reviewed the case materials concerning **Sami Hassoun** that you sent me (the Complaint, the Indictment, the Plea Agreement, and the Discovery documents). I interviewed him on July 23, 2012, at the Metropolitan Correctional Center in Chicago, Illinois, and his mother Siham Matar in my office on August 27, 2012.

I understand that some of the principal issues before the court in Sami's sentencing decision are these:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

Sami was born in Lebanon but was raised from infancy in Abidjan, Ivory Coast. Sami speaks of his childhood in the Ivory Coast as "a beautiful life. His mother echoes this, saying "we had an easy life in the Ivory Coast." Sami's father owned a successful electronics business that provided a very comfortable standard of living and economic security for his family (Sami and his mother). Sami sees his life since then as a fall from the grace of that privileged position (he now says of that time, "I was a spoiled only child."). When Sami was a child, there was a coup that led to political violence in the Ivory Coast. He viewed the 1999 coup through the eyes of an 11-12 year old child, saying, "It was a shock. Overnight everything changed. I saw people with machetes stopping cars and pulling people out of the cars and attacking them. It was a bloodbath in the streets." He could observe all this from his apartment. He heard stories of attacks against families like his—Lebanese—and "felt fear that 'we're next.'" During a truce arranged by the French Army Sami and his mother escaped to the United States: "We left quickly, left everything behind, all my collections, and my father

and my grandparents." Siham's description of the coup and its aftermath confirms Sami's account.

In the United States Sami still lived in fear because his father and grandparents remained in the Ivory Coast. He reports, "I was living in shock and I would never talk about it." His mother confirms that he was very silent during this period. His fear of the new situation in the United States was compounded by the fact he spoke no English, and when forced to attend the local school by his mother and uncle, he faced some bullying because of being "different." Eventually, he started making friends as he discovered ways to fit in (in Wilmette, IL), but his adjustment was difficult. His mother recalls him being "sad and lonely in school." His underlying medical condition, Familial Mediterranean Fever (FMF) worsens under conditions of stress, and his mother reports that she was called to come get Sami from school repeatedly (about once per week) because of his symptoms—vomiting and intense stomach pain.

But it was the fall from financial security that weighed most heavily on Sami, even then. He remembered that on his 12th birthday—in contrast to earlier years when his family was together and "rich"—there were no presents and no father, no grandparents. The expectations of financial security and the accoutrements of affluence fostered by Sami's childhood in Ivory Coast were central to his understanding of "normal life." The breakdown of economic security and ripping away of the affluence he experienced subsequently stimulated a "search for financial security" as a major theme in his life, and is relevant to understanding his motivation to commit the crime in the current case. His mother verifies that Sami became intensely motivated to replicate the affluence he had known as a child. For example, shortly before his arrest in 2010, he was promising his beloved younger brother A█ that he would have many presents for his birthday. Their mother reports that Sami was "always buying things for A█ because he wanted him to be happy."

No sooner had Sami begun to find ways to adapt to his changed life in the United States than, as he says, "Boom! We moved to Lebanon." In 2000, he was reunited with his father and grandparents and other extended family. But speaking no Arabic, Sami once again struggled to find ways to adapt and fit in with a new social environment. As his mother says, "he didn't fit in anywhere." Once again, as he did in the United States, Sami initially experienced bullying from peers because he was an outsider and didn't speak the language. But he found ways to adapt: learn the language and mores of his peers. However, Sami was from a Shia background in a society in which the Sunni-Shia distinction was crucial for identity. He reports, "I was not religious. I thought I was a Muslim, but I was told I was a Shia." He was forced to lie repeatedly, depending upon who he was with. "To get of out being attacked I had to lie my way out of situations. I pretended to be a Sunni with Sunnis and to be a Shia with Shias." In addition to the religious issues he faced in Lebanon, there were economic issues as well. Loss of his father's business in the Ivory Coast coup and subsequent departure (during which the family was not allowed to take any money or significant possessions) reduced the family's financial standing dramatically. The school Sami attended in Lebanon was an international school, and most of his fellow students were affluent. This led to several incidents in which Sami was shamed and humiliated because of his lower financial status in relation to his peers.

Psychiatrist James Gilligan has worked with highly violent men and concluded that shame is a powerful impetus to violence because it seems the most compelling way that young males can avoid the "psychic annihilation" that threatens them in a state of extreme shame. I believe this is relevant to understanding the crime for which he is being sentenced. It seems likely that when Sami spoke of committing this crime to earn money and to embarrass Mayor Daley (by showing that he was weak and could not protect "his people"), Sami was acting from the shame and rage generated by his earlier humiliations and his belief that he needed money in order to get respect and safety.

5

When Lebanon devolved into another period of chaos (after the assassination of the Prime Minister in 2005), civil war broke out, and Sami started to think, "Where are we going to go now? It was Africa happening again. We're next." Then came the War with Israel in 2006. There were bombing attacks in his area (and TV coverage of the national situation). Once again, he was exposed first hand to vivid horrible images of dead and mutilated bodies. Sami's mother likewise describes the bombings and the images of death and destruction to which her son was exposed. She speaks about how upset Sami was during the war and explains that his FMF again flared up. Sami himself remembers thinking, "Here we go again. I was scared. I was afraid for my little brother. But except for my little brother I didn't feel anything. I used to fear death but then I didn't care anymore. I said to myself, 'I'll be dead or alive, whatever.'" The social chaos in Lebanon had a profound effect on Sami's view of the world. "I saw people doing whatever it took to survive. Young girls were prostituting, crime went up, there was raping." In that world of Lebanese social chaos, gangsters ruled alongside religious militias. Trust was in short supply.

He says, "After we survived, a great shift in my life happened. I became a person that's not me. I wanted to make money in any way. I wanted to run the street life. I became so cold, I wanted to be part of the underworld. If we had money and we were rich we would be safe and we could leave. Money was a big issue in my life. I'm going to make money at any cost. I was such a good liar. I would believe my own lies. Realty and lying become one in my head. Lying made me feel smarter than anyone else. I could do and be anything or anyone by lying." The development of this pattern of deception was an adaptation to the difficult and dangerous social situation he faced in Lebanon, and it continued when he left that country. Unfortunately, it became the gateway to his present situation.

Once again his family escaped from a war zone, relocating back to the United States in 2008. Sami was once again forced to leave behind friends and familiar social environments. Once in the United States

6

(again) he lived out the idea of himself that he had developed in Lebanon to deal with his situation there. "I became the person I wanted to be. I lied about how rich I am. I just wanted money. It became hard for me to retreat from my lies. I embellished events with lies to put myself in it. Not being accepted by friends for who I really was forced me to lie more, to make everybody love me for what they want." His mother acknowledges that Sami seemed "changed" when they arrived in the United States, "aggressive and disrespectful with his parents and very distant." She also acknowledges that she observed in Sami a very intense craving for acceptance, saying "He would follow anybody to get accepted." This included a wide range of pro-social behaviors (volunteering to help the elderly, for example) as well as being susceptible to anti-social behavior.

In the United States, Sami was excited that he might finally regain the life of childhood affluence that had been taken from him when he was forced to leave the Ivory Coast. "I am no longer a mama's boy. It's me against the world. You could make money at any cost in the US."

Sami's repeated dislocations meant that he had to develop a facility for moving into strange and sometimes hostile situations. It appears this pattern led him to become a kind of psychological and social "chameleon," in the sense that he learned to become whatever his current situation demanded in order to fit in and escape attack. When coupled with his motivation to become rich (again), "no matter what it takes," his response to the cultivation offered by the Government's CI can be seen in this light. He felt "I was dead from the inside. I don't care." The CI groomed Sami very effectively, finding his weak points—making money—illegal possibilities. Sami wanted to impress him at any cost so the CI would be able to connect him to Assyrian Mafia people. "And there was a girl here. I didn't want to lose her- -at any cost. I wanted to impress her because I thought she would love me more when I had money." Note that the expression "at any cost" is a recurrent theme in Sami's account of himself in relation to the world around him.

Clearly, the crime for which he is being sentenced fits within that framework.

I believe there are three principal developmental questions to be answered in making a decision regarding a young man such as Sami who has committed a serious offense in relation to the issues stated above and I have summarized my answers below. I elaborate on each question and answer in the remainder of the report:

Question #1 Mitigation: Did his experiences as a child and as an adolescent contribute to his orientation and state of mind during the period when he was involved in planning and executing the crime for which he is being sentenced in a way that mitigates the seriousness of his criminal actions?

Answer: Yes, the cumulative damage experienced by Sami's exposure to traumatic events and the strategies he learned to cope with the social, cultural, and linguistic dislocations of his life, all contributed to his state of mind during the time when became involved in the crime.

Question #2 Recidivism: Was he so psychologically damaged as a child that by the time he approached adolescence he was irreparably harmed developmentally, and thus at high risk for a life long pattern of anti-social behavior and crime?

Answer: No, the developmental damage he experienced is remediable, and does not mean a life-long pattern of anti-social behavior and crime is inevitable.

Question #3 Rehabilitation: Does he have the psychological resources and the social support necessary to make a successful transition from being at high risk for offending against society to being sufficiently well adjusted so as to no longer constitute a risk to others?

8

Answer: Yes. Sami has the intelligence to undertake the personal changes necessary for rehabilitation. He as a high degree of family support and a willingness on their part to provide counseling and therapy resources that could facilitate that process of insight, which would lead to healing and rehabilitation.

Based upon my review of the case material and the interview, I have reached some conclusions about these questions. These conclusions reflect my 25 years of experience as a researcher studying issues of trauma and community violence, including my work aimed at understanding the developmental impact of war and political violence on children and youth (which resulted in the publication of a book entitled *No Place to Be a Child: Growing Up in a War Zone* (1991). This work has also included serving as a consultant to UNICEF assessing the impact of the Gulf War on children in Iraq and Kuwait. I have relied as well on my study of adolescents involved in lethal violence (which has included in-depth interviews with 20 males involved in homicides and is reported in my 1999 book *Lost Boys: Why Our Sons Turn Violent and How We Can Save Them*). I have also worked on the issue of bullying (e.g. my book *And Words Can Hurt Forever: How to Protect Adolescents from Bullying, Harassment, and Emotional Violence*), an issue relevant to the present case.

**Question #1: Did his experiences as a child and as an adolescent contribute to his orientation and state of mind during the period when he was involved in planning and executing the crime for which he is being sentenced in a way that mitigates the seriousness of his criminal actions?**

I believe the cumulative damage experienced by Sami's exposure to traumatic events, his need for security, his adoption of lying and misrepresentation of self as a strategy to cope with social, cultural and linguistic dislocations, all contributed to his state of mind during the

9

time when he became involved in the crime for which he is being sentenced. To my mind, these constitute mitigating factors. They compromised his ability to act pro-socially and resist the anti-social influences of the Government's CI. They resulted in the desensitization to violence that is implicit in his involvement in an action that had the potential to produce mass civilian casualties.

**Question #2: Was Sami so psychologically damaged as a child that as he approached adolescence he was irreparably harmed developmentally, and thus at high risk for a life long pattern of anti-social behavior and crime?**

Some individuals who commit serious crimes as young adults engage in these criminal acts as part of an adjustment crisis that can and will resolve with access to psychotherapy, maturation, and a change in circumstances. Others evidence childhood experiences that result in them entering adolescence with very serious developmental damage, damage that is very difficult to heal. The childhood of these individuals is typically characterized by severe abuse and neglect in the family, violently traumatic experiences in the community and/or school, high levels of family disruption (often including abandonment and rejection by parents), social deprivation, and on-going exposure to anti-social lifestyles on the part of immediate and extended family, family associates, and communities and neighborhoods in which they grow up. Usually this results in childhood onset of a chronic pattern of aggression, bad behavior, acting out and violating the rights of others (which may be diagnosed as Conduct Disorder). If untreated, children characterized by this pattern by the time they are 10 years of age enter adolescence at high risk for later anti-social behavior (perhaps diagnosis with Anti-Social Personality Disorder). For example, on average, some 30% of youth who demonstrated childhood onset of Conduct Disorder end up evidencing serious violent delinquency as adolescents. As testimony to the power of the social situation facing a child as he becomes a teenager, this figure is 60% in some particularly anti-social neighborhoods but only 15% in some "good" neighborhoods. Few individuals with

childhood onset Conduct Disorder "get better" spontaneously. However, most individuals whose Conduct Disorder does not start until adolescence do get better (often spontaneously in a process in which maturity displaces the negative behavior—what is called "aging out"). *In both cases, intensive psychological intervention (particularly when it includes the active support of parents and others in the adolescent's social environment) can result in restoring the youth to a positive pattern of behavior and pro-social attitudes.*

The principal socially and psychologically toxic influences on Sami's development include the following:

*exposure to traumatic political violence as a child in the Ivory Coast when he was 11 years old, including first hand witnessing of brutality and killing
*abrupt separation from his father and grandparents due to the violent crisis in the Ivory Coast, which led Sami (who spoke only French) and his mother being evacuated to the United States in 2000, when he was 12 years old
* abrupt relocation from the United States to Lebanon in that same year (despite the fact that he did not speak Arabic), just as he was beginning to learn English and adjust to American society,
* exposure to the social chaos of Lebanon (in which criminal and sectarian predatory groups dominated the community)
* exposure to traumatic experiences during the 2006 War in Lebanon (involving Hezbollah and Israel, but contributing to violent political instability among factions and criminal elements in Lebanon)
* abrupt relocation to the United States in 2008, once again disrupting his friendship patterns and sense of identity
* significant financial downward mobility of his family stemming from the loss of his father's business in the Ivory Coast and the end of the financially secure affluence that he has not known since.

11

Trauma is the result of encountering experiences that are characterized by "overwhelming negative cognitions" (i.e. where the idea of what is happening violates normal standards of reality, such as when you witness people being killed or you are physically attacked with potentially lethal violence) and "overwhelming negative arousal" (i.e. when you are so terrified that normal emotional coping is disrupted, when "your emotional circuits are blown"). Effects of trauma in the short run include disrupted sleep and normal activities of life, emotional deadening and disconnection ("dissociation"), hypersensitivity to events and stimuli that are associated with the traumatic event(s) and other psychological symptoms of what has come to be known as Post Traumatic Stress Disorder (PTSD). In the long run, effects can include a wide range of effects on pro-social behavior and moral development.

One of the most important variables in understanding trauma is whether it is a single incident ("acute" trauma) or it is an on-going pattern of experience ("chronic" trauma). Acute trauma is amenable to resolution through some combination of "psychological first aid," in the form of comforting processing from mental health professionals, and the reassurance that comes with the return of life to "normal" through the passage of time. Any one of Sami's early traumatic experiences in the Ivory Coast would have qualified as an acute traumatic event. However, in his case the nature of the situation as a socially deteriorating war zone, coupled with his subsequent pattern of traumatic experiences in Lebanon clearly transformed his exposure to trauma from acute/single incident to chronic/on-going trauma.

War zones and neighborhoods with high levels of community violence, are prime examples of chronic trauma. Sami experienced these as a child in the Ivory Coast and in Lebanon as an adolescent. What is more, he experienced abrupt, long-term separation from his father and grandparents and dislocation from his community and peer group because of the political violence in Ivory Coast and Lebanon. This kind of "abandonment" itself can be highly disruptive to the development of a child. All in all, the kind of chronic, on-going trauma experienced by

12

Sami can be understood as a psychologically toxic influence, an influence that can distort an individual's view of the future (substituting "terminal thinking" for "positive future orientation") and relation to legitimate social authority (substituting anti-social orientation for pro-social orientation). Sami experienced both emotional and moral damage as a result of his exposure to chronic untreated trauma as an adolescent. It is clear that the trauma and social toxicity of Sami's life since he was 11 years old has disrupted his development in ways relevant to the crime for which he is being sentenced. It does not appear, however, that Sami has suffered profound and irremediable developmental damage. Rather, it appears that he has suffered from trauma-related adjustment problems and the effects of repeatedly being socially and economically uprooted as a child and young adolescent. The cumulative effect of all this was to induce in him profound shame, shame he sought to counter by grandiosity, an impulse to revenge, material acquisitiveness, and willingness to engage in violence. It is his adjustment to those factors that has resulted in his current psychological status, not some underlying psychological disabilities.

Chronic trauma is more difficult to resolve than acute trauma. A simple therapy of reassurance is not feasible because a "return to normal" is not a solution; the problem is "the normal." One important positive feature in responding to chronic trauma is to remove the individual from the chronically traumatic environment(s) and begin therapeutic intervention in a safe setting. This has proved effective in dealing with trauma-related issues ranging from being a torture victim to being a child prostitute. It is relevant to the present case because although removed from the situation in the Ivory Coast, Sami did not receive therapeutic support in the wake of that removal and then was returned to a chronically traumatic environment in the Lebanon. In addition, he never received any treatment for the trauma he experienced.

13

**Question #3: Does Sami have the psychological resources and the social support necessary to make a successful transition from being at high risk for offending against society to being sufficiently well adjusted so as to no longer constitute a risk to others?**

Access to therapeutic resources should prove invaluable in helping Sami deal successfully with the underlying emotional issues that are linked to his childhood and adolescent experiences in the Ivory Coast and Lebanon. Second, Sami has the on-going support of his family, who is willing to move back to Lebanon with him when he is released. He will thus come out of prison into the kind of safe, normal environment he was deprived of as a child and adolescent.

Sami is well positioned developmentally and socially to recover from his current situation. We can expect the results of psychotherapy to help him resolve emotional and conduct issues that led to him the situation in which he committed his criminal act. With the process of maturation and reflection that could be open to him while serving his sentence, I believe that Sami can rehabilitate his thinking in a way that will mitigate the risk of future antisocial behavior, and can eventually become a productive member of society.

Respectfully Submitted,

Dr. James Garbarino, Ph.D.

14

# Exhibit 3:

# Photograph of Samir, Siham, and Sami Hassoun



# Exhibit 4:

# Defendant's Version

October 12, 2012

Dear Judge Gettleman,

I wish to take this time to personally share with you who I was before the arrest and who I am becoming today. But before I bring you through my life experience, I would like to sincerely apologize. Judge Gettleman, I am so ashamed of my actions and of this horrific crime that I've committed and the shame that I brought upon my family, my ethnicity, the country and the world. I know that nothing I can say will change my dreadful actions, but I would like to tell you about how I came to commit this crime, and how I have changed since that dark period.

I was born in Beirut, Lebanon on January 20, 1988. Soon after my birth, my parents took me back to Abidjan, Ivory Coast, where they lived. My father had left Lebanon and moved to Abidjan due to the 1975 civil war, and had settled there with the help of his Jewish friend and business partner. My father traveled a lot so I was primarily raised by my mother. Growing up, I had a good childhood. I grew up with a group of friends living in the same building. We went to the same school and did everything together. Life was good until the coup d'état that happened in 1999.

Everything changed overnight. The Ivorians were revolting, swarming the streets with machetes, blocking roads, stopping cars in the middle of the streets and slaughtering people in the streets. It was a bloodbath, and I witnessed all these horrific and barbaric scenes and images from the balcony of our apartment. I lived in constant fear, hearing rumors that they were invading homes, and raping women and kids. We heard that foreigners especially were being targeted because the Ivorians were angry at the colonizers.

One night I couldn't sleep. I went to the window and I witnessed something I have never been able to forget. It was like a bad dream, a nightmare. I saw a woman dressed in white being kidnapped. A car pulled up and someone inside grabbed her and pulled her in. The car remained stopped for a long time and I could hear horrible screams. At the time I did not know what was happening, but when I got older, I understood that the sounds I heard were the sounds of her

1

being raped.

After about three weeks, the French army was able to occupy the airport and there was a truce for a little time. They were only giving visas to women and kids and my parents told me that my mom and I had to flee the country immediately. When we fled to the U.S., we had to leave everything and everyone behind: my father, my family, my friends, and all of the things I had collected during my childhood—ninja turtles, matchbox cars, Japanese cartoons, everything. I could not even say goodbye to anyone. It all happened so fast, and it left me in pain and shock and fear.

Arriving in the U.S. a week before my 12th birthday, everything was different. No words can explain the loneliness, sadness and fear I was feeling. I couldn't get much in touch with my father due to the country's ruined infrastructure, and I was in constant fear that I was going to lose him, my grandparents, my family. I lost contact with my childhood friends and never knew what happened to them. For the first time in 12 years, I celebrated my birthday with pain and sadness and no clear indication of when I was going to see my family again. We were staying with my relatives, but no matter what they did to try to make me forget and make me feel good and happy, they couldn't take away what I was feeling and passing through. I would picture what happened and would have nightmares. I didn't talk much during this time.

I also had awful stomach problems. There were days where I was in constant pain and threw up bile. I lost a lot of weight and I became very thin. Doctors examined me, but they couldn't diagnose me. I later found out in Lebanon that I suffer from Familial Mediterranean fever (FMF). My stomach problems were never as severe before the coup as they were after it. Going to school in the U.S. made things a little easier for me, but I was a foreigner and I only spoke French and no English. It was hard blending in and making friends and getting accustomed to the environment.

Just as I started to adapt and learn, we moved to Lebanon to join my father. I felt relief and happiness to go back to my father, thinking that I would go back to my old good life again. Seeing my father and being with him made me very happy, but my life in Lebanon didn't turn

2

out as I expected. My father had lost everything during the coup in Abidjan. We were not comfortable anymore. We were stripped of all our belongings and treasures and were left with day-to-day uncertainty. We lived in a village, not the city. Life was different, and my dad did his best not to make me feel it, but I did. For a frightened and fearful kid like me, it was hard. On top of all that, I spoke no Arabic and again it was hard to adapt and make friends. Kids my age acted different, they were wild. Everything was different in the village, and it was hard at first to blend into their way of life.

I enrolled in an American School in Saida, Lebanon. I would ride for hours in a van to get to and from school everyday. All the kids in that school came from wealthy families. I felt shy and small around them. I felt shame, and I felt I had to lie about my family and who I was in order to get accepted by them. I didn't want them to know I was poor. Being around them made me want to look richer.

After a year of village life, we moved to the city. Life was different in the city, especially for a Shiite kid living in a Sunni neighborhood. I didn't know the difference at first. I knew I had Muslim heritage, but that's all. My parents never taught me much about religion. Once I figured out how important the religious differences were to people, I felt I had to lie about being a Sunni when I was with a Sunni and a Shia when I was with a Shia in order to satisfy everyone and have friends. Especially after the assassination of the Lebanese Prime Minister Rafic Hariri in 2005, differences in religious sects became a major issue. There were protests everywhere, roads blocked, and fights between religious sects. The memories of Abidjan all came back. I was living in fear and now I had a baby brother, A█, who I was worried about. I didn't want him to have to witness and see all this, to have to live my past through all this chaos, even though he was two years old, too young to understand.

On top of all that was already happening, a war between Hezbollah and Israel broke out in summer 2006. All the roads were closed and all the bridges were bombed. Saida was not targeted in the beginning, but toward the end of the war, Shiite sites were bombed in Saida and again I was witnessing all this from the balcony of our building. Hundreds of missiles were coming down all around the south of Lebanon, forcing thousands of people to move north toward

3

Saida.

Saida was like a zoo, with people sleeping in the streets and in schools. People were constantly being rushed to the hospitals, and I saw bodies cut in half and people with their brains out in front of my eyes. I saw people with their hands and legs blown off in hospitals. I was also obsessed at the time watching all the live TV coverage of the war. Hezbollah showed everything, no censorship. They would show gruesome and bloody images, aftermaths of attacks. It was all bad and awful.

When Saida was being bombed, I remember constantly grabbing my baby brother A█ and running down the stairs to the basement of the building. I was focused on protecting my brother, he was so small and defenseless, just a toddler still in diapers. I was extremely worried about him, and protecting him was my main concern. One early morning at around 5 a.m., an electricity station near our home got bombed. It was so close to our building that I thought we were being hit. I was deaf for a minute and just froze. The windows next to where I was sleeping all shattered. I thought I was going to die. After moments of complete shock, I raced down to the basement, carrying A█. I was so worried what could happen to my family, friends, and neighbors, and my baby brother most of all.

I was also afraid for myself, and I thought if they bombed that close, then they were going to bomb us next. I would ask myself, "Am I living my last moments? Am I going to be next?" I came to a point where I didn't feel fear. I didn't fear anything, not even death itself. Life didn't matter anymore. I would constantly tell myself that if it's going to happen, we're going to die. I came to accept that the end of my life was a breath away. During that time, we learned that we had lost friends and family members, and that hurt me a lot.

After the war, I performed community services, helping to clean the streets, get the injured to hospitals. Saida was very unstable after the war – drugs, crime, prostitution all increased. Experiencing the war, and after all I had been through, changed me in bad ways. I became uncontrollable with my emotions and thoughts. I thought money and power would solve all my problems and help my family. Right after the war, I went to American University of Beirut

4

(AUB) and did not do well. I used to be a top student and graduated from high school top of my class, but at AUB I struggled to focus. During my time at AUB, I lost the girl I dated for 5 years and grew up with. Her family was wealthy and they told me I was not worthy of their daughter, and forced us to separate. After that, I completed a year of college in Saida at Lebanese International University (LIU). Then I learned that we were going to get our green cards and move to the U.S. It felt like a dream come true. I always imagined anyone could do anything in the U.S. with no limits on success. I imagined you could get rich fast.

I landed in the U.S. in July of 2008. I was 20 years old and when I took that first step out of the plane, I told myself my dreams will come true here and I will fulfill my desires. However, the reality wasn't the same as my dreams. It wasn't easy living here. I worked endless hours at a bakery store making and selling Middle Eastern pastries (Baklava), in order to make money and provide for my family. I enrolled in college, but again I struggled to succeed. I wanted to make money faster than I could earn it at the bakery.

I also wanted to escape the horrific memories of war that were part of my past life. I became addicted to alcohol. After my 21st birthday my drinking escalated until I was drinking five times a week and was actually getting drunk at least every Friday and Saturday night, if not more often. After my 22nd birthday, my drinking increased even more. I would start drinking in the morning and continue drinking throughout the day. By two to three months before my crime, I was drinking all day, every day. I was at the point where I would open a bottle of Johnnie Walker Black in the morning and finish it by evening, while also drinking vodka and beer. I used drugs, too, to deal with the thoughts that were eating away at me. I smoked marijuana two to three times daily from my 20th birthday until my arrest. I was using cocaine and ecstasy multiple times per week, and even tried heroin, but thankfully only twice. I was scared and confused and was trying to drown out visions of the violence I had known.

Your Honor, I want you to know that in my past I was someone who protected, assisted, and helped people in need. But I never was good at taking those qualities and using them for my benefit, because I always believed I was not worthy and that I wasn't an effective human being. Judge Gettleman, I was lost, truly unable to follow any positive path. The self-destructive path

that I was on destroyed everything good that I had.

Now I would like to share with you what has happened since my arrest, what the beginning of my new life has been. I never was able to accept who I was due to my great immaturity. I allowed myself to be a truly undesirable and unproductive human being. As I have become able to appreciate who I was, I have grown up. I fully understand that I am responsible for the serious crime that I committed and I fully accept the consequences. Judge Gettleman, you can say it's now easy for me to say that I am sorry for my awful actions because I was caught. But in fact I want to show you why and how truly sorry I am.

During my time incarcerated, I began to examine myself and seek guidance to understand my behavior. The only way I can describe how I acted is unconscionable. Judge Gettleman, I cannot fully describe how awful I feel about what I did. But your Honor, I am seeking the right road to permit me to return back to society as a human being, as a brother, as a son to my father and mother, and to someday get married and build a family of my own.

When I began my incarceration, I was placed in solitary confinement. Judge Gettleman, it was a small cell, just me, 3 walls, and a door. They would give me my food through a slit in the door. I lived that life for just under 4 months, and fortunately I was forced to deal with the good and evil of myself. I was able to tear myself apart and examine who I never should have been, and I began to learn who I needed to be. I began on a course of teaching myself the proper fundamentals of a productive human being. Since my release to the general population, I have begun taking courses toward improving my life to be a responsible and respectful human being. I've completed an anger management course, a cognitive skills class, a drug and alcohol treatment program, yoga sessions, and am currently enrolled in a life skills class. Another important step I have taken toward improving my life is applying to the University of Ohio (College program for the incarcerated), in order to continue my education, earn a degree, and pursue my career. I have become so much wiser and so much more understanding, perceptive, caring, and remorseful than I ever thought I could be, both with others and myself.

6

Please understand, your Honor, that in the years that I will be away, I will continue to grow and accept who I am as a person and, most importantly, I will continue being the law-abiding citizen that I always should have been. After I am released, I will be deported back to Lebanon and my family will come with me. I ask for the mercy of this Court, and I ask you to please take a moment and look at the potential qualities that I will offer when I return to society. I ask you, your Honor, to give me the opportunity to demonstrate to you and my family that I am capable of being a different person than the person who committed this appalling crime.

Judge Gettleman, in closing, I am fortunate that my family, my girlfriend, and my attorneys have been so helpful since I have been in jail. They found Dr. Garbarino to open me up and understand me, and to show the scars and skeletons that were in this young and vulnerable body. I beg this Court that while you contemplate my sentence, you take the time to understand who I was, and who I can be. Because it wasn't just the violence, it was the entire life style that I lived and experienced. I lived in a dry well, and after being able to open up with my family and the professional doctor, the well has begun to fill up. And with me being honest and allowing myself to open up, I have truly learned and started to realize how what I kept inside greatly influenced my daily life. With the true and unconditional love of my mother, father, brother, and girlfriend, I have come to begin to understand my true self. I thank you Judge Gettleman for this opportunity.

Sincerely,

Sami Hassoun

7

## Exhibit 5:

## Richard Cornwell, *Côte d'Ivoire: Asking for it*, African Security Review 9:1, 80-93 (2000)

# Africa Watch
# Côte d'Ivoire: Asking for it

*Richard Cornwell*
*Africa Early Warning Programme, Institute for Security Studies*

Downloaded by [University of Chicago] at 11:01 18 March 2013

## COASTING TO POWER

On Christmas Eve 1999, those inhabitants of Côte d'Ivoire who were tuned into the local station *Radio Nostalgie* were informed by General Robert Gueï, sometime chief of defence staff, that *"... as of now, President Henri Konan Bédié is no longer the president of the republic."* Saying that he was speaking on behalf of a group of young mutineers, Gueï announced that they would shortly form a 'committee of national salvation'. He added that the government, parliament, constitutional council and supreme court had been dissolved.[1]

On the night of 22/23 December, six non-commissioned officers of the Para-Commando Rapid Deployment Force (FIRPAC) seized control of the arsenal at the military camp at Akouédo, on the north-eastern outskirts of Abidjan. The six were veterans of the United Nations mission to the Central African Republic (MINURCA) and had spent eleven months in Bangui as part of the deployment to stabilise the situation in the CAR where periodic mutinies had threatened to overthrow the government of President Ange-Felix Patassé.[2]

The Ivorian mutineers subsequently explained that their unhappiness was the result of poor living conditions for other ranks in the army, that ethnicity was now a factor in determining promotions and, more particularly, that their pay was in arrears and that their officers had appropriated large proportions of their special UN allowances. The contagion of the mutiny evidently spread quickly through the camp and

at three o'clock on the morning of the 23rd, the initial six set off as a delegation to present their grievances to the army chief, General Maurice Tauthuis. The mission was unsuccessful and one of the mutineers was wounded in an exchange of fire outside the general's house.[3]

The remaining five returned to Akouédo to find the camp in a state of near insurrection. A number of soldiers commandeered vehicles and headed into Abidjan, discharging automatic rifles and looting the shops and petrol stations in the capital. The reaction of President Bédié to these alarming events was extraordinary. Brushing aside the concerns of some of his advisors, he announced his intention of flying to his home town of Daoukro to celebrate Christmas there. As matters continued to develop during the day, his advisors pressed him to return to the capital, but he did so reluctantly, refusing to share their sense of alarm.[4]

At about one o'clock in the afternoon, some of the mutineers seized control of the buildings housing the state-run television and radio stations, forcing them to go off the air, though foreign and local stations continued to broadcast. There was total confusion in the city, as people wondered whether this was a pay mutiny or a full-scale *coup*. By five in the afternoon, the centre of Abidjan was deserted, and public transport had ceased to operate.[5]

Bédié still refused to meet the mutineers' representatives, instead delegating this task to certain senior ministers. The latter were unable to placate the soldiers with a series of vague

Downloaded by [University of Chicago] at 11:01 18 March 2013

meeting with the president was repeated. In the meantime, Colonel Mathias Doué, an officer popular with the ranks and only recently returned from an attaché posting in the Far East, was charged with maintaining contact with the soldiers.[6]

Several ministers were still trying to impress the gravity of the situation upon the president, suggesting that it might be necessary to dismiss some of the army command. Bédié remained reluctant, but eventually agreed that he would install Doué as chief of the army once circumstances permitted. He also agreed to meet the mutineers' representatives the following morning.[7] The defence minister now informed foreign journalists that the mutineers would not be suppressed by other troops, but that the protests would be allowed to run out of steam, and that the president would then meet with them to discuss their grievances, which were described as purely economic.[8]

This was hardly sufficient to stay the hand of the soldiers, and at 2 o'clock on the morning of 24 December, they seized control of the international airport. An hour later, they had blocked access to the two bridges linking the northern and southern parts of Abidjan.[9]

The president was now irritated rather than frightened. His humour was not improved by a number of telephone calls during the night, including one from President Matthieu Kérékou of Benin, who sought to persuade him that the television images being relayed by foreign stations showed more than a simple pay mutiny. The soldiers involved were ready to risk facing a firing squad, he said, and were

meant advice was ill-received, for it touched upon an issue that had become increasingly sensitive over the past year: the refusal to countenance any interference in matters concerning national sovereignty.[10]

A little before five in the morning, there was another call from General Gueï. He explained that he had been at his home town of Gouessesso in the Bainkouma region when he received a telephone message that his wife had been taken hostage by the mutineers. He was therefore returning to the capital and, by his own account, urged Bédié to take the demands of the soldiers seriously.[11] Bédié agreed to bring forward his meeting with the mutineers to 7:30, when he received four soldiers led by a sergeant who had belonged to the guard of former prime minister, Allasane Dramane Ouattara. After listening to their grievances, the president assured them that they would go unpunished, provided that they returned to their posts immediately. He also promised to make a personal study of their complaints. Although further discussions were offered, this meeting appears to have been remarkably brief.[12]

As Francis Kpatindé remarks in his detailed account of these events, by now it was too late for grudging and partial concessions, for the *putsch* had gathered irresistible momentum.[13]

At the same time as Bédié was meeting the delegation, other soldiers had entered *Radio Nostalgie,* a station whose head was close to Ouattara, and interrupted programmes to demand an end to the looting. A few hours later, several armed soldiers returned to the radio station saying that General Gueï, as their spokesperson, had an

*On Christmas eve 1999, inhabitants of Côte d'Ivoire were informed by General Gueï that President Henri Konan Bédié was no longer the president of the republic*

Downloaded by [University of Chicago] at 11:01 18 March 2013

announcement to make? It was at this stage that Filed Colonel Doué informed a news conference on
the parameters of the military challenge became
apparent. Gueï's broadcast, claiming the
overthrow of the Bédié regime, was greeted by
outpourings of public joy on the streets of
Abidjan.[14] Soldiers now proceeded to the prison
to release the opposition politicians incarcerated
there, though several other common criminals
also made good their escape during the ensuing
confusion.[15]

Bédié was apparently unaware of Gueï's
announcement, and assured *Radio France
Internationale* that he had no intention of
relinquishing power, but would continue the
dialogue about military grievances.[16] The
French government evidently was considering its
options in this uncertain situation, with its
Foreign Ministry condemning the assault on the
institutions of the West African republic, and
calling for the immediate restoration of order
and security in Abidjan. Particularly ominous
was the subtext emanating from Paris, of
concern for the fate of some 20 000 French
nationals resident in Côte d'Ivoire, which some
interpreted as a precursor to a French military
intervention, using the 43rd Marine Infantry,
based in the south of Abidjan at Port-Bouet.[17]

An announcement by the newly established
Committee of Public Salvation that it was to
enforce a curfew gave rise to one final act of
defiance by the embattled president who
responded to the broadcast by calling on loyalist
forces, civilian and military, to resist.[18]

By now Gueï, while continuing to insist that he
had come forward only at the request of the
young mutineers, began to take on an even
more prominent profile, offering to assume the
role of head of state if that was required.[19] He
also warned France that any attempt to reverse
the situation would meet with firm resistance. In
any event, Paris demurred, with socialist prime
minister, Lionel Jospin, and Gaullist president,
Jacques Chirac concurring that the days of
intervention to support unpopular and
recalcitrant regimes were something of the past,
whatever the objections of hardline Gaullists.[20]

the 25th that Gueï would head the new National
Committee of Public Salvation.[21]

The announcement of the members of the
Committee was greeted with interest. Apart
from General Gueï, the membership consisted
of General Lassana Palenfo, who had served as
security minister during Ouattara's premiership
in the early 1990s; General Abdoulaye
Coulibaly, an officer who had been Houphouët-
Boigny's personal pilot, and had subsequently
commanded the air force under Ouattara;
Colonel Mathias Doué; Naval Captain Djikalou
St Cyr; Naval Lieutenant Sama Henri Cesar;
Chief Petty Officer Zohin Honore; Staff-
Sergeant Boka Yapi Laurent, the only one of the
original six insurrectionists named to the
Committee; and Major Mouassi Grena.[22] The
association of the senior members of the
Committee with Allasane Ouattara was lost on
nobody, yet too close an identification in public
would neither benefit the ruling junta, which
needed the temporary legitimisation of a
national base of poplar support, nor Ouattara
himself, who needed to emerge as an eventual
presidential candidate in his own right.[23] By
now, all other force commanders had declared
their loyalty to the junta, dashing any remaining
hope of a counter-*coup* that would restore
Bédié, or, indeed, encourage any outside powers
to do so.[24]

France's reaction was interesting: with matters
apparently still in the balance, the Foreign
Ministry in Paris issued a statement condemning
the assault on the institutions of the Ivorian
republic and calling for the immediate
restoration of order and security.[25] Other
European countries also voiced concern over
developments.[26] Before Christmas Eve was
over, however, there were indications that the
French government had interceded with Gueï to
allow Bédié, his family and his immediate
entourage to leave the country.[27] The following
day, Bédié and his family were ensconced at the
French military base adjacent to the city's airport
and Gueï announced that the deposed head of
state was free to leave Côte d'Ivoire.[28]

Downloaded by [University of Chicago] at 11:01 18 March 2013

restoration of democratic constitutional rule, without stipulating the reinstatement of Bédié.[29] Some of the African reactions were less equivocal, however. Nigeria and South Africa initially insisted on the return to power of the elected president, though these demands became more muted as the weeks passed, and the new regime consolidated itself.

As Gueï set about cementing the foundations of his new regime, he questioned the accuracy of the term *'coup d'état'* as a description of what had taken place. He emphasised that he sought only to create the conditions necessary to install a true democracy and enable the holding of free and fair elections.[30] Apart from signalling that the army's intervention had either been far more ambitious than first realised, or that its objectives had been broadened considerably, this was an early indication of Gueï's recognition that *coupists* faced much heavier odds than in the past in terms of the international arena.

Was the Ivorian *coup* going to follow the example recently set by the soldiers of Niger? Understandable though the reaction of civilian heads of government to *any* military interference with the body politic is, these events, unresolved as they remain, may give pause for thought to many recognised heads of state experiencing problems with their legitimacy.

## A MOST UNLIKELY *COUP?*

As shall be shown, the events of the past year gave plenty of reasons for anxiety about the stability of Côte d'Ivoire in 2000. Yet, of all the African countries least likely to experience a

long featured high on most people's lists. Not only was the army relatively small – about 7 500 strong – but many observers believed that the army would be deterred from direct intervention in the political arena by the countervailing presence of the *gendarmerie* and, more particularly, the presence of a sizeable French garrison at Port-Bouet, on the southern edge of the capital. Thus, since independence, of all the states of West Africa, the most significant in regional terms to Paris — Côte d'Ivoire, Senegal, Cameroon and Gabon — apparently had enjoyed an externally guaranteed immunity, since the former colonial power was unlikely to tolerate the military overthrow of incumbent regimes deemed important to the maintenance of France's regional influence.[31]

Several developments had changed the international and local political context, however, in ways evidently unnoticed by President Bédié and his advisors. First among these was the inability of Bédié himself to fill the political space left by his predecessor, Felix Houphouët-Boigny. This in itself was scarcely surprising, for Houphouët-Boigny was perhaps the ablest politician of all the founding fathers of independent Africa. He dominated the political scene in Francophone West Africa for almost five decades, including his presidency of Côte d'Ivoire from independence in 1960 until his death at the age of 88 in 1993. Houphouët-Boigny's close relationship with France began with his election to the French National Assembly in 1945. Between 1956 and 1959, he served as a cabinet minister in Paris. For the remainder of his life, he remained a valued confidant of French presidents and Prime ministers on matters African.[32]

Downloaded by [University of Chicago] at 11:01 18 March 2013

been described as a benevolent, paternalistic authoritarianism, derived from a chiefly tradition and with the emphasis on accommodation and co-option rather than repression. He emphasised the primacy of economic growth and development over liberal political freedoms. While resources lasted, this approach was reasonably successful in terms of its own objectives.[33]

In the decade preceding independence, the colonial administration of Côte d'Ivoire developed a system of agriculture based upon indigenous plantations.[34] An extensive transport infrastructure was created and between 1950 and 1965, annual economic growth averaged nine per cent, and exports increased fourfold. Nevertheless, this 'economic miracle' of state capitalism came at a price, albeit one to be paid by future generations:

- The plantation economy was based on the availability of a low-paid immigrant workforce, numbering as many as a million, most of whom had entered the country from Upper Volta (Burkina Faso) when both territories were part of French West Africa.

- The excessive emphasis on export crops threatened domestic food production and led to the importation of non-traditional food imports. The rapid exploitation of timber resources also threatened the ecological balance of whole districts.

- Industrialisation and mining were neglected in the pre-independence years leaving the country dangerously exposed to fluctuations in commodity prices and deteriorating terms of trade.

- There was an excessive dependence on foreign capital which, thanks to the open exchange market of the CFA franc, could be withdrawn in times of recession.[35]

All of this was yet to become obvious in the 1960s and 1970s, when there were abundant economic resources to fuel the political machine and keep the patronage system thriving.[36]

By the late 1970s, however, the flaws in the plan were beginning to become apparent. A boom in commodity prices yielded embarked on a programme of infrastructural expansion supported by massive foreign borrowing. In 1978, cocoa and coffee prices began a steep and protracted decline, leaving the government deeply in debt and struggling to make ends meet. Between 1979 and 1984, employment in the modern sector contracted by thirty per cent, and gross domestic product declined by more than 1,5 per cent per year. By 1987, the country was forced to declare a moratorium on interest payments to its principal foreign creditors.[37]

Houphouët-Boigny's reaction to the crisis was characteristically shrewd: he facilitated a constitutional revision allowing for popular participation in politics for the first time since independence, through competitive elections to the national assembly, albeit within the context of the single-party system. Rather than being seen as a concession to pressure for political liberalisation, this innovation allowed the president to deflect popular discontent towards corrupt officials and members of the party 'old guard'. More than eighty per cent of the sitting national assembly was voted out in 1980, and the new incumbents of political office owed their positions to the president. In 1985, the process was repeated, and 65 per cent of the assembly was ousted.[38]

The introduction of intraparty competition raised the issue of home-based politics for the first time, including feelings between 'locals' and 'strangers' reflecting the latent tensions created by the government's encouragement of internal migration to develop the plantation economy. This was aggravated by the movement back to the land of thousands of urbanites, trying to alleviate the effects of the economic downturn. Back in their 'home areas' many of these people found that the best agricultural land was already overcrowded.[39]

Once begun, the process of political 'liberalisation' found more radical proponents. In 1982, Laurent Gbagbo, a university lecturer who had already been detained and imprisoned

Downloaded by [University of Chicago] at 11:01 18 March 2013

published a tract calling for an alternative form of democracy in Côte d'Ivoire. He then prudently left for six years of exile in France, during which time he set up the *Front populaire ivorien* (FPI) as an opposition party.[40]

The early years of Houphouët-Boigny's rule had seen their share of upheavals, of which the nature remain somewhat enigmatic. In 1963, a series of events led to the arrest and secret trial of between 120 and 200 people, thirteen of whom were subsequently sentenced to death. This marked the consolidation of presidential power, and also revealed something of Houphouët-Boigny's political style. None of the death sentences were carried out, and he was later heard to describe the perpetrators half affectionately as *"my little perverts."*[41]

There were also violent student protests in 1968 and a revolt in the Bete region in 1973, both of which were easily contained.[42] University student demonstrations continued to be a feature of the 1970s, but only in the late 1980s did protests become heavily politicised. Austerity measures arising from Côte d'Ivoire's acceptance of a structural adjustment programme in early 1990 were abandoned, following protests by students, workers and, ominously, soldiers. In what looks with hindsight almost like a dress rehearsal for the events of 1999, conscripts demanding pay increases occupied the capital's international airport, invaded the business district and commandeered motor vehicles.[43] Apart from retreating on the issue of structural adjustment, Houphouët-Boigny realised the need for further concessions to ease the pressure on his regime and evade the fashionable demand for a national conference now being voiced in some quarters. At the

return to the multiparty system as laid down in the constitution, and agreed to run in a competitive election for the first time since independence.[44]

Elections were held at the end of October 1990. Official obstruction, inexperience, harassment and the fragmentation of the opposition presented Houphouët-Boigny with a comfortable victory in the presidential race, with 82 per cent of the vote to Gbagbo's eighteen. In the national assembly, the ruling *Parti démocratique de la Côte d'Ivoire* (PDCI) secured 163 of the 175 seats, although only 61 incumbents were returned. In that same year, Houphouët-Boigny – now in his mid-eighties, in failing health and eager to distance himself from the onerous complexities implicit in the daily management of state affairs – decreed the establishment of the post of prime minister, to which he appointed a 48-year old US-trained economist, Dr Alassane Dramane Ouattara, then serving as governor of the West African central bank (BCEAO).[45]

Ouattara's principal task was to resume the unpopular austerity programmes and to force through structural measures that, by their very nature, would expose him and his administration to a barrage of criticism. Throughout 1991 and 1992, the government met turbulence in the universities and among the urban poor with a mixture of firmness and conciliation. There were also further incidents of unrest in the armed forces. In July 1991, General Gueï, who had been promoted a year earlier to head the army, announced that a number of soldiers had been detained as they were planning to stage a mutiny.[46] In April 1993, members of the

presidential guard, stationed at Yamoussoukro, staged a brief mutiny over pay and conditions.[47]

Case: 2:10-cr-00773 Document #: 84-1 Filed: 03/18/13 Page 38 of 134 PageID #:409

Downloaded by [University of Chicago] at 11:01 18 March 2013

The violent suppression of protests began to attract unfavourable attention from abroad, though this was mitigated by the country's recovery as an attractive haven for foreign investment. A deal was also struck with the opposition, many of whose leaders had been jailed in February 1992 following a demonstration which had become a riot. A general amnesty for politically-related crimes and for those connected to the maintenance of public order was announced in August 1992, also protecting the security forces, including Gueï, from brutality charges.[48]

By mid-1993, Houphouët-Boigny's health had begun its final decline, and he was admitted to a Paris hospital in that June, suffering from prostate cancer. He returned to Côte d'Ivoire only in November and died on 7 December. The constitution had been modified in 1990, ostensibly to provide for a smooth succession in the event of Houphouët-Boigny's death in office. The post of vice-president, created in 1980, had been abolished in 1985 without ever having been filled. The 1990 amendment stipulated that the president would be succeeded by the president of the national assembly, who was to hold office until the next scheduled election.[49]

Within hours of the announcement of Houphouët-Boigny's death, the president of the national assembly, Henri Konan Bédié, had laid claim to the succession, over the protests of Ouattara, who wanted the supreme court to assume temporary charge, pending a new election. This latter position evidently enjoyed the support of General Gueï and the army. Bédié's interpretation of the constitution was upheld two days later by the supreme court, and Ouattara resigned to take up an appointment in Washington as deputy managing director of the International Monetary Fund (IMF).[50]

France's relations with its African partners were already undergoing changes by 1993. The French prime minister, Balladur, announced in September that Paris would make further structural adjustment aid conditional upon the signing of agreements with the World Bank and the IMF, signalling that France was unwilling to bear the burdens of Francophone Africa's economic problems alone. President Mitterand and Balladur made use of the occasion of Houphouët-Boigny's funeral to explain that the CFA franc would be devalued by fifty per cent. Côte d'Ivoire, with a more robust export sector than most of its poorer neighbours, was able to ride out the political backlash of devaluation relatively well.[51] Ouattara's structural reforms and the windfall benefits of devaluation provided Bédié and the PDCI with an excellent platform from which to ward off challengers during the presidential campaign, due in 1995. This position was reinforced by the adoption of an electoral code requiring that both parents of a presidential candidate should be of Ivorian nationality, and that the candidate should have lived in the country for the past five years. This was a scantily disguised attempt to exclude Ouattara from the lists.[52]

This trend in Ivorian politics marked a sharp departure from Houphouët-Boigny's style and philosophy. He had long advocated a very broad concept of dual nationality and only local opposition made it impossible to write this into law. He had still made it possible for foreign residents to vote, a privilege of which they were now deprived. The new policy, cloaked as it was in the pseudo-philosophical trappings of Ivorité, constituted a potentially grave threat to the communal peace in a country where as many as thirty per cent of the population were of foreign origin. In addition, the PDCI began to play the dangerous game of stimulating ethnic and religious tensions, attempting to prevent an alliance between opposition elements in the Moslem north and the Catholic south.[53] Nonetheless, a united opposition front took to the streets to protest against the new electoral code. A breakaway group from the PDCI established the *Rassemblement des républicains* (RDR) in 1994 and, in mid-1995, asked Ouattara to stand as its presidential candidate. The government remained obdurate

Downloaded by [University of Chicago] at 11:01 18 March 2013

Ouattara and the RDR boycotted the presidential elections, as did Gbagbo and the FPI. As a consequence, Bédié secured the presidency, winning 96 per cent of the votes in a much diminished turnout against the head of a small left-wing party, Francis Wodié.[54] In the parliamentary elections of November, the PDCI retained 147 of the 175 seats, fighting off the challenge from the RDR and the FPI.[55]

On the eve of the polls, in a move that now appears doubly significant, Bédié dismissed Gueï as chief of defence staff for refusing to deploy troops against demonstrators during the turbulence leading up to the elections.[56] There were also rumours of a *coup* plot.[57]

In general, however, Bédié could reflect on his position at the end of 1995 with some satisfaction. He had co-opted some of those into his cabinet whom he most suspected of disloyalty, his principal political opponent had taken up a post overseas, his party had won convincingly enough at the parliamentary election to eliminate the bad taste left by a lopsided presidential contest, and the French minister of co-operation had assured him that *"France will be at your side, Mr President, for the long period that lies ahead of you."*[58]

The economy, too, was thriving, at least in the macro-economic terms most appealing to the IMF. Côte d'Ivoire's implementation of the three-year structural adjustment and reform programmes of 1994-1996 was deemed a success: economic recovery, especially in the export sector, was sustained, rapid growth resumed, and inflation was reduced to single digit figures.[59]

however, despite a significant rise in per capita GDP. The IMF noted the fragility of the public finance sector, the need for an environment more conducive to private sector growth, and the urgency of further efforts to reduce poverty and improve access to basic services. Most ominous was the high level of Côte d'Ivoire's debt, especially in the context of reduced international financial assistance, both bilateral and multilateral. By the end of 1996, the country's total debt stock amounted to US $19.5 billion, of which US $16.2 billion was public debt. Merely servicing this debt amounted to an equivalent of 25 per cent of the value of exports and 52 per cent of government revenue. It was therefore essential that the government pursue prudent fiscal policies that would earn it substantial relief under the highly indebted poor countries (HIPC) programme.[60] This constituted a fatal conundrum for a regime increasingly committed to obstructing change and attempting to reverse the effects of some of the gains made by pluralist democrats.[61] The irony was that it was unlikely that austerity measures alone would satisfy the IMF while key issues of governance and corruption remained undressed. In the event, the Bédié administration managed to make the worst of a bad job.

In March 1998, the government had secured an agreement with the IMF for an enhanced structural adjustment package of US $348 million, following tough negotiations in which the IMF and the World Bank insisted on the liberalisation of the cocoa and coffee sectors. By September 1998, there were difficulties, as the IMF withheld its six-monthly tranche on worries about the slow pace of liberalisation and

*Côte d'Ivoire's implementation of the three-year structural adjustment and reform programmes of 1994-1996 was deemed a success*

Downloaded by [University of Chicago] at 11:01 18 March 2013

other questions concerning corruption. In particular, a sum of US $220 million could not be accounted for in the records of Caistab, the parastatal agricultural marketing and stabilisation fund. The Ivorian authorities tried, unconvincingly, to persuade the IMF that this was a 'technical problem'. It now appeared that the earliest the delayed tranche could be expected, was April 1999, which was to prove wildly optimistic.[62]

By the beginning of 1999, the agricultural sector was in uproar. The world prices of the country's principal agricultural products, which comprised 75 per cent of exports by value, had begun to slump, the 1999 budget had to be cut by five per cent, and in the midst of all this uncertainty, Caistab was reformed. Over the next few months, the coffee and cocoa farmers' safety net was whisked away.[63] Whatever the justification for replacing the marketing and stabilisation organisation, 1999 provided the worst possible conditions in which to undertake such an enterprise. At precisely the time when world prices for cocoa were reaching a seven-year low, farmgate prices were being set by the market rather than the state, a situation barely intelligible to a largely illiterate farming population after all these years. Even the international agencies were compelled to admit that it would probably be at least three years before small-scale plantation owners could organise adequate co-operative structures to replace the state network. Throughout the year, farmers either refused to sell their produce, occasionally burning stocks as a protest, or smuggled them across the border into Ghana, where higher prices might still be obtained. In any event, the consequences for the country's balance of payments and tax collection were catastrophic.[64]

The desperation of the government's position and the consequent sense of frustration manifested themselves in a series of angry public exchanges about the way in which the IMF was handling its relations with Côte d'Ivoire. The finance minister admitted that differences existed about the structure of the adjustment programme, but added that he suspected that political considerations were taking precedence over technical aspects. This reflected a growing conviction in government circles that Ouattara was using his position as deputy managing director at the IMF to make life difficult for the Bédié administration in the run-up to the elections due in 2000. A few days later, the president added his voice to the complaint, urging the IMF to respect Ivorian sovereignty, only to stimulate an angry rebuke from the IMF, which dismissed the allegations as groundless and inadmissible.[65] Both parties subsequently tried to play down the rift, Abidjan realising full well that IMF assistance was vital to any prospect for an HIPC deal in 2001.[66]

Towards the end of June, another disaster struck: an audit by the European Union showed that as much as US $33 million of its aid funding to Coté d'Ivoire for 1992-1997 had been misappropriated.[67] Eventually, the government had to promise to repay the embezzled funds, three ministers were sacked, and eighteen civil servants and three businessmen put on trial. But the damage to the administration's public reputation was immeasurable and the worst fears of the IMF confirmed. In its July review, the IMF said that it was still not ready to resume disbursements under the 1998 agreement.[68] By November, prospects were no better, and Bédié's exasperation once again manifested itself in a public condemnation of the imposition of structural adjustment programmes without due regard to domestic conditions.[69] Little did he suspect that, as far as he was concerned, such matters would be of little more than academic importance in just over a month's time. Not satisfied with the magnitude of his, albeit partially flawed, electoral victory in 1995, Bédié took steps to guarantee the impregnability of his position. He did so in ways that actually contributed to undermine his hold on office and to alienate many of his erstwhile supporters overseas.

In 1998, for instance, he revised the constitution to provide for a presidential term of seven years

Downloaded by [University of Chicago] at 11:01 18 March 2013

presidential terms were removed. The amendments also included presidential powers to delay elections or the announcement of results in the event of serious trouble. There were plans to create a senate, one-third of whose members would be appointed by the president. The residence requirement for presidential candidates was extended from five to ten years, in addition to the existing conditions regarding Ivorian birth and parentage. The opposition boycotted the vote in the assembly and protestors took to the streets in an expression of solidarity against the reforms.[70]

Foreign government and media attention and worries about the adverse effects of confrontational politics on investor confidence seem to have played a part in persuading Bédié to revert to the tried and trusted tactics of co-option towards the end of 1998. In December, the PDCI and Gbagbo's FPI reached a partial agreement on ensuring democracy and good governance. The government also undertook to submit an amnesty law to the assembly to enable the release of those imprisoned for offences linked to the 1995 election. The accord provided details of party funding and provisions for the establishment of a national election commission.[71] Though the accord sufficed for a while to separate Gbagbo from support for Ouattara's right to contest the 2000 election, the failure to fulfil promises of a national electoral commission ultimately undermined any confidence in the government's commitment to its undertakings.[72]

Similar approaches were made in March 1999 towards the RDR, in talks concentrating on electoral rules and organisation. But by now Ouattara was

intended to return to Côte d'Ivoire to press his right to contest the presidency, and the PDCI was unprepared to continue dialogue that would entertain such a possibility. By the beginning of May, the dialogue was dead.[73]

The remainder of the year saw a steady deterioration in relations between the government and the opposition, against a background of recurrent student and labour unrest.[74] The RDR refused outright to retract its position on Ouattara's leadership, saying publicly that he would become president of the party upon his retirement from the IMF in August.[75] From now until the fall of the government, the press recorded the grim pantomime of Ouattara's attempts to prove his eligibility to stand as a presidential candidate, and the government's persistent manoeuvrings to thwart this. The details do not have to be provided here, for events have rendered the argument redundant, but the struggle to prevent Ouattara's candidacy and the absurd lengths to which Bédié was prepared to go on this issue went a considerable way in eroding the support he might have expected from foreign political allies in the final crisis.[76]

The next few months witnessed a deepening cycle of public unrest, partly political, partly socio-economic in inspiration, and government threats and repression. In a final attempt to ease the situation on 18 September, Ouattara met for three hours with Bédié. Subsequent reports in the opposition press alleged that the president had tried to buy off his rival by offering him the premiership, with full powers. If the offer was indeed made, it was rejected, and Ouattara

*The rest of the year saw a deterioration in relations between the government and the opposition, against a background of student and labour unrest*

Case 1:16-cr-00773 Document 84-1 Filed 03/18/23 Page 42 of 134 PageID #:428

Downloaded by [University of Chicago] at 11:01 18 March 2013

proceeded to meet Laurent Gbagbo later that day, following which the two opposition leaders announced that they were preparing a joint government programme, reviving the Republican Front of the 1995 campaign. Ouattara then left for Washington and Paris, after which the government again raised the stakes by issuing a warrant for his arrest on suspicion that he had forged the identity papers supporting his claim to Ivorian citizenship.[77]

Ouattara now tried to engage the attention of other regional leaders to the dangers of the developing crisis, hoping that they would intercede with Bédié to moderate both his actions and inflammatory language of his government. Over the next two months, he met presidents Eyadema of Togo, Diouf of Senegal and Bongo of Gabon. He was joined on the Senegalese leg of his mission by Laurent Gbagbo.[78] These efforts and the expressions of concern emanating from other West African capitals met with a robust denunciation from Abidjan of efforts to interfere in the internal affairs of a sovereign state.[79]

Perhaps the final defining moment came on 27 October in Abidjan, when RDR demonstrators protesting against the Ouattara arrest warrant clashed with police. Some violence and damage to property ensued, and the entire top leadership of the party was arrested. In terms of Ivorian law, political leaders could be charged with responsibility for the actions of their supporters in public rallies, and on 4 November, a number of RDR leaders went to trial. On 12 November, eleven of them received jail sentences and fines. Ouattara condemned these proceedings as a transparent attempt to cripple the RDR ahead of the elections. Gbagbo's FPI confirmed the resolve of his party to hold to the alliance with the RDR. The French and US governments expressed their disquiet, and received the usual government rebuff.[80]

Harassment of RDR politicians continued elsewhere in the country, and the party urged Ouattara to delay his planned return.[81] By now, the international press was beginning to give serious attention to developments.[82]

The renewal of the arrest warrant for Ouattara, and a presidential proclamation banning all street protests simply aggravated matters further.[83] Even now, the possibility of compromise seemed to exist, and when President Bédié addressed the national assembly on 22 December, he hinted at an amnesty for the RDR's jailed leaders that would allow them to contest the election, though he dashed any hope of concessions about Ouattara's candidacy, and insisted that the RDR respect the law and uphold public order. He also added a denunciation of foreign interference in the country's internal affairs and took a sideswipe at the IMF and its draconian economic prescriptions.[84]

That this was to offer too little, too late, became only too evident in the next two days. But that the overthrow occurred to the astonishment of many people throughout the world, as well as of Ivorians themselves, remains a fact. Were the signs clear enough that there was trouble afoot? Was the complacency of those with a vested interest in the stability of the country of such a nature that these signs were gladly ignored? What became clear, is that even the seemingly most peaceful parts of Africa – such as West Africa, with its established relationship with the former colonial power that even has forces garrisoned there – are prone to unrest, *coups* and conflict.

That the country's new military rulers and the politicians they have co-opted face a daunting task is obvious. The removal of President Bédié has done nothing to change the fundamentals underlying Côte d'Ivoire's current economic and financial crisis. Indeed, it could be argued that the IMF and the World Bank will be even more cautious before lending assistance to military-dominated government. Recently Gueï has responded to diplomatic pressure by promising elections by October 2000 and a return to civilian rule. He has been evasive in his answers to questions whether he intends to stand for office when that time comes. In the meantime,

Downloaded by [University of Chicago] at 11:01 18 March 2013

handling of the delicate political egos
in the wings, as well as having to keep
a weathered eye on a still dissatisfied
military. Other West African states will
monitor his progress with interest and
not a little anxiety.

## ENDNOTES

1 *Ivorian President overthrown after 2-day mutiny*, Agence France Presse, 24 December 1999

2 F Kpatindé, *Les derniers jours de Bédié*, Jeune Afrique Spécial — Côte d'Ivoire: Est-ce une révolution?, January 2000, pp 12-13.

3 Ibid.

4 Ibid, p 14; *Ivorian president returns to Abidjan*, Reuters, 23 December 1999.

5 Ibid, p 13-14; M F Dara, *Film of events*, West Africa, 10-16 January 2000, p 13; *Radio says soldiers angry over unpaid allowances*, Radio Nostalgie, 23 December 1999.

6 Kpatindé, op cit, p 15.

7 Ibid.

8 N Phythian, *Soldiers jolt Ivory Coast peaceful image*, Reuters, 24 December 1999.

9 Kpatindé, op cit, p 15.

10 Ibid, p 16.

11 Ibid; Dara, op cit. There is no way of knowing whether this is an accurate reflection of the introduction of Gueï into the drama, or whether it was a construction designed to disguise a deeper and more elaborate conspiracy. See also *Portrait of Côte d'Ivoire's new strongman*, Agence France Presse, 28 December 1999.

12 Kpatindé, op cit, p 16. According to Dara, the soldiers stormed out of the meeting. He also maintains that they had added the release of opposition jailed following demonstrations against the regime to their previous demands. See Dara, op cit, p 13.

13 Kpatindé, op cit, p 16.

14 Ibid, pp 16-17.

15 Ibid, p 17; V Thorin, *Noël à la Maca*, Jeune Afrique Spécial — Côte d'Ivoire: Est-ce une révolution?, January 2000, p 19.

16 *Bédié tells RFI relinquishing my post is 'out of question'*, Radio France Internationale, 24 December 1999.

17 *France strongly condemns apparent putsch in Ivory Coast*, Dow Jones International News, 24 December 1999.

18 *Military committee imposes overnight curfew until further notice*, Radio Nostalgie, Abidjan, 24 December 1999; *President Bédié calls for resistance to 'attempted' coup*, Radio France Internationale, 24 December 1999; *President Bédié says he is in power, calls Gen Gueï a 'nitwit'*, Radio France Internationale, 24 December 1999.

19 *Ex-army chief announces Ivorian coup*, Reuters, 24 December 1999.

20 F Soudan, *Comment la France a géré le coup d'état*, Jeune Afrique Spécial — Côte d'Ivoire: Est-ce une révolution?, January 2000, pp 48-51.

21 *Ivorian army ruler heads nine-member council*, Reuters, 25 December 1999.

22 *List of members of Ivory Coast's ruling council*, Reuters, 25 December 1999; *Key players in Ivory Coast crisis*, Reuters, 26 December 1999.

23 N Phythian, *Who wants what from Ivory Coast coup*, Reuters, 26 December 1999; F Kpatindé, *Qui est Robert Gueï?*, Jeune Afrique Spécial — Côte d'Ivoire: Est-ce une révolution?, January 2000, pp 23-25; *Côte d'Ivoire — Mon general*, Africa Confidential, 21 January 2000.

24 V T'Sas, *Army digs in after Ivory Coast coup*, Sunday Times, 26 December 1999.

25 *France strongly condemns apparent putsch in Ivory Coast*, Dow Jones International News, 24 December 1999.

26 *Europe condemns Ivorian violence*, Reuters, 24 December 1999.

27 *Gueï says France wants Bédié out of Ivory Coast*, Reuters, 24 December 1999.

28 Kpatindé, op cit, p 18; N Phythian, *Christmas coup in Ivory Coast, France guards Bédié*, Reuters, 25 December 1999; *President free to leave, says military leader*, Radio France Internationale, 25 December 1999. Phythian, *Christmas coup*, op cit; *France guards Bédié*, Reuters, 25 December 1999.

29 *Britain urges return to democracy in Ivory Coast*, Reuters, 25 December 1999.

30 *Ivorian ruler Gueï says plans fair elections*, Reuters, 25 December 1999; *Ivorian ruler heads nine-member council*, Reuters, 25 December 1999.

31 S Decalo, Coups and army rule in Africa: Motivations and constraints, second edition, Yale University Press, New Haven, 1990, p 14.

32 R J Mundt, *Côte d'Ivoire: Continuity and change in a semi-democracy*, in J F Clark & D E Gardinier (eds), Political reform in Francophone Africa, Westview, Boulder, 1997, pp 182-187; A Rake, 100 Great Africans, Scarecrow Press, Metuchen, NJ, 1994, pp 363-367.

33 Mundt, ibid, pp 185-186.

34 P Manning, Francophone sub-Saharan Africa 1880-1985, Cambridge University Press,

> *Quattara tried to engage the attention of other regional leaders to the dangers of the developing crisis, hoping that they would intercede*

Cambridge: 1bb0pc1800d9702690601 mm intself: vad-a1 Files BQ/221281Page 44 of 134 PageID #:415

Downloaded from [University of Chicago] at 11:01 18 March 2013

wealthy planter, with interests in cocoa and coffee. His early political career was built on the promotion of indigenous planters' interests and the erosion of competitive advantages enjoyed by French planters who, until 1946, had access to forced labour in the colonies.

35  A A Mazrui & M Tidy, Nationalism and new states in Africa, Heinemann, London, 1984, p 37. An alternative view of the relationship between cash crop production and food security is presented in D E Sahn, P A Dorosh & S D Younger, Structural adjustment reconsidered: Economic policy and poverty in Africa, Cambridge University Press, Cambridge, 1997, pp 214-215.

36  M Meredith, The first dance of freedom, Sphere Books, London, 1985, pp 324-327; Mundt, op cit, p 186.

37  Meredith, ibid, p 327; Mundt, ibid, p 187.

38  Mundt, ibid, p 188; M Bratton & N van de Walle, Democratic experiments in Africa: Regime transitions in comparative perspective, Cambridge University Press, Cambridge, 1997, p 75.

39  Mundt, ibid, pp 188-189.

40  Ibid, pp 188-189.

41  Ibid, p 85; Mazrui & Tidy, op cit, p 290, Rake, op cit, p 365.

42  Mazrui & Michael Tidy, ibid, p 290.

43  Bratton & Van de Walle, op cit, pp 101-102; Mundt, op cit, pp 189-190.

44  Bratton & Van de Walle, ibid, p 103; Mundt, ibid, pp 190-191.

45  Mundt, ibid, p 192; Ivory Coast's premier was Mr Fixit for economy, Reuters, 9 December 1993. Ouattara also held the portfolios of finance and the economy.

46  N Kotch, Ivory Coast army chief says soldiers under arrest, denies coup, Reuters, 30 July 1991. Gueï quickly built up a reputation as the regime's hard-man, dealing fairly brutally with student and military dissidents. An argument with Colonel Mathias Doué, then commanding the base at Akouédo over the alleged death of a military detainee under torture led to a public row and the arrest of Doué. See M Koffi, Ivory Coast's number two soldier detained, Reuters, 7 August 1991.

47  A Sangare, Ivory Coast troops shoot in fresh pay protest, Reuters, Abidjan, 4 April 1993; G Tudor, Ivory Coast mutineers meet president over demands, Reuters, 6 April 1993.

48  G Tudor, Ivory Coast frees dozens of political prisoners, Reuters, 1 August 1992.

49  Mundt, op cit, p 185.

50  Ibid, p 193.

51  Ibid, pp 193-195.

52  Ibid, pp 195-196; Main players in Ivory Coast's presidential election, Reuters, 22 October 1995. At the time, the PDCI position was that Ouattara should be excluded because his father was a Burkinabé. Counter-allegations that Bédié's father was Ghanaian led to the prosecution of the journalists investigating the allegation.

53  Mundt, ibid, pp196-197.

55  Ibid; N Phythian, Ivorians choose president, army protects voters, Reuters, 22 October 1995.

56  Ivorian president replaces army chief, Reuters, 21 October 1995; Government communiqué on the replacement of the army chief of staff, Radio Côte d'Ivoire, 21 October 1995; J Chiahemen, Ivory Coast poll ends without feared violence, Reuters, 23 October 1995.

57  N Phythian, Bédié wins Ivorian poll, faces difficult weeks, Reuters, 23 October 1995; M Koffi, New Ivorian armed forces chief preaches unity, Reuters, 24 October 1995. Gueï was absorbed into the cabinet as minister for the civil service, ostensibly to plan for employment creation, but probably to keep him busy and to compromise his newly won popularity with the opposition. M Koffi, Ivory Coast acknowledges coup bid last October, Reuters, 17 May 1996. Gueï was eventually dropped from the cabinet in a reshuffle in August 1996 and was then questioned about his role in the 1995 coup plot. He was subsequently dismissed from the army for serious faults of discipline. See J Chiahemen, Two generals fired from Ivory Coast cabinet, Reuters, 10 August 1996; Former Ivorian army chief held over coup claims, Reuters, 14 August 1996; Former Ivory Coast army chief faces coup tribunal, Reuters, 18 November 1996; Former Ivorian chief of staff thrown out of army, Reuters, 30 January 1997.

58  Mundt, op cit, p 196, citing Jacques Godfrain's words as reported in the New York Times, 23 October 1995.

59  IMF, Côte d'Ivoire: Enhanced structural adjustment facility: Policy framework paper, 1998-2000, International Monetary Fund, Washington DC, 9 February 1998.

60  Ibid.

61  Mundt, op cit, pp 182-183.

62  V T'Sas, Ivory Coast hits new problems with IMF, Reuters, 26 February 1999; Economist Intelligence Unit, Côte d'Ivoire: Country Report, 4th Quarter, 1999, p 7.

63  State reduces budget by nearly 90 billion CFA francs, PANA, 21 January 1999; Economist Intelligence Unit, ibid, p 7.

65  Finance minister gives details of IMF negotiations, Television Ivorienne, 15 May 1999; V T'Sas, Ivorian farmers seen ill-prepared for cocoa reform, Reuters, 17 August 1999; Cocoa plummets to a 7-year low on prospects for big African crop, Associated Press, 3 November 1999; A Wyley, Ivorian cocoa shake-up needed more time — analysts, Reuters, 3 November 1999; V T'Sas, Ivory coast won't renounce cocoa reforms, Reuters, 4 November 1999.

66  A Raybould, Ivory Coast angry at polemic over IMF loan talks, Reuters, 1 March 1999; Ivory Coast's president takes IMF to task, Reuters, 5 March 1999; IMF wants end to Ivorian government 'denigration', Reuters, 6 March 1999.

67  European Union accuses Ivorian officials of embezzling aid money, PANA, 24 June 1999. This sum amounted to a third of the total disbursed in EU funds to the country.

68  Ivory Coast to reimburse embezzled EU aid money, Reuters, 6 August 1999; A Raybould, Still no date for IMF to resume aid to Ivory coast, Reuters, 7 September 1999.

69  A Raybould, Ivorian president slams imposed adjustment plans, Reuters, 22 November 1999. In a keynote speech, Bédié referred to the programmes as a mixture of bitter pills,

Case: 1:10-cv-00773 Document #: 84 Filed: 03/18/13 Page 45 of 134. PageID #:
Downloaded by [University of Chicago] at 11:01 18 March 2013

nit-picking controls will countless continual human interference in the political life of countries.

70 Africa Research Bulletin, 1-31 July 1998, p 13177; 1-30 September 1998, p 13249.

71 Ibid, 1-31 December 1998, p 13359.

72 N Phythian, Ivorian opposition leader shuns poll row, Reuters, 7 July 1999; Opposition FPI leader slams government's crackdown, Le Jour, 15 September 1999; Opposition leaders Ouattara, Gbagbo discuss joint programme, Radio France Internationale, 19 September 1999.

73 Africa Research Bulletin, 1-31 March 1999, pp 13474-13475. According to one anonymous source in this report, the PDCI delegation to the talks admitted that the RDR's claims were just and logical, but urged the RDR representatives to accept the existing political dispensation as normal, arguing that life is full of injustice and the situation is similar all over the world. Government embarks on talks with opposition party, Television Ivorienne, 15 March 1999; Government, opposition RDR talks reportedly fail, Radio France Internationale, 6 May 1999.

74 F Kpatindé, Les derniers jours de Bédié, Jeune Afrique Spécial — Côte d'Ivoire: Est-ce une révolution?, January 2000, pp 12-13.

75 University of Bouake closed down, PANA, 26 March 1999; Government issues statement on schools, university crisis, Fraternité Matin, 17 May 1999; Government warns young people against demonstrations, Fraternité Matin, 29 May 1999; Ivorian police break up attempted student marches, Reuters, 1 June 1999; Ivorian students desert schools and universities, PANA, 2 June 1999; Civil servants strike in Ivory Coast, Reuters, 15 June 1999.

76 IMF's Ouattara to head Ivorian party from August, Reuters, 31 May 1999.

77 Moderates within his own party argued that it was foolish to overestimate the electoral threat from Ouattara, that the opposition would remain divided, and that it was unnecessary to take the risk of antagonising the donors. Economist Intelligence Unit, op cit, p 7; Ivorian minister annuls Ouattara nationality paper, Reuters, 6 October 1999; Opposition leader Ouattara says nationality certificate valid, Radio France Internationale, 9 October 1999; Ivory Coast annuls nationality certificate of ex-PM, Reuters, 27 October 1999.

78 Opposition leaders Ouattara, Gbagbo discuss joint programme, Radio France Internationale, 19 September 1999; Paper says legal threat against Ouattara constitutes blackmail, Le Patriote, Abidjan, 23 September 1999.

79 President meets Ivorian opposition leaders, Radio Togo, 18 October 1999; Opposition leaders discuss country's crisis with Senegalese president, Le Patriote, 30 November 1999; Gabonese leader says vital that other countries assist in ending Ivorian crisis, Radio France Internationale, 3 December, 1999; Ivorian

president's mediation, Radio France Internationale, 21 December 1999.

80 N Phythian, Stakes rise in Ivorian political crisis, Reuters, 8 December 1999; Ivorian, Guinean leaders back adherence to 'noninterference in internal affairs', Fraternité Matin, 6 December 1999. Guinea's Lansana Conté shared Bédié's interest in avoiding too close a perusal of his political system.

81 Opposition RDR figures arrested after unauthorized demonstration, Television Ivorienne, 27 October 1999; Minister regrets 'over-zealous' police action, Africa No 1 Radio, 27 October 1999; M Koffi, Ivorian opposition chief condemns detention of MPs, Reuters, 30 October 1999; M Koffi, Ivorian opposition trial triggers protests, Reuters, 4 November 1999; French socialists want Ivorian politicians freed, Reuters, 4 November 1999; Ambassador to USA responds to State Department statement on arrests, Television Ivorienne, 3 November 1999; Ruling party official responds to French party statement, Television Ivorienne, 4 November 1999; M Koffi, Ivorian politicians deny public order charge, Reuters, 10 November 1999; Judge jails Ivorian opposition leaders, Reuters, 12 November 1999; Côte d'Ivoire opposition leader denounces jail sentences as political, Radio France Internationale, 13 November 1999. Ironically, the charges were made under a law promulgated during Ouattara's premiership.

82 Ivorian opposition leaders held in party bastion, Reuters, 16 November 1999; Ivory Coast's Ouattara urged to delay return home, Reuters, 16 November 1999; Nine opposition leaders charged in Ivory coast, Reuters, 17 November 1999.

83 Côte d'Ivoire — Bédié's flashpoint, Africa Confidential, 19 November 1999; Côte d'Ivoire: Disharmonious rumbles, The Economist, 20 November 1999.

84 N Phythian, Stakes rise in Ivorian crisis, Reuters, 8 December 1999; Former Ivorian PM keeps up presidential challenge, Reuters, 9 December 1999; Ouattara says Ivory Coast no longer a state of law, Reuters, 12 December 1999; A Thomson, Ouattara backers hold rally in Ivory Coast, Reuters, 18 December 1999.

85 M Koffi, Ivorian president hints at opposition amnesty, Reuters, 22 December 1999.

What became clear, is that even the seemingly most peaceful parts of Africa, are prone to unrest, coups and conflict

**Exhibit 6:**

**Donald McNeil, Jr., *Ivory Coast Coup Draws French Reply*, N. Y. Times. Dec. 26, 1999**

**The New York Times**

# World

## Ivory Coast Coup Draws French Reply

By DONALD G. McNEIL Jr
Published: December 26, 1999

In the wake of a coup in Ivory Coast, France said today that it wanted to send small numbers of troops to the country -- its former colony -- to protect the deposed president and to evacuate roughly 20,000 French nationals should that become necessary.

But tonight the Ivory Coast's new ruler refused entry to the French reinforcements, saying their presence could lead to a "coup de sang" or bloodbath.

"We say no to that," the new ruler, Gen. Robert Guei, said in a telephone interview with Agence France-Presse. The 550 French troops already on a base near the airport in Abidjan, the country's largest city, "is sufficient," he said.

The ousted President, Henri Konan Bedie, was reported to have taken sanctuary with the French garrison. Reports said 40 more French soldiers were ready to arrive by helicopter from Libreville, Gabon, and another 300 were awaiting orders in Dakar, the capital of Senegal.

At the moment there is no direct threat aimed at foreigners, but there has been looting and gunfire. The United States Embassy in Abidjan warned Americans to lock themselves in their homes, saying looters were going through the wealthy neighborhoods where foreigners live. However, one official said they seemed to be stealing only vehicles parked outside.

Armed soldiers have been joy-riding in stolen cars and taxis for two days, and have used their rifles and hand grenades to blow open the doors of downtown shops in the city of 3 million people. Today, orders were broadcast over the radio telling all soldiers to report to their units by this evening and to turn in all civilian vehicles at the central barracks.

General Guei, a former armed forces chief, had earlier said that Mr. Bedie should leave the country quickly because young officers who began the coup wanted to kill him. Tonight, he amended that, saying a nine-man national steering committee -- all military men -- would meet tomorrow to decide whether the former president could leave. He has already stipulated that Mr. Bedie's cabinet, many of whom are in the hands of mutineers, will stay.

Paris has condemned the coup and the Foreign Ministry said Mr. Bedie, at his own request, was at the Port-Bouet military base next to the Abidjan airport under the protection of the French 43rd Marine Infantry Battalion.

The French government, which has generally given up direct intervention in the affairs of its former colonies, has not demanded that Mr. Bedie be restored to power, but has called for the immediate re-establishment of order and security. News reports here were sketchy because it is Christmas Day and the coup caught almost everyone by surprise.

Ivory Coast has long been an island of relative stability, democracy and prosperity in the former French West Africa, and one of the pillars of French policy there. It is the world's biggest supplier of cocoa, and produces palm oil and other tropical products. Many French sun-worshipers vacationing in Africa head first for Abidjan on the direct Air France and Air Afrique flights and use it as a jumping-off spot to poorer countries.

The new military leaders said Abidjan airport, closed by the coup, would reopen on Sunday. The leaders of the army and police appeared on television tonight to pledge their allegiance to the new government.

Abidjan, the commercial capital, looks much like a French city. It has the same black-and-white arrow-shaped signs, traffic circles and red-and-white stone road markers. There are luxury hotels, nightclubs and restaurants, and the same stores and brands that can be seen in France are spotted there.

The government has been stable compared with those of other former colonies like Congo, Madagascar or the Comoro Islands. As a supplier of products that cannot be grown in Europe, Ivory Coast has become an important part of the French economy.

For decades, France had a much more interventionist policy in Africa than Britain, Portugal or other former colonial powers. It diplomatically embraced rulers that it approved of, and it also was ready to send troops -- often the Foreign Legion -- to prop up or restore presidents it favored.

Sometimes that contributed to stability in former French colonies. But it also contributed to resentment of some rulers who were perceived as puppets of France.

General Guei imposed a dusk-to-dawn curfew in Abidjan today after two nights of looting and sporadic gunfire in some districts. He warned that violators would be summarily shot.

The streets were reported empty. Stores had been closed for 48 hours, but Friday night's curfew failed to curb looting. Unpaid soldiers mutinied on Thursday, leading to a breakdown of law and order; others joined in as generals tried to re-establish military discipline.

President Bedie was overthrown on Friday when General Guei, a former armed forces chief, took the reins of power. He set up a 10-man junta and urged politicians of the governing Democratic Party and the opposition to form a government of national unity.

Relations between France and its former colony have deteriorated in the last few months because of differences between President Bedie and Alassane Ouattara, a former prime minister and deputy director of the International Monetary Fund.

Mr. Ouattara, who is seen as a serious challenger to the long rule of the Democratic Party, wanted to run in next year's election, but Mr. Bedie's government barred him, claiming he was not a citizen and had forged identity documents.

Some French press comment today was equally severe toward both Mr. Bedie's and France's approach to its former colony. For the center-left newspaper Liberation, the tardy French reaction to the deteriorating political situation was a triple failure in political, military and diplomatic terms."

# Exhibit 7:

# Letter from Mother, Siham Matar

October 19, 2012

Dear Judge Gettleman,

I am writing a letter to your honor as a mother. I just wanted to take it out of my chest, it might be just a mom feeling, but please understand a mom heart. I pray to God everyday to forgive my son Sami and have your forgiveness and have him a fair sentence. This is the only hope I have, and I only have this opportunity to ask you.

I am Siham, Sami's mother, and I work at Chicago Public Schools (CPS) as a Lunch Room Attendant. I worked so hard to get this job. When we came to the U.S. as new immigrants, I spent two years volunteering without a job. My husband too didn't find a job easily, we were new here and everything was different and also the language was hard to learn especially for my husband. At that time, only our son Sami was working and helping the family. He worked so hard in Arabic stores early in the morning til late at night with no rest, and he was always exhausted and had a demanding boss. Sami contributed his income to us and his contribution was important in making ends meet and helping us with living. He just wanted us to feel comfortable, especially his little brother A█. They are very attached. A█ loves his brother a lot, and Sami would do anything to make A█ happy like other kids here, he always wants the best for A█. Even when we were sad, Sami put smiles in our faces every morning with his peaceful smile. We miss this smile.

I want to talk about my son Sami's background and the difficulties that he experienced growing up. Sami was born in Lebanon on January 20, 1988. At the time we lived in Africa in Ivory Coast but I came back to Lebanon to have the baby. Sami was raised from infancy in Abidjan in Ivory Coast. We had a very beautiful and good life, living with Sami's grandparents (father side). Sami loved them a lot. My husband had his own business that provided us a comfortable life. Sami was a unique child, and he was loved by all the family.

Suddenly all this life was gone when a coup happened in Ivory Coast in 1999. Sami was almost 11 years old and it was so terrible, they were killing people including women and children. Sami would watch from balcony, he would see people with machetes running, stopping cars, taking people out of cars and killing them, people waving machetes and dancing around after the killing, lots of bloods on the street and horrible screaming. We were living in fear that any time they would break the lock for the main gate for our building and get in and kill us.

Sami saw everything from our balcony, and it was a shock for him. He stopped talking for few days, lost weight, had severe stomach pain, and was absent-minded for a long while. We heard a lot of stories about men breaking into houses and raping girls and women in front their family. This lasted 10 days-2 weeks. There was a truce for a few hours, and during that Sami and I ran to the airport and flew to the U.S. Only women and child were allowed to leave. My husband and Sami's grandparents stayed behind. Sami and I were so worried about them, and we could

only speak with them for 1-2 minutes on the phone at the time.

Sami was never treated for trauma at the time, but we later learned that he has Familial Mediterranean Fever (FMF). This disease get worse after Ivory Coast coup. My brother Dr. Michael Maitar and other doctors didn't know about the disease, they thought stress was causing Sami's symptoms. He experienced fever, stomach pains ,weigh loss, chills, shaking, shivering. They were always calling us from school and saying that your son threw up a lot, had stomach problems. The pain was so bad that he could not walk sometimes. And when I think about now, it breaks my heart, he is alone in jail and nobody is beside him when he is suffering from the pain of this disease. I can feel when he is sick when he talks to me from his voice, but he doesn't want to show me. I am sorry I am telling you that, but I am a mother and you can understand me with your heart .

In U.S., Sami missed his father, grandparents and his friends a lot. We stayed in my brother's house in Wilmette. Sami went to a public school in Wilmette, called Mary Murphy school. It was so hard for him, he did not fit in. He was a foreigner, and he spoke only French, no English.

And after about 6 months,, my husband got out to Lebanon. Sami and I joined him there end of 2000. And now a new hard life for my son Sami. He did not fit in there, and he was also like a foreigner there because he did not speak Arabic and still did not have much English. Also Sami was not raised with much religion. My husband and I are not religious so he didn't know the difference between Suni and Shias until we moved to Lebanon.

While in Lebanon, Sami witnessed the 2006 33 Day War. We were living in Saida at that time, and we could see and hear the bombs all around the town. Every hour we would have to run to the basement, hiding in the middle of the night. One bomb was so close that it shattered the window in the building where we were living. The worst was when they bombed the power station, it was so close that we thought it was our building. It took years from my life that day. We ran almost naked to the basement. Sami had awful stomach pain and fever from the stress of the bombings and the war. He was so sick at that time, but all he wanted is to protect his little brother A█, who was 3 years old. That was all he cared about, that A█ would survive. Sami would carry him in the middle of the night and run to the basement, trying to protect him because he saw a lot of kids being killed and burned. He was terrified something would happen to his brother. Our cousin, Wurud, was killed in that war. She was a mom for two kids and Sami knew her. He was so upset, and we all were crying over her. We also had friends that died in that war.

After the war, Saida become unstable for a while. There was disorder, no food, homeless people, the price of everything tripled. Sami helped clean up the city after the war. He volunteered his time taking people to the hospitals and collecting donations.

In 2008, we immigrated to U.S. and started a new life with a lot of dreams.

2

Everything was new for us and different at the beginning, and as I said only Sami got a job at that time. We lived a simple life here until this happened. We noticed me and my husband, a few months before this happened that our son become moody and aggressive. Sometimes, we would find him crying by himself and nervous, Sometimes he came home very late. When we tried to ask him, he got nervous and said nothing. It gives us pain that we didn't know what to do to help him.

But despite all this, I know my son has a baby heart. He likes to help people, especially the elderly people. One time we went to Citybank to deposit money, and we saw a young man in the parking lot attack an old lady. She was screaming and she was very afraid and she was shaking in her car and nobody helped. Sami felt so bad about this and he defended the lady and told the man to let her go, this is one of the stories that makes me know inside himself, there is a good person. I feel so bad I never took Sami to a psychologist or got him treated by a psychiatrist. He never received any kind of mental health treatment, none after Ivory Coast coup or after Lebanon war. I didn't know he needed help. I didn't know how all the things he went through affected him.

I just want to let you know your honor that my son Sami felt very bad about what he did and regret a lot. When I visit him, I always see this sign of remorse on his face and he tells me I don't know how I got to this point Mother. But I believe everything happens for a reason. This woke him up and cleaned his soul from the nightmare he had growing up. Please your honor, trust as a mother I know my son has been changed and learned from his mistake in a hard way.

It was a shock and a bad experience for the whole family, especially for his little brother A█. It affected him a lot. At the beginning he couldn't believe as a kid of six years old what happened. A█ was shocked and stayed calm until he heard Sami's voice on phone for the first time and then they started crying a lot and all the family start crying. It was very emotional. Sami got arrested three days before A█'s birthday and Sami promised him to bring a lot of things he like in his birthday. They are very attached to each other. A█ always prays and asks God to bring back his brother, and every Christmas, he writes a letter for Santa to bring his brother as a gift to him. A█ loves Sami a lot. When we go to visit his brother at MCC, A█ cannot sleep at night because he wants to go very early so he'll be the first one waiting on the line.

Sorry for writing this long letter, but this is my only hope. Only God and you I can ask to forgive my son, and give him a fair sentence and give him a chance. We dream me and my husband to see our son with us before something happens to us. Thank you again your honor to give me this chance to write to you. Thank you.

Sincerely,

*Siham Matar*

Siham Matar

3

# Exhibit 8:

# Letter from Father, Samir Hassoun

October 20, 2012

Dear Judge Gettleman,

My name is Samir Hassoun, I am Sami's father. I'm writing a letter to your honor
to tell you about my life with my son Sami. I want to tell you about Africa (Ivory Coast) and
how my son was raised there and the wonderful life we had there. Sami was a smart,
hardworking student, loving all people. We had relationships with all people and saw no
difference between Lebanese, French, African, Christian, Muslim or Jewish. For example, my
business partner of 15 years even before Sami's birth was Jewish. We opened several companies
together and participated in all events with all people without any discrimination to religion.

In 1999 the coup happened in Ivory Coast and everything in our lives changed- we saw murder,
robbery, rape and heard about a lot of kidnapping. The scene was terrifying for Sami. I lost all
my business in the coup. My family fled with the help of French army to the U.S. Sami was sad
to leave this way leaving everything behind- especially his grandparents - he loved them a lot.
He lived with them from infancy, he was a cherished boy for the whole family - he was our only
child for a long time. He was so worried about what would happen to his family and friends.

I stayed in Lebanon for six months after Sami left, and then we met up again in Lebanon. I saw a
lot of changes in my son's health- he lost weight and he was always sick and had stomach pains.
When he was diagnosed in Lebanon at AUB they found he has FMF disease (Familial
Mediterranean fever). In Lebanon was also tough days. Life there is quite different. You must
declare your religion, Muslim or Christian, and if Muslim you have to say Sunni or Shiite. It was
so tough for Sami especially as he didn't speak any Arabic at that time and had no idea what they
were talking about. He tried to fit in but he couldn't.

Then the war broke out in 2006 in Lebanon. It was called the 33 days war it was terrible -
bombing, destruction, killed and burned people, adult and children, homeless people.
It was a shock for everybody and especially for Sami when the rocket landed near the building
we lived in. We thought it had hit the building -  Sami carried his little brother A█ and ran down
to the basement despite his stomach pain, trying to protect him. He didn't want something to
happen to his brother - he saw a lot of kids killed in that war and Sami loved his brother more
than anything. They are so attached to each other.

After the war finished, there was mass destruction in the streets in Saida where we lived. There
were a lot of homeless people because their homes were destroyed. Sami saw all these events.
Sami helped cleaning the city, and helped people find shelters, and collected donations  -
he was such a helpful boy.

After the War I noticed a lot of change in Sami's personality but his actions were normal and still
the nice boy who loves all people. Then we came here to the U.S. and it was a great joy
especially for my kids Sami and A█. At the beginning it was so hard for me to find a job because
I was weak in English - only my son Sami found a job and helped us with living. I noticed that
my son had friends older than him not in his age - he said they are customers in the store he
worked in. I noticed  changes - he was lying to us and stayed out till late, coming home very

1

moody and his sickness increased. Sometimes he was happy, sometimes he was upset and one time I found him was crying in his bed. I asked him why, but he always said nothing. That happened the day before he did this.

When Sami was arrested it was a shock for the whole family - I couldn't believe it at the beginning. This is not the morals and upbringing of how he was raised. Sami was never treated for trauma, or taken to a psychologist - I feel bad for that. Maybe we could have helped him.

I'm 56 years old and all I ask of your honor is to give him a chance and forgive him and ease his sentence so I can help him and be in his side to secure his future. Please give this chance to help him. I know that my son Sami has learned a lot from what happened to him in this hard way. When I visit my son he always asks for forgiveness and regrets a lot and feels bad. After the arrest I noticed a lot of changes for good in him - he became another person - the son that I know wants to finish school and be a useful person in the community. When I visit I can clearly see that he wants to prove for us that he changed. I dream for me and Sami's mother and brother to have a chance to be with him and with these good changes.

Thank you.

Sincerely,

Samir Hassoun

# Exhibit 9:

# Letter from Uncle Dr. Michael Maitar



**M E D I C A L    C E N T E R**

4708 N. Kedzie, Chicago, IL 60625
Phone: (312)583-7420 Fax: (312)583-1539
E-mail: RiteCare@AOL.com

October 12, 2012

Dear Judge Gettleman:

My name is Dr. Michael Maitar. I am a practicing gastroenterologist in Chicago since 1995. I first met Sami Hassoun when he was about 5 or 6 years old when he visited me along with his mother for about 2 weeks. They came back to Chicago around the year 2000 after the coup in Africa where they lost all their wealth and belongings. His father stayed behind. They stayed in Chicago about six months before they went to Lebanon.

During that period around 2000, I remember Sami crying a lot and missing his dad in Africa. He had multiple episodes of severe abdominal pains that were associated with vomiting and fever that lasted few days at a time. Work up was negative. I noticed that these severe episodes of pain and continuous vomiting were associated or preceded by anxiety attacks or stress, so I unfortunately diagnosed him with irritable bowel syndrome especially because his basic blood work was negative.

They came back to Chicago around July 2008 and for the following couple of years he also had multiple similar severe episodes of these abdominal attacks that also seemed to have been related to stress. But this time I had him undergo a CAT Scan of the abdomen as well as an upper endoscopy and blood work , all were unremarkable so that enforced my diagnosis of irritable bowel syndrome.

Even though my interactions with Sami were limited, based on my observations he seemed to have had multiple stressful times and instability between Africa, Lebanon, and the USA. I noticed that his life revolved around the wellbeing of his family, and especially his younger brother. Sami was always making a reference about securing his younger brother's future as well as his parents' security. He was a very hard working young man always looking for security and again especially when he spoke of his younger brother's future.

If you need any further information please call or write.

Respectfully,

Michael Maitar

M. MAITAR M.D.

# Exhibit 10:

# Letter from Dr. Ghassan Aswad

Dear Judge Gettleman:

My name is Ghassan Aswad M.D, FAAP, and I am a pediatrician. I am board certified in Pediatrics and Pediatric Emergency Medicine and am licensed to practice in the state of Illinois.

I am writing you this letter concerning my previous patient, Sami Hassoun. Sami became my patient after he was brought to me by his mother in January 2000. Sami and his mother had to flee from the Ivory Coast after a bloody and violent coup. Sami told me about the horrible events he witnessed there, with killings and violence in the streets around him.

When I met Sami he was a young boy, very friendly and fragile. To me he appeared a very nice boy, who wanted to put all his troubles behind and blend in the new society. He was a perfectionist and wanted to make everybody happy.

Sami had been suffering from abdominal pains, body aches, and fevers that made him ill for many days. I saw him in the clinic multiple times, and at that time we could not find the right diagnosis and we attributed his symptoms to the effect of stress. It was not until years later that he was diagnosed with a rare disease called "Familial Mediterranean fever."

Familial Mediterranean fever (FMF) is a hereditary disease that presents as abdominal pains, fever, chest pains, and neurological manifestations that can lead to impairment in social development. The disease is known to exacerbate under stressful events. Once I learned of Sami's FMF diagnosis, it became clear to me that the symptoms Sami was suffering from when I first met him were caused by his FMF flaring up during and after the events that he experienced in the Ivory Coast.

Sincerely,

Ghassan Aswad, M.D, FAAP

# Exhibit 11:

# FMF Diagnosis

الجامعة الأميركية في بيروت ـ المركز الطبّي

دائرة الباثولوجيا والطب المخبري

**American University of Beirut Medical Center**

DEPARTMENT OF PATHOLOGY & LABORATORY MEDICINE

*Accredited by The College of American Pathologists*

(Lap # 7178201)

**Archived Results**

**Cytogenetics   0148P**

| | | | |
|---|---|---|---|
| Patient Name | : HASSOUN SAMI | Sex/Age | : M/14 |
| Hosp.Case | : 00087455-000 | Service | : OC |
| Doctor | : SHARARA ALA' | Date I/O | : 16/10/2002   23/01/2003 |
| Diagnosis/Rem.: | | Time I/O | : 16:43 / 14:33 |

**Code Test**                        **Result**

3333 REFERRED TEST                  SEE NOTE
Referral:
        Molecular Diagnosis of Familial Mediterranean Fever

Type of sample:
        Blood

Technique used:
        Sequencing of exon 10 of the MEFV gene (codons 670-765)

Result:
        Compound heterozygote for mutations M694I and R761H. Each copy of the MEFV
gene in this patient has a different mutation

Interpretation:
        This comfirms the diagnosis of FMF in the patient.


Performed by Cerba-France

---

*\* Unofficial Copy - Please check the final official report !*

*\* Archived Result [L.Z/L.Z/L.Z]   \* Printed on 11/07/2012 at 13:22 pm*

# Exhibit 12:

# Photograph of Sami Suffering from FMF in the U.S.



# Exhibit 13:

# Letter from Uncle, Anthony Matar

Dec 5, 2012

To whom it may concern

Dear Sir

I am writing this letter about my nephew Sami hassoun. Sami is the first grandchild for both my sister and her husband parents. We were so happy that baby Sami was born especially my parents. Unfortunately Sami had an unlucky and unsettled childhood and adolescence where He felt alone.and an outsider.

Sami was raised in Ivory Coast where in the beginning he had a comfortable rich life style. When the coup occurred there were a lot killing and destruction. Sami's eyes caught all that extreme violence as a child. I remember when we talked to my sister at that time; she was repeating the stories of horrors over and over because of that unlucky sad experience.

After that Sami's family fled Ivory Coast to Lebanon with nothing, they lost all their business and their personal belongings and their house. Sami at that time had to go through a lot of hard and depressed time. In addition to that Sami had to adjust from a rich comfortable life to modest poor life.

Sami in his own country Lebanon felt an outsider, he did not know Arabic or English, he only spoke French in addition to that his perception got mixed up about what is acceptable or what is not and what is right or what is wrong. After the hard time of adjusting as child through developing into adolescent, Sami ended up growing as an insecure unfocused person. Sami had to behave in a way that he did not like just to have friends or to impress other people around him.

After that Sami met a friend who volunteered at a center for the elderly people. Through this friend Sami started volunteering to help out in this elderly care center. After that he joined a charity organization where he was responsible in distributing food and medicine to the needy people. Sami's behavior changed, he changed to a more secure happy person. I remember

when I was speaking with him at that time I felt for the first time that sami is finally start acting in a secure , focused way. I was very happy to see him happy and full of energy.

But that did not last long, the war broke up between Israel and hozeballah organization in July 2006. The war was devastating and the area where Sami lived got hit hard. Sami against the family advice continued volunteering at the charity organization during the war. He was assigned with other volunteers through this organization to distribute food and medicine to the refugees who fled this war.

During that time of the war, I remember my sister was crying every time Sami left the house and every time he came back safely. I remember I talked to him many times to stop volunteering. It was too dangerous to volunteer because of the bombing. Sami never listened to any of us as family members to stop volunteering. He was risking his own life and he was happy, content and full of pride that he is helping these refuges.

After the war was over, there were a lot of human casualties including some of his friends in addition to that there was a total destruction in some areas. Sami went again into depressed state, he did not like to eat as much as he used to and he constantly had severe pain in his stomach. I remembered when I talked to him at that time; he was unfocused, not acting himself again.

He is only focused in when his immigration paper will be done so he can come to the USA. He was counting the minutes to come to the states, he had hoped that USA will be his final destination and it is going to be his homeland.

Finally his immigration papers were done and it was the time for him to go to USA. He was extremely happy and excited. He looked for a job all over Chicago area and due to the economy; he did not find a job. Sami went against the family advice, he start working at the Arabic ethnic stores such as pastry stores or grocery stores. These owners of these stores let him worked too many hours for a few dollars and never appreciate that he is doing his best. He was treated like a machine only to make money for them. Sami was sadly surprised and disappointed that he was taken advantage by his own people. Sami was desperate to find another job. Everywhere he went to apply for a job, he was unsuccessful and they turned him down due to the economy.

It was unfortunate that his hope for a better life start fading away due to the economy crisis and his terrible abused working conditions at these Arabic ethnic stores.

 I remember many times I told him to stop working for these people. His answer was that he felt obligated that his father is getting old and he needs to help out with the family. He felt he is responsible for his youngest brother Ali. He felt he has to take care of him. He was happy buying toys and cloth with the money he made through working in these places.

Sami is a loveable, good, good hearted person. He is from a good, highly educated family. I beg for mercy for him and I speak for the whole family. We feel he should not be severely punished because of his unfortunate unsettled childhood and adolescence in addition to the mental and physical abuses he received while working in these stores in Chicago. We keep praying for a mercy for his sentencing and forgiveness. Sami is a big and beneficial asset to society if he is given another chance to serve society.

My mom and dad (Sami's grandfather and grandmother) sitting beside me while I am writing this letter. They are saying they wish to see Sami free from jail before they die. And constantly they keep praying and begging the lord in their prayers:

*"Please Lord have mercy on Sam's sentencing, Lord we are too old please lets us see our grandchild Sami free again before we die, Lord we believe in your miracles."*

Thank you and may the lord bless you.

Anthony G . Matar

 Sami 's uncle

# Exhibit 14:

## Photograph of Sami on his family's apartment balcony in Lebanon



# Exhibit 15:

**Avi Livneh & Pnina Langevitz, Diagnostic and treatment concerns in familial Mediterranean fever, 14:3 Bailliere's Clinical Rheumatology 477–98 (2000)**

Baillière's Clinical Rheumatology
Vol. 14, No. 3, pp. 477–498, 2000
doi:10.1053/berh.2000.0089, available online at http://www.idealibrary.com on **IDE ▶L**®



**4**

——————

# Diagnostic and treatment concerns in familial Mediterranean fever

Avi Livneh* MD
Senior Researcher and Senior Physician

Pnina Langevitz MD
Senior Researcher and Senior Physician
*The Heller Institute of Medical Research and Department of Medicine F and Rheumatology Unit, Sheba Medical Center, Tel-Hashomer, Israel
(affiliated with Sackler Medical School, Tel-Aviv University, Tel-Aviv, Israel)*

Familial Mediterranean fever (FMF) is an autosomal, recessively inherited disease, affecting people of Jewish, Arabic, Turkish and Armenian ancestry. The disease is the prototype of the periodic febrile syndromes. Its hallmark is short attacks of fever and painful manifestations in the abdomen, joints, chest, scrotum and skin. Chronic and protracted manifestations, particularly nephropathic amyloidosis, chronic arthritis, and protracted myalgia, may also occur in the disease. The diagnosis of FMF should be considered in individuals of an appropriate ethnic background who present with febrile disease of episodic nature. The differential diagnosis in this case is broad and includes a large number of infectious, inflammatory and genetic diseases. However, in most cases, the very specific general and site-restricted features of the FMF attacks on the one hand, and the absence of manifestations typical of other conditions on the other hand, determine the diagnosis of FMF. This chapter presents clues and tips that help in the diagnosis and treatment of FMF.

**Key words:** familial Mediterranean fever; periodic febrile syndromes; colchicine; amyloidosis; diagnostic criteria.

Familial Mediterranean fever (FMF) may be considered as the prototype of the episodic febrile conditions, characterized by bouts of fever and painful manifestations. It is inherited as an autosomal recessive trait and usually affects people living in or originating from the Mediterranean basin, including Sephardi Jews, Arabs, Turks, Armenians and others.[1] The disease results from a missense mutation or a deletion in *MEFV*, the gene of FMF. This gene encodes a currently putative protein, with a still speculative function, which was named pyrin/marenostrin by the researchers who cloned the gene in 1997.[2,3] The dramatic change in diagnosis, therapy and understanding of the pathogenesis of FMF, which was expected to follow the finding of the gene, is yet to come. At present, the main progress, made over the last 2 years, is in detection of new mutations[4–6] which define some genetic–clinical correlates[7,8] and shedding a new

* Correspondence to Professor Avi Livneh MD, The Heller Institute of Medical Research, Sheba Medical Center, Tel-Hashomer, Israel

1521–6942/00/030477 + 22 $35.00/00   © 2000 Harcourt Publishers Ltd.

478   A. Livneh and P. Langevitz

light on the common origin of some ethnic groups. FMF should be considered in individuals, with appropriate ethnic backgrounds, presenting with episodic febrile syndrome. The diagnosis of FMF and the exclusion of other diseases remain essentially clinical. In the following we present clues to help in the diagnosis and differential diagnosis of FMF, we discuss the diagnostic work-up, including the role of genetic testing, and we describe current principles of treatment.

## THE CLINICAL PICTURE OF FMF WITH A DIAGNOSTIC PERSPECTIVE

### FMF attacks

*Common features of FMF attacks*

The clinical picture of FMF is so distinctive that, in most cases, the need for laboratory and genetic support for the diagnosis is redundant. Ninety percent of the patients will experience their first attack at an age younger than 20 years. In this sense FMF is a paediatric disease. In most patients, the disease is evident only during the acute attack. In between the acute episodes, the patients are usually asymptomatic, and routine laboratory results are essentially normal. Regardless of the affected site, the general features of the attacks are very similar (Table I), with a fast build-up of symptoms, short duration, high-grade fever, unendurable and disabling pain, rendering the patient bedridden, and eventually, spontaneous remission and complete recovery.[1,9] Laboratory results during the acute attack suggest an inflammatory process, reflected by mild granulocytosis and elevated sedimentation rate, C-reactive protein and other

| Table I. Common general features of the FMF attacks. | |
|---|---|
| Feature | Description |
| Precipitating factor | Usually none. Very infrequently trauma, exertion, cold exposure, menstruation, emotional stress and certain foods are claimed to precede attacks |
| Aura | Rare and variable among patients |
| Rate of evolution of the manifestations | Rapid (2–4 hours) |
| Temperature | Elevated (38–41°C). Exclusion of fever is acceptable only by rectal measurement |
| Duration | Short (6–96 hours) |
| Intensity | Severe, as suggested by unbearable pain and confinement to bed |
| Constitutional symptoms | Occasional lassitude, malaise, loss of appetite, generalized myalgia and/or arthralgia |
| Acute-phase response | Elevated white blood cell count, erythrocyte sedimentation rate, fibrinogen, C reactive protein, serum amyloid A and phospholipase $A_2$ |
| Recovery | Spontaneous, fast, within 2–4 hours, with complete relief of symptoms and freedom of functional sequelae and abnormal tests |
| Rate and frequency of attacks | Irregular, with weekly to less than yearly episodes |

acute-phase reactants.[9–11] The fluctuant nature of the disease, with only short intervals of activity, makes FMF a diagnostic challenge and causes remarkable diagnostic delay even in endemic areas.[12] The common features shown in Table 1 are therefore helpful diagnostic clues that should be accounted for, specifically when the patient presents to the diagnostician in between the acute attacks.

*Abdominal attacks*

There are seven types of attack in FMF, each with typical local features (Table 2), which, when combined with the general common features, make the clinical picture distinctive and pathognomonic of FMF. Abdominal attacks are the most common, occurring in about 95% of patients.[1,9] Characteristically, the abdominal pain is generalized and physical findings are compatible with the diagnosis of generalized peritonitis, with rebound tenderness and muscle rigidity. Usually, the patient assumes a position that relieves his pain while lying in bed or walking (bent). Plain abdominal films, taken during the acute attack, may show fluid levels and small bowel distension suggestive of ileus. Episodes of generalized peritonitis with features and course delineated in the list of general features are pathognomonic of FMF. The decision that an FMF patient, presenting with acute abdomen, actually suffers from another abdominal attack of FMF, may be made by an experienced physician, overwhelmed by the contrast between the abdominal findings and the seemingly mild general situation (absence of shock or sepsis). Sometimes, the diagnostic uncertainty is resolved only by laparotomy. In this respect, preventive appendectomy, suggested by other workers[13], is not recommended by us, as was discussed elsewhere.[9] *Incomplete* abdominal attacks may occur[14], manifested by normal temperature, minimal or no change in the acute-phase reactants, shorter or longer duration, absence of strict peritonitis and localization of the attack to one abdominal area. Such incomplete attacks are usually associated with diagnostic dilemmas, solved only after other attacks, with more typical manifestations, join the clinical picture and extensive work-up excludes a long list of other causes for FMF-like abdominal pains (Table 3).

| Type | Main feature | Most common location | Prevalence (%) |
|------|-------------|---------------------|----------------|
| **Table 2.** Types and prevalence of FMF attacks. | | | |
| Abdominal | Peritonitis | Generalized | 95 |
| Joint | Mono-arthritis | Large joints of lower extremities | 75 |
| Chest | Pleuritis | One-sided | 40 |
|  | Pericarditis |  | <1 |
| Scrotal | Vaginalitis | One-sided | <5 |
| Muscle | Myalgia | One or several groups of muscles | <1 |
| Skin | Erysipeloid | Lower shin/calf | <5 |
| Fever alone |  |  | 25 |

*Joint attacks*

Joint attacks, almost always, affect only one joint at a time (Table 2). The most commonly involved joints are those of the lower extremities, but other joints, in particular large joints, may also present with acute monoarthritis.[1,15,16] Different styles of joint attacks, for example oligoarticular, small joint involvement and migratory

480   A. Livneh and P. Langevitz

| Table 3. Differential diagnosis of abdominal pain simulating FMF attacks. | |
| --- | --- |
| **Febrile attacks** | **Afebrile attacks** |
| Pyelonephritis | Nephrolithiasis |
| Urinary tract infection | Cholelithiasis |
| Cholecystitis | Peptic disease |
| Pelvic inflammatory disease | Ovulation or menstruation |
| Pancreatitis[a] | Haemolysis[b] |
| Behçet's disease[a] | Sickle-cell anaemia |
| Inflammatory bowel disease | Abdominal epilepsy |
| Hyperimmunoglobulinaemia D | Syphilitic neuropathy |
| Familial Hibernian fever | Hereditary angio-oedema[b] |
| Chronic diverticulitis/appendicitis | Porphyria |
| Conditions leading to chronic abdominal pain in FMF[c] | Hyperlipidaemia |
| | Abdominal angina |

[a]May be afebrile.
[b]May present with low-grade fever.
[c]Described in Table 9. Some of these conditions may be episodic and afebrile.

format of joint disease, raise doubts as to their associations with FMF and should prompt an investigation toward other diagnostic possibilities. If they appear in a well-established case of FMF, the possibility of a second disease (in addition to FMF) should be considered, with attention to syndromes, more commonly associated with FMF, such as spondyloarthropathies and various vasculitides.[17,18] Indeed, in our registry there are FMF patients with systemic lupus erythematosus, rheumatoid arthritis, ankylosing spondylitis, gout, rheumatic fever and inflammatory bowel disease (Livneh et al, unpublished data).[17,19] Joint attacks should not be confused with polyarthralgia, which commonly accompanies acute attacks as one of the constitutional symptoms (Table 1), generalized joint pain due to secondary fibromyalgia (see FMF related diseases), or uni/bilateral ankle swelling or leg pain induced by exertion (see chronic and prolonged manifestations). The affected joint presents with all of the signs characterizing acute inflammation of an articular and peri-articular tissue, including redness, swelling, tenderness and motion limitation. The pain is severe. The appearance may bear great resemblance to an acute gouty joint. Joint X-ray, with exclusion of soft-tissue swelling, is usually normal. The synovial fluid is turbid and may easily be mistaken for a septic tap. The leukocyte count may reach 100 000 cells/µl. Clues eliminating infections are the generally well appearance of the patient, the negative Gram-stained smears and the sterile cultures. Also, contrary to infection, the synovial fluid retains its viscosity. The fast and spontaneous remission will eventually end any possible diagnostic hesitation. As in the incomplete abdominal attack, *incomplete* joint attack (upper extremity joints, low-grade fever, shorter or longer duration of the attack) may occasionally be encountered.

Because recurrent episodes of monoarthritis, as the sole manifestation, are relatively common in several diseases, and may often precede other manifestations (Table 4), it may be difficult to sort out their origin. In a series of 30 FMF patients with recurrent monoarthritis as the only manifestation of FMF, clues in favour of FMF were the

| Table 4. Differential diagnosis of recurrent episodes of monoarthritis simulating FMF. | |
|---|---|
| Disease | Diagnostic clue |
| Gout and pseudogout | Degree of joint inflammation is high. Intragranulocytic crystals in smears of synovial fluid. The temperature rarely exceeds 38°C |
| Palindromic rheumatism | All joints may be affected. The amount of synovial fluid and degree of inflammation is low. Usually afebrile |
| Behçet's disease | All joints may be affected. The degree of joint inflammation is variable. A diagnosis requires agreement with the criteria for diagnosis of Behçet's disease[20] |
| Recurrent aphthous stomatitis (RAS) and arthropathy[21] | All joints may be affected. The degree of joint inflammation is variable. A diagnosis requires the presence of RAS and exclusion of other entities associated with RAS |
| Spondyloarthropathy | The underlying disease (inflammatory bowel disease, psoriasis, Reiter's etc.) is usually evident. Otherwise, criteria for undifferentiated spondyloarthropathy must be fulfilled[22] |
| Juvenile chronic arthritis | The arthritis becomes chronic after a short while. Anti-nuclear antibodies, uveitis and thrombocytosis may be present |
| Intermittent hydrarthrosis and mechanical derangement | Usually lower extremity. Degree of inflammation is very low. Afebrile. Synovial cell count <1000. Often findings underlying the condition are present in imaging or arthroscopy |
| Malingering or Munchausen's syndrome | Variable joint manifestations |

agreement with the distinctive local and general features of FMF (Table 1) and family history of FMF (Livneh et al, unpublished data). Genetic evaluation may support the FMF origin of episodic monoarthritis but it has its limitations (see diagnosis of FMF).

### Chest attacks

Chest attacks are less frequent, occurring only in about 30% of the patients.[1] They are one-sided and associated with sharp pain, causing fast and shallow breathing. Radiation of pain to the shoulder may erroneously be interpreted as acute shoulder arthritis. Physical findings are usually poor. Occasionally friction-rub, or dullness on percussion may be evident. The most common radiographic finding is costophrenic angle blunting. Rarely, larger effusion and even atelectasis may be seen and misread as pleuropneumonia. One of the diagnostic difficulties in patients with chest attacks is to identify a pericardial attack, which occurs infrequently and usually with scant or no specific manifestations.[23] Awareness of this possibility is the clue. Physical examination may rarely reveal pericardial friction rub, and diagnosis should be supplemented by electrocardiograph and chest X-ray, which may demonstrate transient ST-T changes or transient enlargement of cardiac silhouette respectively. Cases, where after the initial study pericarditis is still strongly suspected, may be helped by echocardiography. Massive pericarditis with tamponade was reported only rarely.[24]

### Skin attacks

Erysipelas-like erythema (ELE) is the only rash typical of FMF.[1] Its preferable location is the lower extremity below the knee. It may overlay the dorsum of the foot or the

ankle joint. In these locations, it may be impossible, even for a careful observer, to separate it from underlying joint attack. Therefore, it may be wise to limit the term ELE to the shin and the calf. It appears as a red, warm and tender skin patch, with sharp borders, usually affecting large areas (>100 cm²). The resemblance of FMF rash to infectious cellulitis (erysipelas) may cause diagnostic difficulties. Similar skin eruption also characterizes familial Hibernian fever (FHF), but specific features of ELE in FMF facilitate the distinction between the two entities (see differential diagnosis and diagnostic work-up).[25] Skin specimens from the ELE lesion were reported to show oedema and cellular infiltration. In a series of skin biopsies in six patients with ELE, we demonstrated mild perivascular cellular infiltrate consisting of lymphocytes, neutrophils and nuclear dust at the site of inflammation and C3 deposits in the capillary walls.[26] These histological findings, although not specific, were enough to exclude infectious erysipelas.

Of all the other acute/episodic and recurrent skin manifestations reported in FMF[27], nodular lesions, usually smaller than 1 cm, with red overlying skin and some tenderness that may be termed erythema nodosum-like eruption, are the only manifestations possibly related to FMF. It is more often present in FMF patients who also have Behçet's disease (BD) or a family history of BD. It may leave a blue-black spot as evidence of haemorrhage in the site of occurrence, suggesting vasculitis as the underlying mechanism.

### Scrotal attacks

Acute scrotum is seen only rarely after the age of 20. The attack is usually one-sided, presenting with swelling, tenderness and red skin on the affected side. It results from inflammation of the tunica vaginalis (vaginalitis).[28] It is more common in earlier childhood, when torsion testis is the regular cause of acute scrotum. This may result in diagnostic failure and an unnecessary operation. The diagnostic dilemma may be solved by Doppler study or radionuclide testicular scan, showing in the FMF attack increased or normal testicular perfusion.[29]

### Attacks of fever alone

Recurrent episodes of fever alone, or fever with constitutional symptoms, are characteristic but not specific for FMF.[1] Fever alone may occur in other periodic febrile diseases, particularly in periodic fever aphthous stomatitis, pharyngitis and adenopathy (PFAPA) (see differential diagnosis and diagnostic work-up). Other diagnostic considerations include inflammatory bowel disease, cyclic neutropenia, lymphoma, malaria, relapsing fever, allergic fever and factitious fever. Nevertheless, if febrile episodes are the only manifestation over a long time, and they follow the general features of the FMF attacks, the diagnosis of FMF is almost certain.

### Muscle attacks

Myalgia, affecting muscle groups of one limb or more, are poorly characterized manifestations of FMF.[9] This manifestation is uncommon, yet bearing the general features of other manifestations of FMF. Unlike protracted febrile myalgia (see chronic and prolonged manifestations), the pain, tenderness and loss of function are less severe. About 30% of patients with FMF experience muscle pain in the legs upon exertion. This pain usually affects the calf and less often the thigh musculature. It is not

accompanied by fever, and there is no known objective laboratory or physical evidence that supports the patients' complaint. Other causes for muscle pain in FMF include secondary fibromyalgia, myalgia as a constitutional symptom during febrile attacks, myalgia of FMF related vasculitides and myalgia associated with colchicine intoxication.

## Chronic and prolonged manifestations of FMF

### Amyloidosis

The most devastating manifestation of FMF is amyloidosis.[1] Prior to the colchicine era, it developed in up to 60% of FMF patients. In one study, in our institution, the number of FMF patients surviving past the age of 60 was negligible, a finding leading to the assumption that most patients would eventually develop amyloidosis and die of it.[30] Our current knowledge suggests that the risk of developing amyloidosis are highly associated with the ethnicity, the specific *MEFV* mutation, family history of amyloidosis and male sex of the patient.[7,31–33] Although, very rarely, extrarenal organs may take the lead, the main site of amyloid deposition, and the only observed symptoms in most cases, are those of nephropathy. The disease follows five stages in its gradual development: asymptomatic, proteinuric, nephrotic, azotaemic and uraemic. Each phase lasts several years. Our experience shows tremendous variability in the duration of each stage, probably depending on compliance with treatment, genetic and other factors. No relationship with the severity of the disease has been identified in either the occurrence of amyloidosis or the rate of its development.

The appearance of persistent proteinuria ($> 0.5$ g/24 hours) in patients with FMF is diagnostic of amyloidosis, with a high level of certainty.[1,9,30] Although other FMF-associated conditions, such as vasculitis, glomerulonephritis and increased consumption of non-steroidal anti-inflammatory drugs, may affect kidney function, the rule that proteinuria, without active nephritic sediment, is diagnostic for amyloidosis stood the test of time and, in most cases, precludes kidney biopsy and additional diagnostic evaluation. Definitive diagnosis relies of course on tissue examination. The most informative site is the kidneys. The most commonly used alternative is the rectal submucosal tissue, giving a yield of 70–80% in well-established cases. Other sites for biopsy, reported as diagnostically beneficial, are the gums and bone marrow. Subcutaneous fat biopsy is a disappointing procedure in amyloidosis of FMF.[34]

Amyloidotic FMF patients may display manifestations suggestive of extrarenal involvement in the amyloidotic process, including diarrhoea, malabsorption, liver enlargement, jaundice, elevated liver enzymes, signs of portal hypertension, congestive heart failure, and rhythm and conduction disturbances. Although these manifestations may suggest amyloidosis of the gastrointestinal tract, liver and heart, both tissue biopsy and exclusion of other diagnostic possibilities are required to confirm that amyloidosis is indeed the underlying mechanism. This is because amyloid deposition is expected in most tissues anyway, but usually to the extent that is clinically insignificant.

Other diagnostic techniques for amyloidosis are of secondary importance and include echocardiograph, abdominal computerized tomography (CT), magnetic resonance imaging (MRI) and radioactive technetium scanning. These procedures are still investigative, with respect to amyloidosis. Regrettably, there is no large series on the application of radioactive serum amyloid P (SAP) for the diagnosis and study of the course of amyloidosis of FMF.

484    A. Livneh and P. Langevitz

*Chronic arthritis*

Chronic arthritis of FMF, defined as arthritis of a duration longer than 30 days, occurs in 5% of FMF patients with joint involvement.[16,35] It usually affects one joint, continues for several months and remits without sequelae. While a benign course is the rule, in some patients, severe changes, functional impairment and pain may require joint replacement. In some instances of chronic arthritis, very large effusion with massive synovitis develops.[36] Local steroids plus an increase in daily colchicine (dose up to 3 mg) may lead to remission or improvement. Usually however, good results were achieved only with chemical or surgical synovectomy. The diagnosis of the chronic arthritis as FMF-related requires exclusion of other causes with similar presentation, particularly spondyloarthropathy.

Indeed, exploration of underlying disease among 200 patients with chronic arthritis revealed that, in some, the arthritis could be assigned to rheumatoid arthritis, ankylosing spondylitis, BD and inflammatory bowel disease. However, in 11 patients of this cohort, a spondyloarthropathic syndrome emerged with features distinctive of other spondyloarthropathies (Table 5), leading to the conclusion that FMF is another cause of seronegative spondyloarthropathy.[17]

| Table 5. Features of spondyloarthropathy of FMF. | |
|---|---|
| Features of spondyloarthropathy of FMF common to other spondyloarthropathies | Features of spondyloarthropathy of FMF distinct from other spondyloarthropathies |
| Inflammatory back pain | HLA-B27-negative |
| Inflammatory neck pain | Absence of bamboo spine or significant radiological changes in spine |
| Reduction in spinal mobility | Absence of joint involvement in anterior thorax |
| Sacroiliitis | No uveitis |
| Chronic oligo/mono arthritis | |
| Enthesitis | |
| Rheumatoid factor-negative | |

*Chronic manifestations related to recurrent serositis*

Recurrent serositis may lead to adhesions, which, in turn, may cause chronic or recurrent abdominal manifestations, simulating FMF attacks. This resemblance may end up unfavourably. The clue for the right diagnosis is awareness of this complication of FMF and attention to a variant course of an 'attack'. Often the patient indicates the difference from the regular attack quite early. In one case, abdominal pain, constipation and vomiting due to intestinal strangulation were ascribed to an acute abdominal attack of FMF. The obstructive nature of the symptoms was realized only after massive intestinal infarction developed.[37] In another case, orchidectomy was required to treat necrotic testis, possibly resulting from adhesions.[38] Other chronic consequences possibly resulting from multiple episodes of serositis are constrictive pericarditis, sclerosing peritonitis, chronic ascites and mesothelioma.[9,39,40]

### Protracted febrile myalgia

Protracted febrile myalgia is an FMF-specific manifestation. It presents as excruciating muscle pain and tenderness, usually bilateral and in the lower extremities. In some patients all muscles ache, and in others the anterior abdominal muscles may take the lead. It is accompanied by high-grade fever. Occasionally it may include skin rash and non-muscular abdominal pain.[41] If untreated, the symptoms may continue for 6 weeks. Treatment consists of high-dose prednisone, beginning with 1 mg/kg/day with slow and cautious tapering over 6 weeks. Based on findings in skin biopsy in several patients, a dramatic response to prednisone and a substantial similarity to Henoch–Schönlein purpura (HSP), it is considered as a manifestation of vasculitis. However, histological and laboratory evidence for vasculitis is scant, particularly in the major organ involved, the muscle, which appears normal on biopsy and electromyography. Serum muscle enzymes are also normal. The diagnosis is clinical and is based on the above description. The clinical picture is so distinctive that, for those who are familiar with the condition, the diagnosis is straightforward.

## FMF-related diseases

### Vasculitis

Some vasculitides are more common in FMF. These include polyarteritis nodosa (PAN), HSP and BD.[18,42,43] Manifestations of PAN, including fever, abdominal pain, joint pain and muscle pain, may mimic those of FMF and cause delay in the diagnosis of PAN. Central nervous system manifestations, perirenal haematoma and unremitting disease are the keys, allowing the observer to separate the clinical picture of PAN from that of FMF. A definitive diagnosis should be based on the histology of a tissue involved in the disease, showing necrotizing vasculitis.

HSP is currently the most common vasculitis complicating FMF in children. Here again, the clinical picture, with fever, abdominal pain, muscle pain and arthritis, may resemble that of FMF. However, palpable purpura with typical distribution and with biopsy findings consistent with leukocytoclastic vasculitis, kidney disease with nephritic urine sediment and gastrointestinal bleeding determine the HSP origin of the manifestations.

The increased association between FMF and BD was realized only recently.[43] In our cohort of 4000 FMF patients, we found 39 with signs and symptoms compatible with the diagnosis of both FMF and BD. The rate of BD in FMF is therefore higher than in populations known to be rich with BD patients, such as those found in Japan and Turkey. In most patients, fine characterization of the overlap manifestations, such as arthritis, abdominal pain and scrotal disease, could safely locate the symptom in one of the entities, FMF or BD. In about 50% of patients with FMF–BD the FMF is expressed despite heterozygosity to *MEFV* mutation, suggesting that, in these patients, the FMF is precipitated by BD (Livneh et al, unpublished observation).

Various types of glomerulonephritides have been described in FMF.[44] Yet, the association of this syndrome with FMF is not certain. In over 5% of FMF patients, erythrocyturia of variable range is found. This finding, as well as its underlying pathology, is not well characterized. Yet, the benign course of this manifestation favours IgA nephropathy as a possible cause. Finally, increased association between FMF and occult blood in stool has recently been identified and claimed to reflect GIT vasculitis.[45]

486   A. Livneh and P. Langevitz

*Fibromyalgia*

Fibromyalgia is another condition associated with FMF. It is found in 30% of FMF patients, the same frequency as in other chronic inflammatory or autoimmune diseases.[46] It has a profound effect on the symptomatology and quality of life of some patients (unpublished data).[47] Because the symptoms of fibromyalgia, particularly muscle, joint and abdominal pain, mimic those of FMF, they erroneously may be related to FMF, and the diagnosis of fibromyalgia overlooked. Experience with the two diseases is the key to the correct diagnosis.

## DIAGNOSTIC CONSIDERATIONS IN FMF

### Diagnosis of FMF

*Clinical diagnosis and diagnostic criteria*

The diagnosis of FMF is still mainly clinical. In most patients, the clinical picture is typical, making the diagnosis simple and straightforward. The diagnostic criteria for FMF may facilitate diagnosis in some patients, but their main purpose is to serve as standard cornerstones for comparison between FMF patient cohorts. Over the years, many sets of criteria have been developed, usually based on personal or institutional experience, but not on patient-versus-control evaluation and statistical methods. Our recently published criteria were developed on the basis of this critical approach and showed 99% sensitivity and 99% specificity to FMF (Table 6).[14] Some of the other sets of criteria yielded poor results, with as low as 60% sensitivity, when subjected to objective testing (Livneh et al, unpublished data).

| **Table 6.** Criteria for diagnosis of FMF[a] (simplified set, adapted from ref. 14). | |
|---|---|
| Major criteria | Minor criteria |
| 1–4. Typical[b] attacks of: | Incomplete[c] attacks of the: |
|   1. Peritonitis (generalized) |   1. Chest |
|   2. Pleuritis (unilateral) or pericarditis |   2. Joint |
|   3. Monoarthritis (hip, knee, ankle) |   3. Exertional leg pain |
|   4. Fever alone |   4. Favourable response to colchicine |
| 5. Incomplete[c] abdominal attacks | |

[a]Requirements for diagnosis of FMF: ⩾1 major or ⩾2 minor criteria.
[b]Typical attacks are defined as *recurrent* (⩾3 at the same site), *febrile* (38°C or more, rectal) and *short* (lasting 12 hours–3 days) attacks.
[c]Incomplete attacks are defined as painful and recurrent attacks differing from typical attack in one or two features as follows: (1) The temperature is normal or lower than 38°C. (2) The attacks are longer or shorter than specified (but not shorter than 6 hours or longer than 1 week). (3) No signs of peritonitis are recorded during the abdominal attacks. (4) The abdominal attacks are localized. (5) The arthritis involves joints other than specified. Attacks not fulfilling the definition of typical or incomplete attacks are not counted.

*The practice of therapeutic trial with colchicine*

Response to colchicine may serve as a diagnostic test supporting a diagnosis of FMF.[14] Because about 5% of patients are poor or non-responders, failure to respond does not exclude FMF. Also, response to colchicine cannot serve as a major criterion because

other diseases considered in the differential diagnosis of FMF, such as gout and BD, may also benefit from this treatment. A therapeutic trial is usually reserved for uncertain cases which present with atypical manifestations. In these cases, colchicine 1.5 mg is prescribed for 6–12 months, followed by discontinuation. The best result is remission while on colchicine regimen and exacerbation upon treatment termination. Failure to respond and failure to resume attacks after treatment cessation require an individual approach to each patient.

### Mutational analysis

In 1997, two independent groups successfully cloned the FMF gene and identified several disease-associated mutations.[2,3] The gene is 10 kb long and consists of 10 exons. It encodes a protein of 781 amino acids, called pyrin/marenostrin. So far, 17 disease-associated mutations have been identified (Table 7).[48,49] Most of them are clustered in exon 10, which encodes the C terminal of the protein. Transcripts of the gene were found almost exclusively in the cytoplasm of granulocytes. The cloning of the FMF gene raises hopes for a more accurate diagnostic test. However, the current status of molecular diagnosis is less than satisfactory because, among patients with clinically certain FMF, only 70% are homozygous or compound heterozygous to *MEFV* mutations. The rest appear to be heterozygous, or without any identifiable mutation.[50] On the other hand, some unaffected individuals have two mutations, suggesting a low penetrance mutation (e.g. E148Q, P369S and even M694V), or a pre-clinical state. These findings are presented however, with the reservation that the large majority of mutational analyses are limited for just a small number of mutations of the 17 currently known. Mutational analysis is therefore just another tool to help clinical diagnosis. The current approach to genetic diagnosis of FMF is summarized in Table 8. As can be seen, the only benefit of genetic diagnosis is for patients in whom, based on clinical evaluation, FMF is suspected and mutational analysis reveals double mutation. It is hoped that in the near future, a diagnostic test, based on pyrin function or level, will be developed.

| Table 7. Mutations in the FMF gene. | |
|---|---|
| Exon | Mutations |
| 2 | E148Q, E167D, T267I |
| 3 | P369S |
| 5 | R408Q, F479L |
| 10 | M680I (×2), T681I, I692del, M694del, M694V, M694I, K695R, V726A, A744S, R761H |

### Evaluation of FMF patients with chronic and protracted manifestations

As noted earlier, several conditions predispose FMF patients to the development of chronic or protracted manifestations. This is not a common situation but, because of broad and variable symptomatology that may affect almost any system, the FMF patient must consult an expert in FMF for any long-lasting clinical problem. The underlying factors were reviewed earlier and they are categorized as: (a) part of the FMF spectrum (e.g. amyloidosis), (b) sequelae of recurrent attacks (e.g. adhesions), (c) part of FMF related disease (e.g. BD), and (d) colchicine side-effects. The most common

488   A. Livneh and P. Langevitz

**Table 8.** Current approach to the genetic diagnosis of FMF.

| Pre-test clinical diagnosis | Genetic diagnosis[a] | Final diagnostic conclusion | Treatment decision |
|---|---|---|---|
| FMF certain | +/+ | FMF certain | Colchicine |
| FMF certain | +/− | FMF certain | Colchicine |
| FMF certain | −/− | FMF certain | Colchicine |
| FMF suspected | +/+ | FMF certain | Colchicine |
| FMF suspected | +/− | FMF suspected | Follow-up or therapeutic trial[a] |
| FMF suspected | −/− | FMF suspected | Follow-up or therapeutic trial[a] |
| No FMF | +/+ | Pre-clinical or low penetrance | Follow-up |
| No FMF | +/− | Carrier | No treatment; no follow-up |
| No FMF | −/− | Healthy | No treatment; no follow-up |

[a]Therapeutic trial with colchicine (see text).
+/+ indicates two mutations; +/− indicates one mutation; −/− indicates no mutations.

**Table 9.** Conditions causing chronic/protracted manifestations in FMF.

| Disease/condition | Arthritis/arthralgia | Myalgia | Abdominal pain |
|---|---|---|---|
| Behçet's disease | + | + | + |
| Henoch–Schönlein purpura | + | + | + |
| Polyarteritis nodosa | + | + | + |
| Protracted febrile myalgia | + | + | + |
| Fibromyalgia | + | + | + |
| Adhesions | | | + |
| Mesothelioma | | | + |
| Sclerosing/fibrous peritonitis | | | + |
| Colchicine side-effect | | + | + |
| Spondyloarthropathy of FMF | + | | |
| Chronic arthritis of FMF | + | | |
| Exertion | + | + | |

manifestations involve three sites: the abdomen, joints and muscles. The conditions causing chronic (prolonged or intermittent) pain in these organs are summarized in Table 9.

### Diagnostic and laboratory work-up

In most cases of FMF, the very specific presentation and course of FMF, as delineated in Tables 1 and 2, determine the diagnosis. The diagnostic criteria of FMF (Table 6) may lend support or even help in the diagnostic decision. Exclusion of other diagnostic possibilities may be required. This is usually based on the absence of manifestations, or laboratory findings specific to the entities considered (see next section). In atypical presentation, specifically with respect to chest or abdominal attacks, it is wise to view plain radiographs and order abdominal ultrasound and CT. Gastrointestinal tract studies are rarely required to exclude infectious or inflammatory processes. Mutational analysis is also helpful, but usually only in a small number of patients with atypical presentation. Finally, the most important information is derived from *physician examination at the time of the acute attack*. The examining physician should note the

presence of peritoneal irritation, presence of arthritis and nature of chest pain (whether unilateral and pleuritic). Rectal temperature must be recorded and determination of complete blood count (granulocytosis), erythrocyte sedimentation rate and fibrinogen should be performed. Additional blood tests and examination, performed in remission, usually show that the acute-phase responses and abnormal signs have normalized or resolved. Patients, in whom the diagnosis of FMF remains questionable, even after all the work-up, may benefit from therapeutic trial with colchicine.

## Differential diagnosis

The differential diagnosis of FMF is vast and includes episodic febrile syndromes and other diseases with symptoms simulating FMF. The main considerations in the differential diagnosis of FMF attacks, arranged according to the involved site, are presented in Tables 3, 4 and 10. Currently, there are five disease entities, manifested with attacks of fever and painful symptoms, closely resembling FMF. This chapter will shortly discuss these entities.

| Table 10. Differential diagnosis of FMF attacks.[a] | | |
|---|---|---|
| Febrile attacks | Chest attacks | Scrotal attacks |
| PFAPA | Infectious pleuropericarditis | Torsion of testis |
| HIDS | Autoimmune pleuropericarditis | Epididymitis |
| Crohn's disease | Recurrent benign pericarditis | Orchitis |
| Allergic reaction | Pleuropneumonia | Behçet's disease |
| Cyclic neutropenia | Recurrent pulmonary emboli | |
| Hodgkin's and non-Hodgkin's lymphoma | | |
| Malaria | | |
| Relapsing fever | | |
| Factitious fever | | |
| [a]See the differential diagnosis of abdominal and joint attacks in Tables 3 and 4. | | |

*Periodic febrile syndromes*

The hyper IgD syndrome (HIDS) is a genetic disease, with autosomal recessive transmission, presenting with attacks of fever and abdominal pain, arthritis and skin eruption.[51] Recently, the gene encoding for mevalonic acid kinase was recognized as the disease-associated gene and several mutations were identified.[52] The diagnosis of this disease is based on the presence of the clinical picture, elevated serum IgD and increased levels of mevalonic acid in the urine. It should be noted that about 10% of FMF patients and some healthy controls have increased serum IgD levels. Therefore, in atypical cases, increased serum IgD by itself is insufficient for diagnosis of HIDS.[53] Currently, there is no satisfactory treatment for this disease and patients are on palliation alone. Features of the disease, distinctive from FMF, are presented in Table 11. These include absence of peritonitis, involvement of cervical lymph nodes, symmetrical oligo-arthritis and generalized maculo-papular skin rash.

490    A. Livneh and P. Langevitz

Table II. Periodic febrile syndromes; distinguishing features of overlapping manifestations.

| Feature | FMF | HIDS | TRAPS | PFAPA |
|---|---|---|---|---|
| Abdomen | Peritonitis | No peritonitis | Peritonitis | – |
| Joint | Monoarthritis in lower extremity | Symmetrical arthritis of large joints of lower extremities | Oligoarthralgia of large joints | Generalized arthralgia (uncommon) |
| Chest | Pleuritic or pericarditis | – | Pleuritic and non-pleuritic | – |
| Skin | Erysipelas-like erythema | Generalized maculopapular | Migratory ELE | – |
| Myalgia | Rare | Rare | Migratory myalgia associated with stiffness (common) | – |
| Scrotum | Vaginalitis | – | Pain and testicular swelling | – |
| Duration of attack (days) | 1–4 | 3–7 | 1–70 | 1–2 |
| Other discriminatory manifestations | – | Cervical lymphadenopathy | Conjunctivitis, peri-orbital oedema | Exudative tonsillitis and RAS |
| Laboratory | – | Elevated IgD, mevalonic aciduria | – | – |
| Therapeutic trials | Colchicine | – | Etanercept | Prednisone |
| Genetics | Pyrin. Recessive | Mevalonic kinase. Recessive | TNF-receptor. Dominant | – |
| Ethnicity | Jews, Arabs, Turks, Armenians | People of central Europe | Irish, Scottish | Universal |

FMF = familial Mediterranean fever; HIDS = hyper IgD syndrome; TRAPS = TNF-receptor 1 associated periodic syndromes; PFAPA = periodic fever aphthous stomatitis and adenopathy; RAS = recurrent aphthous stomatitis; ELE = erysipelas-like erythema.

FHF is another genetic syndrome (this time autosomal dominant) with episodes of fever and painful manifestations.[25] Here, the affected organs/sites are the muscles, skin and abdomen. Again, ethnicity and fine characteristics of the attacks make the differential diagnosis from FMF possible. Long attacks, usually longer than 1 week, with severe myalgia with stiffness of the involved muscle, *migratory* erysipelas-like erythema, conjunctivitis and peri-orbital erythema are features distinguishing FHF from FMF (Table 11). The recent finding that FHF arises from several mutations in the TNF-receptor had a dramatic impact on the diagnosis and treatment of the disease.[54] Current diagnosis of FHF requires, in addition to the typical picture, the presence of mutation in the TNF-receptor gene. Following cloning of the FHF gene, the disease was renamed TNF-receptor 1-associated periodic syndromes (TRAPS), and trials with etanercept (enbrel, Immunex Corp., Seattle, Washington, soluble recombinant human TNF-receptor) have been initiated with promising preliminary results.

A syndrome called PFAPA was recognized by Marshall et al[55] about 15 years ago. As per its name, patients, who are usually 20 years old or less, sustain attacks of fever alone or fever and sore throat. Examination shows red pharynx and enlarged swollen red tonsils and mouth ulcers. The febrile episodes last for 24–48 hours and subside spontaneously. Administration of 20–40 mg prednisone causes rapid remission (within 2–4 hours), and may be used as a diagnostic test for this condition. Distinction of this condition from FMF is based on the repetitive presence of characteristic findings in the throats of patients with PFAPA, absence of response to colchicine and dramatic response to prednisone (Table 11).[56]

Finally, BD is another consideration in the differential diagnosis. It may take a course of an episdoic febrile disease with arthritis, abdominal pain or epididymitis.[57] The distinction between FMF and BD is based on: (a) the presence of findings characteristic of BD, such as recurrent oral and genital ulcers, uveitis, pustulosis and erythema nodosum, and (b) differences in the fine features of the attacks, such as its longer duration and possible presence of oligoarthritis and vague abdominal pain. Of note is the possibility that some patients have both FMF and BD.[43]

## TREATMENT OF FMF

### Prevention and treatment of the acute attacks

*Prevention of FMF attacks by colchicine*

Since 1974, following the report of Goldfinger and two controlled studies on the beneficial effect of colchicine, this drug became the mainstay of FMF treatment.[58] The usual initial dose for adults as well as for children is 1 mg (either 0.5 mg b.i.d. or 1 mg single dose). Following treatment intervals of 2–3 months, the clinician should decide on the basis of the response to treatment whether a 0.5 mg increment is needed. A dose of 2 mg is usually the end point because of possible toxicity from higher doses and our experience that failure to respond to 2 mg predicts failure to benefit from higher doses. Rarely do we continue to 2.5 or 3 mg; this is usually done only with compliant patients on 2 mg who nevertheless suffer from frequent and severe attacks, thereby losing their capacity to perform normally.

*Failure to prevent attacks*

Response to colchicine, signified by complete cessation of attacks, occurs in about 60% of patients, and significant reduction of attacks occurs in 20%. Non-compliance, non-adherence to treatment regimen or lower-than-required dosage are the main causes of treatment failure. In 5% of patients, non-responsiveness occurs despite faithful compliance to the maximal tolerable dose. Causes for treatment failure are not clear. In some patients, assuming that unresponsiveness is due to malabsorption, we have tried to add to the daily colchicine treatment a weekly intravenous (i.v.) injection of 1 mg colchicine. We have not conducted a controlled study, but our impression is that some patients have benefited from this approach. (Note: intravenous colchicine injection may cause phlebitis. Paravenous colchicine injection may cause tissue necrosis.)

*Treatment of the acute attack*

Colchicine is not effective for the acute FMF attack. The severe pain should be alleviated using analgesics and anti-inflammatory drugs. A common practice that proved helpful for the severe pain reduction was administration of 75 mg i.m. sodium diclofenac. Avoidance of narcotics is essential to prevent development of drug addiction.

*Alternative treatment to colchicine*

At the time of writing, no substitute for colchicine treatment is available. Preliminary experience with intramuscular interferon-alpha (IFN-$\alpha$) is promising.[59] For patients not responsive to colchicine, who experience aura prior to the attack, it may be appropriate to administer interferon immediately before the attack. It is hoped that some patients who do not have aura would benefit from continuous treatment with one or two weekly injections of this drug. However, this must be considered as experimental only at this stage.

## Prevention and treatment of amyloidosis

*Prevention of amyloidosis*

Ever since colchicine was shown to prevent amyloidosis in the majority of patients compliant with the advocated treatment[60], prevention of amyloidosis is another major goal of colchicine treatment. Therefore, failure to respond to colchicine with respect to attacks should not discourage patients and physicians to continue with the treatment regimen. Usually, the colchicine dose that prevents attack is the dose that prevents amyloidosis. If attacks continue despite compliance with treatment, the patient should adhere to 2 mg/day dosage, with almost complete certainty that amyloidosis will not develop.[60]

*Treatment of established nephropathic amyloidosis of FMF*

Amyloidotic patients with mild proteinuria to nephrotic-range proteinuria may benefit from colchicine treatment, even if colchicine was initiated late in the course of the disease, as long as their renal function is unaffected (creatinine is lower than 1.5 mg/dcl) and the daily colchicine dose is 2 mg.[61] In several patients fulfilling these conditions, the remission of the nephrotic syndrome lasted more than 10 years. In uraemia, due to amyloidosis, the recommended dose is also 2 mg. This dose, however,

due to increased rate of side-effects, is poorly tolerated. Nevertheless, it is important to continue colchine, at the maximum dose tolerated in order to slow the kidney-function deterioration rate.[61] In uraemic patients, the risk of developing colchicine toxicity is higher and should be taken into account.

Kidney transplantation has proven to be a well tolerated long-standing solution for patients with amyloidosis of FMF. Rates of acute and chronic rejections are not different from those reported in other systemic diseases. Recurrence of amyloidosis is a problem, but is limited to those not compliant with colchicine treatment.[62] Administration of cyclosporin should be adjusted to prevent colchicine intoxication, caused by a competition of the two drugs on metabolic pathways.[63] Successful results with respect to quality of life and longevity have been reported in at least half of the patients.[64]

## Concerns about the use of colchicine

### Colchicine side-effects

Other than diarrhoea and abdominal pain, which occur transiently or chronically in 20% of patients, colchicine in therapeutic dose is considered a safe drug with only extremely rare side-effects. These include rash, hair loss, leukopenia, thrombocytopenia, neuropathy, myopathy, liver injury and disruption of spermatic function.[65] All are reversible upon lowering of dose or cessation of treatment. However, lowering of dose may cause attacks, and fine adjustment of the colchicine dose may be required. In certain cases of abdominal pain it is hard to tell whether the patients' pain is due to FMF or to untoward effects of the drug. Whether to handle this diagnostic difficulty by slow tapering of the maximal tolerable dose or by gradual increments of low dose, should be decided in each case.

Even pregnancy and family planning should not interrupt the colchicine treatment regimen. The rates of infertility and miscarriages, which were high prior to the advent of colchicine treatment, have been normalized.[66,67] No increased frequency of chromosomal aberrations or other abnormalities were observed in infants of FMF parents taking colchicine. Nevertheless, amniotic fluid examination is recommended until overwhelming evidence in favour of the safety of colchicine during conception and pregnancy becomes available.

### Mechanism of action of colchicine

The mechanism by which colchicine prevents FMF attacks is still not known. However, the many effects of colchicine on granulocyte functions (Table 12) may jointly produce its anti-inflammatory action.[65] The preferential effect of colchicine in FMF is explained by the finding that granulocytes, the major location for pyrin/marenostrin action, are the preferential sites for colchicine accumulation. Finally, the mechanism of the anti-amyloidotic effect of colchicine is obscure. Decreased production by liver cells of SAA, the precursor of amyloid A protein, provides part of the explanation.[68] This mechanism, however, does not explain the resolution of proteinuria shortly after the beginning of colchicine therapy, despite minor or no reduction in the amount of the deposited amyloid protein.[61]

494    A. Livneh and P. Langevitz

| Table 12. Possible mechanisms underlying colchicine inhibition of FMF attacks.[a] | |
|---|---|
| Anti-inflammatory effects of colchicine | Underlying mechanism |
| Reduced motility, migration and chemotaxis | Stabilization and inhibition of polymerization of microtubules, inhibition of release of leukocyte-derived chemotactic factors |
| Reduced phagocytosis | Microtubular depolymerization and stabilization |
| Reduced crossing of capillary vessel wall | Reduced expression of neutrophil and endothelial adhesion molecules |
| Suppressed neutrophilic pro-inflammatory function | Reduced lysosomal degranulation in PMN. Reduced leukotriene T4 release. Increased cellular AMP. Increased prostaglandin E2 release. Inhibition of tyrosine phosphorylation. Prevention of nitric acid synthetase in vascular cells |
| Possible interaction with the mutated pyrin protein | High concentration of colchicine in PMN cells |
| Induction of apoptosis | Induction of phosphorylation of oncogenes |
| Inhibition of cell-mediated immune response | Inhibition of IL-1 production, Ig secretion, histamine release and HLA-DR expression |

[a]In some experiments, conflicting results were reported; some were performed in cell lines irrelevant to inflammation, or at colchicine concentrations higher than therapeutic levels.

## SUMMARY

FMF should be considered in the differential diagnosis of a disease presenting with recurrent episodes of fever and painful manifestations in the abdomen, chest, joints, skin and scrotum. Athough such presentation may characterize a large number of infectious, inflammatory and genetic diseases (Tables 3, 4, 10 and 11), the specific generalized features of the attacks (Table 1) and the fine features of the disease in each site (Table 2) easily distinguish FMF. Also helpful is the absence of the specific manifestations characterizing other periodic fever syndromes, considered in the differential diagnosis, including HIDS, FHF, PFAPA and TRAPS (Table 11). A new set of diagnostic criteria with high sensitivity and specificity was established to assist the inexperienced practitioner in the diagnosis of the disease (Table 6). Genetic diagnosis has only minor impact on the diagnostic work-up. It may help only in some questionable cases (Table 8). The most important aspect of the diagnostic work-up is the examination of the patient during the acute attack. Finally, accounting for chronic or protracted manifestations of FMF resulting from amyloidosis, fibromyalgia and certain vasculitides, may help to decrease possible diagnostic confusion. The mainstay of treatment remains colchicine prophylaxis, which prevents both acute attacks and amyloidosis. Colchicine also causes resolution of proteinuria in patients with established amyloidosis. In general, colchicine is a safe medication with rare side-effects. Non-responders to colchicine may benefit from IFN-α, but this drug is still considered experimental for FMF.

---

### Practice points

- FMF should be considered in the differential diagnosis of a patient presenting with recurrent episodes of fever and painful manifestations in the abdomen, chest, joints, skin and scrotum
- the diagnosis of FMF is mainly clinical
- examination of the patient during the acute attack is of prime importance for diagnosis
- genetic diagnosis is still unsatisfactory in FMF
- there is no laboratory or clinical test which is diagnostic for FMF
- colchicine prophylaxis is the mainstay of treatment
- analgesics and non-steroidal anti-inflammatory drugs, but not prednisone or colchicine, may be used to alleviate the pain of the acute FMF attack

---

### Research agenda

- establishment of a diagnostic test for FMF
- determination of the role of pyrin in the induction of the acute FMF attack
- elucidation of the mechanism of the colchicine effect in preventing the acute FMF attacks and amyloidosis
- investigating the defect that causes colchicine resistance in non-responders
- identification of the articular and systemic factors leading to joint damage in the subset of FMF patients with chronic arthritis
- studying IFN-$\alpha$ as an alternative prophylactic and therapeutic treatment modality

---

## REFERENCES

\* 1. Sohar E, Gafni J, Pras M & Heller H. Familial Mediterranean fever. A survey of 470 cases and review of the literature. *American Journal of Medicine* 1967; **43**: 227–253.

\* 2. The International FMF Consortium. Ancient missense mutations in a new member of the RoRet gene family are likely to cause familial Mediterranean fever. *Cell* 1997; **90**: 797–807.

\* 3. The French FMF Consortium. A candidate gene for familial Mediterranean fever. *Nature Genetics* 1997; **17**: 25–31.

4. Bernot A, da Silva C, Petit J-L et al. Non-founder mutations in the MEFV gene establish this gene as the cause of familial Mediterranean fever (FMF). *Human Molecular Genetics* 1998; **7**: 1317–1325.

5. Booth DR, Gilmore JD, Booth SE et al. Pyrin/marenostrin mutations in familial Mediterranean fever. *Quarterly Journal of Medicine* 1998; **91**: 603–606.

6. Samuels J, Aksentijevich I, Torosyan Y et al. Familial Mediterranean fever at the Millennium. Clinical spectrum, ancient mutations and survey of 100 American referrals to the National Institute of Health. *Medicine* (Baltimore) 1998; **77**: 268–297.

7. Livneh A, Langevitz P, Shinar Y et al. MEFV mutation analysis in patients suffering from amyloidosis of familial Mediterranean fever. *Amyloid* 1999; **6**: 1–6.

8. Dewalle M, Domingo C, Rozenbaum M et al. Phenotype–genotype correlation in Jewish patients suffering from familial Mediterranean fever (FMF). *European Journal of Human Genetics* 1998; **6**: 95–97.

9. Livneh A, Langevitz P, Zemer D et al. The changing face of familial Mediterranean fever. *Seminars in Arthritis and Rheumatism* 1996; **26**: 612–627.

10. Gang N, Drenth JPH, Langevitz P et al. Activation of the cytokine network in familial Mediterranean fever. *Journal of Rheumatology* 1999; **26**: 890–897.

11. Frensdorff A, Sohar E & Heller H. Plasma fibrinogen in familial Mediterranean fever. *Annals of Internal Medicine* 1961; **55:** 448–455.

12. Tunca M, Akar S, Ellidokuz E & Kavukcu S. Significant delay in diagnosis of patients with familial Mediterranean fever. In Sohar E, Gafni J & Pras M (eds) *Familial Mediterranean Fever*, pp 53–56. London: Freund Publishing House Ltd, 1997.

13. Reissman P, Durst AL, Rivkind A, Szold A & Ben-Chetrit E. Elective laparoscopic appendectomy in patients with familial Mediterranean fever. *World Journal of Surgery* 1994; **18:** 139–142.

*14. Livneh A, Langevitz P, Zemer D et al. Criteria for the diagnosis of familial Mediterranean fever. *Arthritis and Rheumatism* 1997; **40:** 1884–1890.

15. Schwabe AD & Peters RS. Familial Mediterranean fever in Armenians. Analysis of 100 cases. *Medicine* 1974; **53:** 453–462.

16. Heller H, Gafni J, Michaeli D et al. The arthritis of familial Mediterranean fever (FMF). *Arthritis and Rheumatism* 1966; **9:** 1–17.

17. Langevitz P, Livneh A, Zemer D et al. Seronegative spondyloarthropathy in familial Mediterranean fever. *Seminars in Arthritis and Rheumatism* 1997; **27:** 67–72.

18. Flatau E, Kohn D, Schiller D et al. Schönlein–Henoch syndrome in patients with familial Mediterranean fever. *Arthritis and Rheumatism* 1982; **25:** 42–47.

19. Langevitz P, Livneh A, Zemer D et al. SLE in patients with familial Mediterranean fever (FMF). *Lupus* 1995; **4 (supplement 2):** 11.

20. International Study Group for Behçet's Disease. Criteria for diagnosis of Behçet's disease. *Lancet* 1990; **335:** 1078–1080.

21. Livneh A, Zaks N, Katz J et al. Increased prevalence of joint manifestations in patients with recurrent aphthous stomatitis (RAS). *Clinical and Experimental Rheumatology* 1996; **14:** 407–412.

22. Zeidler H, Mau W & Khan MA. Undifferentiated spondyloarthropathies. *Rheumatic Disease Clinics of North America* 1992; **18:** 187–202.

23. Kees S, Langevitz P, Zemer D et al. Attacks of pericarditis as a manifestation of familial Mediterranean fever (FMF). *Quarterly Journal of Medicine* 1997; **90:** 643–647.

24. Zimand S, Tauber T, Hegesch T & Aladjem M. Familial Mediterranean fever presenting with massive cardiac tamponade. *Clinical and Experimental Rheumatology* 1994; **12:** 67–69.

25. McDermott EM, Smillie DM & Powell RJ. Clinical spectrum of familial Hibernian fever: a 14-year follow-up study of the index case and extended family. *Mayo Clinic Proceedings* 1997; **72:** 806–817.

26. Barzilai A, Langevitz P, Goldberg I et al. Erysipelas-like erythema of familial Mediterranean fever: clinical pathological correlation. *Journal of the American Academy of Dermatology* (in press).

27. Majeed HA, Quabazard Z, Hijazi Z et al. The cutaneous manifestations in children with familial Mediterranean fever (recurrent hereditary polyserositis). A six-year study. *Quarterly Journal of Medicine* New Series 1990; **75:** 607–616.

28. Eshel G, Zemer D & Bar-Yochai A. Acute orchitis in familial Mediterranean fever. *Annals of Internal Medicine* 1988; **109:** 164–165.

29. Eshel G, Vinograd I, Barr J & Zemer D. Acute scrotal pain complicating familial Mediterranean fever in children. *British Journal of Surgery* 1994; **81:** 894–896.

30. Gafni J, Ravid M & Sohar E. The role of amyloidosis in familial Mediterranean fever. A population study. *Israel Journal of Medical Sciences* 1968; **4:** 995–999.

31. Shohat M, Magal N, Shohat T et al. Phenotype–genotype correlation in familial Mediterranean fever: evidence for an association between Met694Val and amyloidosis. *European Journal of Human Genetics* 1997; **7:** 287–292.

32. Saatçi Ü, Ozen S, Özdemir S et al. Familial Mediterranean fever in children: report of a large series and discussion of the risk and prognostic factors of amyloidosis. *European Journal of Pediatrics* 1999; **156:** 619–623.

33. Pras M, Bronshpigel N, Zemer D & Gafni J. Variable incidence of amyloidosis in familial Mediterranean fever among different ethnic groups. *Johns Hopkins Medical Journal* 1982; **150:** 22–26.

34. Tishler M, Pras M & Yaron M. Abdominal fat tissue aspirate in amyloidosis of familial Mediterranean fever. *Clinical and Experimental Rheumatology* 1988; **6:** 395–397.

35. Sneh E, Pras M, Michaeli D et al. Protracted arthritis in familial Mediterranean fever. *Rheumatology and Rehabilitation* 1977; **16:** 102–106.

36. Salai M, Zemer D, Segal E et al. Chronic massive knee effusion in familial Mediterranean fever. *Seminars in Arthritis and Rheumatism* 1997; **27:** 169–172.

37. Michaeli D, Pras M & Rozen N. Intestinal strangulation complicating familial Mediterranean fever (FMF). *British Medical Journal* 1966; **2:** 30.

38. Livneh A, Madgar I, Langevitz P & Zemer D. Recurrent episodes of acute scrotum with ischemic testicular necrosis in a patient with familial Mediterranean fever. *Journal of Urology* 1994; **151:** 431–432.

39. Zemer D, Cabili S, Revach M & Shahin N. Constrictive pericarditis in familial Mediterranean fever. *Israel Journal of Medical Sciences* 1977; **13**: 55–58.

40. Livneh A, Langevitz P & Pras M. Pulmonary associations in familial Mediterranean fever. *Current Opinion in Pulmonary Medicine* 1999; **5**: 326–331.

41. Langevitz P, Zemer D, Livneh A et al. Protracted febrile myalgia in patients with familial Mediterranean fever. *Journal of Rheumatology* 1994; **21**: 1708–1709.

42. Glikson M, Galun E, Schlesinger M et al. Polyarteritis nodosa and familial Mediterranean fever: a report of 2 cases and review of the literature. *Journal of Rheumatology* 1989; **16**: 536–539.

43. Schwartz T, Langevitz P, Zemer D et al. Behçet's disease in familial Mediterranean fever. Characterization of the association between the two diseases. *Seminars in Arthritis and Rheumatism* (in press).

44. Said R, Hamzeh Y, Said S, Tarawneh M & Al-Khateeb M. Spectrum of renal involvement in familial Mediterranean fever. *Kidney International* 1992; **41**: 414–419.

45. Ozdogan H, Arisoy N, Kasapçapur O et al. Vasculitis in familial Mediterranean fever. *Journal of Rheumatology* 1997; **24**: 323–327.

46. Langevitz P, Buskila D, Finkelstein R et al. Fibromyalgia in familial Mediterranean fever. *Journal of Rheumatology* 1994; **21**: 1335–1337.

47. Buskila D, Zaks N, Neumann L et al. Quality of life of patients with familial Mediterranean fever. *Clinical and Experimental Rheumatology* 1997; **15**: 55–60.

*48. Aksentijevich I, Torosyan Y, Samuels J et al. Mutation and haplotype studies of familial Mediterranean fever reveal new ancestral relationships and evidence for high carrier frequency with reduced penetrance in the Ashkenazi Jewish population. *American Journal of Human Genetics* 1999; **64**: 949–962.

*49. Cazeneuve C, Sarkisian T, Pêcheux C et al. MEFV-gene analysis in Armenian patients with familial Mediterranean fever: diagnostic value and unfavorable renal prognosis of the M694V homozygous genotype – genetic and therapeutic implications. *American Journal of Human Genetics* 1999; **65**: 88–97.

50. Chen X, Fischel-Ghodsian N, Cercek A et al. Assessment of pyrin gene mutations in Turks with familial Mediterranean fever. *Human Mutation* 1998; **11**: 456–460.

51. Drenth JPH, Haagsma CJ, van der Meer JWM & International Hyper-IgD Study Group: Hyperimmunoglobulinemia D and periodic fever. The clinical spectrum in a series of 50 patients. *Medicine* (Baltimore) 1994; **73**: 133–144.

*52. Drenth JPH, Cuisset L, Grateau G et al. Mutations in the gene encoding mevalonate kinase cause hyper-IgD and periodic fever syndrome. *Nature Genetics* 1999; **22**: 178–181.

53. Livneh A, Drenth JPH, Klasen IS et al. Familial Mediterranean fever and hyperimmunoglobulinemia D syndrome: 2 diseases with distinct clinical, serologic and genetic features. *Journal of Rheumatology* 1997; **4**: 1558–1563.

*54. McDermott MF, Aksentijevich I, Galon J et al. Germline mutations in the extracellular domains of the 55 kDa TNF receptor, TNFR1, define a family of dominantly inherited autoinflammatory syndromes. *Cell* 1999; **97**: 133–144.

55. Marshall GS, Edwards KM, Butler J & Lawton AR. Syndrome of periodic fever pharyngitis and aphthous stomatitis. *Journal of Pediatrics* 1987; **110**: 43–46.

*56. Padeh S, Brezniak N, Zemer D et al. Periodic fever, aphthous stomatitis, pharyngitis and adenopathy syndrome: clinical characteristics and outcome. *Journal of Pediatrics* 1999; **135**: 98–101.

57. Chajek T & Fainaru M. Behçet's disease. Report of 41 cases and review of the literature. *Medicine* (Baltimore) 1978; **54**: 179–196.

58. Ben-Chetrit E & Levy M. Colchicine prophylaxis in familial Mediterranean fever reappraisal after 15 years. *Seminars in Arthritis and Rheumatism* 1991; **20**: 241–246.

*59. Tunca M, Tankurt E, Akbaylar Akpinar H et al. The efficacy of interferon alpha on colchicine-resistant familial Mediterranean fever attacks: a pilot study. *British Journal of Rheumatology* 1997; **36**: 1005–1008.

60. Zemer D, Pras M, Sohar E et al. Colchicine in the prevention and treatment of the amyloidosis of familial Mediterranean fever. *New England Journal of Medicine* 1986; **314**: 1001–1005.

61. Livneh A, Zemer D, Langevitz P et al. Colchicine treatment of AA amyloidosis of familial Mediterranean fever. An analysis of factors affecting outcome. *Arthritis and Rheumatism* 1994; **37**: 11804–11811.

62. Livneh A, Zemer D, Siegal B et al. Colchicine prevents kidney transplant amyloidosis in familial Mediterranean fever. *Nephron* 1992; **60**: 418–422.

63. Siegal B, Shtrasburg S & Pras M. Cyclosporine toxicity in amyloidotic patients. *Transplantation Proceedings* 1987; **19**: 1544–1545.

64. Zemer D, Shabtai M, Lustig S et al. Survival and outcome of FMF amyloidotic patients post renal transplantation. In Sohar E, Gafni J & Pras M (eds) *Familial Mediterranean Fever*, p 185. London: Freund Publishing House Ltd, 1997.

65. Ben-Chetrit E & Levy M. Colchicine: 1998 update. *Seminars in Arthritis and Rheumatism* 1998; **28**: 48–59.

498    A. Livneh and P. Langevitz

66. Ismajovich B, Zemer D, Revach M et al. The causes of sterility in females with familial Mediterranean fever. *Fertility and Sterility* 1973; **24**: 844–847.
67. Rabinovitch O, Zemer D, Kukia E et al. Colchicine treatment in conception and pregnancy: two hundred thirty-one pregnancies in patients with familial Mediterranean fever. *American Journal of Reproductive Immunology* 1992; **28**: 245–246.
68. Tatsuta E, Sipe JD, Shirahama T et al. Colchicine inhibition of serum amyloid protein SAA and SAP synthesis in primary mouse liver cell cultures. *Arthritis and Rheumatism* 1984; **27**: 349–352.

# Exhibit 16:

# Letter from Dar Al Ajaza, a Charity Organization in Lebanon

HOME FOR ELDERLY PEOPLE

DAR AL AJAZA

IN SAIDA

We care with love & passion

November 3, 2012

To whom it may concern

The administration of Home for Elderly People thanks Sami Samir Hassoun who was a distinctive member of its team. Sami was typical for his high liveliness and permanent energy, for his fun spirit and affectionate heart that radiates warmth to the elderly living in the Home. He used to spend lots of his time talking and reading to the elderly. They all loved him and waited for him to come.

One example of Sami sympathizing with the elderly is when one of the elderly whose children were abroad asked him for a KFC meal. Sami bought him the meal from his own money. Everyone was impressed. Later the daughter of the elderly called Sami and thanked him for what he did.

His help to others made him feel very happy, and this was reflected in his good conduct for all who knew him. I wish him the best for his future.

Aida Berjawi

signature

دار العجزة الخاص

في صيدا

Home For Elderly people

٢٠١٢/١١/٣

## إلى من يهمه الأمر

إن إدارة دار العجزة تتوجه بالشكر إلى سامي سمير حـــسون الـــذي كـــان عضواً مميزاً ضمن كادرها. تميز سامي بالإضافة إلى همته العالية ونشاطه الدائم، بروح مرحة وقلب حنون يشعان دفئاً على المسنين الساكنين في الدار. كان يمضي مع المسنين وقتاً طويلاً يحدثهم ويقرأ لهم وكانوا جميعاً يحبونه وينتظرون قدومه.

واحد الأمثلة على تعاطف سامي مع المسنين عندما في احد الأيام طلب احـــد المسنين ممن كان اولاده خارج البلاد، طلب وجبة من الطعام من KFC فـــذهب سامي واشترى له وجبة من ماله الخاص فأثار بذلك اعجاب الجميع واتصلت ابنة المسن بسامي وشكرته على ذلك.

فقد كانت مساعدة الآخرين تشعره بسعادةٍ كبيرة تنعكس في معاملته الجيدة لكـــل من عرفه، أتمنى له الخير في مستقبله.

عايدة برجاوي

# Exhibit 17:

# Letter from Al Ata, a Charity Organization in Lebanon

AL ATA' CHARITABLE ORGANIZATION

November 20, 2012

I am writing this letter about Sami Samir Hassoun who volunteered in his benevolent organization during the years 2004-2007.

Our charitable organization is specialized in distributing food to needy families in addition to basic clothes and some generic drugs that were given by private donations.
A lot of young men and women came to volunteer to work with us, but our charitable organization remembers Sami quite well not only due to his distinctive personality and attitude but also to his charitable works during the destructive war of July 2006 (thirty-three days of war): Israel on one part and Hezbollah on the other .

When this war happened, a lot of people fled from targeted military areas to safe areas in order to save their lives. The number of the displaced people due to war was very large and was estimated between one million to one million and a half. Due to the great number, many of the displaced people were forced to find shelter in schools, churches, mosques and public places. Since the war lasted long, the displaced people were in need of urgent help such as medical care, meals, mattresses, blankets and clothing.

Sami were among the few volunteers who kept working with us and from the ones who risked their lives to danger to help the displaced people to receive aids during those times. Sami were among the few volunteers who had to go through dangerous devastated areas, full of deaths and destruction and were targeted to military raid. He went through all that only to deliver these aids to the displaced people because of this war.

During this war, lots of people were rescued due to their urgent need to drugs and meals. Their lives were saved because of people like Sami Samir Hassoun.

I am always happy to write about or remember Sami Samir Hassoun with not only pride and honor but also with lots of love in the name of our benevolent organization as well as from me. Sami is a very distinctive and good-hearted person who shows love and tenderness through helping others with his good well works. I wish him good luck. God bless him wherever he goes.
Nawal Hodroj / signature



٢٠١٢/١١/٢٠

أكتب هذه الرسالة عن سامي سمير حسون الذي تطوع في منظمته الخيرية خلال ســنوات ٢٠٠٤ إلى ٢٠٠٧.

منظمتنا الخيرية متخصصة في توزيع المواد الغذائية على العوائل المحتاجة اضافة إلــى الملابــس الأساسية وبعض الأدوية العامة من خلال التبرعات الخاصة.

الكثير من الشباب والشابات يأتون ليتطوعوا للعمل معنا ولكن منظمتنا الخيرية تذكر ســامي جيــداً بسبب شخصيته المميزة وموقفه وأعماله الخيرية خلال حرب تموز ٢٠٠٦ (حرب ٣٣ يوم) المدمرة مــن إسرائيل من طرف وحزب الله من جهة أخرى.

عند حدوث هذه الحرب هرب الكثير من الناس من المناطق المستهدفة بالحرب إلى منــاطق امنــة لينجو بحياتهم. كان عدد النازحين من الحرب كبير جداً يقدر ما بين المليون إلى المليون ونصف، وبــسبب كثرة العدد اضطر الكثير من النازحين إلى اللجوء إلى المدارس والكنائس والجوامع والأماكن العامة. نظراً إلى استمرار الحرب لفترة طويلة كان النازحين بحاجة ماسة إلى المساعدات الطارئة من الطبابة الــصحية والوجبات الغذائية والفرش المؤمنة للنوم والأغطية والملابس.

سامي كان من ضمن هؤلاء المتطوعين القلة عددهم الذين استمروا بالعمل معنا وخـــاطروا بحيـــاتهم لمساعدة هؤلاء النازحين لإيصال هذه المساعدات إليهم. سامي كان من ضمن هؤلاء المتطوعين القلة الذين اضطروا بالمرور بالمناطق الخطرة المليئة بالدمار والقتلى ومعرضه للقصف العسكري فقط لإيصال هــذه المساعدات الى النازحين من هذه الحرب.

خلال هذه الحرب تمَ انقاذ الكثير من الناس بسبب حاجتهم الماسة إلى الدواء وتم انقاذ حياة الــبعض الآخر من خلال الوجبات الغذائية بسبب اشخاص مثل سامي سمير حسون.

يسعدني دائماً أن اكتب عن أو أذكر سامي سمير حسون بفخر واعتزاز عالي وحب شديد له مني ومن منظمتنا الخيرية. سامي إنسان مميز جداً بقلبه البسيط الطيب وحبه وعطفه وحنيته بمساعدة الآخرين وعمل الخير،أتمنى له الخير والتوفيق والبركة من الله اينما ذهب.

نوال حدرج

# Exhibit 18:

# Letter from Girlfriend, Duaa Albadawi

Duaa Albadawi
9236 West 143rd Terrace
Overland Park, KS 66221

October 21, 2012

Dear Judge Gettleman,

I write you this letter with the utmost sincerity and optimism and hope it reaches you in good health. My name is Duaa Albadawi, and I am Sami Hassoun's girlfriend and soon to-be fiancée. I was born and raised in Kansas City and currently reside with my parents in Overland Park, Kansas. Though I am of pure Syrian decent, I was raised in America my entire life. I attend Johnson County Community College and will be transferring to University of Kansas next year pursing my undergraduate degree in Psychology with a minor in dietary studies. My dream is to one day become a psychiatrist and help treat people who have mental, emotional, and behavioral disorders. This study has always been something that fascinated me and hope to excel by pursuing a lifelong career in it.

I met Sami in December of 2009 in Chicago, and as cliché as this might sound, it was love at first sight. I was attending a conference and was meeting some friends for dinner and happened to walk into the wrong restaurant. Sami was working that evening at Nazareth Sweets in Albany Park. After Sami had directed me to the right store I was looking for, we got to making small talk. I was late that evening 30 minutes to dinner, but it was worth it. We ended up exchanging numbers and our relationship started from there. I just felt that he understood me from the get-go and had a way with making me feel comfortable and safe when I was with him. When I am feeling frustrated, excited, annoyed, bothered, etc., he always knows how to comfort me. Sami was a number of things: charming, intelligent, and ambitious. I remember how we would stay up all night on the phone talking of our aspirations, dreams, life-goals, and the type of people we wanted to be in the future. We had so much in common and so many differences, but we didn't care. Those differences are what attracted us to each other. As days and months began to pass, I knew only one thing after: Sami was my soul-mate.

It was the little things that Sami would do and say that had the biggest effect on me. What I love the most is how generous and caring Sami is. He would always tell me how he would just be coming back from the park with his younger brother A▋. Every week, he would spend a day with A▋, going to see a movie then going out for ice cream afterwards. He is so good with children and I could see that with him and A▋'s relationship. Aside from the other talents Sami possesses, I found him most charming and delighting when he would romance me in French and Spanish, as he was a fluent speaker in both even though I could not understand a single word. When it comes to work, Sami is one of the hardest working men I know. He is quick on his feet, efficient, and produces quality work. He has always been very independent and goal-oriented.

The Sami I knew prior to the summer of 2010 was confident, self-assured, and happy. However, before his arrest in September 2010, I began to notice some strange behavior that Sami had never displayed before. He would call me at times panting, stuttering on his words, asking me to stay on the phone with him until he fell asleep. At random times when I would be out with family or in class, he

would call me several times, sending me text messages like "CALL ME NOW!" or "ANSWER NOW!" I would receive these phone calls even more during the nighttime. I had no idea why he had these tantrums and his calls nearly half frightened me to death. I knew something was wrong, but I could never get him to tell me what was going on.

During that period, he would call me every single hour of the day. Sometimes, if he knew I was home or studying at the library, he would make me stay on the phone with him or webcam on Skype, even though we would not be conversing whatsoever. When I would ask him why he wanted me to stay on the line, he would say things like "just please stay on the line, I feel safer" or "when I know you're on the line, I know everything will be okay." It was a *completely different* Sami.

Sami had a sensitive side to him and he would show that to me at times, but soon enough with his new strange behavior, it was coming out more than what I was used to. The day I will never forget is three days prior to his arrest. He called me at night and we stayed on the line for over five hours. During these five hours, he would break down crying. I asked him "what's wrong?" He paused and I heard his sobbing, and then he replied "nothing, just my allergies." I told him "you don't have allergies." He said "don't worry about it." My heart that night was never in so much pain and anxiety, especially because he would not tell me what was going on.

The night of September 19, 2010, I received seven missed calls from Sami at about 10 pm, just a couple hours before the incident. I was busy at the moment so I sent him a text "I will call you back, I cannot talk at the moment." When I did free up, I called him back multiple times and he did not answer. I woke up the next morning and noticed there were no missed calls or texts from him. When I learned he was arrested, my heart dropped.

Sami has matured significantly since his arrest. Now, when he feels upset, he calls me right away to talk about it or he goes to his jail cell and reads a book. When Sami calls, the first thing he asks me is how I am doing and wants to hear all about my day in detail.

Even though I know he is stressed to the max and just wants to pour his heart out to me, he never ever puts himself first. Once during his visit, I began to cry uncontrollably and he said to me "please hang in there, be strong. Everything will be okay. I'm going to fight for us for as long as it takes. My heart aches when I see your beautiful eyes tearing." His words of comfort always take me to a vision of our future and then my heart is at rest.

Regret is all I see in his eyes and forgiveness is all he seeks from me. He always tells me how remorseful he is and says "I regret a lot of choices I have made in my life and can only hope that one day you and my family can forgive me for the pain and suffering I have bought upon you all." I truly see his guilt and sorrow whenever I go for visits. He tells me of how he was a lost soul and this is a wake-up call for him. He says, "This made me rather than breaking me."

If anyone's relationship in the Hassoun family is above and beyond the ordinary, it is Sami and his younger brother, A⬛'s. A child of A⬛'s age, nine years old, usually idolizes a superhero or athlete as his/her role model, but not A⬛. His is Sami. The most precious thing ever is during visits. A⬛ and Sami run to each to each other kissing and hugging like they have not seen one another in ages, but in reality it has only been a week. They sit next to each other and start cracking jokes and talking about A⬛'s future

and how he is going to be the best and most famous Dentist in the world. What hurt and broke Sami's heart the most was how he could not be present for A█'s ninth birthday. I remember he called me the night before and broke down crying saying, "A█ wants me to celebrate with him tomorrow. I can't be there for my baby brother during his special moments. He's growing before me so fast and I can't do anything about it. He needs me out there for him and I can't be there for him."

In addition to their family bundle is Sami's mother and father, or what he calls, "the guiding light of my heart and eyes." He has always been close with his parents, but after his arrest, their relationship has grown stronger. He tells me often how his parents have continuously supported and provided him with everything and more than what he needs. His relationship changed with his mother and father in ways such as, telling them "I love you" every single chance he gets when talking to them, something he never really used to do.

The love that Sami and I share transcends all boundaries. Sami is planning on finishing his degree in prison and plans to study Political Science and Finance/Marketing. As soon as Sami is released, we will get married. Our engagement might have to be during his years in prison but we will manage. He knows I will be with him no matter what or where life takes us, no matter how complicated his situation becomes; he knows I am right by his side. After Sami is released, I will be joining him in Lebanon immediately. Since I will be established and ready to begin my career, I will support the family in the beginning until Sami catches up alongside.

We plan on having as many children as God blesses us with, for having a big family is something Sami and I have always dreamed of. It is unfortunate that Sami and I will be beginning our future and starting a family later than most couples. In the end, all that matters is that we have one another. As Shakespeare once quoted in his famous play, "the course of true love never did run smooth." He couldn't be more right. What I ask from your honor, Judge Gettleman, is for a fair and just sentencing. If you have any further questions, I would be more than happy to answer. My cell phone number is: (816) 686-4154 and my email address is dalbada2@stumail.jccc.edu. Thank you for taking the time to read my letter. I wish you only the best in the future.

Sincerely,

Duaa Albadawi

# Exhibit 19:

**Jacqueline Reis, *Local residents stuck in Lebanon*,
Telegram & Gazette, July 15, 2006**

## Local residents stuck in Lebanon

**Author:** Reis, Jacqueline.

**Publication info:** Telegram & Gazette [Worcester, Mass] 15 July 2006: A1.
ProQuest document link

**Abstract:** "Lebanon's isolated from the world right now," said Bilal T. Jaber of Worcester. His 51-year-old father, a Lebanese native and U.S. citizen, has been visiting Lebanon for two weeks and is stuck in the family's apartment in the Khalde area, a short distance south of Beirut. With the ongoing battle between the Israeli military and Hezbollah, it is difficult, if not impossible, for U.S. citizens to get out of the country. The State Department's Office of Overseas Citizens Services said yesterday morning that their only advice is for U.S. citizens caught in Lebanon "to stay put and make sure that they're registered with the U.S. embassy" in Beirut. He estimated that thousands of U.S. citizens are in Lebanon and said an evacuation team from the Department of Defense is working on a plan to get them to Cyprus. In addition, Syria has reportedly opened its borders to U.S. citizens fleeing Lebanon, he said.

**Links:** Find It at University of Chicago Library

**Full Text:** WORCESTER - When violence spread from the Israeli-Gaza border to the Israeli-Lebanese border Wednesday, several local residents were trapped inside Lebanon, and the government is working to get them and thousands of other U.S. citizens to safety. "Lebanon's isolated from the world right now," said Bilal T. Jaber of Worcester. His 51-year-old father, a Lebanese native and U.S. citizen, has been visiting Lebanon for two weeks and is stuck in the family's apartment in the Khalde area, a short distance south of Beirut. With the ongoing battle between the Israeli military and Hezbollah, it is difficult, if not impossible, for U.S. citizens to get out of the country. The State Department's Office of Overseas Citizens Services said yesterday morning that their only advice is for U.S. citizens caught in Lebanon "to stay put and make sure that they're registered with the U.S. embassy" in Beirut. U.S. Rep. James P. McGovern, D-Worcester, who tried to get more information for Mr. Jaber and Mohannad A. Younes, another Worcester resident who has family traveling in Lebanon, cautioned against going to the embassy, however, because of protests outside. He estimated that thousands of U.S. citizens are in Lebanon and said an evacuation team from the Department of Defense is working on a plan to get them to Cyprus. In addition, Syria has reportedly opened its borders to U.S. citizens fleeing Lebanon, he said. In the meantime, Mr. Jaber and others are keeping in touch with their families by phone. Mr. Younes, who like Mr. Jaber is a student at Worcester State College, said his parents, sister and 14-month- old niece, all U.S. citizens, are in Saida (also known as Sidon), about 30 minutes south of Beirut. "They're scared, and actually, I can hear the bombing behind them," he said, referring to recent phone conversations. His family cannot go elsewhere, because bridges leading out of the area have been destroyed by Israeli jets, he said. Hazem Kabbara of Boylston said his wife and their two children, a 3-year-old and a 4-week-old baby, are visiting Lebanon's second- largest city, Tripoli, and are also worried. They had planned to visit family until mid-September and might not be able to leave any sooner. Mr. Kabbara calls them every day. "It's hard to be here, and it's hard to be there," he said. The International Committee of the Red Cross has people in Lebanon and Gaza and, according to its Web site, has "serious concern about the humanitarian consequences of the current conflict." Dr. Jihad Boura of Northboro has been getting reports on the situation from his brother, who lives in Beirut. "Beirut right now, he tells me, is like a ghost town. Usually, it's always congested with people, 24-7." The tourists have fled to Syria, he said. "Lebanon is a virtual island," Dr. Boura said, "except that instead of being surrounded by water, we're surrounded by ammunition and guns." Although his brother fears for his life, many Lebanese "have built some kind of immunity to war over the years," Dr. Boura said. That resignation and a

belief in God have helped people cope, he said. The country's 16-year civil war ended in 1991, and Mr. McGovern described the government as one "that actually holds out some hope for a calmer and more peaceful future." Dr. Boura and others predicted that the toll of the current conflict on civilians, coupled with President Bush's response - that Israel has a right to defend itself - will swell the ranks of people who oppose the United States and see it as synonymous with Israel. "It's like opening a road or a highway for people to go to the other side, which we don't want people to go to," he said. "It is not OK to stand still and watch while a country is being destroyed." Mr. McGovern said the two priorities for the U.S. government regarding Lebanon must be to ensure the safety of U.S. citizens and de-escalate the violence. Individuals concerned about travelers in Lebanon can get more information from the State Department at (888) 407-4747. Travelers can register with the U.S. embassy at https:// travelregistration.state.gov/ibrs/. Jacqueline Reis can be reached by e-mail at jreis@telegram.com. Illustration PHOTOS; MAP; (PHOTOS) ELLEN HARASIMOWICZ; (MAP) T&G Staff; (PHOTO 1) Dr. Jihad Boura of Northboro, who has a brother in Beirut, talks yesterday outside the Worcester Islamic Center mosque. (PHOTO 2) Mr. Kabbara

**People:** Jaber, Bilal T, McGovern, James P, Kabbara, Hazem

**Publication title:** Telegram&Gazette

**Pages:** A1

**Number of pages:** 0

**Publication year:** 2006

**Publication date:** Jul 15, 2006

**Year:** 2006

**Dateline:** WORCESTER

**Section:** NEWS

**Publisher:** Globe Newspaper Company, Inc.

**Place of publication:** Worcester, Mass.

**Country of publication:** United States

**Journal subject:** General Interest Periodicals--United States

**ISSN:** 10504184

**Source type:** Newspapers

**Language of publication:** English

**Document type:** NEWSPAPER

**ProQuest document ID:** 268975441

**Document URL:** http://search.proquest.com/docview/268975441?accountid=14657

**Copyright:** Copyright New York Times Company Jul 15, 2006

**Last updated:** 2011-08-31

**Database:** ProQuest Newsstand

## Exhibit 20:

## Peter Bouckaert, *Both Israel and Hezbollah Committing 'War Crimes'*, Council on Foreign Relations, August 7, 2006

COUNCIL*on*
FOREIGN
RELATIONS

# Bouckaert: Both Israel and Hezbollah Committing 'War Crimes'

Interviewee: Peter N. Bouckaert
Interviewer: **Bernard Gwertzman**, Consulting Editor
August 7, 2006

Peter N. Bouckaert, a senior emergencies researcher for Human Rights Watch who has been traveling in Lebanon and Syria, says that both Hezbollah and Israel have been committing 'war crimes' by their strikes against civilians on either side of the Israeli-Lebanese border.

Bouckaert said in the Israel-Hezbollah clash there is "a sense of self-righteousness on both sides of the conflict, and a willingness to look away from abuses committed on both sides of the conflict." But he adds: "We are talking about a different mentality. I mean, it's perfectly clear that Hezbollah is directly targeting civilians, and that their aim is to kill Israeli civilians." He says Human Rights Watch does not accuse the Israeli army of trying to kill civilians but of "not taking the necessary precautions to distinguish between civilian and military targets."

## Why has the Lebanese government seemed so close to Hezbollah lately, even though the government had nothing to do with the start of the conflict with Israel?

To a large extent, the Israeli offensive has consolidated the relationship between the government and Hezbollah because of the heavy civilian casualties. It's very unlikely that we will see the government moving away from Hezbollah and taking an independent position and joining an international effort to demilitarize southern Lebanon and create those Hezbollah-free zones. And it's very unlikely that Hezbollah itself will agree to any such step because its backers in Iran won't agree to it.

## Did you spend much time with the Hezbollah people in the south?

When we went to visit some of the villages in the south, we certainly saw Hezbollah persons on some of the roads and near some of the villages, and they are a very well-organized guerilla group. I've worked in three countries with civil wars and guerrilla forces on the ground, and Hezbollah comes across as very impressive. They have very good communications, and they seem very disciplined and well-trained. So Israel faces a real threat on the ground from a very well-motivated and well-trained force in Lebanon. That was also the impression of the experienced journalists that I worked alongside.

**And of course the new UN resolution allows Israel to keep its forces on the ground until there is an international force, and I take it you are very dubious that Lebanon can agree to this.**

Well, there are more than two parties to this conflict. It's not between Israel and Lebanon. The fighting taking place is between Israel and Hezbollah, with Lebanon being increasingly drawn in because some of its infrastructure has been destroyed. It's very difficult to see a UN resolution which allows Israel to stay on the ground leading to a suspension of Hezbollah activity in the south. And as we have seen in Iraq, the occupation force that Israel would have in the south would be very vulnerable to guerrilla attack, to attacks from insurgents. Basically, what would happen would not be a palatable outcome for the Israelis, obviously.

**And this only seems to increase the Israeli determination to not appear weak, so that will only increase the fighting, I suppose.**

I think Israel seriously miscalculated in going into Lebanon with this all-out offensive. First of all, they thought they would be able to deal Hezbollah a mortal blow from the air. That certainly hasn't been the case. If you look at guerilla wars around the world, it's almost impossible to deal a guerrilla force a mortal blow from the air. I mean, go back to Vietnam with all the aerial bombardment that was tried there—it didn't have a real impact on the Viet Cong.

Air power works very efficiently when you are dealing with an enemy like Saddam Hussein with a small army, tanks, and other targets you can hit, or the Serbian military, but it doesn't work very well against guerrilla forces. Rather than hitting Hezbollah hard, Israel hit a civilian population hard, and many, many

people were killed. Now, the second option is to go in on the ground with ground forces, and they are taking very heavy casualties by doing this. And they have not impacted significantly on Hezbollah's ability to fire rockets into Israel, and to continue fighting. So Israel is faced with a real dilemma: how to end this war and appear victorious? Not to stop would mean a long period of continued fighting with an uncertain outcome, and with significant casualties—military casualties on Israel's side, Hezbollah casualties, but also heavy civilian casualties.

**Has Human Rights Watch tried to urge Hezbollah to stop its attacks on obviously largely civilian targets in Israel? Human Rights Watch is very critical of the Israeli air attacks on Lebanon. What about from the Hezbollah side?**

I think the record is there. If you go to our **web site**, our first **statement** denounced Hezbollah for indiscriminately firing rockets into Israel and said it was a crime. One of the problems we face is the Israelis and those who are generally supportive of Israel have not looked at our work on Hezbollah and our criticism of Hezbollah. And the same goes for the Arab world. We have been very objective in our coverage of this conflict. We don't just cover abuses on one side. We have people inside Israel, we have people inside Lebanon, and we have people inside Gaza.

The whole point, the whole general thrust of our work, is that outsiders need to stop pursuing policies which have such a heavy impact on the civilian population, and that no side should use abuses committed by the other party as an excuse for their own abuses. But so often we get frustrated either at the pro-Arab organizations or the other side. And I find it very interesting that so few people look at our work in a kind of broader context, as an impartial record of what is happening in the conflict, rather than just how our work affects their side.

**It's interesting that you say you are accused by the Arab side of being partial toward Israel. And of course, as you know, many Israelis have been critical of Human Rights Watch for its reporting on the bombing. So I guess perhaps you win by being attacked by both sides.**

Because of our objectivity we end up making everybody angry with our reporting because we do have to deal with a sense of self-righteousness on both sides of the conflict, and a willingness to look away from abuses committed on both sides of the conflict. And we are talking about a different mentality. I mean, it's

perfectly clear that Hezbollah is directly targeting civilians, and that their aim is to kill Israeli civilians. We don't accuse the Israeli army of deliberately trying to kill civilians. Our accusation, clearly stated in the [latest HRW] **report**, is that the Israeli army is not taking the necessary precautions to distinguish between civilian and military targets. So, there is a difference in intent between the two sides. At the same time, they are both violating the Geneva Convention.

**You're in Damascus now. Do you expect Syria to get involved in this?**

The whole region is involved in what is happening in Lebanon, and it's impossible to divorce developments in Gaza from what's happening in Lebanon, and that's why it's so important that we do look at these issues in a regional sense. You see Hezbollah flags everywhere in Damascus these days, and there's a lot of posters of [Hassan] **Nasrallah** up. We have written to the **Iranian** and **Syrian** governments to ask them to use their influence over Hezbollah to stop some of these abuses. In our letters we clearly state what kind of influence we think they have.

# Exhibit 21:

# Letter from Aunt, Chaimaa Matar

Dear Judge Gettleman,

Thank you for giving me the opportunity to write this letter to tell you about Sami. I am his aunt, Chaimaa Matar. I am a family physician. I met Sami for the first time in Lebanon when he was 12 years old. I used to treat him as a nephew and a friend. I know the type of person he is very well. I know how he is an emotional, kind, lovely person and has a child heart. All the family loves him very much.

Sami passed through a lot of bad circumstance in his life, like the tough war in Lebanon in 2006. Buildings were destroyed and smoke filled the sky. Roads and bridges were closed and destroyed and people whose houses were destroyed lived in the school-building –three families in one room. They suffered from illness and lack of food and medication. I still remember how Sami called me and he said it's really hurting to see these people suffering and he said I will go to volunteer to help injured people and help to provide food and the other basic needs for these families. It really hurt to do nothing for them so he volunteered. I was impressed by his kindness and his wish to help others.

At the same time he worried so much about his family and carried the responsibility of the safety of his family and behaved like the father of his family. He is very attached to them, especially to his younger brother, he always wanted to do the best for him and treated him like his son and his little brother is very attached to him too and treats Sami like a second father.

I have a few memories of Sami that made me sure what type of a person he is. One time on a rainy day I was driving and he was sitting beside me and suddenly told me auntie stop the car. I stopped the car and he walked out of the car toward a lady carrying a baby under the rain. Sami gave her his umbrella and came back to the car and said to me sorry I scared you but I couldn't see this woman with the baby under the rain and do nothing.

Another thing that touched my heart and left me sure about what kind of a person he is, is that when he was about 14 or 15 year old we went for a walk and we passed by a restaurant filled with people and he was hungry, so we got a sandwiches. As we were leaving Sami saw a kid about 10 or 11 year with very old clothes watching the people coming out of the restaurant. Sami walked toward this kid and gave him his sandwiches. You can't imagine how happy that kid was. Sami said to me, "How can I eat it knowing that this kid is hungry and might not be able to buy it?" Sami's action touched my heart and let me know how kind he is and how he has the sense to help others. Sami is very emotional and has a good spirit and is a kind person.

I am sorry for writing this long letter. I just wanted to let you know more about Sami and to consider give him a chance because his family and his younger brother are dreaming to reunite with him again and to live together as one family.

Thank you again.

Sincerely,


Chaimaa Matar, MD

**Exhibit 22:**

**Scheherezade Faramarzi, *Trauma of war is scarring Lebanese children*, St. Louis Post-Dispatch, July 30, 2006.**

## Trauma of war is scarring Lebanese children

**Author:** Faramarzi, Scheherezade; THE ASSOCIATED PRESS.

**Publication info:** St. Louis Post - Dispatch [St. Louis, Mo] 30 July 2006: A.14.

ProQuest document link

**Abstract:** A third of Lebanese killed in Israeli attacks against Hezbollah guerrillas are children, the U.N. humanitarian chief said. Experts warn the conflict is taking a heavy psychological toll on survivors, as well. U.N. humanitarian chief Jan Egeland estimated that a third of the hundreds of people killed in Lebanon were children. UNICEF spokeswoman Susan Lagana said Friday that Egeland's figure was based on numbers compiled by UNICEF. PHOTO; PHOTO - Katrina Karouni, 11, injured in an Israeli airstrike in Tyre, Lebanon, receives treatment at a medical center in the city of Saida on Wednesday. A third of Lebanese killed in Israeli attacks against Hezbollah militants are children, a U.N. official says. AFP/Getty Images

**Links:** Find It at University of Chicago Library

**Full Text:** Once again, Lebanon's children are seeing what they shouldn't -- visions of death and destruction that may scar them for life. A third of Lebanese killed in Israeli attacks against Hezbollah guerrillas are children, the U.N. humanitarian chief said. Experts warn the conflict is taking a heavy psychological toll on survivors, as well. "You can't run away from the sound of bombs," said Nadine Maalouf, a child psychologist who has been working with traumatized children. Lebanese are no strangers to violence, having suffered through the 1975-90 civil war and Israel's 1982 invasion. But parents who lived through those conflicts had hoped to shield their children. Instead, they have found themselves helpless in the face of relentless Israeli airstrikes on guerrilla positions in Beirut and southern Lebanon that have flattened entire neighborhoods. "There was a plane that made a pffff sound," 11-year-old Noor el- Hoda Sherri said, recalling her terror during the bombardment of her Haret Hreik neighborhood, which destroyed her apartment building. "My heart was hurting. It was pounding very fast," she said, squeezing her chest. "I was thinking, 'This is it, we are going to die. This is our destiny.' I said, 'God will now punish me for all the things I did wrong.'" Ali Kalash, 14, said that when an Israeli missile hit Hezbollah's Al-Manar TV studios in Haret Hreik on July 13, he and a dozen friends -- anticipating more attacks -- scribbled their names on a water tank near their homes "so that we can recognize our homes when the war is over." His family's apartment building was destroyed in the strike, and they sought refuge in the same underground shelter as Noor el-Holda and her family. "I was thinking we're all going to die and we'd never come back," Ali said. U.N. humanitarian chief Jan Egeland estimated that a third of the hundreds of people killed in Lebanon were children. UNICEF spokeswoman Susan Lagana said Friday that Egeland's figure was based on numbers compiled by UNICEF. "There is something fundamentally wrong with a war where there are more dead children then armed men," Egeland said Friday at U.N. headquarters in New York. "It has to stop." Variety of symptoms At least 443 people -- most of them civilians -- have been confirmed killed in Lebanon since fighting broke out after Hezbollah captured two Israeli soldiers in a July 12 cross-border raid. On Thursday, Lebanon's health minister put the number at as many as 600 civilians. Fifty-two Israelis have been killed in the fighting, including 19 civilians who died in a Hezbollah rocket attacks on Israel. Three were children -- two boys, ages 4 and 8, from the town of Nazareth, and a 15-year-old girl from the village of Mughar. Hundreds of thousands of Lebanese have been displaced, fleeing to shelters in schools, parks and underground parking lots. It will be years before homes can be rebuilt, and the children will probably have to move to unfamiliar neighborhoods -- deepening their trauma, Maalouf said. That's when the children will miss "their point of reference" -- their friends, their favorite play spots, the store where they bought ice cream, she said. Her clients have shown a variety of symptoms, ranging from depression and hypertension to withdrawal. Many parents say

their children have become aggressive or unruly. And they relive their horrifying experiences in dreams or in drawings. Illustration PHOTO; Caption: PHOTO - Katrina Karouni, 11, injured in an Israeli airstrike in Tyre, Lebanon, receives treatment at a medical center in the city of Saida on Wednesday. A third of Lebanese killed in Israeli attacks against Hezbollah militants are children, a U.N. official says. AFP/Getty Images

**Publication title:** St. Louis Post - Dispatch

**Pages:** A.14

**Number of pages:** 0

**Publication year:** 2006

**Publication date:** Jul 30, 2006

**Year:** 2006

**Dateline:** BEIRUT, LEBANON

**Section:** News

**Publisher:** Pulitzer, Inc.

**Place of publication:** St. Louis, Mo.

**Country of publication:** United States

**Journal subject:** General Interest Periodicals--United States

**ISSN:** 19309600

**Source type:** Newspapers

**Language of publication:** English

**Document type:** NEWSPAPER

**ProQuest document ID:** 403024203

**Document URL:** http://search.proquest.com/docview/403024203?accountid=14657

**Copyright:** Copyright Pulitzer Publishing Company Jul 30, 2006

**Last updated:** 2010-08-21

**Database:** ProQuest Newsstand

# Exhibit 23:

# Sami Hassoun's American University of Beirut Transcript

# American University of Beirut

Student No: 200703188

Date of Birth: 20-JAN-1988

Date Issued: 24-AUG-2012

Page: 1

Record of: Sami Samir Hassoun
Current Name: Sami Samir Hassoun
Zein Bldg. Block B
Hilalyeh Main Street
Saida,
Lebanon

Course Level: Undergraduate

Current Program
College : Arts & Sciences
Major : Majorless

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|--------------|------|-----|-----|---|

INSTITUTION CREDIT:

Fall 2006 - 2007
Arts & Sciences
Majorless

| AROL 101 | Introduction to Archaeology | 3.00 | 80 | 240.00 | |
| CHEM 101 | General Chemistry I | 3.00 | 63 | 252.00 | |
| ECON 103 | Introduction to Economics | 3.00 | 60 | 180.00 | |
| GEOL 103 | Introduction to Marine Geology | 3.00 | 63 | 189.00 | |
| MATH 101 | Calculus & Analytical Geom. I | 0.00 | W | 0.00 | |

Ecrs: 13.00 TAV-Crs: 13.00 Qpts: 861.00 TAV: 66.23

Spring 2006-2007
Arts & Sciences
Majorless

| BIOL 101 | Basic Concepts in Biology | 3.00 | 50 | 150.00 | |
| ENGL 203 | Academic English | 3.00 | 46 | 138.00 | |

**************** CONTINUED ON NEXT COLUMN

| SUBJ | NO. | COURSE TITLE | CRED | GRD | PTS | R |
|------|-----|--------------|------|-----|-----|---|

Institution Information Continued:

| MATH 101 | Calculus & Analytical Geom. I | 3.00 | 55 | 165.00 | I |
| PHIL 102 | Philosophical Classics | 3.00 | 40 | 120.00 | |
| PHYS 103 | Physics for the Life Sciences | 3.00 | 45 | 135.00 | |

Ecrs: 0.00 TAV-Crs: 15.00 Qpts: 708.00 TAV: 47.20

Dropped from Faculty

*************** TRANSCRIPT TOTALS ***************

| | Earned Crs | GAV Crs | Points | GAV |
|---|---|---|---|---|
| TOTAL INSTITUTION | 0.00 | 28.00 | 1569.00 | 56.03 |
| TOTAL TRANSFER | 0.00 | 0.00 | 0.00 | 0.00 |
| OVERALL | 0.00 | 28.00 | 1569.00 | 56.03 |
| EQUIVALENT GPA | | | | 0.00 |

************** END OF TRANSCRIPT **************

P.O.Box: 11-0236, Riad El Solh-Beirut 1107 2020, Beirut-Lebanon, E-mail: registrar@aub.edu.lb

Moueen Salameh
Registrar

# Exhibit 24:

# Photograph of Sami receiving his high school diploma



# Exhibit 25:

# Dr. James Garbarino's CV

# (PROVIDED SEPARATELY TO THE COURT)

# Exhibit 26:

# Photograph of Sami and Adnan celebrating Adnan's birthday



# Exhibit 27:

# MCC Education and Activity Records



**U.S. Department of Justice**
Federal Bureau of Prisons

*North Central Regional Office*

_____

400 State Avenue
Tower II, Suite 800
Kansas City, KS 66101

October 3, 2012

Alison Siegler
University of Chicago
Mandel Legal Aid Clinic
6020 S. University Avenue
Chicago, IL  60637

Re: Information Request No. 2013-00052
    HASSOUN, Sami, Registration No. 42215-424

Dear Ms. Siegler:

This is in response to your above referenced information request.   Specifically, you request a copy of Bureau of Prisons records relating to Sami Hassoun's educational programming, such as drug treatment classes, communication skills classes and anger management classes that he has attended since being incarcerated at MCC Chicago.

The records have been retrieved and reviewed in this office for a release determination. It is our conclusion the requested information may be disclosed to you.   The releasable records (4 pages) are enclosed.

I trust this is responsive to your request.

Sincerely,


Richard W. Schott
Regional Counsel

**SENSITIVE BUT UNCLASSIFIED**



# Federal Bureau of Prisons
## Psychology Data System

**Date-Title:** 05-02-2012 - GRP CLOSED [85] Cognitive Skills Group II
**Reg Number-Name:** 42215-424 - HASSOUN, SAMI S.    **Unit/Qtrs:** JAIL UNSEN, C03-021L
**Facilitator:** DANIEL S. GREENSTEIN, PSY.D., DRUG ABUSE PROG COORD
**Institution:** CCC - CHICAGO MCC

---

**Status:** COMPLETED
**Enroll - End Date:** 05-02-2012 - 05-23-2012
**Total Hours:** 5.0

## SESSION DATA:

**Number of Sessions:** 5    **First-Last Session:** 05-02-2012 - 05-23-2012

| ID | TITLE | DATE | DUR | ATTEND | PART | HMWK |
|----|-------|------|-----|--------|------|------|
| 5 | Session 5 | 05-23-2012 | 60 | C | G | S |
| 4 | Session 4 | 05-22-2012 | 60 | C | G | S |
| 3 | Session 3 | 05-16-2012 | 60 | C | G | S |
| 2 | Session 2 | 05-09-2012 | 60 | C | G | S |
| 1 | Session 1 | 05-02-2012 | 60 | C | G | N |

| Attendance | | Participation | | Homework | |
|------------|------|---------------|--------|-----------------|--------|
| Complete | 100.0 % | Good | 100.0 % | Satisfactory | 80.0 % |
| Incomplete Excused | 0.0 % | Fair | 0.0 % | Unsatisfactory | 0.0 % |
| Incomplete Unexcused | 0.0 % | Poor | 0.0 % | N/A | 20.0 % |
| Absent Excused | 0.0 % | N/A | 0.0 % | | |
| Absent Unexcused | 0.0 % | | | | |
| Expelled | 0.0 % | | | | |

## COMMENTS:

**SENSITIVE BUT UNCLASSIFIED**

**SENSITIVE BUT UNCLASSIFIED**



# Federal Bureau of Prisons
# Psychology Data System

**Date-Title:** 04-19-2012 - GRP CLOSED [82] Re-Entry Anger Management Group

**Reg Number-Name:** 42215-424 - HASSOUN, SAMI S.  **Unit/Qtrs:** JAIL UNSEN, C03-021L

**Facilitator:** CHRISTINE A. SCRONCE, Ph.D., FORENSICS UNIT PSYCH

**Institution:** CCC - CHICAGO MCC

---

**Status:** COMPLETED

**Enroll - End Date:** 04-19-2012 - 05-24-2012

**Total Hours:** 5.42

## SESSION DATA:

**Number of Sessions:** 5  **First-Last Session:** 04-19-2012 - 05-24-2012

| ID | TITLE | DATE | DUR | ATTEND | PART | HMWK |
|----|-------|------|-----|--------|------|------|
| 6 | Session 6 | 05-24-2012 | 65 | AE | N | N |
| 5 | Session 5 | 05-10-2012 | 60 | C | G | S |
| 4 | Session 4 | 05-03-2012 | 60 | C | G | S |
| 3 | Session 3 | 04-26-2012 | 60 | C | G | N |
| 2 | Session 2 | 04-19-2012 | 80 | C | G | N |

| Attendance | | Participation | | Homework | |
|------------|------|---------------|------|----------|------|
| Complete | 80.0 % | Good | 80.0 % | Satisfactory | 40.0 % |
| Incomplete Excused | 0.0 % | Fair | 0.0 % | Unsatisfactory | 0.0 % |
| Incomplete Unexcused | 0.0 % | Poor | 0.0 % | N/A | 60.0 % |
| Absent Excused | 20.0 % | N/A | 20.0 % | | |
| Absent Unexcused | 0.0 % | | | | |
| Expelled | 0.0 % | | | | |

## COMMENTS:

**SENSITIVE BUT UNCLASSIFIED**

```
   CCCEP          *          INMATE EDUCATION DATA          *      10-02-2012
PAGE 001 OF 001 *              TRANSCRIPT                   *      14:24:44

REGISTER NO: 42215-424     NAME..: HASSOUN                   FUNC: PRT
FORMAT.....: TRANSCRIPT     RSP OF: CCC-CHICAGO MCC

-------------------------- EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION                 START DATE/TIME STOP DATE/TIME
CCC  GED UNK    GED STATUS UNKNOWN          09-19-2010 0544 CURRENT

---------------------------- EDUCATION COURSES ----------------------------
SUB-FACL    DESCRIPTION             START DATE  STOP DATE EVNT AC LV  HRS
CCC M      DAILY LIVING REENTRY COMPONENT 09-06-2012 CURRENT
CCC M      STRUCTURED RECREATION YOGA    03-29-2012 05-17-2012  P  C  P    28
CCC M      STRUCTURED RECREATION YOGA    02-12-2012 03-19-2012  P  C  P    18
CCC M      STRUCTURED RECREATION YOGA    12-16-2011 02-08-2012  P  C  P    54
```

```
G0000     TRANSACTION SUCCESSFULLY COMPLETED
```

```
   CCCEP  531.01 *                  INMATE HISTORY              *       10-02-2012
   PAGE 001 OF 001 *                 DRUG PGMS                  *       14:23:06

   REG NO..: 42215-424 NAME....: HASSOUN, SAMI SAMIR
   CATEGORY: DRG        FUNCTION: PRT          FORMAT:

FCL    ASSIGNMENT DESCRIPTION                          START DATE/TIME STOP  DATE/TIME
CCC    NR PART    NRES DRUG COUNSEL PARTICIPANT  06-22-2012 1144 CURRENT
CCC    NR WAIT    NRES DRUG TMT WAITING          05-10-2012 0700 06-22-2012 1144
```

G0000      TRANSACTION SUCCESSFULLY COMPLETED



Certificate of Completion

from

The Metropolitan Correctional Center - Chicago, IL

This certifies that

Sami Hassoun

has satisfactorily completed

Anger Management

April 10-May 24th, 2012

This certificate is hereby issued this 24th day of May 2012.

T. Smith, Reentry Affairs Coordinator



# Certificate of Completion

from

## The Metropolitan Correctional Center - Chicago, IL

This certifies that

### Sami Hassoun

has satisfactorily completed

**Cognitive Skills**

May 2-23rd, 2012

This certificate is hereby issued this 23rd day of May 2012.

T. Smith, Reentry Affairs Coordinator

# Exhibit 28:

# Ohio University Acceptance Letter



**OHIO**
UNIVERSITY

eLearning OHIO

December 11, 2012

Haning Hall 102
1 Ohio University
Athens OH 45701-2979

T: 740.593.2910
F: 740.597.3005
www.ohio.edu/elearning

Sami Hassoun #42215-424
Metropolitan Correctional Center
71 W. Van Buren St
Chicago, IL 60605

Sami:

Welcome to Correctional Education at Ohio University! This letter will serve as official notification of your admission. If you have any questions regarding your coursework, academic program or course choices, please contact our office at the above address, or use the toll-free number. Additionally, you have been issued a university identification number – **P100156563**. Please use this number on any correspondence with us to avoid confusion.

You have been admitted as a degree-seeking student and expressed an interest in earning the Associate in Science degree. I recommend that you begin with 2 courses in the Print-Based format. If you do not have fulltime responsibilities you may consider a third course; however, no more than 3 courses will be approved, but no CCE (Credit-By-Exam) courses may be taken until after you successfully complete your initial courses in this format. We want to be sure that your OU experience is successful and will lead to the degree goal that you have listed, so please consider this information carefully prior to completing course registration forms.

Enclosed is Ohio University's new Course Handbook. There is a large amount of information in this Handbook, so please read through it carefully. In order to register for courses, you need to send in one of the course registration forms that are included in the Course Handbook and complete it with your educational counselor and mailroom to get the exact instructions on how to mail the course materials and what materials are prohibited. If you want specific information from Ohio University on what materials will be sent for your courses, please indicate that on the registration form. Send no money at this time.



**eLearning OHIO**

Haning Hall 102
1 Ohio University
Athens OH 45701-2979

T: 740.593.2910
F: 740.597.3005
www.ohio.edu/elearning

I have included additional important information for you to keep for future registrations. Please keep these and all of your application materials handy so that you can reference back to them as needed. It is very important that you read over the Course Handbook and other materials thoroughly regarding our policies. Most answers can be found in these materials. Additional information regarding your degree program will be provided after successful completion of your initial courses.

I have reviewed your academic history and based on the courses we are currently offering, I have made several recommendations on the best courses to start with. Currently, there are very few courses available, as the University has recently switched from a quarter based to a semester based system. Therefore, all of our courses have been adapted recently, but we are still working on the vast majority of them. In the near future, many courses will be added to the Course Handbook and will be available for selection. We will be contacting you consistently to update you on the courses available. I have taken into account the transfer credit you have received. Here are the courses I recommend for you to begin with (all recommended courses will help you toward your degree aspirations):

**ENG 1510 – Freshman Composition (mandatory course)**

Natural Science, Applied Science, Quantitative Skills Area
        PHIL 1200 – Principles of Reasoning
        PHYS 2001 – Introduction to Physics
        PSY 2110 – Statistics for the Behavioral Sciences

Social Sciences Area
        GEOG 1200 – Human Geography
        POLS 1010 – Politics in the United States
        SOC 2610 – Deviant Behavior

Once you have submitted your course selections (up to 3 courses to begin) and they are approved, an invoice is generated which is then sent to you and another person, if requested. Then, when the invoice is paid in full, we will send your books and materials and in approximately 4 weeks, you will be ready to begin sending in lessons for grading. Be sure to work on all courses simultaneously and strive to submit lessons monthly.



**OHIO**
UNIVERSITY

eLearning OHIO

Haning Hall 102
1 Ohio University
Athens OH 45701-2979

T: 740.593.2910
F: 740.597.3005
www.ohio.edu/elearning

I realize that this is a lot of information. Your next step is to register for courses. If you have any questions or need further assistance, please contact me at your convenience.

Sincerely,

Justin Kish
Academic Advisor
eLearning OHIO
Ohio University