UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

SAMI SAMIR HASSOUN

Case No. 10 CR 773

The Honorable Robert W. Gettleman

**GOVERNMENT'S SENTENCING MEMORANDUM**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.     A Sentence of Thirty Years' Imprisonment Is Appropriate For
Hassoun's Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    The Nature Of Hassoun's Offense: Attempted Indiscriminate
Murder. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.    The Advisory Guidelines Suggest A Thirty Year Sentence
Is Appropriate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     C.    The Seriousness Of Hassoun's Offense. . . . . . . . . . . . . . . . . . . . . . . . . 3

     D.    Hassoun Is Responsible For His Actions. . . . . . . . . . . . . . . . . . . . . . . . 5

          1.    Perpetrating A Random Act Of Violence Was
Hassoun's Idea. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          2.    The Undercover Agents Repeatedly Offered Hassoun
Opportunities To Reconsider His Plot. . . . . . . . . . . . . . . . . . . . 9

          3.    The Attempted Bombing Was Hassoun's Choice. . . . . . . . . . . . 12

II.    A Significant Sentence I Necessary To Adequately Protect The
Public. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

III.   The Defendant's History And Personal Characteristics Do Not
Support A Reduced Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     A.    Hassoun's Traumatic Childhood Does Not Explain His
Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     B.    Hassoun's Exaggeration And Self-Aggrandizement. . . . . . . . . . . . . . . 20

IV.   A Sentence Of Thirty Years' Imprisonment Is Consistent With
Comparable Cases. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

          1.    Similarly Situated Defendants Receive Sentences Exceeding
20 Years' Imprisonment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.      The Cases Upon Which Hassoun Relies Are Substantially
        Different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*, 552 U.S. 38 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Hawkins v. United States*, 706 F.3d 820 (7th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Augustin*, 661 F.3d 1105 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Batiste*, No. 06-CR-20373-JAL (S.D. Fla. Nov. 24, 2009). . . . . . . . . . . . . . . . 27

*United States v. Booker*, 543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Cromitie*, No. 09 CR 558 (CM), 2011 WL 2693297
  (S.D.N.Y. June 29, 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*United States v. Defreitas*, 07-CR-543-DLI, (E.D.N.Y. March 11, 2011). . . . . . . . . . . . . . . . . 29

*United States v. El-Khalifi*, 1:12-CR-37 (E.D. Va. June 22, 2012 and Sep. 14, 2012). . . . . . 24, 25

*United States v. Ferdaus*, 11-CR-10331-RGS (D. Mass. July 20, 2012,
  Sep. 13, 2012 and Nov. 1, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States v. Finton*, 09 CR 30098-DRH (C.D. Ill. May 9, 2011). . . . . . . . . . . . . . . . . . . . . 23

*United States v. Ibrahim*, 07-CR-543-DLI (E.D.N.Y. Feb. 24, 2012). . . . . . . . . . . . . . . . . . . . . 29

*United States v. Issa*, 09 CR 1244 (S.D.N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*United States v. James*, 05-CR-214 (C.D. Cal. Dec. 14, 2007 and
  March 9, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Kadir*, 07-CR-543-DLI (E.D.N.Y. Jan. 18, 2011). . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Mandhai*, 02-CR-60096-WPD (S.D. Fla. Aug. 30, 2005). . . . . . . . . . . . . . . . . 29

*United States v. Mandhai*, 375 F.3d 1243 (11th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*United States v. Martinez*, 1:10-cr-798-JFM (D. Md. Dec. 21, 2010 and
  Jan. 26, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii

*United States v. Nur*, 07-CR-543-DLI (E.D.N.Y. Jan. 25, 2011). . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Padilla*, 04-CR-60001-MGC (S.D. Fla. Jan. 22, 2008). . . . . . . . . . . . . . . . . . . 27

*United States v. Rana*, 09-CR-830-8 (N.D. Ill. Jan. 17, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Rivas*, 254 Fed.Appx. 742, 2007 WL 4124340
(10th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Shareef*, 10 C 7860, 2011 WL 1838876 (N.D. Ill. May 13, 2011). . . . . . . . . . 24

*United States v. Smadi*, 3:09-CR-294-M (N.D. Tex. May 25, 2010 and
Oct. 28, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

*United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Wright*, No. 12-CR-238-DDD (N.D. Ohio Nov. 14, 2012 and
Nov. 21, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

## STATUTES

8 U.S.C. § 1182(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

18 U.S.C. § 844(i) and (n). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

18 U.S.C. § 2339A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

18 U.S.C. § 2339B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

18 U.S.C. § 3535(a)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3553(a)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

18 U.S.C. § 3553(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18 U.S.C. § 3624(a) and (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

iv

**RULES**

Fed. R. Crim. P. 11(c)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 30

**SENTENCING GUIDELINES**

USSG § 3A1.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 30

USSG § 3E1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

USSG § 5A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

As Sami Hassoun walked away from the Clark Street crowds in the early morning of September 19, 2010, he expected that, within minutes, Wrigleyville's late night revelry would be displaced by chaos and carnage. This Court must now sentence Hassoun for the attempted murder of the scores of innocent people who filled the bars and crowded the street that night. Pursuant to the parties' plea agreement, that sentence must include a term of imprisonment between twenty and thirty years. The government submits that under the statutory sentencing framework established by Congress, a term of thirty years' imprisonment is the appropriate sentence within that range.

I.     **A Sentence Of Thirty Years' Imprisonment Is Appropriate For Hassoun's Conduct.**

      A.     **The Nature Of Hassoun's Offense: Attempted Indiscriminate Murder.**

Sami Hassoun wanted to engage in an act of terrorism. He thought about how to accomplish that goal for months. When introduced to individuals whom he was told could help him realize that aspiration, Hassoun embraced the opportunity. He attended meeting-after-meeting to discuss and plan a proposed attack. Hassoun scouted prospective sites, looking for "targets" at which he could inflict the greatest amount of damage and cause the largest number of casualties. It was Hassoun who chose the entertainment district surrounding Wrigley Field for the attack. He identified a street-side trash receptacle located next to an oft-crowded bar as the location in which to deposit a bomb. He selected the day and time at which to strike – midnight on a Saturday night – to maximize the number of prospective casualties. And, in early hours of September 19, 2010, Hassoun weaved his way through the Wrigleyville crowds in order to leave what he thought was a ticking time bomb among the masses. If the bag that Hassoun left in that Clark Street trash receptacle had contained the type of explosive device Hassoun thought was secreted therein, the results would have been catastrophic.

At his sentencing hearing, the government will walk the Court through the evolution and execution of Hassoun's crime. In particular, the government will present segments of the consensually-obtained video recordings in which Hassoun first proposed and then planned this attack. The Court will be able to watch portions of Hassoun's video-taped reconnaissance missions in which he searched for prospective targets. It will observe the government's undercover agents tell Hassoun, on multiple occasions, that they did not need his assistance executing the attack he had planned, offering Hassoun the opportunity to withdraw from the proposed assault. The Court will be able to listen to Hassoun insist that he wanted to participate in the attack. The government will present the purported explosive device provided to Hassoun on September 19, 2010. Finally, the Court will be able to view a recording of Hassoun delivering the bag containing that inert bomb to its target location.

The government submits that the totality of this evidence will establish the need for the Court to impose a sentence of thirty years' imprisonment.

**B.     The Advisory Guidelines Suggest A Thirty Year Sentence Is Appropriate.**

Although the length of Hassoun's prospective sentence is governed, in part, by the parties' plea agreement, that agreement does not obviate the need for the Court to first calculate Hassoun's sentencing guidelines. In his memorandum, Hassoun writes that because the parties' plea agreement is governed by Federal Rule of Criminal Procedure 11(c)(1)(C), the Court "is not bound by the Sentencing Guidelines." R. 84 at 1.[1]  In fact, no court is bound by those guidelines.

---

[1] Citations to the record in this case, including Hassoun's sentencing memorandum, are designated with an "R." notation, followed by the relevant document number and page reference. Citations to the probation officer's February 27, 2013 presentence investigation report are referenced by a "PSR" notation, followed by the paragraph number associated with the text referenced. Citations to the transcripts of certain recordings are referenced by their bates-label production number.

2

*See United States v. Booker*, 543 U.S. 220 (2005). Rather, the guidelines provide an initial benchmark for a court to consider in imposing a sentence under the factors set forth in Title 18, United States Code, Section 3553(a). *Hawkins v. United States*, 706 F.3d 820, 827 (7th Cir. 2013). Accordingly, in imposing sentence, a court must first calculate the defendant's applicable guideline range. *Gall v. United States*, 552 U.S. 38, 49 (2007); *United States v. Vrdolyak*, 593 F.3d 676, 681–82 (7th Cir. 2010) ("[A]lthough a judge is no longer required to give a Guidelines sentence, he is required to make a correct determination of the Guidelines sentencing range as the first step in deciding what sentence to impose."). This case is no different.

The guideline calculations applicable to Hassoun's conduct suggest the need for the Court to impose a sentence of thirty years' imprisonment. As the parties acknowledged in their plea agreement, and as confirmed by the probation officer in his presentence investigation report, the defendant's conduct results in an "off the chart" offense level of 46, coupled with a category VI criminal history. PSR, ¶¶ 19-41; R. 64, ¶ 10. Based on those calculations, Hassoun is subject to an advisory guideline range of life imprisonment. U.S.S.G. § 5A. A prospective sentence of thirty years' imprisonment is, accordingly, most consistent with the guideline's advised sentence.

### C. The Seriousness Of Hassoun's Offense.

A sentence of 30 years' imprisonment is commensurate with the seriousness of his offense. *See* 18 U.S.C. § 3535(a)(2)(A) (directing that a court's sentence shall "reflect the seriousness of the [defendant's] offense"). Hassoun attempted to carry out an act of terrorism that was designed by him to maximize both actual and psychological damage. In recorded conversations with both the government's cooperating source and its undercover agents, Hassoun talked about using terrorism to embarrass and undermine Chicago's political leadership,

"paralyze" commerce, and undermine the city's sense of security. R. 1, ¶¶ 10, 22, 29-30, 34-35.

"You hit them mentally, psychologically, . . . you hit the city." Hassoun-5 83.[2] Succinctly stated,

Hassoun wanted to "shake Chicago." R. 1, ¶ 25. When asked to pick an actual target, however,

Hassoun planned an attack that was designed to not only undermine Chicago's sense of security,

but also to maximize human casualties. *See* R. 64, ¶ 6 (Hassoun told the government agents that

he chose the target location because "it presented the opportunity to inflict a greater number of

casualties than alternate locations.").[3] Hassoun's target location and hour of attack were chosen

with the specific intent to kill and maim as many people as possible. Hassoun-5 162-66.[4]

Despite the death and destruction his actions would cause, Hassoun never hesitated from

proceeding with the attack.[5] The government respectfully submits that the Court's sentence must

reflect the seriousness of Hassoun's intent and action. A sentence of 30 years' imprisonment is

appropriate.

---

[2] Citations to the government's criminal complaint are provided as a reference to the recorded conversations referenced therein. As the government stated in its Response to the Defendant's Motion for Disclosure, *see* R. 77, the government is not relying on the cooperating source for purposes of sentencing. *Id.* at 3. Any references to Hassoun's communications with the source are therefore based on consensually-recorded conversations. To the extent that any of the government's prior filings with the Court may have reflected information obtained from the source, consistent with its Response to the Defendant's Motion for Disclosure, *see* R. 77, the government asks that the Court only consider those statements verified by consensual recordings.

[3] On August 31, 2010, the government's agents and Hassoun traveled to Wrigleyville to look at the various targets Hassoun had considered and his final choice so that they could do a "walk through" of the proposed attack. Looking at the garbage receptacle that he had chosen, Hassoun explained: That's more casualties, you know. Casualties right here. More of 'em are right here." Hassoun-5 198.

[4] As one of the government's agents explained to Hassoun, if they were successful, the city's street-sweepers would be "cleaning body parts" off Clark Street on September 19, 2010. Hassoun-5 178.

[5] Moments before he stepped out of the agents' van to head toward Clark Street to deliver the bomb, Hassoun instructed the agents to reset the timer from twenty to fifteen minutes, assuring them that he would not need any extra time. Hassoun-5 418.

D.     **Hassoun Is Responsible For His Actions.**

1.     **Perpetrating A Random Act Of Violence Was Hassoun's Idea**.

Although Hassoun has acknowledged his culpability, accepting responsibility for his "unconscionable" acts, Hassoun suggests in his sentencing memorandum that those acts were instigated, if not somehow caused, by the government's cooperating source and undercover agents.  R. 84 at 12, 13-23.  Hassoun's efforts to deflect responsibility for his criminal conduct to the government's investigation is belied by the evidence.

In his memorandum, Hassoun claims to be bewildered by the government's initial decision to ask a cooperating source to approach and befriend him in the spring of 2009, suggesting that the government's interest in him was unfair.  R. 84 at 15-16.  The justification for the government's inquiry is, however, irrelevant.[6]  Of import is that, one year later, Hassoun was advocating the commission of acts of violence against Chicago.  *See* R. 64 at 2; *see e.g.*, R. 84, ¶ 10.

Hassoun argues that his championing of violence was mere bluster somehow prompted by the government's investigation.  *See* R. 84 at 17-20.  The recordings in this case and Hassoun's eventual action do not support that characterization.  As evidence in those recordings, from early June 2010 to the date of his arrest, Hassoun suggested various acts of violence.  Although the government's source told Hassoun he had "contacts" willing to pay Hassoun to

---

[6]  Hassoun suggests that the government's initial investigative interest in him is irreconcilable with his then-claimed associations.  *See* R. 86 at 16.  Although further irrelevant to the charges in this case, the government submits that the inferences suggested in Hassoun's memorandum are inconsistent with acknowledgments he made in an April 10, 2012 law enforcement interview.  Although that interview is subject to a proffer agreement with the government, if, at sentencing, Hassoun mischaracterizes his now admitted representations to the source, the government may seek leave to advise the Court of Hassoun's statements in that interview.

engage in those acts, even suggesting that he and Hassoun could become rich as terrorists, *see, e.g.*, Hassoun-5 37-38, Hassoun appeared independently enthusiastic about a proposed attack.[7] In particular, Hassoun stated that he wanted to perpetrate a terrorist act in order to undermine the city's political establishment.[8] Thus, while the source offered Hassoun the allure of terrorism for profit, Hassoun also appeared interested in violence as a goal in-and-of itself.

Hassoun now claims that he did not want to engage in acts of actual violence, but was both pressured and enticed to pursue violence by the government's source. R. 84 at 16-17. In particular, Hassoun claims he was naive and vulnerable to the source's exploitation. *Id.* Hassoun's allegations, however, do not comport with his own recorded statements. In their early interactions with Hassoun, the government's undercover agents questioned Hassoun concerning his violent desires. In response, Hassoun did not reference the source, let alone identify him as an inspiration. Rather, Hassoun identified his violent intent as the manifestation of his own political beliefs and personal frustrations:

| | |
|---|---|
| UCE1: | How long you been thinkin' about this? |
| Hassoun: | About a year, man. |
| UCE1: | What, when did you . . . |
| Hassoun: | Every time I feel like uh, strangled, you know, American stuff. |

---

[7] In his sentencing memorandum, Hassoun speculates on the source's motivation to assist the government in its investigation. *See* R. 84 at 17. That speculation, in which Hassoun hypothesizes as to the various potential incentives that the government could lavish on a source, is nothing more than what it purports to be: speculation. Importantly, this Court has already held that those factors that may have motivated the source to assist the government in this case are not relevant to the Court's consideration. *See* R. 82. Rather, only the source's actual interaction with Hassoun is relevant in assessing the impact the source's statements may have had on Hassoun's state of mind and, accordingly, his resulting conduct. *See* R. 77.

[8] In a June 4, 2010 recorded conversation, Hassoun told the source that he wanted to take action against Chicago in order to force the city's mayor from power. R. 1, ¶ 10.

| UCE1: | Yeah. |
|---|---|
| Hassoun: | Sit down myself, ideas come. |
| UCE1: | What, what started this? Why, why didn't, what prompted this change? |
| Hassoun: | You know like, like, when I started working I see, like, how it's, it's like back home here. You have the money and the power, you do anything you wanna do. You know? . . . . It's like I see police buying, bought off in front of me. |

* * * *

And, there's no jobs out there. That's what pisses me off, Because of, because of [Mayor] Daley.

Hassoun-5 292-93. In his conversations with the undercover agents, Hassoun did not attribute his violent ideas to the source (who was allegedly a confidant of both Hassoun and the undercover agents), but instead described them as his own.

In his sentencing memorandum, Hassoun selectively refers to certain of his recorded statements to suggest that, initially, he only wanted to engage in non-lethal terrorism. He claims he only embraced actual violence at the agents' direction. It is a claim that is belied by his own recorded statements. In his early recorded conversations, Hassoun's "ideas" vacillated between destructive, deadly attacks and action intended solely to instill fear in victims. For example, in a June 4, 2010 consensually-recorded conversation with the source, Hassoun identified the Wrigley Field entertainment area as a potential target. When the source asked Hassoun how he would carry out such an attack, Hassoun succinctly replied: "You park the car, and let it 'boom.'" Hassoun-5 8; R. 1, ¶ 10. When, in response, the source suggested that their attack should not kill anyone but simply attract public attention, Hassoun suggested they could deploy a bomb that would not explode, but would be purposefully "discovered" prior to detonation. Hassoun-5 8; R. 1, ¶ 11. The source and Hassoun then proceeded to discuss other possible attacks in that same

7

meeting.  The source again stated that he did not want to kill anyone.  R. 1, ¶ 13.  Hassoun, at times, appeared to agree:  "no killing."  *Id.*  However, when discussing other ideas, Hassoun appeared to disregard potential victims, suggesting that they bomb buildings, perpetrate a biological attack, and take action to "hit" police officers (which Hassoun described as "attacking" and "harming" the police.  Hassoun-5 8-10.[9]

In his memorandum, Hassoun seeks to recast his conversations with the source in an undeservingly favorable light.  For example, Hassoun references his June 14, 2010 meeting with the source as an instance in which he allegedly spoke only of creating fear of a terrorist attack. *See* R. 84 at 20.   In reality, in that June 14, 2010 recorded conversation, Hassoun told the source that he had been thinking of "big things," *i.e.*, terrorist attacks, that would command public attention.  Hassoun identified the Daley Center as a potential target, and suggested placing a bomb in Daley Plaza during the then upcoming Arabesque festival.[10]  R.1, ¶ 20.  When the source responded with surprise, stating: "You're going to hit Arab people," Hassoun appeared to retreat from the suggestion, telling the source he would not detonate an actual bomb, but would, instead, construct an explosive device that would look like an explosive but would only emanate smoke when activated.  *Id.*  Hassoun's reliance on this conversation as alleged evidence that he initially did not want to engage in an actual bombing simply does not comport with the recording

---

[9]  Similarly, when the source and Hassoun met on June 7, 2010, Hassoun discussed building both real explosives capable of leveling a skyscraper, and "fake bombs" that they would not detonate.  Hassoun-5 13; R. 1, ¶ 16.

[10]  According to its website, the Chicago Arabesque Festival was a non-religious, non-political festival sponsored by the Chicago Commission on Human Relations Advisory Council on Arab Affairs that was designed to promote public awareness, understanding, and appreciation of the cultural heritage of the Arab world.   The festival was held in Daley Plaza from June 24, 2010 to June 26, 2010.  *See* http://www.chicagoarabesque.com/aboutus.htm (last visited September 16, 2010).

as a whole.

Finally, irrespective of the nature of Hassoun's conversations with the source, it is clear that Hassoun embraced the proposed attack, rejecting every opportunity to withdraw from the plan. In their conversations with Hassoun, the government's undercover agents offered Hassoun numerous opportunities to withdraw from their proposed terrorist plot. He turned them down.

### 2. The Undercover Agents Repeatedly Offered Hassoun Opportunities To Reconsider His Plot.

In his memorandum, Hassoun falsely claims that the government's undercover agents pushed him to perpetrate an act of terrorism. R.84 at 20. It is a false accusation belied by the evidence. Hassoun first met with an undercover FBI agent on July 8, 2010. In that meeting, Hassoun explained to the agent that he had been considering various forms of potential attacks. As Hassoun would later admit in his plea agreement:

> When asked by UC-1 what Hassoun was personally willing to do, Hassoun indicated that he would be willing to facilitate a car bombing or the assassination of Chicago police officers. Hassoun assured UC-1 that he wanted to participate in some violent act. When asked if he was concerned about those who would be hurt by such violence, Hassoun stated that casualties were the inevitable result of what he termed "revolution."

R. 64, ¶ 6.

Hassoun met with both of the government's undercover agents on July 21, 2010. In this meeting, Hassoun assured the agents that he wanted to "dedicate himself" to the proposed attack and asked the agents effectively to employ him in planning the proposed bombing.[11] Hassoun now claims that by asking him whether he was dedicated to the attack he had been advocating,

---

[11] In his sentencing memorandum, Hassoun asserts that he was enticed to commit an act of violence by payments he received from the government's undercover agents. R. 84 at 21. In total the agents provided Hassoun a total of approximately $3,200 over the two months that they interacted with him. PSR, ¶ 21.

Hassoun felt "pressured" to "follow through with the plot." R. 84 at 21. It is an allegation that is completely belied by the recording of their meeting.

In their July 21, 2010 conversation, the undercover agents told Hassoun that they could have someone else carry through the attack he was advocating, assuring him that he did not have to participate personally in the proposed attack. *See* Hassoun-5 285. They warned Hassoun that perpetrating an act of terrorism was "dangerous." *Id.* Hassoun was not deterred; he assured the undercover agents that he wanted to participate:

| | |
|---|---|
| Hassoun: | You know. And I'm willing to do it. I have the heart for it. |
| UCE1: | You have the heart for it? |
| Hassoun: | With a smile on my face. |
| * * * * | |
| Hassoun: | You know the thing is once you believe in something, . . . . When you wanna do it, you do it then. |

Hassoun-5 286. The agents would question Hassoun again in their August 16, 2010 meeting about whether he wanted to partake in the proposed attack. Hassoun was unequivocal, stating that he was "positive."

Rather than encourage Hassoun to execute the proposed bombing, the government's undercover agents told Hassoun again and again that he could withdraw from the plan at any time. In their July 21, 2010 meeting, the agents told Hassoun he did not need to participate: "I mean, there's no shame in saying 'no' anytime. We walk away. No, no big deal. We know you mean well." In response, Hassoun stated: "It's not like, you know, you brought me up to this thing, putting the idea in my mind." Rather, Hassoun reiterated that an attack was his idea. "I'm telling you, . . . I wanna do it, you know. I brought you the idea." Hassoun-5 359; *see also*

10

Hassoun-5 309.  The government's second undercover agent reiterated the point:

> [I]f at any time, when you feel like, 'Okay.  Hey man.  This is over my head.'  Walk
> away.  There's, there's no shame in that. . . . There, there, there's no shame in saying,
> 'Brother, you know, I want to spend time with my family.  I like my life here.  I just want
> to go ahead and do what I'm doing.  I want to get my education.  I want to get married.  I
> want to live a simply life here.'  There's no shame in that .  Hundreds and thousands of
> people do it.  This takes, . . .this will take you away from all of that.

Hassoun-5 107.  In response, Hassoun again explained that he wanted to take part.  "You know,

when I start something, [I] like to finish it.  You know?"  *Id.*  The government's undercover

agents reiterated to Hassoun in their August 16, 2010 meeting that he could walk away at any

time, explaining: "You don't have to do this.  You don't have to, . . . like remember, like we said,

there is no shame, . . .  cause this is real deal . . . . You can leave at any time and we'll shake

hands. . . . [We'll] be friends for life."  Hassoun responded by reminding the agents that he

"introduced" the idea for the attack to them.

Hassoun would later admit in his plea agreement that the government's undercover agents

did not pressure him to partake in the proposed attack, but rather offered him opportunities to

withdraw from the plot:

> Prior to September 18, 2010, the UCs had, on a number of different occasions, told
> HASSOUN that they did not need his assistance with the execution of the planned attack
> and that he could withdraw from their plan at any time.  During their July 21, 2010
> meeting, the UCs questioned HASSOUN concerning whether he wanted to participate in
> the actual, planned attack.  HASSOUN assured the UCs that he did . . . . When
> questioned by the UCs again on August 16, 2010, HASSOUN again assured the UCs that
> he wanted a role in the execution of the proposed bombing.

R. 64, ¶ 6.  In light of these recordings and Hassoun's plea agreement acknowledgments,

Hassoun's sentencing assertion that he was pushed by the government to engage in the bombing

plot should be rejected.

### 3. The Attempted Bombing Was Hassoun's Choice.

Finally, Hassoun argues that while his conduct was serious, its degree of severity was caused by the government's source. R. 84 at 13-14. Again, the factual record undermines that assertion. Relying on "sting" drug stash-house robbery cases, Hassoun argues that certain Seventh Circuit jurists have criticized sentences predicated on guidelines that are elevated by the weight of drugs the government's source suggested would be available at the robbery target location. *See* R. 84 at 14.

Hassoun's reliance on this critique is misplaced. Unlike the stash-house robbery cases, Hassoun's conduct and choices were not informed by government representations. Hassoun, and Hassoun alone, directed his attempted terrorist attack. When Hassoun first met with the government's undercover agents, they asked Hassoun what ideas he had for a proposed terrorist attack. Hassoun listed a number of violent ideas, but when asked what he could and would be willing to do, Hassoun indicated that he would be willing to deliver a weapon to a target area.[7] The government's agents then asked Hassoun to pick the proposed target. Hassoun obliged, choosing the Wrigleyville entertainment district for the proposed attack. Moreover, Hassoun selected the precise location in which to place the bomb – along a busy street-side thoroughfare and next to an oft-crowded bar. *See* Hassoun-5 160-61. Finally, Hassoun chose when to strike. *See id.* at 164. Hassoun wanted to "hit" Wrigleyville late on a Saturday night when he knew the

---

[7] In their July 21, 2010 meeting, Hassoun told the agents that he was willing to deliver a biological weapon in Chicago's Daley Center, *see* Hassoun-5 96-97, 356-57, and/or deliver a bomb in the Wrigleyville entertainment district. *See* Hassoun-5 83-86, 363. In an August 16, 2010, meeting, the government's undercover agents told Hassoun that they could not supply him with a biological weapon, but could provide him with explosives. Hassoun replied in Arabic, "bring me whatever you want and I will plant it." Hassoun-5 373. When the government's agents questioned again whether Hassoun had any reservation about using an explosive device, Hassoun responded, in Arabic: "I have no objection on anything." *Id.*

bars and restaurants would be crowded with patrons. *Id.* at 164, 166 [8] He chose the precise location at which to deposit the bomb after verifying through reconnaissance that the area would be "crowded" and "packed" on a Saturday night. Hassoun-5 162-63. Thus, unlike the stash-house robbery cases in which the government's representations determine the guideline calculations, Hassoun dictated the circumstances of his offense. The guideline calculations are the result of Hassoun's ideas and eventual action.

Hassoun's comparable reliance on *United States v. Cromitie*, No. 09 CR 558 (CM), 2011 WL 2693297, *3-4 (S.D.N.Y. June 29, 2011) is similarly unavailing. In *Cromitie*, a district court, in imposing sentence, criticized the government's decision to provide prospective terrorists with an inoperable Stinger missile, concluding that the only plausible reason for providing that weapon was to render the defendants subject to a mandatory minimum 25-year sentence. *Id.* at *4. In this case, the government provided Hassoun with a bomb that was consistent with the type of attack Hassoun had advocated for months.[9] When and how Hassoun would use that weapon was also his choice. The putative sentencing manipulation allegations that concerned the court in *Cromitie* do not exist in this case.

Thus, despite his myriad of sentencing arguments to the contrary, Hassoun – and Hassoun alone – is responsible for his September 19, 2010 attempted use of weapon of mass destruction.

---

[8] In their July 21, 2010 meeting in which Hassoun and the undercover agents traveled around Chicago to look at potential targets, Hassoun stated: "I wanna show you the area I like. Where the night life is." Hassoun-5 139. Hassoun described the Wrigleyville area as, "a beautiful place, you [know], nice hit." Hassoun-5 141.

[9] In their August 31, 2010 meeting, the government's undercover agents told Hassoun that the bomb they would provide him would be comprised of composition C-4 explosive. *See* Hassoun-5 214. Shortly before Hassoun left to deliver the bomb to its target location, one of the agents showed Hassoun the device. Looking at the bomb, Hassoun stated, "fireworks." Hassoun-5 419.

His sentence should reflect the seriousness of that crime and his culpability for it.

## II.  A Significant Sentence I Necessary To Adequately Protect The Public.

In imposing sentence, the Court must fashion a sentence that will protect the public from defendant's criminal propensity.  *See* 18 U.S.C. § 3553(a)(2)(C).  The government submits that the Court needs to incapacitate Hassoun in order to protect the public.

As explained above, by the summer of 2010, Hassoun was musing about the various ways in which to attack Chicago.  In conversation after conversation, Hassoun expressed a desire to perpetrate a random act of violence designed to strike fear and instability in Chicago.  These statements proved to be more than disturbing bravado.  In the end, Hassoun was willing to engage in a potentially horrific terrorist attack for a few dollars and the perverse desire to see the chaos and destruction he could cause.  The Court's sentence must protect the public from such an individual.

In his memorandum, Hassoun argues that his relative youth and alleged lack of extremist ideology mitigate against the need to impose a lengthier sentence.  In particular, Hassoun argues that because his attempted act of terrorism was not motivated by what he calls "deeply-held" beliefs, but, instead, "adolescent" insecurity, he claims that he does not present a long-term threat to others.  *See* R. 84 at 24.  It is a hollow assurance.

Hassoun's purported lack of firmly-held religious beliefs does not assure the public's future safety.[10]  Hassoun lacked those potentially motivating influences on September 19, 2010,

_____

[10]  As an initial matter, while the government agrees that a defendant's motivation in engaging in criminal conduct is relevant to a court's sentencing consideration, the defendant's reasoning (or lack thereof) for engaging in violence does not impact the qualitative effect of that conduct.  Had Hassoun succeeded in detonating a bomb on September 19, 2010, his alleged lack of religious motivation would not have, in any way, dissipated the death and destruction caused by his actions.

when he sought to perpetrate an act of terror. While Hassoun may not have embraced violence as an expression of religious ideology, he embraced it nevertheless. As evidenced by his recorded statements, he did so fervently as an expression of what he described as his "own interest." Hassoun-5 287.[11] When asked by one of the government's agents whether he was prepared to kill people for those beliefs – "What about people dying? Can you live with that?" – Hassoun simply responded: "To make a change, you have to sacrifice people." Hassoun-5 288.[12]

Hassoun's cites *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) and *United States v. Issa*, 09 CR 1244 (S.D.N.Y. 2009) for the proposition that terrorism without strongly-held ideology should be viewed as qualitatively different in assessing the need for ensuring deterrence through sentencing. His reliance on these cases is misplaced. In *Stewart*, the court affirmed a district court determination that the defendant had not perpetrated a federal crime of terrorism or had engaged in conduct that involved or was intended to promote a federal crime of terrorism and that, accordingly, Guideline § 3A1.4's terrorism enhancement was inapplicable to the defendant's conduct. *Stewart*, 590 F.3d at 137-38. The court further found the district court's determination that the defendant "did not engage in the offenses [of which he was convicted] for profit and . . . did not support or believe in the use of violence to achieve what he wanted" were correctly seen as mitigating factors that suggested a reduced need to impose a sentence designed to protect the public from the defendant. *Stewart*, 590 F.3d at 140. Hassoun, of course, stands in

---

[11] In discussing his motivation for the proposed attack, Hassoun told the government's undercover agents he wanted to engage in terrorism to effectuate political change. *See* Hassoun-5 77-81.

[12] Moreover, while Hassoun may not have embraced violence as an expression of religious belief, he understood religious extremism to be the motivation of the undercover agents with whom he so willingly conspired. This did not dissuade Hassoun who explained: "And, we're doing the same thing, but everybody has their own interest. Because, you know why? The results of this benefit to everyone." Hassoun-5 287

15

stark contrast to the defendant in *Stewart*. Hassoun may not have been motivated by religious extremism; he was, however, intent on terrorizing the people of Chicago, maiming innocent civilians, and wreaking havoc with the political establishment.

In *Issa*, the defendant was convicted of material support of a terrorist organization after agreeing to arrange the transportation of cocaine through alleged al Qaeda controlled territory on behalf of the Revolutionary Armed Forces of Colombia, commonly referred to as the FARC.[13] *See United States v. Issa*, 1:09-cr-1244-BSJ, R. 12 (S.D.N.Y. Dec. 30, 2009). In imposing sentence, the district court noted that the defendant had absolutely no interest in supporting the ideology of the FARC, let alone was motivated by its political goals. *See* R. 84, Ex. 44. The defendant was, instead, motivated by the profit of drug dealing. *Id.* The court therefore held that there was a reduced need to deter the defendant from supporting terrorists in the future. *Id.* In contrast to *Issa*, Hassoun has not pled guilty to engaging in terrorism as a by-product of some other criminal conduct. Perpetrating an act of violence was Hassoun's goal. Given his predisposition to embrace violence, there is a need to protect the public from Hassoun, irrespective of ideological beliefs.

Relying on the psychological evaluation that he commissioned, Hassoun further argues that his 2010 statements and actions should be attributed to an "adolescent's desire to fit i[n] and impress people." R. 84 at 24. Hassoun claims he was a "psychological and social chameleon," playing a role simply to impress the government's source. R. 85 at 24. Hassoun claims that he now recognizes his insecurities, their cause, and the errant decisions he made allegedly to hide

---

[13] FARC is an acronym for *Fuerzas Armadas Revolucionarias de Colombia*, the Spanish spelling of the Revolutionary Armed Forces of Colombia. *See Issa*, 1:09-cr-1244-BSJ, R. 12, ¶ 1 (S.D.N.Y. Dec. 30, 2009).

them.  Hassoun further assures the Court that he is capable of overcoming those personal weaknesses.[14]  Hassoun therefore concludes that he is no longer as grave a threat as he was in 2010.

The government submits that Hassoun's assurances of self-recognition and rehabilitation should not so easily allay the court's concerns.  As an initial matter, Hassoun's explanation for his actions does not comport with the facts of this case.  Hassoun was introduced to the government's undercover agents in July 8, 2010.  Following that introduction, Hassoun had limited contact with the source.  Rather, he planned his proposed attack almost exclusively with the undercover agents, who, as explained above, did not encourage him to follow through with the proposed plot.[15]  Moreover, the government respectfully submits that, in general, a defendant's recognition of his errant ways coupled with an assurance of reformation is not, itself, sufficient to protect the public.[16]  Incapacitation through incarceration serves that goal.

The government further submits that Hassoun's relative youth at the time of the offense does not mitigate in favor of imposing the reduced sentence he requests.  In his memorandum, Hassoun seeks to characterize his action in this case as the misguided decisions of an immature child.  He argues that "by virtue of his age, [he] was less able to adequately consider risks and control his impulses than a mature adult."  R. 84 at 37.  It is a puzzling argument.  What "risks"

---

[14]  Hassoun offers the report of the child development psychological evaluation he commissioned to support this assurance.  R. 84 at 32-33.

[15]  To the contrary, the agents offered Hassoun a number of chances to withdraw, only to be told by Hassoun that the proposed bombing was his idea and that he wanted to see the attack to fruition.

[16]  A defendant's acceptance of responsibility is, of course, a consideration properly incorporated into a court's sentencing determination, and is, in fact, already included into determining a defendant's prospective guidelines.  *See* U.S.S.G. § 3E1.1.

should Hassoun have differently assessed? There is simply no analysis to be had. The consideration of whether or not to perpetrate an act of terrorism is not some "decision" subject to a cost-benefit analysis. Moreover, it is unclear as to what youthful "impulses" Hassoun refers. The government submits that a desire to perpetrate acts of violence like those Hassoun advocated and eventually attempted cannot be explained as understandable at any age.

Moreover, Hassoun was 22 years-old when he committed this offense. While he may have been young, he was not a child. Unlike many of his then peers, Hassoun was not unfamiliar with the destruction and suffering caused by the type of violence he sought to inflict. *See* PSR, ¶ 54. Moreover, due to his relative youth, whatever sentence the Court imposes in this case, it will not permanently incapacitate Hassoun. Under the terms of the parties' plea agreement and accounting for the potential reduction in sentence that Hassoun could receive for compliance with the Bureau of Prisons' disciplinary regulations, *see* 18 U.S.C. § 3624(a) & (b), Hassoun could be released from prison at some point between the ages of 37 (a twenty-year sentence) and 46 (a thirty-year sentence). In either instance, Hassoun will still be a relatively young, potential threat to others.[17]

Finally, the government acknowledges that as a result of his conviction, Hassoun will likely be deported following his incarceration. *See* 8 U.S.C. §1182(a). However, as the Court is aware, international borders cannot alone protect the American public or its interests from individuals dedicated to inflicting harm against the United States. *See United States v. Rivas*, 254 Fed.Appx. 742, 751, 2007 WL 4124340 (10th Cir. 2007) (unpublished).

---

[17] Given these calculations, the government respectfully disagrees that Hassoun will be of "advanced age" at the time of his release. R. 84 at 34.

III.    **The Defendant's History Ad Personal Characteristics Do Not Support A Reduced Sentence.**

A.    **Hassoun's Traumatic Childhood Does Not Explain His Conduct.**

Hassoun's sentencing memorandum recounts Hassoun's trying childhood experiences and seeks to explain the ways in which those events may have effected his judgment in this case. *See* R. 84 at 11. In his sentencing submission, Hassoun explains how, as a boy, he was twice trapped with his family in conflict zones. Hassoun recounts the various horrors of war he observed, arguing that those events scarred his development, perhaps contextualizing his conduct in this case. *See id.* at 2-12.

Hassoun claims he was first exposed to the brutalities of war in the 1999 Ivory Coast civil war, where he allegedly observed indiscriminate violence on the streets of Abidjan. *Id.* at 2-3. Hassoun further alleges he was in Lebanon when Israeli and Hezbollah forces clashed there for a month in 2006. *Id.* at 6-8. Hassoun claims that he was personally exposed to the suffering of war in both instances. He argues that these scarring experiences desensitized him to violence. *See id.* at 9; PSR., ¶ 75.

Hassoun's description of the violence to which he was exposed does not explain, let alone mitigate his actions in this case. One would think that having observed the horrors of war, Hassoun would abhor it. Instead, Hassoun sought to emulate it through his own act of terrorism. If Hassoun had been desensitized to the suffering of war, that still would not explain his 2010 conduct. The inability to empathize with others' pain does not explain a desire to inflict suffering on others.[18]

_____

[18] Finally, Hassoun's argument is internally inconsistent with his description of his efforts to care for his family and community during the Isreali-Hezbollah conflict. In his memorandum, Hassoun describes

19

### B. Hassoun's Exaggeration And Self-Aggrandizement.

Hassoun next argues that his early advocacy of indiscriminate violence should have been viewed as immature and misguided self-aggrandizement, perhaps worthy of law enforcement confrontation, but not a sting operation. In support of this argument, Hassoun notes that a number of his early terrorism ideas were unrealistic. R. 84 at 18. Indeed, many were. However, while Hassoun advocated violent proposals that were beyond his reach or unrealistic, he also suggested viable terrorist attacks. For example, Hassoun told the government's undercover agents that he could attack Chicago police officers by sniper fire. He further stated that he would be able to deliver an explosive device to a crowded area. Unfortunately, as experience has shown, these type of violent actions are well within the reach of an individual dedicated to engaging in terrorism.

Hassoun nevertheless argues that law enforcement should have viewed him differently because, in addition to advocating acts of violence, Hassoun fabricated stories of criminal feats, personal accomplishments, and various associations that were not true. Although investigating agents recognized some of Hassoun's statements were false, other claims proved to be true. For example, in the late summer of 2009, Hassoun told the government's source he could procure quantities of counterfeit Viagra for resale. In a consensually recorded August 7, 2009 transaction, the government's cooperating source did, in fact, purchase the counterfeit medication from Hassoun. Similarly, when the source met with Hassoun on June 7, 2010, Hassoun claimed

---

his allegedly extensive efforts to protect his brother from the terror of war and to care for the injured following the conflict. R.84 at 6-9. Hassoun's alleged efforts to protect and comfort others from the violence of war in Lebanon does not comport with the psychological scarring that he claims explain his actions in this case.

he had drafted a list of components needed to assemble a bomb. When the source asked Hassoun for a copy of that list, Hassoun promptly provided the source with such a list.

Thus, while Hassoun made statements that investigating agents recognized as false, they could not ignore Hassoun's repeated statements expressing a willingness an desire to perpetrate an act of terror. As Hassoun would demonstrate on September 19, 2010, he was willing to undertake the type of violent action he advocated.

In some regards, Hassoun's tendency to embellish aggravates his offense because it undermines his claims of mitigation. In his sentencing memorandum, Hassoun claims that the same "inner demons" which he addressed through lying also manifested themselves in his pre-arrest abuse of drugs and alcohol. R. 84 at 11. In particular, Hassoun told the probation officer that he was drinking a bottle of scotch, in addition to vodka and beer, every day. PSR, ¶ 79. He further stated that he was also smoking marihuana five or six times a day. PSR, ¶ 80. Finally, Hassoun claimed he was regularly using cocaine (three days a week) and ecstasy (twice a week). PSR, ¶¶ 81-82. In his sentencing memorandum, Hassoun suggests that through introspection, he has recognized his self-destructive behavior, sought to understand its causes and conquer its manifestations. Hassoun argues that the process of psychotherapy evaluation, recognition and renewal suggests he is not a recidivist risk. *See* R. 84 at 13. The government submits, however, that the purpose of Hassoun's argument – to demonstrate his ability to acknowledge and overcome his self-destructive behavior – is belied by the fact that its premise appears to be false.

The government's investigation of Hassoun began over a year before his arrest. At no time during that inquiry did government agents observe Hassoun in the type of intoxicated state he now claims was his perpetual condition. Hassoun never appeared to be impaired in the

21

numerous consensual recordings in which he discussed his violent plans with the source or the government's undercover agents. Moreover, following his arrest, investigating agents interviewed Hassoun acquaintances. Those individuals never advised investigating agents of Hassoun's alleged substance abuse. Tellingly, Hassoun's own family never mentioned his alleged alcoholism or drug addiction.[19] If Hassoun was, in fact, daily consuming a bottle of scotch while habitually abusing drugs, it would have been readily apparent. Moreover, Hassoun's claims of intoxication are further belied by other portions of his own sentencing memorandum. In particular, Hassoun claims that he was both constantly drunk while also stating that "[h]e worked endless hours" to support his family and care for his little brother. R. 84 at 11; *see also* PSR, ¶¶ 100-01 (claiming to work between 70 and 80 hours a week). Simply put, these varying claims are irreconcilable. Irrespective of the reason Hassoun seeks to now convince the Court that he was the victim of addiction, it is an assertion that undermines his claims of self-evaluation and change.

**IV.    A Sentence O Thirty Years' Imprisonment Is Consistent With Comparable Cases.**

Title 18, United States Code, Section 3553(a)(6) requires that, in imposing sentence, a court should seek to "avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." An examination of cases in which defendants have engaged in comparable conduct suggests that an elevated term of imprisonment is appropriate. In contrast, those cases cited by Hassoun in support of his request for a 20-year sentence are readily distinguishable.

---

[19]   Although Hassoun lived at home, his mother never recognized his alleged substance abuse. PSR, ¶ 86.

1.     **Similarly Situated Defendants Receive Sentences Exceeding 20 Years'
Imprisonment.**

The sentence recommended by the government is commensurate with the length of
sentences imposed in other cases in which defendants have attempted to engage in acts of mass
destruction terrorism, only to be thwarted by the government's covert interdiction in their violent
plot.  For example, Michael Finton was sentenced pursuant to the terms of a plea agreement to 28
years' imprisonment.  *United States v. Finton*; 09-CR-30098-DRH, R. 76 (C.D. Ill. May 9,
2011).  Like Hassoun,  Finton attempted to detonate what he thought was a weapon of mass
destruction, but was, in fact, an inert device provided to him by undercover law enforcement
agents.  *Id.*, ¶¶ 4, 22-23. In particular, Finton had attempted to detonate a truck bomb outside the
federal building and courthouse in Springfield, Illinois.   *Id.*, ¶  22(a)-(d).  The improvised
explosive device contained within the vehicle had been manufactured by law enforcement and
was inert.  *Id.*, ¶ 22(c).  Like Hassoun, Finton delivered the bomb to its target location and
walked away as a timer attached to the device ticked towards detonation.  *Id.*, ¶  22(e).  After
leaving the immediate location of the anticipated blast, Finton tried to detonate the bomb using a
cellular telephone trigger.  *Id.*

The sentence imposed by the district court in *United States v. Smadi*, 3:09-CR-294-M,
R. 88 (N.D. Tex. Oct. 28, 2010) also provides guidance.  Like Hassoun and Finton, Smadi pled
guilty to the attempted use of a weapon of mass destruction.   *Smadi*, 3:09-cr- 294-M, R. 61
(N.D. Tex. May 25, 2010). Smadi attempted to blow up the Fountain Place office tower in
Dallas, Texas.  *Smadi*; 3:09-cr- 294-M, R. 60, ¶ 3 (N.D. Tex. May 25, 2010).  Like Finton, Smadi
parked a vehicle containing what he thought was a bomb, but was, instead, an inert explosive

device provided to him by undercover FBI agents in front of the target office tower. *Id.*, ¶¶ 1-3. Again like Finton, Smadi tried to detonate the alleged explosive using a cellular telephone trigger. *Id.* at ¶ 4. Like Hassoun, Smadi pled guilty pursuant to a plea agreement that capped his liability at 30 years of imprisonment. *Smadi,* 3:09-cr- 294-M, R. 61 (N.D. Tex. May 25, 2010). The court imposed a sentence of 24 years' imprisonment. *Id.*

Derrick Shareef was sentenced to a term of 35 years' imprisonment after pleading guilty to attempted use of weapons of mass destruction. Shareef was involved in a plot to detonate explosives at a mall near Rockford, Illinois. *See United States v. Shareef*, 10 C 7860, 2011 WL 1838876, *1 (N.D. Ill. May 13, 2011). Like Hassoun, Shareef was befriended by a law enforcement cooperating source with whom he discussed his violent ideas and plan of attack for months. *Id.* Again like Hassoun, Shareef conducted reconnaissance of the target location. *Id.* Finally, Shareef planned his attack, as Hassoun did, when it would inflict the most damage, during the holiday shopping season. *Id.* Shareef was arrested after purchasing a handgun, four non-functioning grenades, and several rounds of non-functioning ammunition from an undercover agent who presented himself as a weapons supplier. *Id.* Unlike Hassoun, Shareef was never allowed to attempt his assault against the mall. He nevertheless received a 35 year sentence. *Id.*

Amine Mohamed El-Khalifi was sentenced to 30 years' imprisonment after he attempted to attack the United States Capitol Building with an automatic weapon and suicide bomb vest. *United States v. El-Khalifi*, 1:12-CR-37, R. 44 (E.D. Va. Sep. 14, 2012). El-Khalifi planned his attack over a period of three months with two accomplices who, unbeknownst to El-Khalifi, were a government cooperating source and an undercover agent. *El-Khalifi*, 1:12-CR-37, R. 25, ¶2

24

(E.D. Va. June 22, 2012).  Like Hassoun, El-Khalifi proposed a myriad of ideas for a proposed

terrorist attack against various potential targets to the government's cooperating source.  *See id.*,

¶¶ 2-9.  Further like Hassoun, El-Khalifi studied prospective target locations through

reconnaissance missions before deciding on a specific target.  *See id.*, ¶¶ 2-9.  In yet another

similarity, El-Khalifi  discussed executing proposed attacks at times that would inflict the

greatest number of casualties.  *See id.*, ¶ 5.  El-Khalifi, who was charged, like Hassoun, with

attempted use of a weapon of mass destruction, pled guilty to the charges alleged against him

pursuant to a plea agreement that bound the Court to impose a term of imprisonment between 25

and 30 years.  *El-Khalifi*, 1:12-CR-37, R. 24, ¶ 5 (E.D. Va. June 22, 2012).  El-Khalifi, who was

a foreign national, also agreed to his removal following his incarceration.  *Id.*, ¶¶ 10-13.  The

district court sentenced El-Khalifi to the high-end of the parties' agreed-upon sentencing range:

30 years' imprisonment.  *El-Khalifi*, 1:12-CR-37, R. 44 (E.D. Va. Sep. 14, 2012).

Hassoun's case is also analogous to that of Antonio Martinez who was charged with,

*inter alia*, attempted use of a weapon of mass destruction in connection with his attempt to

detonate a improvised explosive device outside of a military recruiting center.  *See United States*

*v. Martinez*, 1:10-cr-798-JFM, R. 9 (D. Md. Dec. 21, 2010).  Law enforcement investigated

Martinez with the assistance of a cooperating source who subsequently introduced Martinez to an

undercover law enforcement.  *Martinez*, 1:10-cr-798-JFM, R. 77 (D. Md. Jan. 26, 2012).

Martinez, the source and the undercover agent then worked together to plan Martinez's proposed

attack.  Like Hassoun, Martinez was given multiple opportunities by both the source and the

undercover agent to terminate his planned operation, but Martinez repeatedly expressed his

desire to proceed with the proposed attack.  *Id.*  When asked if he felt pressured to proceed,

25

Martinez stated, as Hassoun had, that the attack was his idea and that he wanted to proceed: "I came to you about this, brother." Provided with an inert explosive device designed by law enforcement, Martinez, like Hassoun, delivered the bomb to its intended target. Martinez pled guilty to the charges alleged against him, accepting an agreed term of imprisonment of 25 years. *See id*, ¶ 7.

### 2. The Cases Upon Which Hassoun Relies Are Substantially Different

In contrast to the above-referenced cases, the cases to which Hassoun compares himself are striking different. For example, the first case upon which Hassoun relies, *United States v. Wright*, No. 12-CR-238-DDD, R. 208 (N.D. Ohio Nov. 21, 2012), is easily distinguishable. Douglas Wright was sentenced to 11.5 years' imprisonment after he pled guilty to conspiring and attempting to bomb the Brecksville-Northfield High Level Bridge outside of Cleveland, Ohio. *Wright*, No. 12-CR-238-DDD, R. 208 (N.D. Ohio Nov. 21, 2012). Wright expressed initial reservations about an attack, declining an initial offer to purchase explosives. When Wright and his conspirators decided to move forward with a plot to destroy the bridge, they talked about the ways in which that assault could occur without harming anyone. *See Wright*, No. 12-CR-238-DDD, R. 187, at 12-13 (N.D. Ohio Nov. 14, 2012).[20] The co-defendants ultimately attempted to destroy the bridge at night, when traffic would be minimal. *See Id.* at 15. In contrast, Hassoun demonstrated a total disregard for life, planning his attack to maximize casualties.

*Wright* is also distinguishable in that, unlike Hassoun, at the time that he met the government's cooperating source, Douglas Wright was destitute and homeless with "profound"

---

[20] The *Wright* co-defendants discussed different ways they could minimize casualties, including bombing the bridge at night or imitating a construction crew and temporarily closing the bridge to traffic. *See Wright*, No. 12-CR-238-DDD, R. 187, at 13 (N.D. Ohio Nov. 14, 2012).

substance abuse problems. *Wright*, No. 12-CR-238-DDD, R. 205, at 9 (N.D. Ohio Nov. 21, 2012). As the sentencing court held, Wright became financially dependent on the source, relying on him for employment. *Id.* Unable to afford transportation, Wright similarly relied on the source to transport him to every conspiratorial meeting. *Id.* Hassoun, in contrast, conducted multiple independent reconnaissance missions of his proposed target both at his contact's suggestion and on his own volition.

Hassoun's reliance on cases such as *United States v. Batiste*, No. 06-CR-20373-JAL (S.D. Fla. Nov. 24, 2009), *United States v. Padilla*, 04-CR-60001-MGC (S.D. Fla. Jan. 22, 2008), *United States v. Nur*, 07-CR-543-DLI, R. 497 (E.D.N.Y. Jan. 25, 2011) and *United States v. James*, 05-CR-214, R. 368 (C.D. Cal. March 9, 2009) is similarly unavailing. *See* R. 84 at 26-27. Although, like Hassoun, Batiste and Padilla plotted to perpetrate potentially deadly terrorist attacks with confederates they did not realize were cooperating with law enforcement, the government arrested both Batiste and Padilla long before they attempted to execute their proposed attacks. Neither defendant, who were charged exclusively with conspiracy counts, proceeded with their plot to the point of attempting to execute a proposed attack. For example, while Batiste was convicted of conspiring to destroy federal buildings and the Sears Tower in Chicago, the acts that he and his co-conspirators took in furtherance of that plot was limited to requesting financial and logistical support for their group and taking reconnaissance video and photographs of potential targets.[21] *See United States v. Augustin*, 661 F.3d 1105, 1111-14 (11th

---

[21] Batiste was convicted after a third trial. The first two juries that considered his case were unable to reach verdicts, resulting in mistrials. Batiste was then sentenced to 13.5 years' imprisonment for his role in the terrorist conspiracy. *United States v. Batiste*, No. 06-CR-20373-JAL R. 1471 (S.D. Fla. Nov. 24, 2009),

Cir. 2011). Padilla, who was sentenced to over 17 years' imprisonment was convicted of conspiring to send money, recruits and equipment to organizations engaged in terrorist activities overseas. *See United States v. Jayyousi*, 657 F.3d 1085, 1092 (11th Cir. 2011). He was not convicted of attempting to bomb any particular target in the United States or abroad.[22] *See Jayyousi*, 657 F.3d at 1091-1101. Padilla's offense conduct is, accordingly, materially different from Hassoun's attempt to perpetrate a specific, actual terrorist attack within the United States.

Hassoun's reliance on *United States v. Nur*, 07-CR-543-DLI (E.D.N.Y.) is also unavailing. Abdel Nur was sentenced to 15 years' imprisonment – the statutory maximum sentence available to the court – after pleading guilty to providing material support to a group of conspirators who had planned to bomb New York's JFK Airport. *See United States v. Nur*, 07-CR-543-DLI, R. 497 (E.D.N.Y. Jan. 25, 2011).[23] Nur provided sanctuary and guidance to other conspirators by providing them logistical support and guidance in an overseas trip in which they met with a known terrorist. Nur, however, was not a leader of the conspiracy and his logistical support of the conspirators did not involve an attempt to effectuate their proposed attack. *See Nur*, 07-CR-543-DLI, R. 479 (E.D.N.Y. Dec. 30, 2010). Given Nur's unique role in the JFK attack conspiracy, Hassoun's attempt to contrast his conduct and prospective liability with the conspiracy Nur supported is misleading. This is especially so because Hassoun fails to advise the Court that every other member of the conspiracy was sentenced to life imprisonment. *See United*

---

[22] Hassoun errantly stated that Padilla was sentenced to 15 years' imprisonment. *See* R. 84 at 27. In fact, Padilla was sentenced to a term of imprisonment of 17 years and 4 months. *See Jayyousi*, 657 F.3d 1092.

[23] Abdel Nur was, pursuant to a plea agreement with the government, charged in a superseding indictment in which he was charged with a single count of providing material support to terrorists in violation of 18 U.S.C. ¶ 2339A(a). *See Nur*, 07-CR-543-DLI, R. 346 & 497 (E.D.N.Y. June 29, 2010 & Jan. 25, 2011).

*States v. Defreitas*, 07-CR-543-DLI, R. 525 (E.D.N.Y. March 11, 2011) (life imprisonment);

*United States v. Ibrahim*, 07-CR-543-DLI, R. 663 (E.D.N.Y. Feb. 24, 2012) (same); *United*

*States v. Kadir*, 07-CR-543-DLI, R. 492 (E.D.N.Y. Jan. 18, 2011) (same).

Hassoun's case is similarly distinguishable to that of Kevin James who was sentenced to

16 years' imprisonment after he pled guilty to conspiring to levy war against the United States.

*See United States v. James*, 05-CR-214, R. 259 & 368 (C.D. Cal. Dec. 14, 2007 & March 9,

2009). In particular, James recruited individuals to join an extremist group, the purported

purpose of which was to engage in jihad. While James recruited individuals and directed them to

procure weapons, the group's plans never proceeded to developing any actual violent operations.

*See United States v. James*, 05-CR-214, R. 259 (C.D. Cal. Dec. 14, 2007). In contrast,

Hassoun's plans developed well beyond the planning stage.

Hassoun's reliance on *United States v. Mandhai*, 02-CR-60096-WPD (S.D. Fla. Aug. 30,

2005) is also misplaced. Mandhai was sentenced to 14 years' imprisonment after he pled guilty

pursuant to a plea agreement with the government to conspiring to bomb electrical power stations

in Florida. *See United States v. Mandhai*, 375 F.3d 1243, 1246 (11th Cir. 2004).[24]  As the

Eleventh Circuit noted in an opinion assessing the Mandhai sentence, there were a number of

unique mitigating facts that suggested the imposition of a reduced sentence, including the fact

that Mandai was 18 years' old at the time of the plot, he had not proposed or selected the goals of

the proposed conspiracy, he had, on a number of occassions, indicated that he wanted to

withdraw from the plot, and he was not involved in any comparable conduct for over a year after

---

[24] Mandhai pled guilty to conspiring to damage and destroy electrical power stations in violation of
18 U.S.C. § 844(i) & (n) pursuant to an agreement in which the government agreed to recommend a sentence
at the low end of the advisory range.

he was confronted by law enforcement. *Mandhai*, 375 F.3d at 1250. Hassoun, of course, was the genesis of the particular plot at issue in this case. Moreover, he did not attempt to withdraw from the bombing plan that he proposed. To the contrary, when offered the opportunity to withdraw, he insisted in participating in the planned attack. Moreover, unlike Hassoun, the target of the *Mandhai* conspiracy was not human casualties, but government infrastructure.

Hassoun's reliance on *United States v. Rana*, 09-CR-830-8 (N.D. Ill. Jan 17, 2013) is also easily distinguished. Tahawwur Rana, who was sentenced to a prison term of 14 years, was charged in connection with his alleged role in a conspiracy to provide material support to Lashkar e Tayyiba's November 2008 attacks in Mumbai, India, and his conspiratorial role to assault facilities and employees of a Danish newspaper. Rana was acquitted of the charges associated with the Mumbai, India attacks, but convicted of two counts in connection with the planned attack in Denmark.[25] While the goal of the conspiracy in which Rana conspired was violent, the court held that it did not implicate Guideline Section 3A1.4's "terrorism enhancement." In addition, Rana was not convicted of attempting to engage personally in the planned attack. Hassoun, in contrast, insisted on a personal role in a terrorist act that implicates the terrorism enhancement.

Finally, Hassoun's reliance on *United States v. Ferdaus*, 11-CR-10331-RGS (D. Mass. Nov. 1, 2012), is misplaced. Pursuant to a plea agreement with the government governed by Federal Rule of Criminal Procedure 11(c)(1)(C), Rezwan Ferdus was sentenced to an agreed upon term of 17 years' imprisonment for attempting to designing remote control planes carrying

---

[25] In particular, Rana was convicted of conspiring to provide material support to a plot to commit murder overseas in violation of 18 U.S.C. § 2339A, and providing material support to the foreign terrorist organization Lashkar e Tayyiba in violation of 18 U.S.C. § 2339B.

explosive payloads that could by flown into the United States Pentagon and Capitol Building. *See Ferdaus*, 11-CR-10331-RGS, R. 55 & 59 (D. Mass. July 20, 2012 & Sep. 13, 2012). Hassoun's attempt to compare his prospective sentence to that of a defendant whose sentence was agreed to by the government simply is not analogous.

## CONCLUSION

For all of the foregoing reasons, the government respectfully submits that the Court should impose a sentence that includes a term of thirty years' imprisonment.

Respectfully submitted,

GARY S. SHAPIRO
United States Attorney

By:    /s/ Joel M. Hammerman
           JOEL M. HAMMERMAN
           TINOS DIAMANTATOS
           Assistant United States Attorneys
           219 South Dearborn Street
           Chicago, Illinois  60604

Dated: May 1, 2013           (312) 353-8881 / (312) 353-4317

**CERTIFICATE OF SERVICE**

The undersigned Assistant United States Attorney hereby certifies that the Government's

Sentencing Memorandum was served on May 1, 2013, in accordance with Fed. R. Crim. P. 49,

Fed. R. Civ. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the

District Court's system as to ECF filers.


By:    /s/ Joel M. Hammerman
JOEL M. HAMMERMAN
TINOS DIAMANTATOS
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-8881 / (312) 353-4317