IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10-CR-773-1 |
| v. | ) | Hon. Robert W. Gettleman |
| | ) | |
| SAMI HASSOUN | ) | |

**DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant SAMI HASSOUN, by his attorneys, MATTHEW MADDEN and ALISON SIEGLER, respectfully submits this response brief.

I. **The government fails to demonstrate that a sentence above 20 years is the minimally sufficient sentence to reflect the circumstances and seriousness of the offense.**

The government ignores the fact that most of Sami's actions were prompted by the agents' requests and that Sami took no concrete actions for over a year after he was first targeted.

A. **Most of Sami's actions were triggered by the agents' prompts and requests.**

The government attempts to distance itself from the Seventh Circuit's criticism of government-led stings by contending that Sami's "conduct and choices were not informed by government representations," and that "Hassoun, and Hassoun alone, directed his attempted terrorist attack." R. 86 at 12.[1] The government's own evidence flatly contradicts this assertion. In truth, virtually every action Sami took was in response to a direct request or suggestion by the government. The government acknowledges that during the undercover FBI agents' very first meeting with Sami, "*they asked* Hassoun what ideas he had for a proposed terrorist attack," and "then *asked* Hassoun to pick the proposed target." *Id*. at 12; *see also* R. 1 at 12, ¶ 31 (explaining that the ideas Sami provided were "[i]n response to UC-1's inquiries"). Sami was by no means

---

[1] Citations to "R. __" refer to the docket number of the cited document. Citations to "Ex." refer to the exhibits to Defendant's Sentencing Memorandum (Docket #84). Citations to "Disc. __" refer to the discovery by volume and Bates-stamped page number.

1

directing the action; by the government's own admission, Sami simply "obliged" with these requests. *Id*. Even the idea of Wrigley Field as a target first came up in response to a government directive and request: "The CHS *said that they did not want to hit the downtown first* and *asked about Sami's ideas* for different locations. Sami suggested Wrigley [F]ield . . . ." Disc. 5:08 (emphasis added).

The government's influence over Sami's "conduct and choices" did not stop there. The *government decided* that Sami's act would involve a bomb; the agent simply told him: "[I]t is going to be a lot easier to get, probably explosives than what we [were] talking [about]." Ex. 40.[2] Although Sami's earlier ideas included an impossible-to-acquire "virus," Disc. 5:291, he continued to follow the orders of the older agents, stating "you can bring me whatever you want," Ex. 40. Additionally, while the government contends that Sami "selected the precise location in which to place the bomb," R. 86 at 12, in truth *the agents asked Sami* "when and where they could leave an explosive device," R. 1 at 19, ¶ 46. It was only *in response* to that request that Sami "identified the time and area." *Id*. The agents further directed Sami's "conduct and choices" by telling "Sami to buy" a backpack, walkie talkies, and batteries, and "to bring them with him next time they meet." Ex. 40. Sami brought those three items. *See* Ex. 42. They also provided him with a laptop computer for "planning and searching" and "a Camera to video tape the areas that will be surveilled." Ex. 40. Accordingly, in "videotap[ing] reconnaissance missions of potential targets," R.1 at 14–15, ¶ 36, Sami was simply doing the agents' bidding.

The government continued to inform Sami's "conduct and choices" right up to the end. They sent the materials they had instructed him to purchase off to Quantico, where an elaborate

---

[2] The government's claim that Sami suggested placing a *real* bomb in Daley Plaza during an earlier conversation with the informant, R. 86 at 7–8, is not borne out by the evidence. The Complaint is not accurate on this point; the original sources—both the transcript and the FBI report—demonstrate that Sami was talking about a *fake* bomb from the outset of that conversation. *See* Disc. 5:18; Ex. 38.

fake bomb was constructed. On the night of the offense, the agents "provided Hassoun with a grey shopping bag which, they explained, Hassoun could use to conceal the backpack containing the bomb." R.1 at 22–23, ¶¶ 55–56. Later, Sami revealed his utter lack of self-direction by asking the agents what they actually wanted him to *do* with the fake bomb: "How you want me to [UI]? You want me to put it in the car? You put it in your, the garbage. In the street. *How you do it*? . . ." One of the agents answered him in no uncertain terms: "Put it in the garbage." Disc. 5:367 (emphasis added). Sami did what the agents told him to do and was arrested.

In addition, the government's evidence strongly suggests that Sami would never have been involved in a similar offense if left to his own devices. There is no evidence that Sami would have had either the inclination or the wherewithal to move the plot forward on his own. For example, there is no evidence that he would have purchased a camcorder and engaged in recorded surveillance had the government not asked him to "videotape reconnaissance missions." R.1 at 14–15, ¶ 36. There is likewise no evidence that he knew how to make a bomb, or that he took any steps to construct a bomb: no evidence that he used the laptop the government conveniently provided to surf the internet for instructions on how to build a bomb, no evidence that he asked anyone how to build a bomb, no evidence that he had any idea where to acquire a bomb, and no evidence that he had the inclination or the money to purchase a bomb. *See, e.g.*, *United States v. Cromitie*, 2011 U.S. Dist. LEXIS 71821 at *10 (S.D.N.Y. June 29, 2011) (emphasizing that defendant had neither the funds nor the know-how to acquire the weapon the FBI provided).

The informant also influenced Sami, *see* R. 84 at 13–20, though the government has made it impossible to fully assess the informant's influence because it chose not to begin recording their conversations until June 2010, thirteen months after their relationship began. R. 1

at 3, ¶ 8–9. Crucially, the government did not record the first conversation in which a bomb was mentioned (on May 13, 2010, a full year after Sami met the informant). Given the ambiguity of the report, it is entirely possible that the informant raised the topic of the attempted bombing in Times Square to get Sami thinking and talking about bombs. *See* Ex. 30. In addition, the informant injected the promise of material security into the relationship, telling Sami when they first met "that [the informant himself] had $4 million dollars in the United States that he wanted to transfer to Lebanon." Disc. 13:01. The informant reinforced this promise, repeatedly "suggest[ing] that he and Hassoun could become rich as terrorists," to use the government's own words. R. 86 at 6. [3] During that year, the government paid the informant untold sums of money for cultivating a relationship with Sami.[4]

### B. Sami's failure to back out of the plot does not increase the seriousness of the offense and is not inconsistent with governmental influence.

The government contends that Sami must not have felt pressure to follow through with the offense because he did not back out of the plot when offered opportunities to reconsider. R. 86 at 9–11. That argument is a red herring. If Sami had taken any one of those opportunities, he would not be guilty of the offense. Sami's failure to back out merely establishes the elements of the offense; it does not make the instant offense *more serious* than other bombing plots.

Moreover, a defendant's outward enthusiasm for a plot does not necessarily indicate a lack of actual or perceived pressure. As Judge Posner has observed:

> It's true that after agreeing to participate in the stash-house robbery [the defendant] bragged to the government's undercover agent that he had robbed stash houses [before].

---

[3] Despite the government's claim that Sami had limited contact with the source after the agents became involved in July 2010, the evidence shows that the informant was still spending time with Sami as late as September 23, 2010. *See* Disc. 12:06.

[4] The government contends that our assertions about the incentives the government provided to the informant are simply "speculation," R. 86 at 6, n.7. If our speculation was, in fact, wrong, the government easily could have stated that they did not pay the informant large sums of money or provide him with immigration benefits. It is telling that they did not deny those facts.

4

> But he may just have been trying to reassure the agent, who was to lead the robbers into the stash house . . . that he (Mayfield) was competent to participate in such a dangerous undertaking.

*See United States v. Kindle*, 698 F.3d 401, 414 (7th Cir. 2012) (Posner, J., concurring & dissenting), *vacated, reh'g en banc granted*, *United States v. Mayfield*, 2013 U.S. App. LEXIS 1456 (7th Cir. Jan. 16, 2013). Judge Posner thus highlights that bravado and swagger might prompt a defendant to pretend to be more experienced or less biddable than he is. Social science research supports these observations, particularly when it comes to young men.[5] Accordingly, Sami's claim that the ideas for the plot were "his own," R. 86 at 7, and the fact that he did not affirmatively "identify [the informant] as an inspiration" to engage in an attack, *id.* at 6, do not prove that the informant did not influence Sami's decision. It is unsurprising that an insecure 21 year old would pretend to be a leader rather than a follower.

Finally, the person Sami was when he first met the informant is more relevant to the §3553(a)(2)(A) culpability analysis than his failure to withdraw over one year later. As Judge Posner recently emphasized that in sting cases, it is important to focus on the defendant's characteristics when he was first targeted—rather than looking at the defendant's later conduct—when assessing predisposition to commit a particular crime. Relevant factors include: whether the defendant has ever before committed that specific crime, whether he has been convicted of other crimes, whether he was employed when the sting began, and whether he agreed to the scheme at the outset. *See Kindle*, 698 F.3d at 414–15. The judge in *Cromitie* likewise emphasized that "the defendants were not engaged in any terrorist activity" or "any sort of criminal activity at all" "before they encountered the CI," *id.* at *10–11, and that there was no

---

[5] *See* Jessie L. Krienert, *Masculinity and Crime: A Quantative Exploration of Messerschmidt's Hypothesis*, 7.2 Electronic Journal of Sociology 5 (2003) (explaining that among young men, assertions of "violent behavior may be considered an acceptable way to convey the 'toughness' that is linked with masculine traits.").

5

discussion of the offense that was ultimately carried out, *id.* at *5.[6] The government's argument does not account for these factors. *See* R. 86 at 9–11. Indeed, a very different picture of Sami's culpability emerges when the correct timeframe is examined. When Sami met the informant, he had never been convicted of—or even suspected of—a terrorism offense. He had no prior convictions whatsoever, and he was employed. In addition, no bombing plot was entered into until the informant had been in close contact with him for over a year. These facts mitigate Sami's culpability under §3553(a)(2)(A) because they indicate that the government's actions significantly contributed to Sami's ultimate conduct.

## II.     The government's requested sentence of 30 years undermines § 3553(a)(6).

### A. The defendants the government identifies who have received more than 20 years are not similarly situated to Sami.

The five defendants to whom the government attempts to compare Sami all have higher risks of recidivism and played more active roles in their offenses than Sami.[7] *See* R. 86 at 22. Sentencing Sami to a term of imprisonment that approximates the sentences that those individuals received would therefore create "unwarranted sentencing similarities" in violation of § 3553(a)(6). *Gall v. United States*, 552 U.S. 38, 55–56 (2007).

First, the defendants who received more than 20 years for bombing plots have a higher risk of recidivism than Sami because they were motivated by jihad. Finton, for example, "spoke of wanting to secure in place in Paradise . . . by becoming a mujahid (Arabic for one who wages jihad)," and stated that he wanted to fight for Hamas, Jihad, or al Qaeda. Finton Compl. at 6–7,

---

[6] The government attempts to distinguish *Cromitie* on the grounds that the particular legal issue before the judge was whether the government had engaged in sentencing manipulation. *See* R. 86 at 13. But the legal posture of *Cromitie* is beside the point. Because *Cromitie* involved an FBI terrorism sting that is extremely similar to the sting in the instant case, the judge's analysis of the defendants' lack of predisposition and her critiques of the government's conduct are both relevant here.
[7] Those defendants include: Michael Finton (sentenced to 28 years), Hosam Smadi (sentenced to 24 years), Derrick Shareef (sentenced to 35 years), Amine Mohamed El-Khalifi (sentenced to 30 years), and Antonio Martinez (sentenced to 25 years). *See* R. 86 at 23–26.

6

*United States v. Finton*, 09-CR-30098 (C.D. Ill. Sep. 24, 2009). Similarly, Martinez stated that he did not "want to take action just for one day, but rather, wanted to dedicate his whole life to the [jihadist] cause," and stated "the path I have chosen is jihad." Martinez Compl. at ¶¶ 30, 20, *United States v. Martinez*, 10-CR-798 (D. Md. Dec. 8, 2010). Indeed, every one of the five defendants expressly stated that no punishment—not even the threat of death—would prevent him from perpetrating acts of violence based on his ideological beliefs.[8] In contrast, Sami holds no such views. Rather, according to Dr. James Garbarino, "Sami has the intelligence to undertake the personal changes necessary for rehabilitation" and "the developmental damage he experienced is remediable, and does not mean a life-long pattern of anti-social behavior . . . ." Ex. 2 at 8–9. Sami's markedly lower risk of recidivism and his capacity for rehabilitation means that he should not receive the same sentence as the five defendants whose stated intent was to commit acts of violence for the rest of their lives.

Second, unlike Sami, who often followed the instructions of the government agents, *see supra* at 1–3, those five defendants directed their own plots and made numerous logistical and tactical decisions. Shareef proactively purchased the weapons that he attempted to use. He personally agreed to exchange some speakers for four grenades, a handgun, and ammunition, and also arranged the date and time of the transaction. *See* Shareef Compl. at 9–10, ¶¶ 11, 12. Similarly, while the agents in Finton's case proposed an explosive in a backpack, Finton decided

---

[8] Smadi stated that "even if they take me to Guantanamo for the rest of my life," he would not "retreat." Smadi Compl. at ¶¶ 4–6, *United States v. Smadi*, 09-CR-294 (N.D. Tex. Sep. 24, 2010), ECF No. 1. Finton stated "even if they give [me] the death penalty, il-Hamdu li-llah (praise God)." Finton Compl. at ¶ 39. Shareef stated: "I swear to Allah . . . I'm down to live for the cause and die for the cause[.]" Shareef Compl. at 4, *United States v. Shareef*, 06-CR-919 (N.D. Ill. Dec. 8, 2006), ECF No. 1. El-Khalifi was prepared to die in carrying out his attempted bombing; he was arrested just minutes before detonating what he believed was a suicide vest filled with explosives. *See* El-Khalifi Statement of Facts at 7, *United States v. El-Khalifi*, 12-CR-37 (E.D. Va. June 22, 2012), ECF No. 25 ("El-Khalifi . . . put on the vest containing what [he] believed to be a functioning bomb . . . [and] walked . . . toward the United States Capitol, where he intended to shoot people and detonate the bomb.").

on his own to use a car bomb in his attempt to bomb the Federal Building in Springfield, Illinois. *See* Finton Compl. at ¶ 62. In contrast, Sami relied on the undercover agents for both the procurement of the weapon and the logistics of the plot. *See supra* at at 1–3. In further contrast to Sami, Shareef had already taken concrete steps towards planning an attack before the informant approached him. About two months after contact with a confidential informant, he admitted:

> I had *already started* looking at synagogues out here and in the DeKalb area and everything. I was looking at synagogues, I was doing Mapquest . . . I was like, I'm gonna lay low out[side a synagogue] . . . [and] as soon as I see them fools in the building, *I had planned on* trying to grab one . . . I was just going to go over there and shank one or two [Jewish people attending services at the synagogue]. *Id.* at 6, ¶ 7 (emphasis added).

Third, unlike Sami, the defendants cited in the government's brief carried out their plots to further the missions of established terrorist networks. Smadi, Finton, and El-Khalifi believed that they were conspiring with members of al-Qaeda,[9] and Smadi and Martinez saw their plots as the first of many jihadist attacks that they hoped to perpetrate.[10]

Finally, the government entered into a significantly more lenient plea agreement with Sami than with most of the five defendants. Finton's plea agreement was to 28 years, and El-Khalifi and Martinez's plea agreements prohibited sentences below 25 years.[11] Because all plea agreements in terrorism cases must be approved by Main Justice, the fact that the government allowed Sami to request a sentence fully 5 years lower than these three defendants indicates that

---

[9] *See* Smadi Compl. at 2, ¶ 4 (stating that Smadi was introduced to an agent acting as "a senior member of an al-Qa'ida 'sleeper' cell" and later, to another acting as "a lower level operational soldier in the 'sleeper' cell."); Finton Compl. at 15, ¶ 39 ("The [undercover agent] said that Finton was with al Qaeda now, so he could forget about militias and such."); El-Khalifi Statement of Facts at 3, ¶ 6 ("[The undercover agent] represented to El-Khalifi that he was an al-Qaeda operative.").

[10] *See* Smadi Comp. at 2, ¶ 4 ("Smadi made clear his intention to serve as a soldier for Usama Bin Laden and al-Qa'ida, and to conduct violent Jihad[.]"); Martinez Compl. at 11, ¶ 20 ("Martinez told the [undercover agent] that he did not want to take action just for one day, but rather, wanted to dedicate his whole life to the cause [of Jihad].").

[11] *See* Plea Agreement, *United States v. Finton*, 10-CR-30215 (S.D. Ill. May 9, 2011), ECF No. 76; Plea Agreement, *United States v. El-Khalifi*, 12-CR-37 (E.D. Va. June 22, 2012), ECF No. 24; Plea Agreement, *United States v. Martinez*, 10-CR-798 (D. Md. Jan. 4, 2012), ECF No. 77. Shareef did not enter into an agreement with the government, but pled blind to an offense with a statutory maximum of life and received 35 years.

the government saw salient differences between Sami's level of culpability and theirs. (The government essentially admits in its motion that there is a link between the sentences it agrees to and a defendant's culpability. *See* R.86 at 30–31.) The government's plea agreements in the cases it contends are more serious than Sami's also make clear that—contrary to the government's assertion at R. 86 at 2–3—the Guidelines range of life imprisonment vastly overstates the seriousness of Sami's offense and is not an appropriate anchor.

**B. The government's distinctions between Sami and defendants who received less than 20 years are largely irrelevant and thus do not warrant the enormous sentencing disparity that the government requests.**

First, the government attempts to distinguish two cases involving undercover agents based on the fact that the government decided to arrest the defendants "long before they attempted to execute their proposed attacks." R. 86 at 27 (citing *United States v. Batiste*, No. 06-CR-2037-JAL (S.D. Fla. Nov. 24, 2009); *United States v. Padilla*, 04-CR-60001-MGC (S.D. Fla. Jan. 22, 2008)). Given that all of these offenses are equally inchoate, it would be improper to measure culpability based on when *the government* decided to abort a defendant's conduct. Sami is not *more* culpable because the government allowed him to carry his plot through to the end. If anything, the decision to arrest Batiste and Padilla "long before" the culmination of their plans indicates that the government considered them dangerous.

Second, by requesting a 30-year sentence, the government asks this Court to create an extreme sentencing disparity between Sami and defendants who received sentences of **16 years or less** for conduct that either arose under the same statutes as Sami's or was otherwise similar to Sami's.[12] The largely immaterial factual distinctions the government draws do not begin to

---

[12] *See* R. 86 at 26–30 (describing defendants Wright (11.5 years), Mandhai (14 years), Nur (15 years), James (16 years), and Rana (16 years)). Wright pled guilty to 18 U.S.C. § 2332a(a)(2)(D), attempt to use a weapon of mass destruction. Wright Indictment, *United States v. Wright*, 12-CR-238 (N.D. Ohio May 3, 2012), ECF No. 8. Mandhai pled guilty to 18 U.S.C. § 844(i), attempt to damage and destroy, by means

9

justify a sentence *twice as long*—or more than twice as long—as the sentences those defendants received. The hair-splitting discrepancies that the government notes are largely exaggerations based on cherry-picked facts. They fall far short of demonstrating that Sami's culpability or risk of recidivism requires 30 years' imprisonment.

For example, the government contends that Wright (sentenced to 11.5 years under the same statute as Sami) was more "reliant" on the undercover agent because he depended on the agent for transportation and money. *See* R. 86 at 27. But the government also paid Sami and gave him a ride to the location where the plan was to be executed. The argument that the FBI had more influence on Wright than on Sami is further undermined by the fact that, in contrast to Sami, Wright's plotting was underway at the time he was targeted, and only five months passed between his initial contact with the informant and his attempted bombing. *See* Mem. Op., *United States v. Wright*, 12-CR-238, at 2–4 (N.D. Ohio Nov. 21, 2012), ECF No. 205.

Similarly, the government attempts to distinguish Mandhai (sentenced to 14 years under the same statue as Sami) based on what it terms "unique mitigating facts," including the fact that Mandhai expressed hesitations about the plot, "had not proposed or selected the goals of the conspiracy," and was only 18 years old at the time. R. 86 at 29. The government fails to mention that Mandhai's hesitations were based, at least in part, on his concern that he would be caught. *See United States v. Mandhai*, 375 F.3d 1243, 1246 (11th Cir. 2004) (explaining that Mandhai "wavered, *expressing distrust* with [the individual posing as a terrorist]" and stated that he had "*suspicions* of [that individual]") (emphasis added). And contrary to the government's assertion,

---

of an explosive, real property. Mandhai Indictment, *United States v. Mandhai*, 02-CR-60096 (S.D. Fla. May 17, 2002), ECF No. 3.Nur plead guilty to conspiring to attack JFK Airport by detonating an explosive. Nur Indictment, *United States v. Nur*, 07-CR-543 (E.D.N.Y. June 28, 2007), ECF No. 10. James pled guilty to conspiring to levy war against the United States. James Judgment, *United States v. James*, 05-CR-214 (C.D. Cal Mar. 9, 2009), ECF No. 368. Rana was convicted of conspiring to provide support to a plot to commit murder overseas and providing material support to a terrorist organization. Judgment, *United States v. Rana*, 09-CR-830-8 (N.D. Ill. Jan. 17, 2013), ECF No. 361.

10

Mandhai was not a passive participant in his bombing plot: he attempted to "recruit" eight other people for "jihad training" and attempted to further his bombing plot after one of the undercover agents purported to have ties to Osama Bin Laden. *Id.* Finally, he was of a similar age to Sami, and, as in Sami's case, there is evidence of overzealousness by an older and more seasoned government operative. *See id.* at 1245–46 ("[D]espite admonishments from the FBI . . . [the undercover agent] continued to meet and train with Mandhai[.]"). None of the government's distinctions warrants imprisoning Sami for 16 years longer than Mandhai.

### III. The government fails to demonstrate that a sentence above 20 years is necessary to protect the public.

The government has the burden of showing that a sentence of 20 years is not "sufficient" to protect the public under § 3553(a)(2)(C). Because this Court is required to impose the sentence that is *minimally sufficient* to protect the public, the question is whether Sami will pose a *greater* risk to the public if he is released at the age of 40 than at the age of 48.[13] The government does not identify any of Sami's individual characteristics or any studies to support such a finding, and presents no evidence to combat Dr. Garbarino's assessment of the factors that led to the offense or his conclusion that "Sami is well positioned developmentally and socially to recover from his current situation." Ex. 2 at 14.

The government argues that "incapacitation through incarceration serves th[e] goal" of protecting the public. *See* R. 86 at 17. But the Seventh Circuit has unequivocally reversed a sentencing judge for relying on this exact notion—that "imprisoning [a defendant] would prevent

---

[13] The government incorrectly calculates Sami's age upon release. Sami will be 40 years old if sentenced to 20 years, not 37 years old as the government asserts. *See* R. 86 at 18. If Sami were to receive a "good time" reduction pursuant to 18 U.S.C. § 3624(a) & (b), a 20-year sentence would result in him serving 17 years, 5 months, and 6 days, while a 30-year sentence would result in him serving 26 years, 1 month, and 24 days. Sami was born on January 20, 1988, and began serving time at the MCC on September 19, 2010. A 20-year sentence will result in a release date of February 25, 2028, at which point Sami will be 40 years old. After a 30-year sentence, Sami will be 48 years old.

11

him from committing crimes while in prison"—rejecting the statement as a "truism." *United States v. Miranda*, 505 F.3d 785, 796 (7th Cir. 2007). To the extent that the government assumes that longer prison sentences deter defendants, that assumption is not empirically supported. Instead, data shows that "placing offenders in prison does not appear to reduce their chances of recidivating."[14] The government's argument that the "potentially horrific" nature of Sami's offense increases his risk of recidivism, R. 86 at 14, is likewise defeated by empirical data: "Whether an offender has a low or high guideline offense level, recidivism rates are similar."[15]

In responding to our point that Sami's lack of jihadist motivation substantially decreases his risk of reoffending, the government suggests that the Court consider the hypothetical impact of Sami's conduct if the fake bomb had been real. R. 86 at 14, n.10.[16] But Congress directs the Court to engage in a *forward-looking* analysis of whether a sentence of 20 years is sufficient to protect the public from Sami *when he is released*. Sami's lack of ideological—or, for that matter, coherent—motivation makes him less likely to reoffend than the vast majority of terrorism defendants. *See* Ex. 2 at 5 ("Sami was acting from . . . his belief that he needed money in order to get respect and safety"); *see also* R. 84 at 25.[17] The government's efforts to factually distinguish *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), do not undermine the judge's ultimate conclusion that defendants in terrorism cases who are *not* motivated by ideological extremism

---

[14] Francis T. Cullen, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 The Prison J. 58S (2011).

[15] *See* U.S. Sentencing Comm'n, U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 15, *available at* http://www.ussc.gov/Research/Research_Publications/Recidivism/200405_Recidivism_Criminal_History.pdf.

[16] If the Court gives any credence to the government's hypothetical scenario of what would have happened had the bomb the FBI fabricated at Quantico been real, the Court must also credit the far more likely hypothetical of what would have happened had the informant never approached Sami in the first place—Sami would not have committed this offense and would not be facing 20–30 years in prison.

[17] The government's reference to Sami's "*purported* lack of firmly-held religious beliefs," R. 86 at 14 (emphasis added), should be disregarded, because the government has repeatedly acknowledged Sami's lack of religious motivation. *See* R. 1 at 15 n.22 ("Hassoun was clear that he was not motivated to attack Chicago based on any religious ideology.").

require less incapacitation under § 3553(a)(2)(C). Similarly, the government's arguments leave untouched the key holding of *United States v. Issa*, 09 CR 1244 (S.D.N.Y. 2009): a defendant's lack of ideological motivation "makes a difference and is relevant to whether or not he is looking to commit *further crimes*." Ex. 44 at 51 (emphasis added). Judge Jones's analysis did not depend on the fact that Issa's crime was "a by-product of some other criminal conduct," R. 86 at 15, but focused instead on Issa's lack of religious motivation.

### IV. The government's argument that Sami's history and personal characteristics do not support a reduced sentenced ought to be rejected wholesale.

The government summarily attempts to minimize Sami's traumatic childhood and does not engage with the expert report in the instant case. *See* R. 86 at 19. Instead, the government relies on unsupported armchair psychology, positing, "One would think that having observed the horrors of war, Hassoun would abhor it." *Id*. The conclusions of Dr. Garbarino, a developmental psychologist with an expertise in "the developmental impact of war and political violence on children and youth,"[18] contradict the government's hollow analysis: "[T]he cumulative damage experienced by Sami's exposure to traumatic events, his need for security, his adoption of lying and misrepresentation of self as a strategy to cope with social, cultural and linguistic dislocations, all contributed to his state of mind during the time when he became involved in the crime for which he is being sentenced. To my mind, these constitute mitigating factors." Ex 2. at 9–10. The government also provides no support for its contention that Sami's concern for his brother and others during the war "does not comport with the psychological scarring" that Dr.

---

[18] Dr. Garbarino is "the author of over 100 scholarly articles and book chapters dealing with family, child, and adolescent development issues, with an emphasis on violence and trauma, and [ ] the author or editor of 23 books[.] [His] work with children and youth experiencing violence and trauma has included communities across the United States and war zones across five continents. . . . Relevant to the present case, [he] served as a consultant to UNICEF in assessing and responding to the impact of the Gulf War on children in Iraq and Kuwait in 1991, and conducted research on the impact of political violence on Palestinian children and youth." Ex. 2 at 1–2.

Garbarino found. R. 86 at 19, n.18. A person caught up in violent events could simultaneously be concerned about the safety of others and also suffer psychological trauma. The only expert in this case—Dr. Garbarino—has concluded that Sami suffered developmental trauma as a result of the war, and that the trauma he suffered relates to the instant offense, and the government presents no evidence to the contrary.

Contrary to another of the government's arguments, R. 86 at 18, the fact that Sami was in his very early twenties at the time of the offense allows this Court to assume that his youth impacted his behavior. The government attempts to distinguish the Supreme Court cases by arguing that because Sami was 22, the court need not consider his youth. *See id.* But the Supreme Court has emphasized that youth is a mitigating consideration even after a defendant reaches the age of 18. *See Roper v. Simmons*, 543 U.S. 551, 574 (2005) ("The qualities that distinguish juveniles from adults do not disappear when an individual turns 18."). In fact, the defendant in *Gall v. United States*, 552 U.S. 38, 57–58 (2007), was 21 at the time of the offense—the same age Sami was when he met the CI—and the Court upheld a deeply below-Guidelines sentence as supported by *Roper*'s discussion of brain development and the associated immaturity of youth. *Gall* also held, contrary to R. 86 at 18, that a defendant does not need to prove that his "specific behavior in the instant case was impetuous or ill-considered" as a result of his youth. *Id.* at 57.

The government's contention that Sami was not abusing substances during the instant offense, R. 86 at 21, is unsupported conjecture and should be rejected outright. The government attempts to support this accusation by arguing, "If Hassoun was . . . [abusing substances], it would have been readily apparent." *Id.* at 22. While Sami was able to hide his substance abuse from his mother and others,[19] his loved ones observed unusual behavior during the months

---

[19] The fact that Sami's acquaintances did not "advise[] investigating agents of [Sami's] alleged substance abuse," R. 86 at 22, proves nothing; it is likely that these people were simply unaware of Sami's

14

before the offense. *See* R. 84 at 11–12 (Sami's family and girlfriend noticed changes in behavior; he was "moody and aggressive," and often "crying" and "nervous"). In addition, the government's argument that Sami's disclosures about his employment and substance abuse are "irreconcilable," R. 86 at 22, does not comport with the timeline in the PSR. In fact, Sami was unemployed by June 1, 2010, *see* PSR at 18, ln. 99, and his alcohol and drug abuse did not reach the point of "daily consuming a bottle of scotch while habitually abusing drugs," R. 86 at 22, until between June 19 and July 19, 2010, PSR at 15–16, ln. 78-82. Sami was first "introduced to the government's undercover agents [on] July 8, 2010." R. 86 at 17. It is thus not surprising that the agents perceived Sami's altered state as his normal way of being. Further, reputable medical research indicates that many individuals are able to hide their substance abuse from others, and maintain academics, jobs, relationships, etc. *See* Brody, *supra* note 21.

Finally, the Court should reject the government's dismissal of Sami's robust post-offense rehabilitation, *see* R. 84 at 12–13, which has continued with his completion of the MCC's 25-hour "'Breaking the Cycle Non Residential Drug Abuse Program," and "Daily Living: Goal Setting" program. *See* Ex. A.

WHEREFORE, we respectfully request that this Court impose a 20-year sentence.

Respectfully submitted,

s/ Matthew Madden
Matthew Madden

s/ Alison Siegler
Alison Siegler
Attorneys for Sami Hassoun

---

substance abuse. *See, e.g.*, Jane E. Brody, *High Functioning, but Still Alcoholics*, N.Y. Times, May 4, 2009, *at* http://www.nytimes.com/2009/05/05/health/05brod.html?_r=0 ("[A]s many as half of all alcoholics are high-functioning types.").

15

MATTHEW J. MADDEN
Attorney at Law
53 W. Jackson Boulevard, Suite 703
Chicago, IL 60604

ALISON SIEGLER
Associate Clinical Professor of Law
Director, Federal Criminal Justice Clinic
University of Chicago Law School
6020 South University Avenue
Chicago, Illinois 60637
(773) 834-1680

Written With:
Jean Tinkham and Max Kampfner, University of Chicago Law School Class of 2013
James DuBray, University of Chicago Law School Class of 2014

## CERTIFICATE OF SERVICE

      The undersigned, <u>Alison Siegler</u>, an attorney with the University of Chicago Law School Mandel Legal Aid Clinic's Federal Criminal Justice Clinic, hereby certifies that in accordance with Fed. R. Crim. P. 49, Fed R. Civ. P. 5, L.R. 5.5, and the General Order on Electronic Case Filing (ECF), the following document:

DEFENDANT'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM

was served pursuant to the district court's ECF system as to ECF filers, and was sent by first class mail/hand delivery on **May 16, 2013**, to counsel/parties that are non-ECF filers.


      By:    <u>s/Alison Siegler</u>
               ALISON SIEGLER
               Associate Clinical Professor of Law
               Director, Federal Criminal Justice Clinic
               University of Chicago Law School
               6020 South University Avenue
               Chicago, Illinois 60637
               (773) 834-1680