UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

---

**UNITED STATES OF AMERICA**

      **v.**

                             **1:10-CR-00773**
                             **Hon. Robert W. Gettleman**

**SAMI SAMIR HASSOUN,**
                             **MEMORANDUM OF LAW**

            Defendant.

---

**DEFENDANT'S MOTION FOR MODIFICATION OF SENTENCE
BASED ON EXTRAORDINARY AND COMPELLING REASONS**

Sami Samir Hassoun, by undersigned counsel, moves this Court pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended by the First Step Act, for a modification of his sentence based on an extraordinary and compelling reason, that is, debilitating illness in the form of Familial Mediterranean Fever (FMF), an autoinflammatory disease which leaves Mr. Hassoun "immunocompromised" and thereby puts him at very high risk of serious complications or death from the ongoing international COVID-19 pandemic, in conjunction with his medication for FMF which puts him at even greater risk. A failure by this Court to ensure that Mr. Hassoun is released from federal custody immediately may result in his death.

On March 19, 2020, the House Judiciary Committee stated in its letter to the Attorney General:

> "We urge you to use…existing authority…to release federal inmates who are vulnerable to COVID-19 (for instance, persons…who are 50 years old and older, and who suffer from chronic illnesses like…diabetes…')…" Letter of House Judiciary Committee, March 19, 2020 (emphasis added).

A subsequent letter dated March 30, 2020, states

> "The Department of Justice (DOJ) and BOP presently have the authority to request, under 18 U.S.C. § 3582(c)(1)(A)(i), that courts modify the sentences of prisoners who present "extraordinary and compelling reasons." We call on you, in the most urgent of terms, to do the right thing and exercise this authority and immediately move to release medically-compromised, elderly, and pregnant prisoners in the custody of the BOP." Letter of House Judiciary Committee, March 30, 2020 (internal citations omitted).

On the basis of the enormous threat posed by COVID-19 and Congress' advice, multiple federal courts have already released other similarly-situated inmates. Mr. Hassoun moves this court to release him from custody on similar grounds as a medically compromised prisoner.

**Jurisdiction & Sentence Reduction Authority Under 18 U.S.C. § 3582(c)(1)(A).**

On December 21, 2018, the President signed the First Step Act into law. The Act amends 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons under specific circumstances. Where a defendant has requested that the Director of the Bureau of Prisons (BOP) move this Court for defendant's release by submitting the request to the warden of the facility in which he is incarcerated, and thirty days have lapsed since the request was received, the Court may consider the defense motion.

Mr. Hassoun is currently incarcerated under BOP Register Number 42215-424 at United States Penitentiary Leavenworth. On April 9, 2020, he requested of the warden that the BOP grant his release under §3582(c)(1)(A). See Ex. 1. The BOP denied the motion. See Ex. 2. As of May 9, 2020, this Court is empowered under § 3582(c)(1)(A) to act on the defendant's motion.

This Court has discretion to reduce Mr. Hassoun's term of imprisonment in this case based on § 3582(c)(1)(A)(i) if there are "extraordinary and compelling reasons that warrant such a reduction" and such a reduction is consistent with applicable policy statements issued by the Sentencing Commission, after considering "the factors set forth in § 3553(a) to the extent that they are applicable". The relevant policy commission statement in turn adds the requirement that the defendant no longer be a safety threat to any other person or to the community as provided in 18 U.S.C. § 3142(g). § USSG 1.B.13. The policy statement includes a residual category of "other reasons". USSG 1.B.13 Application Notes 1(A)((D). In the present case, Mr. Hassoun's status as immunocompromised by FMF, in conjunction with the high risk of contracting COVID-19 and suffering serious complications or death as a result in a federal prison, qualifies as an extraordinary and compelling reason for Mr. Hassoun's release. Mr. Hassoun is not a threat to

public safety under § 3142(g) and the applicable factors of § 3553(a) further weigh in favor of his release or do not compel otherwise.

**Relevant Facts and Procedural History**

We are currently in the midst of an unprecedented and uncharted territory of American legal history. A deadly pandemic has swept the planet, killing tens of thousands of people, and governments throughout the world struggle to contain the spread of the virus through the use of emergency measures that have grinded public life to a halt. This Court is in a unique position to ensure that federal prisoners, some of the most vulnerable to contracting the virus, are safe by ensuring compassionate release where it is necessary to prevent infection for individuals who would suffer serious complications, such as in this case. The Courts' refusal to do so could effectively amount to a death sentence.

The pandemic and the inability to prevent its spread effectively place individuals like Sami Hassoun, an incarcerated person with a serious medical condition affecting his immune system, in incredible danger. Mr. Hassoun was diagnosed with Familial Mediterranean Fever, a rare autoinflammatory disease, in 2001. See Ex. 3 at 35. Mr. Hassoun experiences episodes of extreme pain in his stomach and chest and along with fever that sometimes causes him to throw up bile. See Def.'s Sent. Mem. 4, Mar. 18, 2013. ECF No. 84; see also Ex. 3 passim. As a result of the illness, he experienced extreme weight loss as a child, weighing only sixty pounds as a thirteen-year-old. Def.'s Sent. Mem. 4, supra. The severity and frequency of Mr. Hassoun's episodes of pain are affected by stress and trauma and have been severe during his confinement. See Ex. 3 at 2, 4, 9-10, 13, 15, 31, 32.  Continuing to undergo treatment for his illness, Mr. Hassoun remains medically vulnerable. He is currently classified as a Level 3 chronically unstable, requiring constant medical care and interventions. See Ex. 6 at 2. Due to FMF, Mr.

Hassoun currently experiences extreme chest pain and breathing difficulties due to inflammation of his chest and pericardium (heart membrane), for which he is currently taking the medication anakinra. See Ex. 3 at 36, Exs. 4 and 5.

The disease, the inflammation and debilitation it has caused, and his medication leave Mr. Hassoun "immunocompromised," meaning he has a reduced ability to fight infections and faces greater vulnerability to serious complications, including death, from the ongoing coronavirus epidemic. See Exs. 4 and 5.[1] Indeed, immunocompromised people are one of four specifically designated groups of people that are most likely to experience serious effects or death according to the Centers for Disease Control. According to the Centers for Disease Control, "People with a weakened immune system have reduced ability to fight infectious diseases, including viruses like COVID-19". Centers for Disease Control, Groups at Higher Risk for Severe Illness (Apr. 17, 2020) available at https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html#immunocompromised.

Moreover, his vulnerability is drastically increased by his presence in a federal prison. As the House Judiciary Committee noted, federal prisoners are particularly vulnerable to the COVID-19. Indeed, federal prisons are among the worst places in the country, and possibly the world, for an individual to be infected by the coronavirus. Some seventy percent of those tested in BOP facilities have tested positive for coronavirus, and at the time of writing dozens have died. See Covid-19 Cases, U.S. Bureau of Prisons, https://www.bop.gov/coronavirus; and ACLU & UCLA School of Law Prison Policy & Law Program, Death by Incarceration: Remembering those Lost to COVID-19, https://tinyurl.com/ycp6ep95. The March 30 House Judiciary

---

[1] On information and belief, additional details about Mr. Hassoun's condition, his prescription of anakinra, and his status as immunocompromised due to both are held by Mr. Hassoun's doctor, Jason Clark, and can be released by the Bureau of Prisons at the Court's order.

Committee letter emphasizes how dangerous federal prison conditions are for those vulnerable to the pandemic and how inadequate the BOP's COVID-19 response has been. The letter cites considerable medical shortages at federal prisons even before the coronavirus, notes the close quarter housing in federal prisons which make adequate distancing between prisoners "impossible" and finally notes that the lack of hygiene in BOP facilities "is no secret". The letter also expresses concern that the BOP is discouraging the release of inmates who are at high risk for contracting COVID-19 based on the seriousness of their offenses without an adequate method to prevent such inmates from contracting the virus. Letter of House Judiciary Committee, March 30, 2020, supra. The letter concludes, "For all these reasons, the best way to ensure that our prisons do not become epicenters of this incredibly virulent, contagious, and deadly disease is to release as many people as possible."

Conditions have unfortunately not improved. At the current time, there have not been any apparent changes and BOP facilities remain incredibly unsafe for individuals vulnerable to serious complications from COVID-19, such as Mr. Hassoun. Despite efforts by BOP, the rate of infection due to the virus has spiked over time. See Walter Pavlo, Federal Bureau of Prisons Institutions not Showing any Sign of Flattening Curve, FORBES (April 15, 2020). The situation is worse than the numbers indicate, as the BOP has underreported infections. Id. ("More inmates are sick than the BOP is reporting and more inmates are not reporting that they are sick out of fear of being identified as sick."); see also Jon Seidel, Coronavirus Cases Rising at Chicago's federal high-rise jail, CHICAGO SUN-TIMES (April 19, 2020) (discussing BOP's delay in reporting new cases). Testing inside prisons has remained almost non-existent, and the BOP's action plan provides no additional protections for individuals who are high risk, such as Mr. Hassoun. See United States v. Gorai, 2020 US Dist. LEXIS 72893 (DNV April 24, 2020) (internal citations

omitted). The BOP has similarly failed to implement proper quarantining in federal facilities, validating the concerns of the House Judiciary Committee about the inability to implement proper social distancing in prisons. See, e.g. United States v. Scparta, 18-cr-578 (SDNY April 19, 2020) (noting that inmates and prison staff at a BOP facility regularly came in direct contact with dozens of other inmates despite a nominal "quarantine"). The continuing death toll and high rate of infection shows the inability of the BOP to protect individuals in Mr. Hassoun's position. See United States v. Joling, 2020 US Dist. LEXIS 67953, 12 (DOR April 17, 2020) ("While the Court is sympathetic to the efforts made by BOP to combat this outbreak, that response has been insufficient as evidenced by the number of infections and deaths which have already occurred in federal custodial institutions).

Though this Court required that he receive treatment for his illness in prison when sentencing him, Mr. Hassoun was repeatedly denied medication for FMF while he was held in BOP detention prior to his conviction. Def.'s Sent. Mem. 36-37, supra. Without medication, Mr. Hassoun suffered extreme and debilitating pain for nearly two years, until he finally received medication in June 2012. If released from imprisonment immediately, Mr. Hassoun will have spent nearly ten years in prison, including two years spent in excruciating, unmedicated pain.

Mr. Hassoun was arrested for the first time in his life for his crimes on September 10, 2010. On May 30, 2013, Mr. Hassoun was sentenced to 23 years and 20 years in prison, to run concurrently, upon his plea of guilty to one count each of attempted use of a weapon of mass destruction, 18 U.S.C. § 2332a(a)(2)(D), and attempted use of an explosive device, § 844(i). Mr. Hassoun pled guilty to these charges after a lengthy sting operation by the FBI in which undercover agents pretending to be terrorists bribed Mr. Hassoun with money to join them in plotting and carrying out a bombing attack against a Chicago street frequented by bar patrons.

Mr. Hassoun, a Lebanese national, has lived in multiple countries and survived two largescale armed conflicts as a child. Def.'s Sent. Mem. 1-9, Mar. 18, 2013. ECF No. 84. Two years after the 2006 Israel-Lebanon War, Mr. Hassoun immigrated to the United States with his parents, where he had briefly lived for six months in 2000. As a result of the significant psychological trauma associated with his survival of both of these armed conflicts, during which he personally witnessed extreme violence and death, the alienation he experienced as a result of constant displacement, as well as the painful and debilitating effects of his illness, Mr. Hassoun began making self-destructive decisions. He began lying to others about his social and financial status at a young age in search of social acceptance, and in his early adulthood, began abusing drugs and alcohol. Unable to find sufficient work to support his family in the United States and feeling a deep lack of self-worth, Mr. Hassoun was enticed by the confidential informants' offers of money and significance in exchange for carrying out the instant offense; he held no ideological motives. See Compl. at 15 n.22 ("Hassoun was clear that he was not motivated to attack Chicago based on any religious ideology."). The confidential informants who recruited Mr. Hassoun into the bomb plot were asked to meet and befriend Mr. Hassoun; spent nearly a year coaxing Mr. Hassoun to take part in the plot; introduced him to other members of the plot; gave their input to Mr. Hassoun about the target for the plot, telling him to change it at least once; asked Mr. Hassoun to come up with a detailed plan for the bombing; offered funding for the operation; and built an inert "bomb" and decided to fill it with what would have been deadly ball-bearings. See Compl. 3-6, 22. Notably, the informants suggested using what they claimed was a real bomb rather than a smoke bomb. See Def.'s Sent. Mem. supra, Exs. 39-40. Though Mr. Hassoun was given an opportunity to extricate himself from the plan, he did not do so. In pleading guilty, Mr. Hassoun admitted his responsibility for the offense.

While in prison, however, Mr. Hassoun has been a model inmate. He expresses deep remorse for his shameful decision to join the bombing plot. He has "sincerely apologized" for his actions. Def.'s Sent. Mem. Ex. 4 at 6. Mr. Hassoun's pursuit of rehabilitation has been extensive and effective since the very start of his incarceration. Id. Among his extensive rehabilitative achievements in prison, Mr. Hassoun has earned an Associate's Degree from Ohio University, see Ex. 6 at 5, successfully kicked his drug and alcohol addictions through substance abuse programs, see Ex. 6 at 7, Ex. 3 at 25, completed the 18 month Life Connections Program recovery program "with honors" for which he now serves as a Joseph Project mentor, see Ex. 6 at 9-32, completed 800 hours of chaplain support apprenticeship through which he now serves as the head chaplain clerk of the facility, see Ex. 6 at 6[2], co-chairs the Reaching Out from Within program and class for others, and completed several vocational training courses, see Ex. 6 at 46-48. Mr. Hassoun has only one disciplinary infraction for absence from a scheduled course due to his illness. See Ex. 7. Furthermore, his SENTRY score indicates that he poses a "low risk" of recidivism, consistent with the conclusion of an expert referenced by defense counsel at sentencing. Def.'s Sent. Mem. 32-33, supra.

If this Court were to release Mr. Hassoun from prison, he would be deported to Lebanon for his conviction. 8 U.S.C. § 1227(a)(4)(B). Mr. Hassoun's family network and length of time spent in Lebanon would enable him to provide for his needs. See Ex. 8.

**Argument**

1. **Mr. Hassoun's Familial Mediterranean Fever, an Autoinflammatory disease that puts him at a unique risk of death from COVID-19 while in BOP custody, constitutes an extraordinary and compelling reason to release him.**

---

[2] On information and belief, additional corroborating information about Mr. Hassoun's work with the prison chaplaincy is held in his SENTRY file by the Bureau of Prisons, and can be released by the Bureau of Prisons at the Court's order.

Mr. Hassoun's medical condition plainly and straightforwardly constitutes an extraordinary and compelling reason as a serious medical condition. Though Mr. Hassoun reports experiencing great stress in prison which has in turn increased the number of FMF outbreaks of extreme pain and fever, his condition has thus far been manageable in prison with medication. But due to his resulting condition as immunocompromised, Mr. Hassoun cannot protect himself from the deadly consequences of a coronavirus infection. As his FMF is a genetic disorder with no cure from which he is not expected to recover, and the BOP remains unable to protect him from an infection that may kill him while in prison, Mr. Hassoun's qualifies as an extraordinary and compelling reason. USSG § 1B1.13, Application Notes 1(A)(ii) & 1(D).

Numerous courts, including this one, have similarly held that individuals with compromising medical conditions that leave them vulnerable to contracting serious complications or death from COVID-19 should be granted compassionate release from federal prisons in light of the pandemic and the danger it has created for this stratum of the prison population. United States v. Hansen, 2020 U.S. Dist. LEXIS 80494 (ND Ill. May 7, 2020) (man with diabetes and hypertension in facility with no reported COVID cases granted compassionate release); United States v. El-Hanafi, 1:10-CR-00162 (SDNY May 19, 2020) (releasing medically vulnerable "Care Level 3" inmate who committed terrorism offense after serving only 8 of 15 year sentence); United States v. Gross, 2020 US Dist. LEXIS 65758, 8 (SDNY April 14, 2020) ("It is now nearly beyond cavil that the combination of the COVID-19 pandemic and [defendant's] health conditions constitutes an extraordinary and compelling reason"); United States v Amarrah, 2020 U.S. Dist. LEXIS 80396 (ED Mich. May 7, 2020) (45 year-old with several medical conditions released after serving only one third of his sentence at a facility with no reported cases);  United States v. Sanchez, 2020 U.S. Dist. LEXIS 70802 (DCT April 22,

9

2020) (high-risk of severe complications due lupus, an autoimmune disease leaving defendant "immunocompromised"); United States v. Robinson, 2020 U.S. Dist. LEXIS 73575 (NDCA Apr. 27, 2020) (severe psoriasis for which defendant takes immune-suppressants); United States v. Park, 2020 U.S. Dist. LEXIS 73048 (SDNY Apr. 24, 2020) (severe asthma and immune-compromising disease); United States v. Campagna, 2020 US Dist. LEXIS 54401 (SDNY March 27, 2020) (immunocompromised); United States v. Gorai, supra (DNV April 24, 2020) (asthma); United States v. Coles, 2020 U.S. Dist. LEXIS 72327 (CDIL Apr. 24, 2020) (hypertension); United States v. Kataev, 2020 US Dist. LEXIS 65756 (SDNY April 14, 2020) (chronic sinusitis); United States v. Powell, 1:94-cr-316-ESH (Mar. 28, 2020) (respiratory problems); United States v. Zukerman, 2020 US Dist. LEXIS 59588 (SDNY April 3, 2020) (advanced age, diabetes, hypertension, and obesity); United States v. McCarthy, 2020 US Dist. LEXIS 61759 (SDNY April 8, 2020) (age, pulmonary disease, and asthma); United States v. Williams, 2020 US Dist. LEXIS 63824 (NDFL April 1, 2020) (compromised immune system, coronary and vascular disease, and advanced age).

**2. The applicable factors in § 3553(a) and § 3142g[3] either require Mr. Hassoun's release or do not compel a different result.**

At the outset, while the Court is expected to "consider" applicable § 3553(a) factors, there is no explicit statutory balancing test that mandates how the Court must weigh these factors against the extraordinary and compelling reason for release. Thus, even if the 3553(a) factors could weigh significantly against a defendant's release, an extraordinary and compelling reason for release may nonetheless compel the Court to release an inmate anyway.

---

[3] Because the § 3142g analysis overlaps significantly with § 3553(a) analysis, the two are merged in this section for the sake of brevity.

Several courts have done exactly that in the context of the ongoing pandemic. For example, in Zukerman, supra, the Court explained that the 3553(a) factors, even where they would normally militate against defendant's release, nonetheless did not bar a considerable shortening of the defendant's sentence:

> Although Zukerman's original release date may be far off, the threat of COVID-19 is at his doorstep…the Court does not disagree that Zukerman's misconduct was egregious. Zukerman was driven not by need, but by unmitigated greed. He entangled himself in a web of lies and deceit…Zukerman thought himself to be above the law. What has changed, however, is the environment where Zukerman is serving his sentence. When the Court sentenced Zukerman, the Court did not intend for that sentence to include incurring a great and unforeseen risk of severe illness or death brought on by a global pandemic. Zukerman, supra at 11, 15-16 (emphasis added; internal citations omitted).

Similarly, in Asaro, supra, the court released the defendant despite the seriousness of his offense -- for which the court had originally issued a sentence above that recommended by the guidelines -- and the potential threat he posed to the public given his life of crime:

> "[The court] found [at sentencing] '…that Mr. Asaro ha[d] lived a life of violence.'…[the BOP] determined that his release at this time would minimize the severity of his offense and pose a danger to the community…Undoubtedly, these considerations largely militate against Asaro's release, and they weigh heavily…his actions amounted to a 'senseless act of violence.'…[the court] did not believe that time in prison would rehabilitate him or deter him from committing crimes in the future, considering his life-long membership in the mafia…Although these considerations are largely the same today, the analysis has changed…at Sentencing, [this court] intended to impose an above-Guidelines sentence – not a death sentence…If Asaro were to remain in detention, he would face a significant risk of contracting – and suffering severe complications from, and perhaps even dying from – COVID-19. [The court does] not believe that continued detention, in light of this risk, is an appropriate or proportionate way to further the purposes of sentencing." Asaro, supra at 2, 5, 18-19, 20, 21.

Federal courts have come to similar conclusions due to the COVID pandemic in Williams, supra at 10 (recognizing defendant's numerous prior convictions and instant offense as "very serious" before nonetheless releasing him), Hammond, supra at 28 (releasing defendant

11

whose crime of armed robbery was "of course, very serious"), and McCarthy, supra at 15 (recognizing defendant's crime as "very serious").

a) **Where failing to release Mr. Hassoun could kill him, his release is required to ensure the need for the sentence to provide the defendant with medical care in the most effective manner and the risk of his death would create a drastic and severely unwarranted sentence disparity. § 3553(a)(2)(D) & (a)(6).**

These factors plainly require Mr. Hassoun's release. Congress' decision to factor in the well-being and medical treatment of a defendant in the "most effective manner" would be flatly contradicted by a sentence that results in the defendant's death or other serious long-term medical consequences. See, e.g. Robinson, supra at 7-8 ("Indeed, one such [3553(a)] factor is the need for the sentence imposed…to provide the defendant with medical care in the most effective manner. He is unlikely to be able to get the medical care he needs at [a BOP facility] in the midst of the pandemic").

Furthermore, as defense counsel noted at sentencing, federal courts generally apply sentences of between eleven and twenty years for in cases involving bombing plots that do not ultimately cause harm, and that as such, a sentence of greater than twenty years would create unwarranted sentencing disparities. Def.'s Sent. Mem. 26, supra. Where Mr. Hassoun is not released from prison, there is a significant risk that he will die. For the same reasons that an excessive prison sentence would contradict the need to avoid unwarranted sentencing disparities, a decision that would result in Mr. Hassoun's death after he has already served nearly ten years in prison would be an even greater sentencing disparity and mandates his release.

b) **Where Mr. Hassoun has served nearly ten years of his sentence, of which two were spent in excruciating pain due to lack of medication, his release under the circumstances would adequately reflect the seriousness of his offense, respect for the law, just punishment, and deterrence. § 3553(a)(2)(A & B) & (a)(6).**

Where the severity of a sentence necessarily reflects its retributive and deterrent value, Mr. Hassoun's service of nearly ten years of his original sentence also weighs in favor of his

release. The circumstances created by the pandemic create a unique situation in which the retributive and deterrent values of the sentence are not undermined even if a sentence is significantly reduced. See, e.g. Zukerman, supra. Here, there is the added factor that the first two years of Mr. Hassoun's custody involved the BOP's failure to provide medical treatment for his illness, resulting in excruciating, untreated pain. These circumstances add to the severity of the time he has already served. Where the time he has served is substantial and was served in part in severe pain, Mr. Hassoun's release due to the pandemic is consistent with the promoting respect for law, just punishment, and deterrence.

   c) **Where Mr. Hassoun held no ideological motives, release adequately reflects the nature and circumstances of the crime and is consistent with deterrence and public safety. § 3553(a)(1)(A); 3553(a)(2)(B-C); § 3142g.**

It is undisputed that Mr. Hassoun held no ideological motives. As it is, Mr. Hassoun is serving a sentence longer than many individuals who carried out similar crimes who did act with ideological motives. Def.'s Sent. Mem. 28, supra. A defendant without ideological motives is far less likely to recidivate. Id. at 25 (citing low sentences for cases in which defendant was not ideologically motivated).

   d) **Where the BOP and others rate Mr. Hassoun at a low risk of recidivism and he has no prior convictions, his release is consistent with deterrence and public safety. § 3553(a)(2)(A-C); § 3142g.**

The BOP and an independent expert both conclude that Mr. Hassoun poses a low risk of recidivism. Moreover, where an individual is a first offender, the risk of recidivism is considerably lower than other defendants. United States v. Baker, 445 F.3d 987, 990-92 (7th Cir. 2006). This is even more the case for first offenders who do not have even a prior arrest, like Mr. Hassoun. U.S. Sentencing Comm'n, Recidivism and the First Offender, A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate 14 (May 2004)

(finding that offenders without prior arrests have "dramatically lower recidivism rates (6.8%) than offenders…with prior arrests but no convictions (17.2%)").

e) **Where Mr. Hassoun will almost inevitably be deported upon his release, his release is consistent with deterrence and public safety. § 3553(a)(2)(B-C); § 3142g.**

Mr. Hassoun's deportation upon release is inevitable. 8 U.S.C. § 1227(a)(4)(B). Inevitable deportation is consistent with his incapacitation to commit any further crimes. See, e.g. United States v. Ngatia, 477 F.3d 496, 502 (7th Cir. 2007) (holding that a drug trafficker's "almost certain" deportation constitutes incapacitation).

f) **Mr. Hassoun's conviction through a sting operation affects the sentence's deterrent value and reflects on the nature and circumstances of the crime. § 3553(a)(1)(A) & (a)(2)(B).**

As defense counsel argued at sentencing, the extensive role of FBI informants in crafting and determining key aspects of the underlying plot and moving it forward necessarily reflect on the nature and circumstances of the crime. See Def.'s Sent. Mem. 13-14 supra (citing, among others, United States v. McKenzie, 656 F.3d 688 (7th Cir. 2011) (upholding mitigation of sentence based on "discomforting factor of the government's role in determining the severity of the Guidelines level" based on informants' conduct). Here, the informants' extensive role in the plot, including its funding, recruitment of Mr. Hassoun, organization, escalation to use real and deadly bombs, bomb construction, and target selection, necessarily diminish the extent of Mr. Hassoun's culpability in the offense as well as the extent to which Mr. Hassoun is likely to reoffend.

g) **Mr. Hassoun's rehabilitative history during incarceration indicates a strong personal character and history and indicates a low likelihood of recidivism. § 3553(a)(1)(A) & (a)(2)(B-D); §3142g.**

Mr. Hassoun's rehabilitative efforts weigh in favor of his release based on its relevance to his personal character and history. United States v. Robertson, 662 F.3d 871 (7th Cir. 2011)

14

("Adequate consideration of a defendant's evidence of rehabilitation fits squarely within [the 3553(a) factors, including 'the history and characteristics of the defendant']...Demonstrated self-motivated rehabilitation is direct and relevant evidence of 'the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; [and to] provide the defendant with needed educational or vocational training . . . or other correctional treatment in the most effective manner."). Mr. Hassoun's successful and extensive rehabilitation and years of self-improvement would be sacrificed if he were to die in prison due to the pandemic, and thereby weigh in favor of his release.

**Conclusion**

For the forgoing reasons, Mr. Hassoun respectfully requests that the Court grant Mr. Hassoun's motion for compassionate release and modify his sentence to time served.

Dated: May 27, 2020

Respectfully submitted,

/s/ Amith Gupta
Amith Gupta, Esq.
GA Bar No. 149222, Pro Hac Vice
848 Spring St. NW 812-C
Atlanta, GA 30308
(202) 627-0747
amith@civilfreedoms.org