UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SAMI SAMIR HASSOUN | No. 10 CR 773<br><br>Judge Robert W. Gettleman |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR MODIFICATION OF SENTENCE
BASED ON EXTRAORDINARY AND COMPELLING REASONS**

The UNITED STATES OF AMERICA, through its attorney, JOHN R. LAUSCH, JR., United States Attorney for the Northern District of Illinois, hereby responds to defendant SAMI SAMIR HASSOUN's motion for modification of sentence based on extraordinary and compelling reasons. (Dkt. No. 94). For the reasons set forth below, the government respectfully submits that defendant's motion should be denied because defendant has failed to set forth extraordinary and compelling reasons warranting his release.

**I.     BACKGROUND**

*Offense Conduct*

On September 19, 2010, defendant attempted to detonate a powerful explosive device in the area of Wrigley Field in order cause political instability and damage to the Chicago economy by indiscriminately murdering countless individuals and destroying a vibrant business district. He wanted to engage in an act of terrorism. He thought about how to accomplish that goal for months. When introduced to

individuals whom he was told could help him realize that aspiration, defendant embraced the opportunity. He attended meeting after meeting to discuss and plan a proposed attack. Defendant scouted prospective sites, looking for "targets" at which he could inflict the greatest amount of damage and cause the largest number of casualties. It was defendant who chose the entertainment district surrounding Wrigley Field for the attack. He identified a street-side trash receptacle located next to an oft-crowded bar as the location in which to deposit a bomb. He selected the day and time at which to strike – midnight on a Saturday night – to maximize the number of prospective casualties. In the early hours of September 19, 2010, defendant weaved his way through the Wrigleyville crowds in order to leave what he thought was a ticking time bomb among the masses. If the bag that defendant left in that Clark Street trash receptacle had contained the type of explosive device defendant thought was secreted therein, the results would have been catastrophic.

### *Criminal Proceedings*

On September 20, 2010, defendant was arrested, charged by complaint with attempted use of a weapon of mass destruction, in violation of Title 18, United States Code, Section 2332a(a)(2)(D) (Count One), and malicious attempt to destroy or damage a building using an explosive device, in violation of Title 18, United States Code, Section 844(i) (Count Two), and remanded into federal custody. Dkt. Nos. 1-2. On September 22, 2010, a detention hearing was held and defendant was detained as a danger to the community and a risk of flight. Dkt. No. 5. On October 14, 2010, a

grand jury returned an indictment charging defendant with the same offenses. Dkt. No. 11.

On April 23, 2012, defendant pled guilty to both counts of the indictment pursuant to a plea agreement. Dkt. Nos. 63-64. On May 30, 2013, the Court sentenced defendant to 23 years on Count One, and 20 years on Count Two, to be served concurrently, followed by 5 years of supervised release. Dkt. Nos. 89-91. On June 6, 2013, the judgment and commitment order was entered on the docket. Dkt. No. 91.

Defendant is currently incarcerated at the United States Penitentiary located in Leavenworth, KS ("USP Leavenworth"), and with good-time credit, the BOP projects defendant's release date to be April 25, 2030.

### *The BOP's Response to COVID-19*

As reported on the BOP's website, in January 2020, the BOP began a course of action to respond to the spread of COVID-19.[1] Phase One of this course of action included the creation of an agency task force working in conjunction with subject matter experts from the Center for Disease Control and Prevention ("CDC") and the World Health Organization to review guidance about best practices to mitigate transmission. *Id.* On March 13, 2020, as part of Phase Two of the course of action, the BOP began implementing various measures to mitigate the spread of the virus. These

---

[1] Federal Bureau of Prisons COVID-19 Action Plan, March 13, 2020, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited June 11, 2020).

measures included suspending social visits, in-person legal visits, all inmate movement, and staff travel. The BOP also began implementing procedures to quarantine and screen inmates and staff for the virus, which included screening all newly arriving inmates for exposure risk factors and symptoms, quarantining asymptomatic inmates with exposure risk factors, and isolating and testing symptomatic inmates with exposure risk factors. *Id.*

Subsequent phases of the BOP's response included the authorization of inmate movement in order to avoid overcrowding at BOP facilities. However, such movements were limited to inmates who had been in custody for more than fourteen days and who had been subjected to exit screening to ensure that the prisoner had no COVID-19 symptoms (fever, cough, shortness of breath) and a temperature less than 100.4 F.[2] Subsequent phases of the course of action included the quarantine and isolation of all new inmates with asymptomatic inmates being quarantined for fourteen days and symptomatic inmates being isolated until testing negative for COVID-19, modifying operations to maximize social distancing, the maximization of telework for staff members, and conducting inventory reviews of all cleaning and

---

[2] Updates to BOP COVID-19 Action Plan, March 19, 2020, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited June 11, 2020).

medical supplies to ensure ample supplies were on hand and ready to be distributed as necessary at BOP facilities.[3]

On April 1, 2020, as part of Phase 5 of its COVID-19 action plan, the BOP secured all inmates to their assigned cells or quarters to decrease the spread of the virus.[4] On April 13, 2020, as part of Phase 6 of its COVID-19 action plan, the BOP continued to secure all inmates to their assigned cells or quarters to decrease the spread of the virus.[5] Thereafter, on May 18, 2020, the BOP extended the implementation of Phase 7 of its COVID-19 plan until June 30, 2020.[6] Phase 7 extends all measures from Phase 6, including measures to contain movement and decrease the spread of the virus. Further details and updates of BOP's modified operations are available on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

---

[3] Bureau of Prisons Update on COVID-19, March 24, 2020, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last visited June 11, 2020); COVID-19 Action Plan: Phase Five, March 31 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited June 11, 2020).

[4] COVID-19 Action Plan: Phase Five, March 31, 2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited June 11, 2020).

[5] COVID-19 Action Plan: Phase Six, April 13, 2020, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited June 11, 2020).

[6] Bureau of Prisons COIF-19 Action Plan: Phase Seven, May 20 2020, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited June 11, 2020).

According to the BOP website, as of June 11, 2020, USP Leavenworth reported no current positive cases of COVID-19. *See* www.bop.gov/coronavirus/index.jsp.

### *Defendant's Motion for Compassionate Release*

On or about April 9, 2020, defendant submitted an administrative request for reduction in sentence or compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) to the Warden at USP Leavenworth. Dkt. No. 94, Exhibit 1. On April 28, 2020, the BOP denied the motion, stating, *inter alia*, that defendant was ineligible for release due to the immigration detainer lodged against him. *Id.*, Exhibit 2. Defendant filed the instant motion on May 27, 2020. *Id.*

## II. ARGUMENT

Defendant's motion is ripe for adjudication by this court because defendant has complied with the First Step Act's requirement that a defendant exhaust administrative remedies before seeking a compassionate release reduction in sentence from the court. Nevertheless, for the reasons detailed below, the Court should deny defendant's motion because defendant has not established that extraordinary and compelling reasons justify his requested reduction in sentence.[7]

---

[7] If the court is inclined to grant the motion, the government requests that the court impose a 14-day quarantine period and medical clearance prior to release to minimize the possibility of any spread of COVID-19 from the inmate to the public.

A.   **Legal Standard**

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g); and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Under this statute, a sentence reduction must be consistent with applicable policy statements issued by the U.S. Sentencing Commission. § 3582(c)(1)(A). In addition to finding "extraordinary and compelling" reasons for the reduction, the Court must also find that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" per U.S.S.G.

7

§ 1B1.13(2). Finally, the Court must consider the 18 U.S.C. § 3553 sentencing factors to the extent relevant. *Id.*

Congress directed that the Sentencing Commission issue policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

Pursuant to this directive, § 1B1.13 of the Sentencing Guidelines Manual sets forth the Commission's policy statement relating to § 3582(c). Guideline § 1B1.13 provides that under § 3582(c)(1)(A), a court may reduce a term of imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community"; and (3) "the reduction is consistent with this policy statement." Application Note 1 to Guideline § 1B1.13 identifies factors that may constitute "extraordinary and compelling reasons" for a sentence reduction, including a defendant's medical condition, age, family circumstances, and an open-ended category for "other reasons."

Thus, in order to obtain relief under § 3582(c)(1)(A)(i), the defendant must show that:

(1) he has requested relief from the BOP and exhausted any administrative appeals in that process;

(2) there exist extraordinary and compelling reasons that warrant a sentence reduction;

(3) the requested reduction is consistent with the policy statements issued by the sentencing commission in Guideline §1B1.13, including the requirement that "the defendant is not a danger to the safety of any other person or to the community"; and

(4) the reduction is warranted in light of the factors listed in 18 U.S.C. § 3553.

**B.   Defendant Has Complied with Section 3582(c)(1)'s Requirement That He Exhaust Available Administrative Remedies.**

As stated above, according to 18 U.S.C. § 3582(c)(1), a defendant is free to bring a motion for compassionate release after he has exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf, or 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility, whichever is earlier. Defendant submitted a request for a reduction of sentence or compassionate release on April 2, 2020, which was denied on ____. Because more than 30 days have elapsed since April 17, 2020, the warden received defendant's request, defendant has satisfied the statutory exhaustion requirement set forth in § 3582(c)(1)(A).

9

### C. Defendant Is Ineligible for Relief Under Section 3582(c)(1)(A).

For the reasons detailed below, the Court should deny defendant's motion because defendant has not established that extraordinary and compelling reasons justify his requested reduction in sentence, when taking into account the pertinent § 3553(a) factors.

Defendant fails to satisfy the standard for release under Section 3852(c)(1)(A)(i). As pertinent here, defendant is not at least 70 years old and has not served at least 30 years in prison; thus, he is ineligible to seek compassionate release under § 3852(c)(1)(A)(ii). Instead, defendant is only eligible to seek release on the grounds that, "after considering the factors set forth in section 3553(a)…extraordinary and compelling reasons warrant such a reduction…and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Congress directed that the Sentencing Commission issue policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence reduction under § 3852(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

10

Guideline § 1B1.13 provides that under § 3852(c)(1)(A), a court may reduce a term of imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person or to the community"; and (3) "the reduction is consistent with this policy statement." Application Note 1 to Guideline § 1B1.13 identifies factors that may constitute "extraordinary and compelling reasons" for a sentence reduction, including a defendant's medical condition, age, family circumstances, and an open-ended category for "other reasons." In addition, any reduction must be supported by "the factors set forth in [18 U.S.C. §] 3553(a)." USSG §1B1.13. *See also, e.g.*, *United States v. Willis*, 2019 WL 2403192, at *2 (D.N.M. June 7, 2019); *see also United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).

With respect to applicable policy statements, before the passage of the First Step Act, the Sentencing Commission concluded that "extraordinary and compelling reasons" were limited to the following four scenarios:

1. The defendant suffered from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG § 1B1.13 cmt. n.1(A).

2. The defendant was at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).

11

3. The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* § 1B1.13 cmt. n.1(C).

4. If there were "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D).

The changes to 18 U.S.C. § 3582(C)(1)(A)(i) made by the First Step Act altered the procedure through which compassionate release could be sought, but did not alter the grounds for granting relief.

Defendant asserts that he is at a higher risk of serious illness should he contract COVID-19 "[t]he disease, the inflammation and debilitation it has caused, and his medication leave Mr. Hassoun 'immunocompromised,'" and cites letters from his prior treating physicians in support of this position. Dkt. No. 94 at 4, Exhibits 4-5. Defendant is diagnosed with Familial Mediterranean Fever, which according to the National Institute of Health is an inherited condition characterized by recurrent episodes of fever accompanied by pain in the abdomen, chest, joints, pelvis, and/or muscles. Dkt. 94, Exhibit 3.[8] A review of defendant's BOP medical records reveals that defendant has experienced many of these symptoms while imprisoned and has been prescribed a range of medications to treat these symptoms. *See* Under Seal Exhibit A (Dkt. No. 100). According to the BOP, defendant was prescribed a new drug

---

[8] *See* https://rarediseases.info.nih.gov/diseases/6421/familial-mediterranean-fever (last visited June 11, 2020).

to treat his FMF symptoms after other medications did not effectively treat his symptoms. Exhibit A at 7. The new medication has been a success to date, as defendant has not had flairs of his FMF symptoms since he began taking the medication. *Id.* at 2. The BOP medical staff further concluded that, due to his FMF diagnosis and the new treatment, which was characterized as "chronic immunomodulator therapy," defendant "is at risk for more complications from COVID-19." *Id.* at 7.

According to the CDC's website, people who are immunocompromised are at higher risk for severe illness should they contract COVID-19.[9] In light of the COVID-19 pandemic, and the fact that, as confirmed by medical records, defendant presents with a medical condition identified by the CDC as a COVID-19 risk factor—specifically, being immunocompromised—the government agrees that defendant has established that he suffers from as he has established "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I), in that the inmate's ability to provide self-care against serious injury or death as a result of COVID-19 is substantially diminished, within the environment of a correctional facility, by the

---

[9] *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited June 11, 2020).

13

chronic condition itself. an extraordinary and compelling reason for release, However, this does not complete the inquiry as the Court must also consider whether release would be consistent with the applicable policy statement and the sentencing factors set forth in 18 U.S.C. § 3553(a).

### B. Defendant's release would not be consistent with the applicable policy statement and the statutory factors set forth in § 3553(a).

Pursuant to the statute and applicable policy statement, the Court must also consider whether defendant poses a danger to the community, as well as all other pertinent § 3553(a) factors, including defendant's history and characteristics, the risk of recidivism he poses, the time remaining on his sentence, the quality of his release plan, and the impact of BOP's efforts to maintain the safety of inmates. On balance, these factors demonstrate that his early release is not warranted.

First, defendant continues to be a danger to the community as reflected by his significantly serious offense conduct—which involved seeking to murder hundreds of innocent people using a weapon of mass destruction. Defendant attempted to carry out an act of terrorism that was designed by him to maximize both actual and psychological damage. Indeed, in recorded conversations with both the government's cooperating source and its undercover agents, defendant talked about using terrorism to embarrass and undermine Chicago's political leadership, "paralyze" commerce, and undermine the city's sense of security. Dkt. No. 1, ¶¶ 10, 22, 29-30, 34-35. Defendant told the government agents that he chose the target location in

14

Wrigleyville because "it presented the opportunity to inflict a greater number of casualties than alternate locations." Dkt. No. 64, ¶ 6. During the months in advance of his offense conduct, defendant mused about the various ways in which to attack Chicago. In conversation after conversation, defendant expressed a desire to perpetrate a random act of violence designed to strike fear and instability in Chicago. These statements proved to be more than disturbing bravado because in the end, defendant was willing to engage in a potentially horrific terrorist attack for a few dollars and the perverse desire to see the chaos and destruction he could cause.

Taking everything into account, including the seriousness of the offense and danger defendant poses to the public, the Court found that a sentence of 23 years – which was below the defendant's guidelines range of life – was warranted. The Court's assessment remains valid; yet more than 50 percent of the sentence imposed by the Court remains to be served. Accordingly, defendant has not established that, taking into account the relevant factors under § 3553(a), extraordinary and compelling circumstances warrant his release at this time.

Moreover, despite defendant's at-risk status due to his medical treatment for his FMF, the fact remains that defendant has over 10 years left to serve on the sentence the Court imposed, his FMF is being treated and controlled by BOP medical personnel, he does not claim to have been exposed to COVID-19, and he is detained at a BOP facility where the BOP has reported no inmates have tested positive for COVID-19 to date. *See* https://www.bop.gov/coronavirus/ (last visited June 11, 2020).

Moreover, defendant is subject to an immigration detainer, and will thus be removed to his home country of Lebanon upon his release from prison. Accordingly, defendant cannot show that his release will reduce his potential exposure to COVID-19, or his risk of serious complications from the virus. *See United States v. Maka*, No. 03 CR 84, 2020 WL 2544408, at \*5 (D. Haw. May 19, 2020) (finding a reduction in sentence not warranted after weighing the violent circumstances of the defendant's crimes and his likely deportation against his age and medical conditions and the COVID-19 risk). In assessing Maka's likely deportation, the court found that early release might increase his risk of contracting COVID-19, when taking into account the fact that he would likely be transferred into an immigration facility where COVID-19 may be present, and then required to travel to Tonga would involve several flights during which Maka could contract COVID-19. *Id.* at \*4.

16

### III. CONCLUSION

For the reasons set forth above, the government respectfully submits that defendant's motion for modification of sentence based on extraordinary and compelling reasons, (Dkt. No. 94), should be denied.

Date: June 11, 2020                                  Respectfully submitted,

                                                        JOHN R. LAUSCH, JR.
                                                        United States Attorney

              By:                   */s/ Shoba Pillay*
                                                        SHOBA PILLAY
                                                        Assistant United States Attorney
                                                        219 S. Dearborn, 5th Floor
                                                        Chicago, Illinois 60604
                                                        (312) 886-7631