UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
_____

**UNITED STATES OF AMERICA**

    v.

**SAMI SAMIR HASSOUN,**

    Defendant.

**1:10-CR-00773**
**Hon. Robert W. Gettleman**

**REPLY MEMORANDUM**

_____

The government concedes that Mr. Hassoun has timely exhausted the necessary administrative remedies and that his medical condition in light of the current COVID-19 pandemic does in fact constitute an extraordinary and compelling reason for his release. Nonetheless, the government maintains that Mr. Hassoun's release is not consistent with the USSC 3553(a) factors, specifically: that his underlying offense was very serious and indicates that he remains a threat to public safety; that he has not served a sufficient amount of time in prison; and that the risk of contracting COVID during the deportation process, combined with the efforts of the BOP to contain the pandemic, undermine the relief sought.

For the reasons described below, this Court should find the government's response unavailing and order Mr. Hassoun's release as requested in defendant's original motion for compassionate release. Mr. Hassoun relies on the facts and arguments presented in defendant's main brief, which will not be repeated here.

1

1) **The nature and circumstances surrounding Mr. Hassoun's offense do not warrant rejecting Mr. Hassoun's petition for compassionate release.**

   a) **The government's claims about the threat Mr. Hassoun poses is inaccurate because it is based solely on his underlying offense and ignores other pertinent information, including his low risk of recidivism, his rehabilitative efforts, and his deportation.**

   The government alleges that Mr. Hassoun "continues to be a danger to the community as reflected by his significantly serious offense conduct". Gov't's Resp. B. at 10 (herein "GRB"). The seriousness of the offense as the government describes it is the only basis for the government's argument that Mr. Hassoun continues to pose a threat. But the court is asked to evaluate, among other categories, the threat Mr. Hassoun would pose if released. This is a necessarily forward-looking analysis rather than a purely backward-looking analysis that only takes the underlying offense into account.

   In fact, Mr. Hassoun's BOP SENTRY file indicates that he poses a low risk of recidivism. The BOP's own conclusions about Mr. Hassoun's unlikeliness to reoffend is only bolstered by the extensive rehabilitative work that Mr. Hassoun has undertaken and the fact that any hypothetical risk would be addressed by Mr. Hassoun's deportation.

   b) **The government's description of Mr. Hassoun's crime overstates Mr. Hassoun's role in the plot.**

   While the seriousness of the underlying offense comprises the government's only argument about the danger Mr. Hassoun might pose, the government's

2

description of the offense itself is exaggerated. Regarding the seriousness of the offense, the court should consider the "circumstances of the…offense, including the extent of [the defendant's] participation in the conduct and the way…peer pressures may have affected him." Miller v. Alabama, 132 S. Ct. 2455, 2468 (2012). As defense counsel noted at sentencing and as noted in Defendant's motion at 14, a number of cases have called into question the appropriateness of federal agents' actions ultimately determining the severity of the offense.

The government argues that Mr. Hassoun "attempted to carry out an act of terrorism that was designed by him to maximize both actual and psychological damage." GRB at 15. In fact, the record makes clear that the plot and its deadliness were designed by the informants: when Mr. Hassoun suggested using "smoke bombs," it was informants who suggested otherwise. Def.'s Sent. Mem. 4, Mar. 18, 2013. ECF No. 84 at 20. It took more than a year for informants to coax Mr. Hassoun, who had never committed any crime, to agree to go along with the plot. Id at 18. The government emphasizes Mr. Hassoun's extensive comments about the plot, but ignores that these conversations were, at all times, with informants who initiated the plot and were necessary to push the plot forward. Id. at 19-21. Indeed, it was the informants that repeatedly coaxed Mr. Hassoun into coming up with detailed plans to carry out a bombing when he had not done so. Id. That Mr. Hassoun complied with instructions from his handlers to look for locations that

3

would cause great damage and that he did not extricate himself from the plot when given the opportunity cannot be denied, and indeed, Mr. Hassoun has spent nearly a decade addressing those choices in in his rehabilitative work. But Mr. Hassoun's bad decisions cannot render a plot that was engineered by others reflect entirely on his own criminal propensity.

2) **The unique circumstances of the pandemic and its potential to kill Mr. Hassoun weigh in favor of finding that he has served sufficient time in prison.**

The government argues that Mr. Hassoun has not completed a sufficient amount of his sentence relying entirely on the calculation at the time of sentencing. Plainly, this argument provides no evaluation of how the threat to Mr. Hassoun's life posed by the pandemic should call for a reassessment of the appropriateness of the time served insofar as it is an extraordinary and compelling reason that was not anticipated by the Court at the time of sentencing. Furthermore, the government's argument fails to address the fact that two of the years Mr. Hassoun has served were served in unmedicated pain. Where the pandemic could kill Mr. Hassoun, such a reassessment is called for.

3) **Mr. Hassoun's deportation does not place him at greater risk of infection than remaining in prison.**

The government's final line of reasoning is that the BOP's action plan, combined with the lack of confirmed cases at USP Leavenworth, mitigate the risk

of infection while a risk of infection might be greater during his deportation process. The Court should find this reasoning unavailing.

First, the BOP's action plan cannot change the fact that prisons remain incredibly dangerous places for the spread of COVID-19, and that many aspects of those threats cannot be properly mitigated due to the impossibility of social distancing. Notably, despite the efforts of the BOP, individuals in U.S. prisons continue to die at significant rates, and currently available data on both infections and deaths at federal prisons indicate that the rate is not decreasing. See The Marshall Project, A State-by-State Look at Coronavirus in Prisons, "Federal," last updated June 12, 2020, https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons. The chart below documents the rate of infections per 1,000 people using the latest data that is available at the time of writing. Id., and Worldometers, Coronavirus Updates, last updated June 18, 2020, https://www.worldometers.info/coronavirus/#countries.



Second, that there have been no cases detected at Leavenworth specifically is belied by the fact that there is still no indication that BOP is testing everyone within Leavenworth nor that it may be well too late to protect vulnerable prisoners like Mr. Hassoun after an outbreak is detected. Indeed, well after the extensive mitigation efforts described by the government, individuals in federal prisoners have continued to contract the virus and some have died as a result. Id.

In contrast to their argument downplaying the risks of infection in a BOP facility, the government argues that Mr. Hassoun may contract the virus anyway during the deportation process. Citing United States v. Maka, No. 03 CR 84, 2020 WL 2544408 (D. Haw. May 19, 2020), the government argues that Mr. Hassoun cannot show that his release would necessarily reduce his risk of infection due to

6

the risk of infection during deportation, including time held in an ICE facility and on board any connecting flights.

But <u>Maka</u> is readily distinguishable. In <u>Maka</u>, the defendant sought to challenge his deportation to his native Tonga, where it was likely that defendant's underlying medical conditions would be worse given the lack of treatment options available to him in that country. The defendant could not establish that he would released from immigration custody on bond or establish how long it would take for his immigration case to be resolved, as the defendant in that case sought to challenge his deportation. Though the court mentioned the risk of contracting COVID-19 on several connecting flights to Tonga, a reasonable reading of this statement from the court would view this as part of the aggregate of potential risks of infection that the defendant might have faced while in process of fighting his deportation. In contrast, Mr. Hassoun does not argue that his medical treatment options would be unavailable in Lebanon, does not believe he has any recourse from deportation, and would likely only be held in immigration custody for a brief transitory period before returning to his extended family in Lebanon. Indeed, available data suggests that the risks of infection in Lebanon are considerably lower than in the United States, whether inside a prison or outside, at .2 infections per 1,000 people. <u>See</u>, Worldometers, <u>Id</u>. A brief period in custody and on several

7

plane flights transparently poses a far lower risk of infection than remaining in a crowded federal prison. As such, the Court should reject this argument.

**Conclusion**

For the forgoing reasons, the Court should grant Mr. Hassoun's motion for compassionate release and modify his sentence to time served.

Dated: June 17, 2020

Respectfully submitted,

/s/ Amith Gupta
Amith Gupta, Esq.
GA Bar No. 149222, Pro Hac Vice
848 Spring St. NW 812-C
Atlanta, GA 30308
(202) 627-0747
amith@civilfreedoms.org